## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
## AND ARREST WARRANT

Joshua Smith-Shimer, a Special Agent with the Federal Bureau of Investigation

("FBI"), being duly sworn, deposes and states under penalty of perjury that the following is

true to the best of my information, knowledge, and belief.

## PURPOSE OF AFFIDAVIT

1.      This Affidavit is submitted in support of a Criminal Complaint charging DANIEL

DEAN EGTVEDT ("EGTVEDT") with violations of 18 U.S.C. §§ 111(a)(1), 231(a)(3),

1512(c)(2), 1752(a) and 40 U.S.C. § 5104(e)(2).

## AGENT BACKGROUND

2.      I have been a Special Agent with the FBI, in Washington, D.C., for the past six

years.  I am currently assigned to an ongoing investigation by the FBI, United States Capitol

Police ("USCP"), Metropolitan Police Department ("MPD"), and other law enforcement

agencies, of riots and civil disorder that occurred on January 6, 2021, in and around the United

States Capitol. Since I became involved in this investigation on January 6, 2021, I have

conducted interviews, reviewed public tips, reviewed publicly available photos and video, and

reviewed relevant documents, among other things.

3.      The facts in this affidavit come from my review of the evidence, my personal

observations, my training and experience, and information obtained from other law enforcement

officers and witnesses. Except as explicitly set forth below, I have not distinguished in this

affidavit between facts of which I have personal knowledge and facts of which I have hearsay

knowledge. This affidavit is intended to show simply that there is sufficient probable cause for

the requested arrest warrant and does not set forth all of my knowledge about this matter.

## BACKGROUND

4.      On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, located at First Street Southeast, Washington, District of Columbia. During the joint session, elected members of the United States House of Representatives and Senate met in the United States Capitol to certify the vote count of the Electoral College for the 2020 Presidential Election, which took place on November 3, 2020.

5.      The United States Capitol is secured 24 hours a day by security barriers and USCP occupy various posts throughout the grounds. Restrictions around the United States Capitol include permanent and temporary security barriers and posts manned by USCP.  USCP officers wore uniforms with clearly marked police patches, insignia, badges, and other law enforcement equipment.  Only authorized people with appropriate identification are allowed access inside the United States Capitol.  On January 6, 2021, the exterior plaza of the United States Capitol was also closed to members of the public.

6.      The January 6, 2021 joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

7.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the United States Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the United States Capitol building and USCP were present, attempting to keep the crowd away from the Capitol building and the proceedings underway inside. As the certification

proceedings were underway, the exterior doors and windows of the Capitol were locked or otherwise secured.

8.     At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and past officers of the USCP, and the crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by the USCP or other authorized security officials.

9.     A short time later, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. As such, all proceedings of the United States Congress, including the joint session, was effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the United States Capitol, including the danger posed by individuals who had entered the United States Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the United States Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 p.m. after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

10.    After the Capitol was breached, USCP requested assistance from MPD and other law enforcement agencies in the area to protect the Capitol, keep more people from entering the Capitol, and expel the crowd that was inside the Capitol.  Multiple MPD officers and other law enforcement officers came to assist.

11.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the United States Capitol building without authority to be there.

## EGTVEDT'S ACTIONS AT THE U.S. CAPITOL

12.     At approximately 2:47 p.m., an individual subsequently identified as EGTVEDT is first observed on the Capitol Grounds.  He is seen standing at the threshold of an exterior door to the United States Capitol building, appearing to nuzzle, or rub his face and nose on the back of the man in front of him.  EGTVEDT appeared to have been recently sprayed with some type of chemical irritant and was attempting to wipe it off.  The video, which was obtained from the social networking application Parler, and published by Pro Publica, shows EGTVEDT among a group of individuals who are attempting to gain entry to the United States Capitol building by pushing their way through a line of USCP officers.  Others rioters nearby are heard saying "here we go, here's the next rush . . . there's a push inside, with resistance," as the rioters continue to push futher inside.

13.     At approximately 3:08 p.m., EGTVEDT was observed on additional Parler video footage from inside the United States Capitol building.  In that video, EGTVEDT was seen walking through the hallway of the United States Capitol building with other rioters who had gained entry to the building.  EGTVEDT is the male in the dark top, directly beneath the blue arrow below.



14.     Shortly after Officer M.D. entered the Capitol, he encountered EGTVEDT in the Hall of Columns, on the south side of the United States Capitol building, directly under the House Chamber.  Officer M.D. told your Affiant that EGTVEDT appeared to be leaving; however, EGTVEDT then decided to come back down the corridor.

15.     Officer M.D. recalled seeing several other officers attempting to stop EGTVEDT and keep him from going back in the direction of the Rotunda.  One of those officers, USCP Officer M.M., recalled EGTVEDT rushed at her while he screamed at her to shoot him on three occasions.

16.     EGTVEDT grabbed Officer M.M. with both of his hands and gained control of her left arm.  EGTVEDT would not let go, therefore, Officer M.M. swung her right arm in a downward motion to break EGTVEDT's grip on her.

17.     Officer M.D. described EGTVEDT as "generally non-compliant, screaming, and incoherent" and "screaming at the top of his lungs."  Officer M.D. tried to grab EGTVEDT below the waist but could not, due to EGTVEDT's size.  He then attempted to push EGTVEDT back in the direction of the south exit door and "held on for dear life" due to EGTVEDT's size.

5

18.     As more officers came to assist in moving EGTVEDT toward the exit, EGTVEDT fell backwards and Officer M.D. was dragged down with him.  Officer M.D. did not recall being pulled.  Officer M.D. fell after attempting to push EGTVEDT toward the door and his momentum carried him forward once EGTVEDT fell.  Officer M.D., who was still holding onto EGTVEDT as he fell, injured his shoulder in the fall.  Officer M.D. then left EGTVEDT to seek treatment from other MPD officers on scene.

19.     One of the other officers who assisted in removing EGTVEDT from the United States Capitol building, USCP Officer A.D., also recounted non-complaint actions by EGTVEDT.  Officer A.D. recalled that EGTVEDT swung his right hand, however, based upon your Affiant's viewing of video, as discussed below, it appears as though EGTVEDT swung his left hand at Officer A.D.  Officer A.D. was able to "move into" EGTVEDT to avoid being hit.

20.     EGTVEDT was on the ground in the Hall of Columns for several minutes before plain clothes law enforcement officers came over to advise that other individuals were being removed from the United States Capitol building and they would need to exit, and EGTVEDT was blocking the hallway those officers planned to use to removed them from the United States Capitol building.  Therefore, Officer A.D. and USCP Officer C.R. attempted to pick EGTVEDT up and move him outside.  EGTVEDT again became non-compliant and "then fought again." According to Officer M.M., EGTVEDT said he wasn't going to leave and splayed out his arms and legs while lying on his back in an effort to inhibit law enforcement from picking him up.

21.     Officers eventually moved EGTVEDT towards the south side door where he fell again. Officers asked EGTVEDT if he needed medical treatment, which he declined. Officer A.D. then returned inside to further assist law enforcement in securing the United States Capitol building.

***Video Footage Review***

22.     Your affiant reviewed video footage from various sources, as detailed below, showing EGTVEDT's actions during the riot.  Your affiant has included, where applicable, references to the type of video footage, whether fixed post surveillance camera footage, body-worn camera (BWC) footage from officers, or video posted to social media.  As part of the security apparatus at the United States Capitol building, the USCP maintain numerous fixed post security cameras in the buildings and on the grounds.  EGTVEDT was captured on several cameras inside the United States Capitol building, specifically, inside the Hall of Columns and the vestibule separating the Hall of Columns from the south side entrance door (respectively hereinafter, Hall of Columns camera and Vestibule camera).

**Hall of Columns Camera**

23.     In the video, which was reviewed by your affiant and is described in more detail below, EGTVEDT is observed walking south through the Hall of Columns at approximately 3:11 p.m.  EGTVEDT appeared to be walking toward the exit and traveled out of view.  Other individuals were leaving the Capitol building at the same time.



24.     Approximately 16 seconds after he left the Hall of Columns, EGTVEDT

reappeared and tried to walk further back into the United States Capitol building in the direction

of the Rotunda when he is engaged by law enforcement, who ordered EGTVEDT to leave the

premises.  Specifically, as shown in the lower left corner of the image below, which comes from

that video, an FBI Special Agent dressed in tactical gear is directing EGTVEDT toward the exit.



25.     EGTVEDT shook his head and proceeded to continue farther back into the United States Capitol building, where he was stopped by Officer M.M. who was wearing her USCP bicycle uniform.  EGTVEDT disregarded Officer M.M.'s commands, swatted at her outstretched arm, and as mentioned above, grabbed at her left arm and held on with both of his hands.  After Officer M.M. was able to break free, EGTVEDT continued to proceed forward in the direction of other officers.  EGTVEDT was then approached by Officer A.D., whom he appeared to shove backward.



26.     As more officers came to assist, EGTVEDT further resisted and violently flailed his arms at officers as they attempted to subdue him.  Finally, with approximately five officers attempting to hold him back, EGTVEDT attempted to charge at Officer M.M.  At this point, as shown in the image below, MPD Officer M.D. can be seen attempting to grab EGTVEDT by his waist to stop him from advancing.



27.     While officers attempted to push EGTVEDT away from Officer M.M., EGTVEDT and Officer M.D. fell against a column and into the ground as a result, causing injuries to Officer M.D.'s right shoulder.  EGTVEDT appeared to grab at his neck after he hit the column.

 

11

**Body-Worn Camera**

28.     Review of Officer M.D.'s body-worn camera from the incident showed additional footage of EGTVEDT physically resisting officers' attempts to keep him from traveling further down the Hall of Columns.  At one point, as officers moved forward to interdict, EGTVEDT was heard shouting "you shoot me; shoot me" at the officers present.

 



**Vestibule Camera**

29.     Several minutes later, Officer A.D. and Officer C.R. assisted EGTVEDT to his feet and tried to walk him through the south side vestibule and out through the south side door.

12

EGTVEDT then fell to the ground as he was being walked out.  After several more minutes, other officers attempted to pick EGTVEDT up and further remove him from the United States Capitol building.  EGTVEDT again attempted to gain entry, and further fought with law enforcement.

30.     Specifically, after offering him medical assistance, Officer A.D. and Officer C.R. helped EGTVEDT to his feet.  As soon as he got to his feet, EGTVEDT again attempted to gain access to the building and proceeded to swat Officer M.M.'s hand as she attempted to stop him. EGTVEDT further grabbed Officer M.M. by the wrist.  EGTVEDT then tried to further push past Officer M.M. while making continued physical contact as she was standing in his way. Officer M.M. viewed the video footage from the vestibule camera and identified herself as the officer in the USCP bike officer uniform in the pictures below; however, she acknowledged that she could not recall details of her second encounter with EGTVEDT at the vestibule door.



31.     Eventually, EGTVEDT is walked down an exterior ramp outside of the south entrance door.  For several more minutes, EGTVEDT can be seen on camera pacing back and forth on the exterior ramp, appearing to yell at passing law enforcement.



32.     Following his removal from the building at approximately 3:14 p.m., EGTVEDT is no longer observed via time-stamped surveillance footage from inside the United States Capitol building; however, there are several additional instances where he is captured on video or interviewed throughout his time on the Capitol Grounds on January 6, 2021.

### *Identification of EGTVEDT*

33.     While EGTVEDT was in the Capitol, he provided an interview to an individual who was livestreaming from inside the United States Capitol building.  The livestream video, posted to DLive – a blockchain livestreaming community – by Tim Ginot AKA "Baked Alaska," captured EGTVEDT inside the United States Capitol building appearing to still suffer from the aforementioned chemical irritant.

34.     During the interview, EGTVEDT told the cameraman: "everyone that's outside, tell them to get in here now"; he further stated that they "shot me in the eyes twice" and said "everybody, if you're seeing this, come down here now.  We're not backing away; this is our house."  EGTVEDT ends the interview by screaming that members of Congress should "grow a spine or fucking resign!" into the camera.



35.     EGTVEDT was observed on several other occasions around the exterior of the United States Capitol building.  In one instance, he was standing in front of a closed door as others attempted to pry it open.  EGTVEDT was standing with his cell phone, appearing to take pictures or a video of the occasion.  In a separate incident, EGTVEDT was observed with a megaphone, standing at the base of the Capitol steps yelling at officers standing on the exterior stairs.

36.    Law enforcement included a picture of EGTVEDT from that DLive interview in an FBI Seeking Information poster as "BOLO 76."  The "BOLO 76" photo was widely disseminated to the public by the FBI Public Affairs Office on January 14, 2021, as shown below.



37.    On January 20, 2021, W-1 contacted the FBI National Threat Operations Center (NTOC) in reference to FBI "BOLO 76."  W-1 reported that the individual in "BOLO 76" is Daniel Egtvedt, and provided a telephone number ("PHONE NUMBER ONE") and an Oakland, Maryland address ("OAKLAND ADDRESS") for EGTVEDT.

38.    On January 21, 2021, your affiant telephonically interviewed W-1.  W-1 confirmed EGTVEDT's identity as the individual in the FBI "BOLO 76" as well as the contact information provided in "its" January 20, 2021, tip to NTOC.  W-1 indicated "it" had wished to remain anonymous.  Nonetheless, W-1 provided "its" own name and explained that "it" had known EGTVEDT for over 10 years, and that Egtvedt had been in W-1's home in the past.

16

39.     W-1 recounted that, on the evening of January 6th, "it" had seen video on social media where EGTVEDT appeared and talked about being sprayed twice and stated that people need to come to the Capitol.

40.     Following the interview, your affiant discovered a Facebook (profile name dan.egtvedt), Pinterest (profile name dane0039), Twitter (profile name @DanEgtvedt), and LinkedIn (profile name danegtvedt) account for a Daniel Egtvedt, with ties to Oakland, Maryland.  Specifically, several of the photos posted by EGTVEDT have "tagged" a named individual, which public record searches confirmed to be EGTVEDT's close relative.  Searches of Maryland property records show that the identified close relative owns the property at the OAKLAND ADDRESS.

41.      Each of the social media accounts referenced above is public and contains either a profile picture of EGTVEDT or photo of EGTVEDT posted to the account.  Below are two photos obtained from Facebook and Twitter, respectively:



42.     Your affiant conducted a comparison of the various social media accounts associated with the name provided by W-1 and the photographs in FBI "BOLO 76," as well as video from the aforementioned livestream inside the United States Capitol building.  Your

affiant, concluded that the photographs and video all depict the same person.  Furthermore, the

multi-colored dress shirt worn in a photo posted to EGTVEDT's public Facebook page on

October 29, 2020, is consistent in color and pattern with the shirt worn by EGTVEDT during his

interview that was livestreamed inside the United States Capitol building.  The Facebook

photograph and a still image from the livestream is attached below.

 

44.     Public record checks of PHONE NUMBER ONE indicate that PHONE

NUMBER ONE was disconnected.  However, public record checks revealed that a known

telephone number ("PHONE NUMBER TWO") was listed as being registered to "Egtvedt,

Daniel" at the OAKLAND ADDRESS.  AT&T Wireless records also show that a device

assigned PHONE NUMBER TWO was present at the U.S. Capitol on January 6, 2021.

Specifically, the PHONE NUMBER TWO device first appears inside the U.S. Capitol at 2:37

p.m., and appears to remain inside the U.S. Capitol until 3:31 p.m.

45.     Maryland driver's license records show that a "Daniel Dean Egtvedt," white male, 6' 2", 320 pounds, was issued a Maryland driver's license on June 23, 2020, and list him as residing at the OAKLAND ADDRESS.  The records provide a specific date of birth for one "Daniel Dean Egtvedt," which is consistent with the apparent age of EGTVEDT in the social media videos images from January 6, and include a photograph that is very similar in appearance to those video and images.

## CONCLUSION

46.     For the reasons set forth above, I submit there is probable cause to believe that EGTVEDT violated:

1.  **18 U.S.C. § 111(a)(1)**, which makes it a crime to forcibly assault or interfere with any person designated in section 1114 of this title 18 while engaged in or on account of the performance of official duties.  Persons designated within section 1114 include any person assisting an officer or employee of the United States in the performance of their official duties.

2.  **18 U.S.C. § 231(a)(3)**, which makes it a crime to commit or attempt to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.  ("Civil disorder" means any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other

individual.  "Federally protected function" means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection and distribution of the United States mails.  18 U.S.C. § 232(1).)

3. **18 U.S.C. § 1512(c)(2)**, which makes it a crime to obstruct, or attempt to obstruct, an official proceeding, including, under 18 U.SC. § 1515(a)(1)(B), a proceeding of Congress

4. **18 U.S.C. § l752(a)(1), (2), and (4),** which make it a crime, with respect to subdivision (1), to knowingly enter or remain in any restricted building or grounds without lawful authority to do so; with respect to subdivision (2) to knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; and with respect to subdivision (4) to knowingly engage in any act of physical violence against any person or property in any restricted building or grounds; or attempt or conspire to do so.  For purposes of Section 1752 of Title 18, a restricted building includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

20

5. **40 U.S.C. § 5104(e)(2)(D) and (F),** which make it a crime for an individual or group of individuals to willfully and knowingly, in subdivision (D), utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; and in subdivision (F) engage in an act of physical violence in the Grounds or any of the Capitol Buildings.

47.     As such, your affiant respectfully requests that the court issue an arrest warrant for EGTVEDT.  The statements above are true and accurate to the best of my knowledge and belief.

<div style="margin-left:40%">

Respectfully Submitted,

_____
Joshua Smith-Shimer
Special Agent
Federal Bureau of Investigation

</div>

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 9th day of February 2021.

<div style="margin-left:40%">

_____
ZIA M. FARUQUI
U.S. MAGISTRATE JUDGE

</div>