```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2    _____

 3    United States of America,    ) Criminal Action
                                    ) No.  1:21-mj-00212-ZMF-1
 4                    Plaintiff,    )
                                    ) Detention Hearing (via Zoom)
 5    vs.                           )
                                    )
 6    Daniel Dean Egtvedt,          ) Washington, D.C.
                                    ) February 23, 2021
 7                    Defendant.    ) Time:  2:45 p.m.
      _____
 8
              Transcript of Detention Hearing (via Zoom)
 9                        Held Before
               The Honorable G. Michael Harvey
10               United States Magistrate Judge

11    _____

              A P P E A R A N C E S
12
      For the Plaintiff:     Colleen D. Kukowski
13    (via Zoom)             U.S. ATTORNEY'S OFFICE FOR THE
                             DISTRICT OF COLUMBIA
14                           555 Fourth Street, Northwest
                             Suite 12101
15                           Washington, D.C. 20530

16    For the Defendant:     H. Heather Shaner
      (via Zoom)             LAW OFFICES OF H. HEATHER SHANER
17                           1702 S Street, Northwest
                             Washington, D.C. 20009
18
      Also Present:          Richard Egtvedt
19    (via Zoom)             Da'Shanta' Valentine-Lewis, Pretrial
                             Services Officer
20    _____

21    Stenographic Official Court Reporter:
      (via Zoom)             Nancy J. Meyer
22                           Registered Diplomate Reporter
                             Certified Realtime Reporter
23                           United States Courthouse, Room 6509
                             333 Constitution Avenue, Northwest
24                           Washington, D.C. 20001
                             202-354-3118
25
```

1          P R O C E E D I N G S

2          (REPORTER'S NOTE:  This hearing was held during the
COVID-19 pandemic restrictions and is subject to the
3     limitations of technology associated with the use of
technology, including but not limited to telephone and video
4     signal interference, static, signal interruptions, and other
restrictions and limitations associated with remote court
5     reporting via telephone, speakerphone, and/or
videoconferencing.)

6

7          THE COURTROOM DEPUTY:  Your Honor, this is Case

8     21-mj-212, United States of America v. Daniel Egtvedt.  This is

9     scheduled to be a detention hearing held by video.

10         Would the parties please introduce themselves to the

11    Court, beginning with the government.

12         MS. KUKOWSKI:  Good afternoon, Your Honor.  AUSA

13    Colleen Kukowski for the United States.

14         MS. SHANER:  Good afternoon, Your Honor.  Heather

15    Shaner with Mr. Egtvedt, also appearing by video from the jail.

16         THE PRETRIAL SERVICES OFFICER:  Good afternoon,

17    Your Honor.  Da'Shanta' Valentine-Lewis, Pretrial Services

18    Agency.

19         MR. RICHARD EGTVEDT:  Good afternoon, Your Honor.

20    It's Reverend Richard Todd Egtvedt, Air Force retired officer.

21         THE COURT:  Good afternoon, Mr. Egtvedt.

22         And, Mr. Daniel Egtvedt, can you hear me?  I want to

23    make sure your audio is working.

24         THE DEFENDANT:  Yes, I can.

25         THE COURT:  All right.  Sir, I'm going to ask that

1    you please just keep your microphone off, muted.  If at any

2    time you wish to say something, just raise your hand.  I'm not

3    going to let you say anything, but I'll let you speak to your

4    attorney.  So that's how you'll indicate, and I'll make sure I

5    give you an opportunity to do that; all right?

6          So this matter has been scheduled for a detention

7    hearing.  Is the government ready to proceed?

8          MS. KUKOWSKI:  Yes, Your Honor.

9          THE COURT:  Ms. Shaner, are you ready to proceed on

10   behalf of the defendant?

11         MS. SHANER:  Yes, Your Honor.

12         THE COURT:  And, Ms. Shaner, does the defendant waive

13   his right to an in-person hearing here today, and is he

14   prepared to proceed by -- by video to protect his health and

15   safety and the health and safety of other court participants?

16         MS. SHANER:  Yes, Your Honor.

17         THE COURT:  Okay.  Government, go right ahead.

18         MS. KUKOWSKI:  Thank you, Your Honor.

19         On January 6th of 2021, the defendant, in both word and

20   deed, was part of a violent attempted overthrow of the U.S.

21   government.  The specific words -- this is the people's house

22   and it's been taken over -- show what his intent was that day.

23   His actions, furthermore, show that he acted on that intent and

24   that he, himself, was trying to bring about an overthrow of the

25   government.

1    He himself engaged in physically violent behavior

2    rushing into the Capitol building as a part of a mob and then

3    assaulting several police officers, refusing to leave the

4    grounds multiple times, causing injury to those officers.

5    The Court's received our detention memo, and the Court

6    is well aware at this point that the government is not asking

7    for detention in every single case that comes before the Court.

8    This case we are, and we're doing that because we -- when the

9    Court looks at the four factors that the Court should be

10   considering here:  the nature and circumstances of the offenses

11   that are charged, the weight of the evidence against the

12   defendant, the defendant's history and characteristics, and

13   then the nature and seriousness of the danger to any person or

14   to the community that would be posed by the defendant's

15   release, I would submit to the Court that all four of these

16   factors weigh in favor of the defendant being held.

17   What I want to do is take the next couple of minutes to

18   highlight just a few parts the defendant's conduct that day

19   and to talk about these four factors, because I think there's

20   elements to the defendant's case that really distinguishes him

21   from others who have been brought before the Court.

22   And I just want to start with when the defendant first

23   entered the Capitol.  As the Court knows, the attempted

24   overthrow of the U.S. government that day started just about

25   after 2 o'clock -- 2:00 p.m., on January 6th.  More

1     specifically, at 2:20, 2:30 p.m. is when the U.S. Capitol

2     Police ordered the Vice President and Members of Congress to

3     start evacuating the building.  I say that because that time

4     frame and that time point is critical.

5          It's 2:37 p.m. when the defendant's phone first started

6     pinging off towers in the vicinity of the U.S. Capitol, putting

7     him in or near the U.S. Capitol building the very moment when

8     U.S. Capitol Police and officers are trying to evacuate our

9     congressmen and democratically elected leaders out of the

10    building because protesters -- rioters, I should say -- were

11    storming into the Capitol.

12         What we see from video evidence is that at 2:47, the

13    defendant was part of a violent mob that was trying to force

14    its way into the Capitol building.  Now, for context purposes,

15    again, 2:47 is just moments after the U.S. Capitol Police saw

16    that rioters were breaking into House Speaker Nancy Pelosi's

17    office and after one individual was shot fatally as she was

18    attempting to break into the House Chamber.

19         2:47 p.m. when the defendant's captured on video trying

20    to enter the Capitol is also when rioters were trying to break

21    into the U.S. Senate Chamber.  Everything the defendant is

22    doing at that point is part and parcel of that initial wave

23    that was overwhelming law enforcement inside the building and

24    posing a direct threat to our lawmakers, onto our represented

25    members of Congress.

1    When the defendant entered the building, moreover, he

2    wasn't someone who took advantage of the situation and waltzed

3    in.  He was very much part of a violet mob.  When he was

4    entering, the video footage that -- captures showing him

5    walking in -- shows Capitol -- or doors to the Capitol extended

6    open with broken windows.  And in the background you hear

7    people yelling, "This is the next rush.  We go with

8    resistance."  And you see the defendant pushing his way in.

9    Once he's in the hallway himself, you see, again, more

10   video footage and, in fact, another video interview that he

11   participates in with an individual known as Baked Alaska when

12   he's talking and extolling others to come, imploring them to

13   come down to the building, come down to their house.  So that's

14   the context of when he broke and forced his way into the

15   building.

16   He wasn't someone that capitalized on an opportunity

17   once the first waves had already gone in, walked in and took a

18   selfie and left.  He very much was a part of that first wave

19   that directly disrupted Congress's actions.

20   So, next, turning to the context of the assaults

21   themselves.  The assaults began at 3:11 p.m.  We know from

22   watching various videos from MPD body-worn camera that officers

23   were stationed in the Hall of Columns, which is on the south

24   side of the building, of the U.S. Capitol.  Around 3:04 you

25   start to hear across the radio traffic -- or across loudspeaker

1    traffic within the Capitol that individuals were pinned in

2    doors and trapped by rioters.

3         Now, this is a point when multiple members of law

4    enforcement who are stationed in that hallway, that hallway

5    that's being used to escort rioters out of the building, go

6    running further into the rotunda.  So those that are in the

7    hall already now are down numbers.  And at the same time that

8    this is happening, these moments leading up to 3:11, is when

9    you see at one point a stretcher being rolled into that hall.

10   And you also see officers being escorted and helped out by

11   other officers that are walking slowly.  They appear -- but we

12   can't confirm at this point -- to be injured.

13        So this is a hallway that's serving a critical purpose

14   at this point.  It's getting rioters out -- of the building --

15   at the most critical juncture of these -- of the attempted

16   overthrow, but then, moreover, it's a place where officers are

17   going to get treatment and move in and out themselves.  They're

18   coordinating their efforts at this point in figuring out how to

19   stop the rioters who have just begun running amuck.

20        So when we first start to see the defendant then in the

21   Hall of Columns, this is the greater context of when the

22   officers encounter him.  He walks down the hallway, which is a

23   hallway that multiple other rioters, like I said, was being

24   used to be escorted out of the building.  And so when he leaves

25   the building and then comes back in and is told by an FBI agent

1    in SWAT gear and by U.S. Capitol Officer M.M. to leave again,

2    you see others are still trying to leave around him at this

3    point.

4         He then tries to push past Officer M.M., assaulting her

5    in the process.  And as he continues to do that and continues

6    to charge at her and charge back into the building is when even

7    more officers have to be taken off this line to go and try and

8    forcefully remove him at this point.  He was acting with such

9    force and charging at her to such a degree that at one point it

10   appeared as though there were at least five different officers,

11   from U.S. Capitol Police, Metropolitan Police Department, all

12   trying to remove him out of the building.  Yet, he continued

13   charging -- attempting to charge in.

14        He eventually fell to the ground, taking down another

15   officer, Metropolitan Police Officer M.D., in the process,

16   severely injuring M.D.'s arm.  When Officer M.D. is able to get

17   up, he walks away.  And his body-worn camera footage shows that

18   as he walks away, he walks up to another one of his colleagues,

19   reaches out his arm to his colleague and says, "Please pull

20   hard."  And the colleague yanks it with all his weight, and you

21   hear Officer M.D. grimace as he's happening -- as it's

22   happening.

23        Meanwhile, as Officer M.D. is going off to get

24   treatment, the colleagues, the other members of the

25   Metropolitan Police Department and U.S. Capitol Police then

1  force the defendant, who was still at that point on the ground

2  refusing to get up and leave, they help lift him to his feet

3  and then finally move him out of the Capitol building, out of

4  the set of double doors to the vestibule that was attached at

5  the bottom of the U.S. Capitol's Hall of Columns there.

6        So at that point they push him finally through.  And

7  what does the defendant do?  He falls again, gets back up, and

8  tries to charge back in.  Once again, Officer M.M. from Capitol

9  Police is standing there in her bike uniform, and she is, once

10 again, stopping the defendant, putting out her arm to

11 physically stop him.  And he is, again, swatting at her, making

12 contact with her, hitting her, trying to go back into the

13 building again.

14       He is finally escorted out, and then we hear, again,

15 more interviews from him, more commentary where he's talking

16 about what he was doing and what he hoped for others to do.

17 And what he says in this commentary and in the interview that's

18 posted and available on YouTube, he says, "I told them, I said

19 you are in violation of the Constitution, this is the people's

20 house, and it has been taken over.  And I said, the

21 Constitution says to preserve and protect against all enemies,

22 foreign and domestic.  You are in violation of that, sirs."

23 That's what the defendant says about law enforcement and those

24 individuals who are serving their duty inside the Capitol.

25       So that's the context at issue, Your Honor.  The conduct

1    itself, I believe, certainly in the nature of these offenses,

2    certainly weighs in favor of his continued detention.

3        The seriousness of the conduct is also reflected in the

4    potential sentences that the defendant could receive.  He's

5    charged with, among other charges -- to include 18 U.S.C. 1512,

6    which carries a prison sentence of up to 20 years, in addition

7    to multiple assault charges because multiple officers were

8    assaulted and physically injured during the course of this.

9        I also want to just take a brief note about the broader

10   effects of the defendant's actions that day.  As I mentioned,

11   the officers were using the -- that hallway as a means to steer

12   rioters out of the building.  When the defendant began his

13   assaultive conduct, they couldn't do that anymore.  So what

14   does that mean?  That means more rioters were stuck in the

15   building and officers who are not responding directly to the

16   defendant then had to reroute others and try to recalibrate

17   their way of getting these violent protesters, these rioters,

18   out of the building.

19       It also had a human effect and a toll of those officers

20   who were directly attacked by the defendant, particularly

21   Officer M.M. and Officer M.D.  They had to keep working that

22   day.  The crisis had only at that point just begun, and they

23   continued serving long hours both that day and then had to wake

24   up the next morning and go to work as well.

25       Eventually both of them, after the threat and the crisis

1   had subsided, were able to go home, and they both were out for

2   extended periods of time.  I believe Officer M.M. has still not

3   returned to work.  Officer M.D. has not returned to work, but

4   that is, in part, due to a family situation that's ongoing.

5           But -- so there's collateral effects here, Your Honor.

6   These officers were who carrying out their sworn duty then were

7   not only injured but had to continue carrying on with the

8   weight of this as they were going about.  You can imagine what

9   Officer M.D. was going through.  He had to have another officer

10  essentially pull his arm, his shoulder, back out so he could

11  continue going on with his activities, and then he's expected

12  the rest of the day to deal with additional actions and actors

13  like the defendant.

14          Those are the actions that happened on January 6th.

15  What I wanted to do also is just briefly proffer to the Court a

16  few other elements about the defendant's personal

17  characteristics and his history as to why he should continue to

18  be held and held pending trial.

19          As the Court saw, the way the defendant was initially

20  arrested, and his location was identified so that he could come

21  into law enforcement custody, came out of an incident that

22  occurred at a family member's house in Garrett County in

23  Maryland in a somewhat remote area where police had to be

24  called because a family member was attempting to take an

25  elderly family member to an appointment to receive a COVID

1    vaccination.  The defendant came over to the house and was so

2    unruly and so physically preventing the family member from

3    taking that elderly family member to the COVID vaccination that

4    the family member was forced to call law enforcement.

5         Law enforcement came, was able to defuse the situation

6    so that the elderly family member could go on to receive the

7    COVID vaccination, but what the defendant said to law

8    enforcement during the course of that encounter, I think, is

9    particularly notable and probative here, which was that he was

10   going to have to be arrested before she left to go and get her

11   vaccination.

12        And then, two, the other thing that he mentioned and

13   stated to law enforcement, that the vaccine itself, which is

14   part of a government initiative to try and curb a global

15   pandemic, was, in fact, going to alter her DNA and to cause

16   population deaths across the population as a part of a

17   government plan to control the population.

18        I highlight this because I would submit to the Court the

19   government [sic] has no respect or recognition for the

20   authority of the U.S. government.  He does not trust what the

21   U.S. government is doing, and his actions and his words show

22   that he will go to violent lengths to subvert actions done by

23   the U.S. government.

24        Again -- and I just want to highlight and conclude on

25   this note.  He himself -- regards himself, I should say, as

1    part of the broader movement here.  After the defendant had

2    been arrested and taken into custody in Maryland, he was

3    initially held in Garrett County and he wrote two letters to

4    the sheriffs that are out there.  And these are part of the

5    government's filings as Exhibits 4 and 5.

6         And in those letters, in what was Exhibit 1 [sic], he

7    refers to there were extenuating circumstances for a

8    once-in-a-lifetime historical event, and in the second letter,

9    which is Exhibit 5, he, again, states and refers to his

10   circumstances that relate to historical events currently in

11   play.  And I want to emphasize the words "currently in play"

12   there, because in the defendant's mind this is not over.  This

13   is --

14            THE COURT:  When was --

15            MS. KUKOWSKI:  I'm sorry, Your Honor.

16            THE COURT:  When was he arrested?

17            MS. KUKOWSKI:  The defendant was arrested on

18   Saturday -- it was February 13th.

19            THE COURT:  Okay.  Continue.  You were saying.

20            MS. KUKOWSKI:  Thank you.

21        And I wanted to highlight the fact that he said

22   continuing in play.  This is a month and some odd days after

23   the events of January 6th.  And this is where his mentality

24   still is.

25        And then, finally, I just want to conclude on the fact

1    that in both of these letters, in both the government's

2    Exhibits 4 and 5, the defendant states, "If you release me to

3    federal agents at this moment, you could place me as a

4    political prisoner in a foreign land."  Your Honor, that is a

5    direct and bold pronouncement twice that this defendant does

6    not recognize the authority of the federal government, which by

7    its very definition would include the authority of this Court.

8         His actions show that he has been violent in the past.

9    His most recent actions during the course of his arrest show he

10   is still willing to engage in violence.  His actions have hurt

11   other people, and they could continue to hurt other people.

12   And we know what his intent was that day; his intent was to

13   overthrow the government.  And we know that up until today and

14   through at least him writing these letters immediately after

15   his arrest, he does not recognize the federal government.  He

16   considers it to be a foreign land.

17        And so for those reasons, Your Honor, I would submit to

18   the Court there is no set of conditions that could be fashioned

19   here to ensure the safety of the community and then,

20   furthermore, to ensure the safety of others.

21        THE COURT:  What about risk of flight?  Are you

22   arguing risk of flight here or not?

23        MS. KUKOWSKI:  Yes, Your Honor.  I -- we discussed

24   risk of flight in our memo.  And just briefly here, to

25   highlight it again, what I would submit is the defendant has

1   changed his appearance.  It's a little bit difficult to see at

2   the moment because of the -- because of the defendant's mask.

3   But you did actually, in fact, see the defendant then pointing

4   to his face.  He grew a beard.  This is notable because, as the

5   Court could see, it was in Government's -- hold on for one

6   moment -- Government's Exhibit 3B and 3A -- and I can actually

7   share my screen to show -- put these up on the screen for the

8   Court here.

9        So in Government's Exhibit 3A, this is a still shot from

10   the interview that he gave outside on YouTube where he is

11   talking about how it is the people's house that has been taken

12   over.  And then Government's Exhibit 3B is his arrest

13   photograph that was taken by the Metropolitan Police Department

14   when he was arrested.  You see he's grown a beard here, and I

15   also submit his hair is a bit shorter.  But the beard is

16   particularly notable because his own brother acknowledged that

17   he has never seen his brother ever in 50-some-odd years grow a

18   beard before.

19        And it's not just limited in terms of change of

20   appearance to his beard.  He changed the way that he moved as

21   well.  The defendant drove to D.C., I would submit -- the

22   evidence would support this -- in his own vehicle, in a Toyota

23   Highlander.  There is a license plate reader that -- from the

24   DEA that showed the vehicle entering the District of Columbia

25   from the Key Bridge on January 5th.  The defendant stopped

1  driving that vehicle and instead started driving his deceased

2  father's vehicle instead, a vehicle that he, again, was never

3  known to drive before.  He did this after January 6th once

4  more.

5       And then I would suggest that on top of these two

6  critical actions that the defendant took, there's other factors

7  here that show he is a risk of flight.  Specifically, we know

8  he has unstable housing right now.  He has proffered that he

9  previously sold his house.  He was at one point living with a

10 brother, was no living there, and then was living in a

11 different residence owned by his brother.

12      He is unemployed, and we know for a fact that he

13 considers himself, again, to be a political prisoner in, quote,

14 a foreign land, which shows he does not perceive this to be his

15 home.  And I would submit that these affirmative actions that

16 he took to change his appearance, change the way he's moving

17 about in society, coupled with his own instability and his lack

18 of ties to the community and then, again, his mindset right

19 now, he is still a risk of flight.

20      THE COURT:  Okay.  Thank you very much.

21      Ms. Shaner.

22      MS. SHANER:  Your Honor, is the affidavit in support

23 of criminal complaint and arrest warrant in evidence?

24      THE COURT:  Ms. Shaner, you can proffer whatever you

25 want.  I certainly read it.

1          MS. SHANER:  All right.  I would put that into

2     evidence, Your Honor.

3          THE COURT:  Okay.

4          MS. SHANER:  The government affidavit indicates that

5     at 2:47 Mr. Egtvedt appeared to have recently been sprayed with

6     some kind of chemical irritant, and he's seen on the video

7     before entering the Capitol trying to wipe this off his eyes.

8     He is not heard screaming anything.  What the government

9     attributes to him were statements made by other individuals.

10          On video, Mr. Egtvedt is --

11          THE COURT:  Explain what you were referring to,

12     Ms. Shaner.  You mean when the government says this is the next

13     rush and --

14          MS. SHANER:  Yes.

15          THE COURT:  -- with the resistance?

16          MS. SHANER:  Yes.

17          THE COURT:  Well, I never understood the

18     government --

19          (Indiscernible simultaneous cross-talk.)

20          MS. SHANER:  Well, okay.  I'll go through it.

21          THE COURT:  Okay.

22          MS. SHANER:  The government indicates that --

23     attributes to this defendant things said by other individuals;

24     that is, here's the next rush, there's a push with resistance.

25     And he is pushed in, along with everyone else.

1    At 3:08 he is seen walking.  He is never seen with

2    anything in his hands.  He is never seen with a stick, with a

3    flag, with anything that is used to destroy anything inside the

4    Capitol or to injure anyone.  Later he is seen appearing to

5    leave, and he is stopped by Officer M.M., and he does touch

6    her, apparently, in the photograph.  The FBI agent does not

7    describe the conduct of this man as violent or as forcible

8    assault.  He describes him on page 5 as generally noncompliant,

9    screaming, and incoherent.

10    On page 6 they indicate not that he assaulted

11    Officer M.D., but that as officers jump on Mr. Egtvedt in an

12    attempt to push him out of the building, the defendant falls.

13    Officer M.D. falls as well.  Officer M.D. did not recall being

14    pulled by the defendant.  His injury was an accident when this

15    large individual, Mr. Egtvedt, was knocked down by the police.

16    Again, at paragraph 19, officers describe him as being

17    noncompliant.  Had he been violent and dangerous to them, this

18    affidavit very clearly would have used those kinds of words.

19    Again, on page 6 at paragraph 20, he -- he -- the defendant has

20    fallen, and he is on the ground.  When they try to pick him up,

21    he is noncompliant.  Multiple officers then ask him, looking at

22    him, is he in need of medical treatment.  That's not the -- the

23    officers to the other officers.  That's the officers to

24    Daniel Egtvedt.

25    At 3:11 he's seen to be walking out, and then he's

1   engaged by law enforcement who ordered him to leave.  If you

2   look at the photograph on page 8, Your Honor, you'll see him

3   walking down the middle of the corridor, and there are about 20

4   law enforcement officers out there.  He gets to the door.  You

5   see him in the photograph on page 9.  He is talking to a -- law

6   enforcement who is pointing him to the door.

7          At paragraph 26 when he is surrounded by officers, it

8   indicates he resists.  It doesn't indicate he goes to the

9   officers.  It doesn't indicate he is assaultive or aggressive

10  towards the officers.  It -- on page 10, paragraph 26 says more

11  officers came.  He resisted and flailed his arms.  At page 11,

12  paragraph 26, it shows where Officer M.D. fell while the

13  officers were pushing the defendant.

14         In no photo does it show Mr. Egtvedt with anything in

15  his hands.  Finally, Officer A.D. -- at the bottom of

16  page 12 -- and Officer C.R. assist him where he's fallen and

17  walk him out through the south door.  He falls to the ground

18  again, and then they, again, offered him medical assistance,

19  and finally he leaves.

20         Clearly his behaviors by entering the Capitol and

21  remaining there after he's told to leave support probable cause

22  that he entered, he was disorderly, and he remained inside the

23  Capitol after being told to leave.  I think it's a little less

24  clear that he used force, as is required by 18 U.S.C. 111, to

25  forcefully assault a federal officer.

1       So while I would concede, Your Honor, that as to the

2  initial two prongs, the strength of the case, there's evidence

3  that there was law violation.  I'm not sure whether there's

4  proof beyond a reasonable doubt.  There is evidence against the

5  defendant, and the offense charged and the circumstances of

6  that charge were very upsetting to most people in the

7  United States of America, but I think in weighing the four

8  factors in 3142(g), the Court could find that there are

9  circumstances -- and should find that there are

10  circumstances -- that would allow him to return to his

11  brother's home.

12       Number one, this is a 60-year-old man who -- this is a

13  nearly 60-year-old man who has never been arrested.  He has

14  never injured anyone.  He has never had any law enforcement

15  problems.  While he was inside the Capitol, he did not

16  forcefully injure anyone.  He did not desecrate the Capitol.

17  He did not break anything.  He did not steal anything.  He was

18  loud.  He is large, and he is described as being screaming and

19  incoherent at times.

20       Most of that is the result of, I mean, some behavioral

21  issues and the fact that he did not take the medicine that he

22  has been prescribed for the days preceding January the 6th.

23  This is a 58-year-old man who's a college graduate who has

24  lived his entire life doing good works in the community.  He

25  moved in with his brother and his mother in 2019.  His housing

1   is stable.  He -- the house -- the apartment that he lives in

2   now is 100 feet across the street from his brother's home.  He

3   can move back into his brother's home if the Court would

4   require that.

5          Pretrial services found that his brother, Richard

6   Egtvedt, is eligible for third-party custodianship.  If the

7   Court wants location monitoring, they would request courtesy

8   supervision from Greenbelt, Maryland.  Pretrial services

9   indicated that his home at 2140 Boy Scout Road, Oakland,

10  Maryland, where he lives with his mother, his brother could

11  live in there, or he could live across the street in a condo,

12  which is less than a hundred yards from his house.  Pretrial

13  services has recommended he's released with supervision by

14  Greenbelt.

15         This is a man who has some physical and mental issues.

16  Were he to be released to the custody of his brother, he would

17  get psychiatric and mental health help at Garrett Regional

18  Medical Center where he is a patient.  His brother would make

19  sure he takes his medicine twice a day, would make sure he sees

20  his doctors and his counselors as required, and he would make

21  sure that he does not leave the area or come into

22  Washington, D.C.  He could have GPS monitoring.  He could have

23  curfew.  There certainly are conditions that the Court could

24  set.

25         I would argue that there is no actual threat of flight.

1    He has a son who's a college student in the Virginia area.  His

2    brother and mother, who are his only family, share a home with

3    him.  And I would proffer his brother to the Court as an

4    appropriate third-party custodian, and I would ask him a few

5    questions, if the Court would allow it.

6              THE COURT:  Go right ahead.

7              MS. SHANER:  Mr. Egtvedt, please state your name for

8    the Court.

9              MR. RICHARD EGTVEDT:  The Reverend Richard Todd

10   Egtvedt, colonel, United States Air Force.

11        Dan, you need to turn off your mike.

12             THE DEFENDANT:  It's off.

13             MS. SHANER:  Turn it off.  It's not off.

14        Okay.  When -- when did you first enter the Air Force?

15             MR. RICHARD EGTVEDT:  It would be 1984.

16             MS. SHANER:  And when did you retire from the

17   Air Force?

18             MR. RICHARD EGTVEDT:  It would have been effective

19   31 March 2010.

20             MS. SHANER:  Okay.  While you were in the Air Force,

21   did there come a time when you worked along with law

22   enforcement in the Washington area?

23             MR. RICHARD EGTVEDT:  I worked with the FBI in the

24   Southern Maryland Metropolitan Resident Agency, as well as with

25   the Customs National Aviation Center located in Oklahoma City,

1    Oklahoma, working counternarcotics activity.

2              MS. SHANER:  Since you retired from the Air Force,

3    how have you been employed?

4              MR. RICHARD EGTVEDT:  Since retiring from the

5    Air Force, I entered into seminary and after four years --

6    three years of academics and one internship in western PA, I

7    was ordained and called to serve a congregation where I'm

8    currently serving located in McHenry, Maryland, called Shepherd

9    of the Hills Lutheran Church.

10             MS. SHANER:  Up until the 6th of January of this

11   year, have you ever known your brother to use force or violence

12   against you?

13             MR. RICHARD EGTVEDT:  No, that -- I have not had

14   force or violence directed towards me, even on the events prior

15   to his arrest on the 13th.

16             MS. SHANER:  Up until January the 6th, had you ever

17   heard that he was involved in any kind of lawlessness or

18   violence?

19             MR. RICHARD EGTVEDT:  I am not aware of any

20   lawlessness or violence, no.

21             MS. SHANER:  When your brother first started taking

22   psychotropic drugs, who gave them to him?

23             MR. RICHARD EGTVEDT:  Upon his arrival in my

24   residence, I arranged for his medical care, both a primary care

25   physician, as well as counselors in order to get that

1    initiated.  And he included me in his treatment sessions

2    through the first four to five months of that procedure.

3              MS. SHANER:  In January were you supervising his use

4    of medicine?

5              MR. RICHARD EGTVEDT:  January of this year, I was

6    not -- not supervising.  January of the previous year I would

7    have been, but not this year.

8              MS. SHANER:  If the Court would exercise its

9    discretion and release your brother to you, would you promise

10   the Court that you would be sure your brother takes all of his

11   psychiatric medication?

12             MR. RICHARD EGTVEDT:  Yes, on my honor, I'll do my

13   best.

14             MS. SHANER:  And do you believe you would be able to

15   ensure that he would take his medication?

16             MR. RICHARD EGTVEDT:  I believe I can, yes, ma'am.

17             MS. SHANER:  Are there any firearms in your home?

18             MR. RICHARD EGTVEDT:  I live in the middle of the

19   woods.  As such, I do, but those will be removed if that is --

20   if Dan is able to return to this area.

21             MS. SHANER:  Okay.  Would you be willing to serve as

22   a third-party custodian for your brother?

23             MR. RICHARD EGTVEDT:  Yes, ma'am, I would be willing

24   to do so.

25             MS. SHANER:  That would require you to bring him back

1   and forth to court for all court appearances, if they were ever

2   in person.

3           MR. RICHARD EGTVEDT:  I understand that, yes, ma'am.

4           MS. SHANER:  Could you explain to the Court whether

5   there was any violence or threat of violence involved when you

6   called the sheriff on the day your brother was arrested?

7           MR. RICHARD EGTVEDT:  I was the one that called the

8   sheriff on the day my brother was arrested.  He had concerns

9   about the inoculation.  My mother had had a rough morning

10  getting things ready.  I was -- got her ready, but I hadn't --

11  was still in my pajamas.  And because of what was going on, I

12  was afraid that she might not realize that going with him

13  had -- might have an inference with her getting her

14  inoculation.  And so that's what transpired.

15          MS. SHANER:  Okay.

16          THE COURT:  My mother has some dementia.  I will just

17  say that for the Court.  That's why we're power of attorney.

18          MS. SHANER:  Nothing further, Your Honor.

19          THE COURT:  Thank you.

20      Government?

21          MS. KUKOWSKI:  Your Honor, may I be permitted to ask

22  Mr. Egtvedt a few questions?

23          THE COURT:  Sure.

24          MS. KUKOWSKI:  Thank you.

25      Mr. Egtvedt, what do you do for your, quote, 9:00 to

1    5:00, Monday to Friday?

2              MR. RICHARD EGTVEDT:  Ms. -- I'm sorry.

3              MS. KUKOWSKI:  Kukowski.

4              MR. RICHARD EGTVEDT:  AUSA Kukowski.  Thank you.  The

5    simple, easy answer is whatever the Lord calls of me, but my --

6    my schedule is very flexible.  I'm with a small congregation.

7    We do mission outreach in this area.

8              Besides regular things within the parish, I'm also

9    involved with senior housing in this area, which is part of the

10   Appalachian portion of Maryland; senior housing, both

11   subsidized and nonsubsidized, and I also work with veterans in

12   the area.  I've worked with the -- I've been a representative

13   of my denomination to the Veterans Administration in the

14   development of the rural clergy training program, which is now

15   called the Community Clergy Training Program.  I'm a trained

16   trainer, and I was the second person to hold a course for --

17   this is designed for medical and clergy personnel to better

18   understand, especially people with PTSD, how they can take

19   it -- what are the resources that are available through the VA

20   and how we can best help those folks to obtain the care that

21   they're required to have.

22             MS. KUKOWSKI:  It's fair to say in your ministry you

23   have a full plate as part your ministry.

24             MR. RICHARD EGTVEDT:  Yes, but we don't have a

25   church, and so I work out of my house.

1     MS. KUKOWSKI:  And I'm assuming, though, you are

2   required to go and interact with your constituents with

3   administering -- go leave the house from time to time; is that

4   right?

5     MR. RICHARD EGTVEDT:  We have worship.  We are

6   currently worshipping both online and in person on Sundays, and

7   we do have online worship during Lent, Wednesday evenings at

8   6 o'clock, if anyone would like to join us.

9     MS. KUKOWSKI:  And I think you probably get -- my

10   question here is:  Are you able to stay with Mr. Egtvedt

11   24 hours a day, 7 days a week?

12     MR. RICHARD EGTVEDT:  Well, I promise you, AUSA, that

13   I will not be in his bed with him.

14     MS. KUKOWSKI:  I -- I leave that to the best of your

15   discretion.  But my point is is you do have a relatively full

16   plate and you have commitments to include taking care of your

17   mother already; is that correct?

18     MR. RICHARD EGTVEDT:  That is correct.

19     MS. KUKOWSKI:  And it's -- is it true that when law

20   enforcement came to your house on February 13th as a part of

21   the disturbance and the issues with your mother going to

22   receive her vaccine that you inquired about processes for

23   having your brother civilly committed?

24     MR. RICHARD EGTVEDT:  I inquired about process -- no.

25   Let me -- no.  Let me restate -- let me restate that whole

1    question, if you'll allow me to do so, Your Honor.

2         What I was told by the deputy is that regardless of what

3    transpired that I might want to go talk to the district court

4    magistrate out here to see if there's something we can do to

5    make sure -- because the -- the -- I believe it's a state

6    police officer.  I -- they were -- both them and the county

7    sheriff.  So I'm a little confused which one -- I think -- but,

8    in any case, they told me that's what I should do as we go

9    forward.  So part of the -- part of the issue was it was

10   obvious to him, as he told me, that there were medication

11   issues.

12         MS. KUKOWSKI:  And then just prior to February 13th

13   and the months leading up to it -- I know Ms. Shaner asked you

14   questions about you were not actively supervising your

15   brother's medications at that point in time, your brother's

16   mental health treatment.  How often were you interacting with

17   him?

18         MR. RICHARD EGTVEDT:  I would interact with my

19   brother as things were going on.  He would come over and spend

20   time with Mom, do things.  There were times when he would help

21   me out with something when I had to do something, in order to

22   be with Mom, just to make sure everything was taken care of in

23   that regards, and so we worked together on -- on doing things

24   along those lines, yes.

25         MS. KUKOWSKI:  Thank you.

1          THE COURT:  Okay.  Thank you.

2          Ms. Shaner, anything further?

3          Thank you, sir.

4          MR. RICHARD EGTVEDT:  Yes, Your Honor.

5          MS. SHANER:  Only one more issue, Your Honor.  In

6     addition to the fact while Mr. Egtvedt is at the jail, he will

7     not be receiving mental health services.  I don't know whether

8     or not he will be receiving medication.  He also has sleep --

9          THE COURT:  Well, he can get his medication.

10         MS. SHANER:  He --

11         THE COURT:  I hope.

12         MS. SHANER:  I hope.  He also has sleep apnea for

13    which a physical machine is required, and I understand that

14    they do not supply that at the jail.  He is also obese, which

15    puts him at a higher risk for COVID at the jail.

16         THE COURT:  Okay.  Government.

17         MS. KUKOWSKI:  Just a couple quick points of argument

18    here, Your Honor.  I have --

19         THE COURT:  Ms. Kukowski, before you respond, let

20    me just get the position of pretrial on -- on the record.

21    What -- what -- what is pretrial's recommendation, having heard

22    the hearing here, what's been said during the hearing here

23    today?

24         THE PRETRIAL SERVICES OFFICER:  Good afternoon,

25    Your Honor.  Pretrial still recommends the conditions that are

1   set forth in the pretrial services report.

2          THE COURT:  Okay.

3          THE PRETRIAL SERVICES OFFICER:  Okay.  I have

4   spoken --

5          THE COURT:  No, I see them.  I see them.  I didn't

6   know if your position had changed.  So thank you.

7          Government, go ahead.

8          MS. KUKOWSKI:  Thank you, Your Honor.

9          While I have no doubt that Reverend Egtvedt would do his

10  absolute best to ensure his brother is not a danger to others

11  or to the community and follow the directives of the Court, I

12  would respectfully submit that it is simply beyond his powers.

13  He already was in regular contact with his brother at the time

14  of the events of January 6th when his brother traveled down to

15  Washington, D.C., and he continued to be in contact with his

16  brother.

17         As things unfolded over the coming weeks, when -- and

18  ultimately up to the point where his brother came over and was

19  preventing their mother from going to get her COVID shot, I

20  would submit it is not fair and not -- just, frankly, would not

21  be a successful endeavor.

22         Mr. Egtvedt has shown he has intent to overthrow the

23  government and through his words he still does not trust the

24  government and through his actions he will take physical action

25  to stop the government from acting.  I don't believe he's going

1    to continue to comply with any conditions that the Court would

2    impose.  I don't believe that it is something that is within

3    Reverend Egtvedt's control, frankly.  I think this is too much

4    for a man who is already taking care of yet another relative to

5    add on to his plate.

6         I don't believe that the defendant is going to comply

7    with any orders and -- I mean, while Reverend Egtvedt joked

8    about he's not going to be in bed with his brother, yet at the

9    same time isn't going to be able to force feed him his

10   medications or things along those lines.  This is a grown man

11   who has shown he has incredible power and incredible obstinacy

12   is shown by the number of times he refused to follow any

13   directives to leave the Capitol, how he kept charging back in

14   after he had fallen to the ground in trying to reenter the

15   Capitol.

16        And I simply would submit that he -- his behavior and

17   his personal characteristics show that even with his brother's

18   best intentions, this third-party situation is not going to be

19   enough to secure his release to -- or his return to the Court

20   or to ensure he abides by the Court directives or to ensure the

21   safety of the community.

22            THE COURT:  Okay.  Thank you.  Mr. Tran, How long do

23   we have this room?

24            THE COURTROOM DEPUTY:  Checking, Judge.  I don't see

25   any other matters after us so we should have it until 5:00.

1          THE COURT:  Okay.  Well, I'm going to take a moment

2     to think about this, and I'm not certain if I'm going to be

3     prepared to rule on this today or not, but let me -- let me

4     take a moment.  I'll return in -- as soon as I can.

5          (Recess taken.)

6          THE COURT:  Ms. Shaner, did you have any -- I don't

7     know why you were meeting with him.  I don't need to know, but

8     do you have anything further you want to say?  Did he want to

9     talk to you for some reason, something more you want to provide

10    the Court?

11         MS. SHANER:  No.

12         THE COURT:  Okay.  All right.

13         Well, I did want to take a few minutes to think about

14    this case.  These cases are -- are challenging for the Court

15    and the decisions that -- that we have to make.

16         The government has not sought detention in all of these

17    cases.  Indeed, in the majority of them, they have not.  That's

18    my impression.  I don't have those numbers in front of me, but

19    I handled a great deal of these cases and a great deal of

20    proceedings where the individuals have been released on

21    conditions.

22         Most of those individuals, however, have been charged

23    with misdemeanors, individuals who have not been charged with

24    assaultive conduct, individuals for which if the government

25    did not seem to have direct evidence of, you know, the intent

1    of the individuals, individuals who were not involved in an

2    actual breach of an entryway or door or window into the

3    Capitol -- into the Capitol -- most of those individuals

4    entered later in the proceeding -- the proceeding -- the

5    events, I should say, at the Capitol, went inside, took photos

6    and left.  Describes a lot of the individuals who have been

7    released on conditions.

8         That's not the situation in this case.  Mr. Egtvedt is

9    being charged with significant federal felonies, assault on a

10   police officer.  It sounds like ultimately if this case is

11   going to be indicted, there's going to be multiple assault --

12   not just one, but multiple assaults, each of which would carry

13   eight years -- up to eight years in jail.  Civil disorder,

14   which is another federal felony offense, carries with it five

15   years in jail; and then this obstruction of an official

16   proceeding, an unusual charge, but one that's showing up

17   increasingly in these cases.  The more serious ones, it carries

18   up to 20 years in jail.

19        So he does face very serious charges, and the Bail

20   Reform Act requires the Court to look at both the charges

21   themselves but also the nature and circumstances of what it is

22   that he's alleged to have done.  In this case, in the

23   complaint -- and I went back a moment ago, Ms. Shaner, to

24   reread the complaint.

25        And Ms. Shaner, as always, she made a valiant effort to

1     emphasize all of the language that's in the complaint, which is

2     less problematic and perhaps it's more ambiguous as to what

3     exactly the defendant did that day.  But I have no problem in

4     reviewing the complaint and, of course, the government's

5     proffer with respect to this detention request to say that he's

6     alleged -- probable cause to believe that he engaged in

7     multiple instances of assaultive conduct, by anyone's

8     definition:  charging, hitting, swatting, pushing law

9     enforcement officers who are clearly doing their job in trying

10    to remove him from the Capitol.

11         So as I read the complaint, it does not describe his

12    passive participation in those events or even his mere

13    resistance.  I think it describes multiple assaults on law

14    enforcement that were trying to do their job that day.  He also

15    appears to me, as the government indicated, part of a group of

16    an initial wave of a violent mob that went into the Capitol,

17    reached one of the entrances into the Capitol; that this

18    defendant was part of that group.

19         He did a lot of the assaults on the law enforcement --

20    or all of them appears happened after he had been peppered

21    sprayed, once, maybe twice, and he persisted in engaging in

22    violence at the Capitol.

23         It ultimately took five officers -- appears,

24    approximately five officers -- I've seen the screenshots.  I

25    have not seen the video -- to wrestle him to the ground, and

1   that officer was harmed, injured in the process.  He was then

2   literally shown the door, and he attempted to come back in and,

3   again, assaulted another officer when he did so.

4        So as I read it, the alleged conduct does not suggest

5   some momentary lapse of reason, some being caught up in the

6   mob, but an individual who engaged in active, sustained violent

7   conduct at the beginning and -- and looks like the 30 to 45

8   minutes after the beginning of the assault on the Capitol.  So

9   I do think that those are circumstances that distinguish this

10  case from many of the others and, I do think, support his

11  detention in this case.

12        The defendant would appear to have been and to be an

13  individual who is inclined towards violence, unable to control

14  himself, no respect for law enforcement.  The government's

15  evidence is strong in this case.  I have not seen the videos.

16  I've just seen the screenshots, but apparently there are

17  multiple videos, both security cameras within the Capitol,

18  body-worn cameras worn by the police officers who were

19  attempting to get Mr. Egtvedt out of the Capitol.  I've just

20  seen the screenshots, but they seem compelling to me.

21        We also have the fact that this defendant was -- has

22  been identified by multiple witnesses who knew him well as

23  being in those videos, say nothing of the law enforcement

24  officers who seem to be able to -- at least some of them --

25  able to identify the defendant as well.

1    The government has electronic evidence, too, placing him

2  at or inside the Capitol that day.  Indeed, the defendant

3  conducted interviews, it sounds like, when the assault was

4  going on.  I think that that is very strong -- indeed,

5  overwhelming -- evidence, which is one of the factors I'm to

6  consider.

7    As for history and characteristics, I -- I hear

8  Ms. Shaner and I can see the record here.  The defendant has no

9  prior contact -- no prior convictions or even contact with the

10  criminal justice system, no history of noncompliance because he

11  hasn't had any contact at all.  So that certainly weighs in his

12  favor, and I have thought about that, and I've considered it.

13    He does seem to be -- be struggling with some mental

14  health issues, an inability to control himself when -- perhaps

15  when he's off his meds, perhaps when he's on.  I don't know.

16  But I take that into account too, but I'm not certain if it's

17  helpful to him today.  I would not detain someone just because

18  they have mental health issues, but it is something that I can

19  and should consider.  And I do consider to the extent there's a

20  record.  And I do think there's a record here -- that the

21  defendant has a very hard time controlling himself.  That

22  concerns the Court.

23    I mean, ultimately I'm trying to figure out if there's

24  something that could be done to reasonably assure the safety of

25  the community.  I am concerned about the government's evidence

1    with respect to this defendant's intent, those interviews, and

2    the letters that he submitted even following his arrest, five,

3    six weeks later, all of which, I think, suggest, as the

4    government has indicated, this defendant does not even

5    recognize at this point the present administration and the

6    authority of the federal government.  That's apparently,

7    according to his own words, what drove him that day to do what

8    he did.

9         He believes the members of Congress who were doing their

10   duty were traitors and justified what he did that day.  Again,

11   I'd be less concerned if it was just a momentary lapse of

12   reason, but it doesn't appear to be.  According to the

13   government's evidence, the letters that have been submitted,

14   the defendant persists in his belief that there are, to use his

15   words, historical events currently in play.  That has led him

16   to believe he's a political prisoner in a foreign land.  The

17   current status of the Washington, D.C. -- of Washington, D.C.,

18   that has left him feeling that he is a political prisoner in a

19   foreign land.  So nothing has changed.  The same events

20   apparently that have caused him to do what he's done continue.

21        So I combine all this together, and I -- I believe that

22   there are no conditions that can reasonably assure the safety

23   of the community at this time.  If the defendant believes what

24   he believes, the mental health issues that he's struggling

25   with, with the government's evidence that -- little over a

1    month ago that led him to be part of the initial wave into the

2    Capitol in violent conduct against law enforcement once he was

3    inside.

4         I don't know what to make of his growing a beard, change

5    of car.  I could be convinced that perhaps living with his

6    brother would avoid him fleeing, but I am concerned about him

7    living with his brother, controlling him, a danger that I think

8    he represents, especially given the circumstances of his

9    arrest, what happened that day, and that was just a few weeks

10   ago -- less than a week ago, I guess.

11        So I appreciate that his brother showed up and is

12   willing to be a third-party custodian, but I can't conclude

13   based on the record that's before me, including the events on

14   the Capitol, what happened the day of his arrest, that his

15   brother can reasonably assure the safety of the community and

16   can control Mr. Egtvedt, and it might be unfair even to ask him

17   to do that.

18        So for all these reasons, I do find that the defendant

19   should be held pending trial.  I do find by clear and

20   convincing evidence that I cannot fashion conditions or

21   combination of conditions that would reasonably assure the

22   safety of the community.  And it's on that basis that I'm going

23   to order that he be held pending trial in this case.

24        Ms. Shaner, I want to talk about a next date with

25   respect to ascertainment of counsel.  What's the latest status

1    on that, and what date do you think we should set to do that,

2    when he'll be in a position to tell me who his counsel is or if

3    you're going to be his counsel or what's going to happen?

4           MS. SHANER:  Your Honor, I believe the family is

5    negotiating with Kira West.

6           THE COURT:  Ah.

7           MS. SHANER:  And that's why she observed today.  They

8    have to figure out how to access funds which -- may I ask

9    Mr. Egtvedt if he has an idea when he would be able to do that,

10   and then could I set a date, Your Honor.

11          THE COURT:  Okay.  Mr. Rick Egtvedt?

12          MS. SHANER:  Yes, sir.

13          THE COURT:  Okay.  Yep.

14          MR. RICHARD EGTVEDT:  Sorry, Your Honor.  I thought

15   it was off.  It was on.  I apologize.

16          I believe there -- I believe we will have money

17   available to -- to get a check to the lawyer tomorrow.  Of

18   course, we're three hours away from her.  So unless I need to

19   drive it down tomorrow to give it to her, it'll be in the mail

20   tomorrow, in any case.

21          THE COURT:  Okay.  All we're trying to do is figure

22   out when's the best next date.  So what do you suggest -- when

23   do you think you'll be in a position to have a hearing where

24   you can say or Dan Egtvedt can say this -- Ms. West is my

25   counsel?  That's really just the nature of the next hearing.

1      MR. RICHARD EGTVEDT:  The nature of the next

2  hearing.  I -- let's see.  Today is Tuesday.  Your Honor, if I

3  have to drive down the check tomorrow, I will deliver the

4  check to Ms. West tomorrow, and then -- then it's her

5  preparation time -- oh, if it's just an appearance, then it

6  would be her --

7      THE COURT:  It's clearly -- it takes a moment, yeah.

8      MR. RICHARD EGTVEDT:  Yeah, it's her schedule.  So I

9  can't speak to that, and she had a 4 o'clock appointment with

10  another client that she had to leave for; otherwise she could

11  answer that question directly.  I apologize.

12      THE COURT:  Okay.  Ms. Shaner, what are you going to

13  propose?

14      MS. SHANER:  I'm going to propose March the 5th.

15      THE COURT:  Okay.

16      MS. SHANER:  Friday, March the 5th for ascertainment

17  of counsel.

18      THE COURT:  All right.  That will give you plenty of

19  time, sir, to get everything squared away.

20      We also need to set a preliminary hearing.  He's held.

21  So that could impact the state too.  So it needs to be two

22  weeks from his first appearance.  I don't have that in front of

23  me.

24      MS. KUKOWSKI:  I believe it was the 16th, Your Honor.

25      THE COURT:  Okay.  So that would take us up to

1  March -- I'm sorry.  The 16th.  That'll take us out to the 2nd.

2          MS. KUKOWSKI:  March 2nd.

3          THE COURT:  Why don't we --

4          MS. SHANER:  Your Honor, why don't I waive the time

5  and allow Ms. West to set a date after she enters her

6  appearance on March the 5th.

7          THE COURT:  Okay.

8          MS. SHANER:  And should she be able to enter her

9  appearance earlier, she can notify chambers.

10         THE COURT:  Well, why don't we do this:  Why don't we

11 set the 5th as the ascertainment of counsel and a preliminary

12 hearing.

13         MS. SHANER:  Okay.

14         THE COURT:  And if -- you know, he may be indicted

15 before then.  It may be that she'll show up and say I need more

16 time, but at least we'll keep this case on track.

17         MS. SHANER:  That's fine, Your Honor.

18         THE COURT:  So let's find a time on the 5th.  This

19 will actually be before -- well --

20         MS. SHANER:  I won't allow you to set this in front

21 of any other judge.

22         (Laughter.)

23         THE COURT:  No, I better hold on to this if it's

24 going to be a potential preliminary hearing, although I suspect

25 there won't be one.  But let's go ahead.  We'll set it for

1    11:00 a.m. on March 5th.

2           Does that work for the government?

3           MS. KUKOWSKI:  Yes, Your Honor.

4           THE COURT:  All right.  Ms. Shaner, does that -- all

5    right.  11:00 a.m.  That's going to be for ascertainment of

6    counsel and a preliminary hearing.

7           Mr. Egtvedt, Rick Egtvedt, you just raised your hand.

8    Yes, sir?

9           MR. RICHARD EGTVEDT:  Yes, Your Honor.  I'm sorry.  I

10   just want to be -- because he -- I am concerned regardless of

11   being able to get any other medications ready, if they are

12   unable to give him a -- it's not just a CPAP.  He requires a

13   BiPAP.  In order for him to be able to be fully cognizant, I

14   encourage the Court to see if we can find some way to enable

15   that capability.  I -- I can -- his pressures and all that

16   are -- are available, and I can connect with the appropriate

17   pretrial or whoever it is involved in order to make sure we get

18   that correct.

19          THE COURT:  I had a case about two months ago where

20   this issue came up, and I reached out to the general counsel.

21   I reached out to the marshals service.  Truly it's the marshals

22   service, as I understand it, who would be responsible for this.

23   So it is a possibility.

24          Unfortunately, it takes some time, and I -- I fully

25   appreciate that this is important.  Sleep apnea is -- is a

1    serious issue that needs to be addressed every night.  Does he

2    have a machine, though?  Could I -- I'm happy to reach out to

3    the marshals service.  I'm happy to reach out to the general

4    counsel of the Department of Corrections, like I did before.

5    But do you have a machine that literally you could get to the

6    jail and say here's his machine?

7              MR. RICHARD EGTVEDT:  Your Honor, we do have his

8    machine.  The jail up here would not take it because, of

9    course, it has an electrical cord or -- or hose associated with

10   it.  And, I mean, those are the issues that I know.  I --

11   working with folks as I have, I understand the challenges

12   there, but I know this is -- if we're going to be able to try

13   to get him back on a good path, this is one of the important

14   steps that has to be made.

15             THE COURT:  Okay.  So -- I'm sorry.  Where are you?

16   You are how far away from D.C.?

17             MR. RICHARD EGTVEDT:  I'm a three-hour drive west, in

18   extreme west -- western Maryland in Garrett County.

19             THE COURT:  Okay.

20             MR. RICHARD EGTVEDT:  I'm so far west the water flows

21   from the -- where I'm at to the Ohio River.

22             THE COURT:  Okay.  Well, I will -- I mean, I will

23   offer your machine.  I don't want you to give it to authorities

24   up there.  It's getting to the D.C. jail.  That's where he's

25   going to be.  So it may be if I can arrange -- and I know

1    there's an issue with hoses and cords and all the rest.

2    Sometimes it's just there's no outlet, you know.

3              MR. RICHARD EGTVEDT:  Understood.

4              THE COURT:  But I'm going to offer to him that

5    you would be willing to, however you're going to do it, get

6    the -- get his machine to the jail.  You would be prepared to

7    do that?

8              MR. RICHARD EGTVEDT:  Your Honor, yes, I would be

9    prepared to do that.  And I can even -- I -- I work as a

10   chaplain for World and National Scout jamborees.  And as such,

11   I have batteries that go with my machine that -- that perhaps

12   we can find some way to work with his.  I don't know yet.  I'll

13   have to figure that part out.

14             THE COURT:  Well, work on that.  I'm going to tell

15   them his requires a cord, but I'll keep in mind that maybe

16   there's a battery option.  I didn't know there was a battery

17   option.

18             MR. RICHARD EGTVEDT:  There are, but whether my

19   batteries will work with his machine, I can't guarantee that

20   right now, and I may have to do a quick order to try to make

21   sure that happens.

22             THE COURT:  Okay.  Well, I think you start working on

23   that.  I will let Ms. --

24             MR. RICHARD EGTVEDT:  Yes, Your Honor.

25             THE COURT:  -- Shaner know or Ms. West.  I don't

1    know who's going to -- I -- I'm going to ask the government

2    right now, I'm going to reach out to -- as I said, to general

3    counsel's office, to the U.S. marshal.  I'm going to ask, if

4    possible, for Ms. Shaner and Ms. West to join me.  I don't

5    think the government needs to be involved in that call, but

6    I did want to let you know that those calls will be happening.

7           MS. KUKOWSKI:  Thank you, Your Honor.  If the Court

8    feels as though we should be involved, we are happy to do so,

9    but for a medical matter like this, I don't believe it's

10   necessary.

11          THE COURT:  Okay.  Ms. Shaner, you also have a

12   medical alert form that you're going to submit?

13          MS. SHANER:  I submitted one with the medicines.  I

14   will submit another with the sleep apnea.  If you could ask

15   Mr. Tran to send me another.  I'm sorry.  I thought I might

16   have one on my computer, but if Mr. Tran is --

17          THE COURT:  He's going to send it to you.

18          MS. SHANER:  Okay.  Thank you.

19          THE COURT:  Mr. Egtvedt, I don't know this other

20   term.  I know -- I know the CPAP machine.  What does he need?

21   A BiPAP?  What?

22          MR. RICHARD EGTVEDT:  It's a BiPAP.  His upper

23   pressure is so high that if -- if it -- it if kept blowing

24   while he's trying to exhale, he would not be able to properly

25   exhale.  And so it has two pressures.  The upper one is to

1    clear the airway, and the lower one is to allow the air to come

2    back out.

3              THE COURT:  Okay.

4              MR. RICHARD EGTVEDT:  That's how severe his condition

5    actually is.

6              THE COURT:  Okay.  BiPAP.  It's a new word for me.

7    I'll be asking for that.

8              MR. RICHARD EGTVEDT:  Thank you, sir.

9              THE COURT:  Okay.  So we've set the next date.  And

10   that will be for ascertainment of counsel, for a preliminary

11   hearing.

12             Ms. Shaner, I'm going to try to set up a call as soon

13   as -- I've got another meeting.  I'm actually involved in a

14   mediation.  It's been a crazy day, but I will let you know when

15   I have that call set up.  And I would like for you or someone

16   to join me just so that, you know, I will put the fire

17   underneath them, but you may need to continue to press more

18   than I'm going to have time to do.

19             MS. SHANER:  Yes, Your Honor.

20             THE COURT:  All right then.  Anything further,

21   Government?

22             MS. KUKOWSKI:  Nothing further from the government,

23   Your Honor.

24             THE COURT:  Ms. Shaner?

25             MS. SHANER:  When is it that -- you want to make the

1      call directly after court?

2                  THE COURT:  Oh, I don't -- that's my problem, when

3      it's going to be.  My -- my clerk will let you know.  We have

4      to figure it out.

5                  MS. SHANER:  Okay.

6                  THE COURT:  All right.  Thank you.  Parties are

7      excused.

8                  (The proceedings concluded at 4:25 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

I, Nancy J. Meyer, Registered Diplomate Reporter, Certified Realtime Reporter, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true, and complete transcript of the proceedings to the best of my ability.

Dated this 9th day of March, 2021.

/s/ Nancy J. Meyer
Nancy J. Meyer
Official Court Reporter
Registered Diplomate Reporter
Certified Realtime Reporter
333 Constitution Avenue Northwest, Room 6509
Washington, D.C. 20001