```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - x
 3     THE UNITED STATES OF AMERICA,
                                          Criminal Action No.
 4                   Plaintiff,           1:21-cr-00177
                                          Wednesday, April 14, 2021
 5     vs.                                1:09 p.m.

 6     DANIEL DEAN EGTVEDT,

 7                   Defendant.
       - - - - - - - - - - - - - - - x
 8

 9     _____

10                   TRANSCRIPT OF MOTION HEARING
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                   UNITED STATES DISTRICT JUDGE
       _____
12     APPEARANCES:

13     For the United States:      COLLEEN D. KUKOWSKI, ESQ.
                                    MICHAEL CHARLES LIEBMAN, ESQ.
14                                  U.S. DEPARTMENT OF JUSTICE
                                    555 Fourth Street, NW
15                                  Washington, DC 20530
                                    202-252-2646
16                                  colleen.kukowski@usdoj.gov
                                    michael.liebman@usdoj.gov
17     For the Defendant:          KIRA ANNE WEST, ESQ.
                                    LAW OFFICE OF KIRA WEST
18                                  712 H Street, NE, Unit 509
                                    Washington, DC 20002
19                                  202-236-2042
                                    kiraannewest@gmail.com
20
       Court Reporter:             Lisa A. Moreira, RDR, CRR
21                                  Official Court Reporter
                                    U.S. Courthouse, Room 6718
22                                  333 Constitution Avenue, NW
                                    Washington, DC  20001
23                                  202-354-3187

24
       Proceedings recorded by mechanical stenography; transcript
25     produced by computer-aided transcription
```

1               I N D E X

2

3    WITNESS                                          PAGE

4    RICHARD EGTVEDT
         (By Ms. West)...................................... 15
         (By Ms. Kukowski)................................. 23
5        (By Ms. West)...................................... 34

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  We're here today for a
 3      criminal motion hearing in 21-177, The United States of
 4      America vs. Daniel Dean Egtvedt.
 5              Starting with counsel for the government, please
 6      identify yourself for the record.
 7              MR. LIEBMAN:  Good afternoon, Your Honor; Michael
 8      Liebman for the United States.
 9              THE COURT:  Good afternoon, Mr. Liebman.
10              MS. KUKOWSKI:  And Colleen Kukowski for the United
11      States; good afternoon, Your Honor.
12              THE COURT:  Ms. Kukowski, how are you?
13              PRETRIAL SERVICES:  Good afternoon, Your Honor;
14      Andre Sidbury from pretrial services.
15              THE COURT:  Good afternoon, Mr. Sidbury.
16              MS. WEST:  Hello, Your Honor; Kira Anne West for
17      Mr. Daniel Dean Egtvedt.
18              THE COURT:  Good afternoon, Ms. West.  You ready
19      to go now?
20              MS. WEST:  Yes, sir.
21              THE COURT:  Okay.
22              Mr. Egtvedt, can you see and hear me?
23              THE DEFENDANT:  Yes, I can see you, Your Honor.
24              THE COURT:  Okay.
25              I'm just pulling your leg, Ms. West.  And now that
```

1    you're ready, I'm actually not ready.  I've got to go back

2    and get my reading glasses; so give me 30 seconds.

3              MS. WEST:  Yes, sir.

4              (Recess taken)

5              THE COURT:  Okay.  That's better.

6              All right.  Ms. West, this is your motion.  Do you

7    want to be heard further?

8              MS. WEST:  I do, Your Honor.  With the Court's

9    encouragement, I've whittled down what I have to say, and

10   I've whittled down to one witness.

11             Just briefly, I'm not going to go through what

12   I've already filed in my initial brief and my reply, but I

13   would like to point the Court to some things that have

14   happened subsequent to that time and how those compare to

15   Mr. Egtvedt's case and why he should be released by this

16   Court.

17             As a housekeeping matter, Your Honor, I would hope

18   that all the body-worn camera evidence are submitted as

19   exhibits.  If the Court would like, the government and I can

20   get together and do an exhibit list, if that makes more

21   sense, but I know the Court ordered in a minute order that

22   those things be delivered to chambers.

23             THE COURT:  Okay.  And the government complied

24   with the order and, I believe, produced everything to you as

25   well.  I've reviewed all of the video evidence.

1            Mr. Liebman, is the U.S. Attorney's Office hosting

2       that material as it has in other cases, or is it on the

3       public record, or is it just something that's been filed

4       with chambers?

5            MR. LIEBMAN:  I'm not 100 percent sure, Your

6       Honor.  Ms. Kukowski is handling the more substantive

7       aspects of that.  Maybe she can address that.

8            THE COURT:  Okay.  Ms. Kukowski.

9            MS. KUKOWSKI:  Your Honor, as of now we have

10      provided defense counsel and the Court with copies of the

11      exhibits.  They've not been posted publicly anywhere.  If

12      the Court wishes us to do so, we would certainly comply with

13      any such orders.  But right now it's maintained by us and

14      has not been produced beyond defense counsel and to the

15      Court.

16            THE COURT:  Okay.  And this is my own curiosity.

17      I thought that there were discussions at some point about

18      the U.S. Attorney's Office hosting video evidence in the

19      January 6th cases so that the public and the press can

20      access them easily.  Is that still a work in progress, or

21      has that been overtaken by the adoption of other means to

22      make those things accessible?

23            MS. KUKOWSKI:  I don't know for certain, Your

24      Honor, so I don't want to speak out of turn about that.  I

25      know that our office is working on putting together

1    discovery platforms for the case at large, but my

2    understanding was that was for the purposes of discovery and

3    providing to the federal public defenders and defense

4    counsel in these cases.  We can certainly provide an update

5    to the Court, but I would have to speak further with those

6    in my office about those.

7              THE COURT:  Well, I don't want to preempt the

8    creation of any sort of discovery platforms that apply to

9    all of these cases.  If there is a request for public

10   viewing or viewing by the press of any of the videos that

11   are at issue in this motion, we'll entertain that request,

12   and we can figure out a way, if necessary, to provide that,

13   but I don't want to, you know, jump the line of any sort of

14   global processes that the U.S. Attorney's Office may be

15   working on, okay?

16             MR. LIEBMAN:  And, Your Honor, excuse me.  There's

17   actually one brief preliminary matter.

18             THE COURT:  Sure.

19             MR. LIEBMAN:  If I can just address the Court

20   briefly?

21             THE COURT:  Of course.

22             MR. LIEBMAN:  Your Honor?

23             THE COURT:  Yes, go ahead.

24             MR. LIEBMAN:  Oh, you had asked me on Monday if

25   the government had calculated the sentencing guidelines

1    applicable in this case.  I hadn't at the time, but we have

2    now.

3         We believe the sentencing guideline -- overall

4    sentencing guideline range for the seven counts in the

5    indictment for which the guidelines apply -- and it's four

6    felonies.  I think I said three last -- on Monday.  We

7    believe the overall sentencing guidelines for the four

8    felonies and the three Class A misdemeanors is 24 to 30

9    months for this defendant.

10        THE COURT:  Okay.  Thank you.

11        All right.  Ms. West.

12        Oh, another housekeeping matter.  Is Mr. Egtvedt's

13   brother going to be providing testimony, as you indicated

14   the last time?

15        MS. WEST:  Yes, Your Honor.  He's in the waiting

16   room.

17        THE COURT:  Very well.  Okay.

18        MS. WEST:  Basically, Your Honor, the government

19   in this case has argued that Mr. Egtvedt was trying to

20   overthrow the government, in their words, but that's an

21   absolutely absurd statement.

22        Mr. Egtvedt had absolutely no weapons with him

23   that day or any other time.  He was in the Capitol for less

24   than 30 minutes.  He was not in the Senate chamber or Nancy

25   Pelosi's office or her lobby or the tunnel.  He was not

1     anywhere that was more severe, as this Court knows probably

2     from reading press reports, other areas of the Capitol where

3     violence was happening.  And I think we have to extract

4     ourselves from the emotions of that particular day, the

5     current political climate, and who Mr. Egtvedt is as an

6     individual.  And when the Court considers those things,

7     there is absolutely no concrete prospective threat from

8     Mr. Egtvedt, which is what the Court in the Circuit in

9     *Munchel* said must be found in order for him to be held, or,

10    in other words, there's no identified and articulable threat

11    or danger posed by Mr. Egtvedt.

12          The government relies in their reply to my motion

13    on the incident at Mr. Egtvedt's home with -- his brother's

14    home with his mother and the vaccine, and that is why we've

15    called back his brother to testify today.

16          I think it's important and it was not discussed --

17    the Court indicated Monday that you'd read the transcript,

18    but when Mr. Egtvedt was approached two different times on

19    February 13th by law enforcement, both times he was

20    completely compliant, calm, respectful of the police

21    officers, and later in the day, when he was taken into

22    custody, there was absolutely no problem.  And I think it's

23    important to note that the police reports from that day

24    indicate what I've just said.

25          The incident with the mother and the vaccine was a

1    one-page report, which didn't indicate any violence or any

2    kind of transgression on Mr. Egtvedt's part at all.

3            Recently, I know that this Court probably knows

4    that Judge Bates released another January 6th defendant by

5    the name of Federico Klein on Monday with severe

6    restrictions.  In that case, that was a case where there was

7    physical violence where the Defendant Klein had held a

8    police shield against police, used it against police more

9    than one time.

10           In my reply I listed four other cases of more

11   violence to give this Court an indication of how other

12   defendants with much more severe charges and much more

13   severe physical action were released in this case.

14           I just -- I know the Court has read *Munchel*, but

15   I'd like to point out how *Munchel* is different and more

16   dangerous, those defendants were, than Mr. Egtvedt in this

17   case.

18           In *Munchel*, one of the defendants had a

19   misdemeanor criminal history, and, as this Court knows,

20   Mr. Egtvedt has absolutely none.

21           The defendant in *Munchel* had connections with the

22   oath keepers and met with them at the Capitol.  They wore

23   tactical vests, had a taser, zip ties, and a pocket knife.

24   Mr. Egtvedt, of course, had none of those things.

25           They also were inside the Senate gallery.  They

1    spoke to the media about a revolution, quote, and to fight

2    if necessary, quote.

3           *Munchel* had a lot of firearms that were found at

4    the search warrant.  Mr. Egtvedt didn't have those.

5           Both those defendants were charged with conspiracy

6    and unlawful entry while armed and carrying a dangerous

7    weapon.  We don't have that in this case.

8           *Munchel* wanted to join the Proud Boys.  We don't

9    have that in this case.  And I think that's very, very

10   important to this Court's assessment.

11          In the *Klein* case, Judge Bates directly quoted

12   from *Munchel* saying that those who actually assaulted police

13   officers, broke through windows, doors, and barricades,

14   those who aided, conspired with, planned or coordinated such

15   actions are in a different category of dangerousness than

16   those who cheered on the violence or entered the Capitol

17   after others cleared the way.  And I think that that's

18   really important in this case.

19          I know that we have a very different opinion about

20   the assault on the police officers.  There is, as the Court

21   is aware, a one-minute-and-15-second clip in this case where

22   Mr. -- we believe Mr. Egtvedt was assaulted by almost nine

23   police officers, and when you start that clip at Second 47

24   and take it to Second 52, and if you go frame by frame, you

25   can see that the blue bicycle cop first laid her hands on

1    Mr. Egtvedt and did it repeatedly, and then another police

2    officer behind him grabbed his left arm, and then another

3    police officer to his right pushed him in the back.  That's

4    how that started, and it ended badly with Mr. Egtvedt being

5    thrown against that column and knocked out for a period of

6    seconds.

7              So we believe that the individual factors that the

8    Court will consider, especially after we hear testimony --

9    very brief testimony, Your Honor -- from Mr. Egtvedt's

10   brother, that you will be able to find that there are, in

11   fact, conditions of release that will ensure that there is

12   no danger to the community and his presence in court.

13             Finally, there's just a few points from the

14   transcript of the detention hearing that are inaccurate.

15   I'd like to point those out to the Court.  And some of those

16   will be explained through the short testimony of Pastor

17   Egtvedt.

18             On Page 8 of the transcript of the detention

19   hearing, the government states that Mr. Egtvedt, quote,

20   eventually fell to the ground, and as the Court saw, he was

21   actually pushed to the ground.  Any injury we believe to any

22   officer at that time occurred accidentally.  He did not

23   intend or try to assault any officer.

24             On Page 9, the government says that he was, quote,

25   on the ground refusing to leave.  That's not so.  As I said,

1    the tape shows that he was unconscious for a few seconds.

2            They also state "so that at that point they push

3    him finally through."  Well, what they actually did was

4    throw Mr. Egtvedt.  Even though he's a big guy, they threw

5    him out the door.

6            They also state on Page 9 that Mr. Egtvedt was

7    swatting and hitting the police officer, which, as the Court

8    can see from the video, that is not so.

9            They also state on Page 12 that Mr. Egtvedt

10   physically prevented a family member from taking the elderly

11   member for a vaccine.  That also is untrue.  The police

12   reports do not in any way indicate that that's what

13   happened.

14           And on Page 16, the government states that

15   Mr. Egtvedt, quote, has unstable housing.  That's patently

16   false.  Mr. Egtvedt sold his home in Virginia and moved to

17   his brother's and lived in a condo for exactly a year, from

18   February 2020 to February -- until he was arrested -- '21

19   after he sold his home so that he could take care of his

20   mother and share that burden with his brother.

21           THE COURT:  Okay.  Just to be clear -- and perhaps

22   the witness can shed more light on this -- your position is

23   that Mr. Egtvedt was living with his brother and his mother

24   in an apartment at the time of his arrest?

25           MS. WEST:  No, Your Honor.  And Mr. Egtvedt's

1    brother, Rick, Pastor Egtvedt, can answer that.

2              Mr. Egtvedt had a home in Virginia.  He sold it

3    when his mother started showing signs of Alzheimer's, and so

4    he sold his home in Virginia.  His brother Rick has a home

5    in western Maryland, far western Maryland, where he lives

6    with his mother.  On that property, approximately 50 yards

7    away, is a condominium where the defendant, Mr. Dan Egtvedt,

8    lives.

9              THE COURT:  And he rents that from the brother or

10   simply is allowed to live there?

11             MS. WEST:  Well, I believe there was -- his

12   brother could answer this better than I.

13             THE COURT:  Okay.

14             MS. WEST:  I believe there was an agreement to

15   rent the property; but whether or not that went through, I

16   don't know, Your Honor.

17             THE COURT:  And does he live by himself?

18             MS. WEST:  He does in the condominium, Your Honor.

19             THE COURT:  Okay.  There was a reference to family

20   members.  Are there family members involved in his

21   residential life?

22             MS. WEST:  Well, his brother and his mother live

23   50 yards away.

24             THE COURT:  Okay.  But no --

25             MS. WEST:  And my --

1     THE COURT:  No spouse or children?

2     MS. WEST:  No, sir, he does have a son.  He is

3 divorced.  His son is a senior at a college in Virginia and

4 will graduate in May.

5     THE COURT:  Okay.  Thank you.

6     Before we get to the witness, the government makes

7 a fair amount of the letter that the defendant sent to the

8 local sheriff saying that if he is turned over to the feds

9 he would be, quote, a political prisoner in a foreign land.

10 I'm not sure you've responded to that.  The government's

11 suggestion is that the defendant may not fully recognize the

12 authority of this Court and that that might affect his

13 willingness to comply with the sort of release conditions

14 that you've suggested.  Do you want to respond to that?

15     MS. WEST:  I would, Your Honor.  Thank you.

16     And I -- as the Court knows, I added those as

17 exhibits because his brother's testimony will answer that

18 question for the Court.

19     THE COURT:  All right.  Very well.  Want to call

20 your witness?

21     MS. WEST:  Yes, Your Honor.  The defense would

22 call Mr. Rick Egtvedt.

23     THE COURT:  Okay.  Mr. Egtvedt -- let's bring him

24 in from the breakout room.

25     Sir, would you like to raise your right hand,

 1    please, and be sworn.

 2                  (Witness sworn)

 3                  THE COURT:  Good morning, sir.

 4                  THE WITNESS:  Good morning.

 5                  THE COURT:  Where are you calling in from?

 6                  THE WITNESS:  Garrett County, Maryland.

 7                  THE COURT:  Okay.  Welcome.

 8                  Ms. West, the witness is yours.

 9                  MS. WEST:  Thank you, Your Honor.

10                        RICHARD EGTVEDT, Sworn

11                        DIRECT EXAMINATION

12    BY MS. WEST:

13    Q.  Good afternoon, Mr. Egtvedt.

14    A.  Good afternoon.

15    Q.  Please introduce yourself to the Court.

16    A.  I'm the Reverend Richard Egtvedt, colonel, retired,

17    United States Air Force.

18    Q.  All right.  And are you the brother of the defendant,

19    Daniel Egtvedt?

20    A.  That is true.  I am his older -- one of his older

21    brothers.

22    Q.  Okay.  You've testified previously in this case; is that

23    right?

24    A.  That is correct; yes, ma'am.

25    Q.  And I'd like to clear up a couple of issues.  One is,

 1    when he sold his home in Virginia and moved to Maryland, did

 2    he initially live with you in your home?

 3    A.  Yes, he did, until just about the time of the pandemic

 4    came up, uh-huh.

 5    Q.  Okay.  And then what happened then?

 6    A.  The area was under or scheduled to undergo some

 7    renovation, and so he moved over to the condo at that time

 8    in consultation with the appropriate individuals.

 9    Q.  Okay.  So when you say "renovation," you mean the

10    condominium?

11    A.  No.  The renovation was in the lower level of my house.

12    Q.  Okay.  So there wasn't room for him there, so he had to

13    go to the condominium?

14    A.  Correct.  Yes, ma'am.

15    Q.  Okay.  And when he moved from Virginia to Maryland, were

16    you helping him find doctors and get medication?

17    A.  Yes, ma'am, I did.

18    Q.  All right.  And did he have a doctor named Dr. Miller?

19    A.  Dr. Miller was his doctor, correct, yes.

20    Q.  Okay.  And did Dr. Miller retire?

21    A.  He did in about August, right in that time frame, July/

22    August.

23    Q.  Okay.  Of last year?

24    A.  Of last year, ma'am.  In the middle of the pandemic,

25    yes, ma'am.

1    Q.  And at that time was your brother taking several

2    medications?

3    A.  Yes, he was, ma'am.

4    Q.  Uh-huh.  And in the beginning, did you help him with

5    those medications?

6    A.  I helped him with those medications from the time he

7    moved in, roughly speaking, in September through -- the

8    previous September, let me state that, through June-ish of

9    the following year.

10   Q.  Okay.

11   A.  Up until about a month or two before the doctor -- yes.

12   Q.  All right.  And after that time, did you have any

13   interaction with your brother with regard to what medication

14   he was taking?

15   A.  Up to that point I was included in a lot of the

16   appointments, and so I was very knowledgeable as to what was

17   going on and was able and actually distributed the

18   medication as the doctor required of me.

19   Q.  Okay.  But then that doctor left.

20   A.  Dr. Miller retired.  That would be correct.

21   Q.  Okay.  And is it fair to say, then, that your

22   interaction with your brother and his medication was much

23   less or nonexistent?

24   A.  Yes.  That would be a fair way of putting it, uh-huh.

25   Q.  And is it fair to say that after that time your

1    brother's behavior changed somewhat?

2    A.  Yes, it did.  I had suspicions about whether there was

3    something going on with the medication or not, and -- but

4    that was one of the things I was paying close attention to

5    from afar.

6              THE COURT:  Reverend Egtvedt -- let me break in

7    just one second for a clarifying question -- when you say

8    "medication," you're referring to some sort of psychotropic

9    medication?

10             THE WITNESS:  I issued him all his medications,

11   Your Honor, but also including those, yes.

12             THE COURT:  Okay.  Thank you.

13   BY MS. WEST:

14   Q.  After that time then we had this case, and you came to

15   court and testified.  I just want you to reiterate for the

16   Court what you told the magistrate judge.

17             If this Court allowed Dan to go home, would you,

18   again, take an active role in his medication?

19   A.  Yes.  I have no problem with doing that.  Like I said, I

20   did it for six to eight months.  I don't know what that

21   works out to right now, for several months, and it was

22   pretty much because of the pandemic that things started

23   getting askew, I would suggest, as well.  But yes.

24   Q.  Okay.  And if the Court let Dan come home with

25   conditions, would you allow him to live in your home instead

1    of the condominium?

2    A.  I can do that, yes.

3    Q.  Okay.  So let's go to a couple of things the government

4    has brought up in their briefs.

5           Do you also have a property that's known as the

6    farm?

7    A.  My mother does, yes.

8    Q.  Okay.  And do you know whether or not Dan spends time at

9    the farm?

10   A.  He has.  In the time period -- during -- after the

11   pandemic initiated and all that, part of the reason why it

12   became harder for me to issue his medication is because he

13   was spending -- wanted to spend some time, more time, at the

14   farm, and I wanted to be up here.

15   Q.  Okay.

16   A.  So that was one of the reasons that contributed to that.

17   Q.  Okay.  And how does he help you with the care of your

18   mother?

19   A.  Well, he's been -- mom likes to go out and do some

20   things, but in my job I'm required to, of course, write a

21   sermon and do other things, and so he would be able to kind

22   of take her out and kind of do things with her so she didn't

23   have to watch TV.  The interaction is a good thing.

24   Q.  In fact, the day that you were taking your mother for

25   the vaccine, you were having an argument about whether or

1    not you were going to discuss it first before you took her;

2    is that correct?

3    A.  Well, we were -- yes, yes.

4    Q.  Okay.  And after that happened, after the police came

5    and left and you came back with your mother, did Dan later

6    take your mom shopping?

7    A.  After we had -- after she was done getting her

8    inoculation, he met us at the inoculation site, and he took

9    her shopping so that I could go back home and, in this case,

10   work on my sermon because I was getting ready for the next

11   day.

12   Q.  And as far as you personally, do you foresee in your own

13   personal life that you have to have shoulder surgery?

14   A.  Well, I just -- it was just recommended to me yesterday,

15   yes.

16   Q.  Okay.

17   A.  And so I -- yes, and so I'm kind of trying to figure out

18   how to go at this one, yes.

19   Q.  All right.  And would it be helpful for you to have Dan

20   at home?

21   A.  Yes, it would, because, if nothing else, if I have the

22   shoulder surgery, I'm not going to be able to drive, so that

23   means mom can't drive, I can't drive, so it would make a big

24   significant impact on how we're going to get things done

25   since there's no public transportation out here unless you

```
 1    plan it out a day in advance.
 2    Q.  And if you're active in his life as far as giving him
 3    his medication, making sure that he takes it, would he be
 4    able to help you in that event?
 5    A.  Yes.  He has in the past.  He could in the future,
 6    without question.
 7    Q.  Speaking of Dan driving, is there a Yukon that is a
 8    family vehicle?
 9    A.  My -- yes, it was my father's vehicle.  But, yes.  It's
10    at the farm.
11    Q.  Right.  And had Dan driven that car before the day,
12    February 13th?
13    A.  Oh, yes.  Yes.  I mean, we were at a family funeral up
14    in Michigan.  My older -- one of my older brothers had the
15    vehicle in Michigan, and Dan drove the vehicle from Grand
16    Rapids, Michigan, all the way down to the farm and drove it
17    around the farm whenever needed to do something large-scale
18    in the area down there.
19    Q.  All right.  And the government also questioned you
20    before about Dan growing a beard.  Do you remember that?
21    A.  Yes.  I remember them asking -- the agent asking about
22    that.
23    Q.  All right.
24    A.  Commenting on it, yes.
25    Q.  Right.  And was there a time before Dan moved to
```

1    Maryland that you didn't see him for some months?

2    A.  Yes.  I mean, obviously I was deployed to Iraq for six

3    months, and prior to that I was deployed to Saudi Arabia for

4    four months, and we might go a couple of months, just with

5    my work schedule and the Pentagon and everything else and

6    catching up with him, so it's -- yes.  I don't have anything

7    definitive to say that he -- you know, what -- how he liked

8    to groom himself from a day-to-day basis.

9    Q.  Right.  Now, back to the time of February 13th, the day

10   that Dan was arrested.

11   A.  Okay.

12   Q.  He was taken into custody, and he went to the Garrett

13   County sheriff's jail; is that correct?

14   A.  The detention facility, yes, uh-huh.

15   Q.  Okay.  I'm sorry, detention facility.  And at that

16   time -- that was a Saturday.  So there were several days

17   that he was held there where he did not have any medication

18   at all; is that correct?

19   A.  That is true.  That is one of the things that I voiced

20   to the special agent when I saw him that day, and he said

21   that he was going to do what he could.  Obviously, from the

22   last hearing I was involved with, those were the issues I

23   brought to the magistrate's approach or attention at that

24   time.

25   Q.  So in your opinion, sir, if Dan took his medication, do

1    you believe that he would be able to follow the Court's

2    rules and everything?  For example, if the Court put him on

3    conditions of release, do you believe that Dan would respect

4    those rules?

5    A.  Without question, yes.

6    Q.  All right.  And what do you base that opinion on?

7    A.  Well, he and I were in the same -- different beds.  We

8    were in the same room for the first 18 years of my life

9    growing up, and so I kind of know him fairly well from

10   there.  And obviously a lot of family involvement ever since

11   then so --

12   Q.  I have to ask you this because my son was an Eagle

13   Scout.  Are you a Boy Scout family?

14   A.  I am a Boy Scout.  I'm an Eagle Scout.  I think Dan

15   ended up deciding, rather than to follow me to the Eagle

16   approach, he went in the Order of DeMolay, which is the male

17   youth organization for the Masonic lodge.

18   Q.  Okay.  All right.

19          MS. WEST:  Pass the witness, Your Honor.  Thank

20   you.

21          THE COURT:  Ms. Kukowski.

22          MS. KUKOWSKI:  Your Honor.

23                       CROSS-EXAMINATION

24   BY MS. KUKOWSKI:

25   Q.  Good afternoon, Mr. Egtvedt.

1    A.  Good afternoon, ma'am.

2    Q.  Prior to the events of January 6th of this year, you

3    said that the defendant was originally living with you,

4    correct, in your residence, and then moved to a condo that

5    you owned?  Is that right?

6    A.  Correct.  He was -- yes.  All within a football's field

7    distance from each other, yes.

8    Q.  Okay.  And you mentioned that move was made, quote, in

9    consultation with appropriate individuals; is that right?

10   A.  I talked with the doctors to make sure everything was

11   good, yes.

12   Q.  Okay.  And this move, was this before or after his

13   doctor, Dr. Miller, retired in July or August of 2020?

14   A.  This would have been before that.

15   Q.  So once he was living in your condo from we'll say mid-

16   2020 on, how often would you speak with the defendant?

17   A.  He was either on the phone talking with mom and/or

18   myself or over here at least every other day, if not more,

19   depending on where we're at in the cycle, whether I was

20   overseeing medication or not.

21   Q.  Okay.  So I think you actually just kind of got to my

22   next question there, which was going to be how often did you

23   see him?

24   A.  Well, when he was living in the house, I saw him every

25   day.  And that's when I was issuing his medication to him

1   every day.

2           As we went forward to the condo, then it was

3   issued -- I gave it to him for, you know, several days at a

4   time, and we would see each other during those times or in

5   conversations when he'd call to talk to mom, et cetera.

6   Q.  Okay.  And that's really what I want to focus on.  When

7   he was living in the condo, is it fair to say you saw him on

8   a daily basis?  A weekly basis?  Was it more extenuated than

9   that?

10  A.  Every couple of days, day or -- you know, something to

11  that effect.  It was -- he was doing things, and then we

12  would -- if there were things that he was going to help out

13  with, I would set that up with him to make sure that we had

14  everything lined up for mom.

15  Q.  And would you be aware of when he would be traveling

16  outside of the area?

17  A.  I was -- yes, I would be.  Without question.

18  Q.  So we know that he traveled down to Washington, D.C., on

19  January 5th for the events at the Capitol and was in

20  Washington, D.C., on January 6th.  Did he talk to you about

21  that?

22  A.  Yes.

23  Q.  And did he tell you why he was going to go?

24  A.  To hear the President.

25  Q.  Okay.  After January 6th did he come home immediately?

1    A.   No.

2              Give me a minute here.  I'm trying to think here.

3              I think he had left a day -- I think the day

4    before to go down to the farm.  He spent the day before

5    leaving, I guess the 4th or something like that or the night

6    of the 4th, and then he spent the night there.  Then he went

7    down, and he came back -- he stayed at the farm for a couple

8    of weeks.

9    Q.   For a couple of weeks?

10   A.   Yes.  He had done that before.

11   Q.   Okay.  And --

12   A.   He'd come back and forth.  He'd been down to the farm

13   many times over the summer.

14   Q.   Okay.

15   A.   Part of that was he was overseeing -- we had a water

16   leak issue and --

17   Q.   All right.

18   A.   -- he was overseeing the activities involved with that.

19              THE COURT:  Reverend Egtvedt, could you tell us

20   where the farm is relative to your house.

21              THE WITNESS:  It is -- it's --

22              THE COURT:  Roughly.

23              THE WITNESS:  Yes.  I'm trying to think how to

24   place this.  Give me one second, Your Honor.

25              I would say it's about not quite -- a little over

1    a third of the way from my place to D.C., something like

2    that.

3              THE COURT:  So still in Maryland?

4              THE WITNESS:  No.  No, sir.  It's out in West

5    Virginia.

6              THE COURT:  West Virginia?

7              THE WITNESS:  Between Romney and Augusta, West

8    Virginia.

9              THE COURT:  Got it.  Thank you.

10   BY MS. KUKOWSKI:

11   Q.  Okay.  So then Mr. Egtvedt, the next question I was just

12   going to ask is, when he returned from the farm, that's when

13   he returned driving your father's Yukon; is that right?

14   A.  He did at that point, yes.

15   Q.  Okay.  Did he give a reason as to why he was no longer

16   driving his own vehicle?

17   A.  He felt that it needed to have some mileage put on it.

18   I don't know.

19   Q.  Did he tell you that, or is that just what you're

20   guessing?

21   A.  I think he said something to that effect.  I don't

22   recall exactly.

23   Q.  Okay.  Did he ever drive your father's Yukon around

24   Garrett County prior to this?

25   A.  Prior to this?  No.

1   Q.  Okay.  And he left his vehicle at the farm, the best you

2   know?

3   A.  No, it's at the farm.

4   Q.  Okay.  Ms. West asked you briefly about the beard that

5   the defendant had, and you had mentioned how there had been

6   some times where you served the country overseas for six

7   months and four months at a time.  Aside from those periods

8   of time when you were overseas, when you were here living at

9   home in the U.S., had you ever seen the defendant as a grown

10  man with a beard?

11  A.  I mean, I've seen him with facial hair.  So, I mean,

12  that depends on how you want to make that delineation

13  between the two.

14  Q.  Okay.  The facial hair, when you recall seeing him with

15  it, when was that?

16  A.  I don't know.  Years ago.  I mean, I -- Dan and I lived

17  in the greater D.C. area for many years, so I can't give you

18  a time frame.

19  Q.  And then we briefly just talked about the incident when

20  you were taking your mother to get vaccinated.  Had you and

21  the defendant had conversations about the vaccine prior to

22  that day in question?

23  A.  Any -- a discussion had taken place, yes.  Anything

24  that -- any major decision involving my mother's health,

25  while I'm the power of attorney, I discuss it with my

1    brothers beforehand before making the final decision.  So

2    all my brothers had a voice into that decision.

3    Q.  Okay.  And it's fair to say Dan was against her

4    receiving the vaccine; is that right?

5    A.  That would be true.

6    Q.  Okay.  Did he mention to you at all how he thought it

7    was a means for the government to control the population?

8    A.  I don't think I ever heard that from him.  I've heard

9    that on the Internet from other people or from the TV from

10   other people, but I don't recall that specifically coming

11   from him, no.

12   Q.  Okay.  Did he mention anything about the ingredients of

13   the vaccine to you?

14   A.  He voiced some concerns about some ingredients, yes,

15   ma'am.

16   Q.  Did those concerns that he voiced, were they related to

17   the fact that he thought some of the ingredients were

18   related to Lucifer?

19   A.  I am not familiar with that one, no, ma'am.  If there

20   were issues about that, I'm sure Dan would have brought that

21   to my attention because of my occupation.

22   Q.  Your occupation as a reverend, correct?

23   A.  Yes, ma'am.  Thank you for that clarification, ma'am.

24            MS. KUKOWSKI:  The Court's indulgence for one

25   moment, Your Honor.

```
1              (Pause)
2    BY MS. KUKOWSKI:
3    Q.  It's clear, Mr. Egtvedt, that you and Dan are quite
4    close.  You guys spoke at length about what he was doing
5    about taking care of your mother.  Did he mention to you,
6    once he returned from the farm after those few weeks, what
7    happened at the Capitol?
8    A.  He did not.  I think I asked him at one point about --
9    something about it, and he just preferred not to talk about
10   it, so we never did.
11   Q.  Okay.  It's fair to say your brother has strong
12   political views; is that correct?
13   A.  I'd say many people in this country have strong
14   political views, yes.
15   Q.  And your brother in particular is one of those; is that
16   right?
17   A.  Well, I think we all do, but yes.
18   Q.  Okay.  He, it's fair to say, doesn't look fondly upon
19   the government in Washington, correct?
20   A.  I believe that would be a -- I believe that is a
21   little -- way too powerful.  He is perhaps not happy with
22   the current administration, but the government itself is
23   not -- is a different issue.
24   Q.  Have you ever heard him refer to Washington as a foreign
25   land?
```

1    A.  I believe you said something about that in the last

2    hearing, ma'am.  I can't recall the exact details.  Can you

3    refresh my memory?

4    Q.  I'm just asking about your conversations with Dan

5    specifically.

6    A.  Oh, no.

7    Q.  Has he ever -- no?

8    A.  No.  No.  I mean, he was concerned about the change in

9    administration.  No question.

10   Q.  And how about political prisoners in D.C.?  Has he ever

11   mentioned that to you?

12   A.  There's nothing that was said to me at length about

13   anything in particular, no, not that I recall.

14   Q.  Okay.

15            MS. KUKOWSKI:  The Court's indulgence.

16            THE WITNESS:  I'm sorry?

17            MS. KUKOWSKI:  I'm just checking with my co-

18   counsel.

19            We have no further questions.

20            THE COURT:  Okay.  Thank you.

21            Just a couple of follow-up questions, Reverend

22   Egtvedt.

23            THE WITNESS:  Yes, Your Honor.

24            THE COURT:  After your brother voiced reservations

25   about your mother receiving a vaccine, the police were

1    called; is that correct?

2         THE WITNESS:  After we had discussed that, and

3    I realized that we weren't going to get any further in

4    this discussion no matter what, I said I'm going to have to

5    call -- you know, I asked him to leave, and he didn't want

6    to leave, and so I was forced in that situation because,

7    Your Honor, I would prefer that the visual not be provided,

8    but I was -- my mother had had a rough morning, and I was

9    standing in my pajamas when he came over, and I was getting

10   concerned about being able to get her to the appointment

11   with me standing in my pajamas.

12        THE COURT:  That's a pretty drastic response, to

13   call the police.  Wouldn't you say?

14        THE WITNESS:  We had a discussion, and we couldn't

15   make any -- couldn't -- weren't making any headway, and I

16   needed to get mom going.  This was -- this was right at the

17   very beginning when the inoculations were first being

18   offered in the county, and as it was we made it with -- we

19   made it with like two minutes to spare.

20        THE COURT:  Okay.  And after the police arrived,

21   were you able to transport your mother to get her

22   vaccination without incident, or did it require further

23   intervention by the police?

24        THE WITNESS:  No, there was no further

25   intervention.

```
 1                    THE COURT:  Okay.

 2                    THE WITNESS:  The -- we were able to -- we were

 3        able to leave to get to the appointment, and, like I said,

 4        we made it barely on time.

 5                    THE COURT:  Was that the first time that you had

 6        occasion to call the police regarding a domestic incident

 7        involving your brother?

 8                    THE WITNESS:  Yes.  I had not -- never called the

 9        police before for anything of that kind.

10                    THE COURT:  Was your brother employed in any way

11        at the time of his arrest?

12                    THE WITNESS:  He retired from the -- he was a drug

13        representative for AstraZeneca, I believe it was.  He

14        retired from that, and then he had been doing various things

15        since then as he's been looking for other more gainful

16        employment.

17                    THE COURT:  When is the last time you remember

18        your brother having at least a part-time job as opposed to

19        just looking for work or doing odd jobs?

20                    THE WITNESS:  About six months or so, maybe in

21        that ballpark.  It was during the winter before coming up

22        to -- before he came -- moved up to Garrett County with me.

23                    THE COURT:  Okay.  And what was that job?

24                    THE WITNESS:  He was involved with -- he's with --

25        involved with -- I don't know.  He was a salesman for a firm
```

1    that sold security services.

2              THE COURT:  So home security?

3              THE WITNESS:  No, sir.  Commercial sports.  I mean

4    large-scale events, I would think.

5              THE COURT:  Okay.  Sir, thank you very much.  Your

6    testimony has been very helpful.  We can put you --

7              Ms. West, do you have brief rebuttal, or no?

8              MS. WEST:  I just had one question, Your Honor.

9              THE COURT:  Okay.

10                        REDIRECT EXAMINATION

11   BY MS. WEST:

12   Q.  How far is the farm from your home there in Maryland?

13   A.  It's about an hour and a half drive from my house to the

14   farm, ballpark.

15   Q.  All right.  Thank you.

16   A.  Okay.

17             THE COURT:  Okay.  Mr. Egtvedt, we'll send you

18   back into the breakout room.  You have a good day.

19             THE WITNESS:  Am I free, Your Honor, or should I

20   stand by?

21             THE COURT:  You're free as a bird, sir.

22             THE WITNESS:  Thank you, Your Honor.  I hope I'm

23   not the only one.  Thank you.  God bless.

24             THE COURT:  Mr. Egtvedt, if you could mute your

25   microphone, please.  We're picking up some cross-talk in the

1     room where you're at.

2                 Okay.  Ms. West, any further argument?

3                 MS. WEST:  Not at this time, Your Honor.

4                 THE COURT:  Ms. Kukowski.

5                 MS. KUKOWSKI:  Thank you, Your Honor.  I am

6     recognizing the fact that it is 1:57 so I don't know how

7     long the courtroom is reserved for or if the court reporter

8     needs a break.

9                 THE COURT:  We're good to go.

10                MS. KUKOWSKI:  My apologies?

11                THE COURT:  We're good to go.

12                MS. KUKOWSKI:  Okay.  Great.

13                As an initial matter, the defendant has already

14    been before a Court, evidence has been heard, and the Court

15    determined -- Magistrate Harvey determined -- that he did

16    continue to pose a threat to the community, and we submitted

17    at length our arguments to that and Judge Harvey's findings.

18    What I want to do briefly --

19                THE COURT:  Just to be clear, Judge Harvey did not

20    have the benefit of the videos; is that correct?

21                MS. KUKOWSKI:  That's correct, Your Honor.  We

22    provided still shots at that point in time.

23                THE COURT:  And Judge Harvey's ruling predated

24    the *Munchel* decision and several other of the decisions that

25    Ms. West referred to from the district court, correct?

1          MS. KUKOWSKI:  Yes, Your Honor.  So that's

2     actually what I wanted to focus my arguments on here and

3     present to the Court the video so that the Court can see

4     them for itself.  The Court referenced that it watched it,

5     but I do want to point out some contacts and elements of it,

6     and then, as an initial matter, I want to address the

7     *Munchel* opinion.

8          THE COURT:  Okay.

9          MS. KUKOWSKI:  Here, I think it's funny that

10    both -- or that Ms. West read the quote that was exactly the

11    quote I was going to read from *Munchel*, which is that the

12    Court stated or the D.C. Circuit stated, "In our view, those

13    who actually assaulted police officers and broke through

14    windows, doors, and barricades, and those who aided,

15    conspired with, planned and coordinated with such actions

16    are in a different category of dangerousness than those who

17    cheered on the violence or entered the Capitol after others

18    cleared the way."  That rationale and the discussion of

19    *Salerno* throughout the opinion is exactly why we believe the

20    defendant is within the category of defendants that should

21    continue to be held.

22          Unlike Munchel and his mother, who did not engage

23    in violence, here we saw that the defendant did take on

24    police and took on police multiple times.  And what I want

25    to show as a part of the video evidence to the Court is the

1    manner in which the defendant entered the Capitol, which

2    I'll note was early in the afternoon and was at a pivotal

3    time when law enforcement was trying to respond to the

4    rioters and protect the members of Congress and other

5    government officials that were still within the building,

6    and then how the defendant, subsequent to that, I would

7    submit, tried to provoke and really bring on a confrontation

8    between himself and law enforcement, and how he actually

9    succeeded in doing that, and how he refused to leave the

10   building, made the decision to try to re-enter it and

11   further engage with law enforcement, which is when he

12   assaulted Officer MM from Capitol Police and Officer MD from

13   the Metropolitan Police Department.  And even after they

14   were forced to physically remove him from the building, he

15   tried to break his way back in.  He tried to charge through

16   Officer MM yet again to get back into the building.

17          The other thing I want to point out through the

18   video evidence that we're going to show is the defendant's

19   state of mind at the time that this was happening.  Both

20   before and after the assaults he was participating in

21   interviews that were then published to social media and

22   published on the Internet in which he was extorting others

23   to come and join him down at the Capitol and which he was

24   referring to those at the Capitol as traitors and that

25   treasonous events were happening, which is ironic since he

1    was the one barging into the Capitol and trying to interrupt

2    congressional proceedings.

3           And then what I also want to show the Court is

4    that after the defendant engaged in these assaults.  After

5    he had been expelled from the Capitol building itself, the

6    defendant didn't leave the area.  He stayed on Capitol

7    grounds and continued to speak with law enforcement and

8    continued, I would suggest to the Court, to try at points to

9    get back into law enforcement's face showing his actions

10   that day were concerted.

11          Defense argues that his actions were the result of

12   the injuries he sustained while he fell on the ground, but I

13   would submit when the Court looks at all of his evidence,

14   his statements before, his statements after, and his

15   continued presence, you'll see that it's part of a concerted

16   effort on his own part and then to extort and bring others

17   into the Capitol to take on the federal government, which,

18   as we see in his letters that he wrote most recently after

19   he had been arrested, he simply doesn't recognize.  He

20   considers himself to be a political prisoner in a foreign

21   land.  And in those letters, he refers to historical events

22   that are currently at play, and I want to focus on that

23   phrase "currently" or that word "currently," which is that

24   is why he should continue to be held here.

25          So in *Munchel*, the Court refers to *Salerno* and

1    asked -- and states that the trial courts and the courts

2    considering detention should be looking to an identified

3    articulable threat and a continuing threat, and here the

4    fact that the defendant believes that these historical

5    events are still ongoing and the fact that he perceives

6    himself as a political prisoner shows that his mentality has

7    not changed and for him this battle is still ongoing.

8              And we've seen from both his actions that day at

9    the Capitol and then, frankly, his actions when he was

10   arrested, the day of his arrest when his brother had to call

11   the police because he was interfering with his ability to

12   take his mother to go and get a vaccine, that when the

13   defendant sets his mind to something, nothing will stop him.

14   His mother is someone who has known him his entire life, and

15   he at that point stated that he had had a discussion with

16   the defendant and couldn't make any headway.  And when the

17   defendant's confronting his own family members, and we see

18   when he's confronting others, specifically law enforcement,

19   he's not rational at all and he's engaging them and trying

20   to provoke them to physical violence and then actually

21   succeeding in being violent against them.

22             THE COURT:  Okay.  I don't want to interrupt you,

23   but before we get to the video evidence, I'd like to raise

24   more of a legal question.  The government sought the

25   defendant's detention before Judge Harvey pursuant to 18 USC

1    3142(f)(1) presumably because he'd been charged with a crime

2    of violence.

3         MS. KUKOWSKI:  Your Honor, my understanding is

4    that we sought it pursuant to (f)(2), that he's a flight

5    risk and a risk of obstruction.  And I believe that's what I

6    cited to in the detention memo as well.

7         THE COURT:  Okay.  Because I have Judge Harvey's

8    order of detention before me, and the first -- only the

9    first box is checked corresponding to 3142(f)(1).  So

10   whether you all moved pursuant to (f)(2) or not, Judge

11   Harvey found or ordered detention based on (f)(1).

12        I don't recall from the transcript whether you

13   moved under both prongs or just (f)(1).

14        MS. KUKOWSKI:  The Court's indulgence, Your Honor.

15        (Pause)

16        MS. KUKOWSKI:  I conferred with my co-counsel

17   here.  I do not believe we moved pursuant to (f)(1), and to

18   be frank, we should not have.  The government's position is

19   that the defendant's charges are not crimes of violence.

20   He's charged with the assault on police officers, 111(a)(1),

21   which, our position is, is not a crime of violence.

22        THE COURT:  Okay.  Hold on, let me just look up

23   (f)(2) just so that we're on the same page.

24        Okay.  So (f)(2)(A) is a serious risk of flight.

25   So it seems like you're devoting most of your argument in

1    your briefs to danger to the community as opposed to flight

2    risk.

3            MS. KUKOWSKI:  Right, Your Honor, and my

4    understanding in reading the bail statute -- and I can

5    provide case law on this point as well -- is that once the

6    government moves for detention, then the question of the G

7    factors and his dangerousness still comes into play.  And so

8    the Court has to -- or the government will initially move

9    for the detention hearing under, in this case, (f)(2), where

10   we're looking or posited and argued and still maintain that

11   the defendant is a flight risk and an obstruction risk; but

12   then once the detention hearing is actually taking place,

13   the Court still needs to consider the four factors laid out

14   in Section G and make a dangerousness determination.

15           THE COURT:  All right.  I'll take your word for

16   that, but it does strike me as somewhat odd to move based on

17   him being a flight risk but not to actually argue before the

18   magistrate or in district court that he is, in fact, a

19   flight risk.

20           MS. KUKOWSKI:  Your Honor, I apologize for

21   not making that clear.  I still maintain that -- or we

22   still maintain that he is a flight risk, and in keeping

23   with the evidence that we just heard during the course of

24   Mr. Egtvedt's testimony, what we see here is that the

25   defendant left Washington, D.C., immediately after January

1    6th, did not go home, and that he went and laid low for

2    what we now know is several weeks at a farm, family farm,

3    in West Virginia, and that upon returning, he did things

4    that were out of character for him.  He grew a beard, which

5    Mr. Egtvedt couldn't state with any certainty when the last

6    time it was that he saw a beard, and when he spoke with law

7    enforcement at the time he stated that he couldn't remember

8    the defendant having a beard.  And then the defendant --

9              THE COURT:  But is it your position today -- I

10   understand, you know, that he may or may not have taken

11   efforts to avoid apprehension, but is it your position today

12   that there are no conditions of release that would assure

13   his continued presence in this proceeding?  I mean, GPS?

14   Home arrest?  Third-party custodian?  None of those things,

15   in your view, will assure that he wouldn't show back up in

16   30 days or 60 days?

17             MS. KUKOWSKI:  Your Honor, given what the

18   defendant's actions have been plus his statements,

19   particularly his statements that he viewed if he were to be

20   brought to Washington, D.C., that he'd be a political

21   prisoner in a foreign land, I mean, we maintain that he --

22   there are still no conditions that could assure his return

23   to court.

24             THE COURT:  Okay.  And you also take the position

25   that there are no set of conditions that would assure the

 1     public safety.  So you're proceeding under both theories of

 2     detention at this point?

 3               MS. KUKOWSKI:  Yes, Your Honor.

 4               THE COURT:  Okay.  Thank you.

 5               MS. KUKOWSKI:  And if the Court's prepared, I

 6     would like to now just play these videos and walk through

 7     why we submit that they support our position that there are

 8     no conditions of release that could both secure the

 9     defendant's presence in court or ensure the safety of the

10     community.

11               THE COURT:  Okay.  Very well.

12               MS. KUKOWSKI:  The Court's indulgence.

13               (Pause)

14               MS. KUKOWSKI:  And I'm just going to share my

15     screen here.

16               And so can the Court see the file here that we

17     see, "Egtvedt Capitol Entry"?

18               THE COURT:  Yes.  I'm looking at it on my monitor,

19     so I'm not looking away from you folks but just getting a

20     closer look.

21               MS. KUKOWSKI:  Okay.  And so this is the first

22     file video that was posted to social media that's referred

23     to on Page 2 of the government's initial detention

24     memorandum on February 19th.  This is the video that was

25     posted to the website ProPublica and time- and date-stamped

2              (Video playing)

3              MS. KUKOWSKI:  I thought I paused at one second

4    here.  We submit what the Court sees is that the defendant

5    is here front and center in the screen with the dark jacket.

6              Restarting, for the record, at the one-second

7    mark.

8              (Video playing)

9              MS. KUKOWSKI:  Paused here.

10             And so what the Court saw there was the defendant

11   was a part of a group that, as we heard the words of the

12   cameraman, was trying to move into the Capitol with

13   resistance.  I don't know that -- the time stamp, according

14   to the ProPublica website, was 2:47 p.m., which was still

15   when the law enforcement inside the Capitol is attempting to

16   evacuate members of Congress and secure the building as the

17   rioters were very first flowing into it.

18             So that is one of the reasons, first and foremost,

19   why the defendant is someone we should consider being held

20   under *Munchel* because we see that he's part of that initial

21   wave of individuals who are entering the building.  He's not

22   going in hours later.  You see he is a part of a mob that's

23   forcing their way in.

24             So what I'll proceed to play now is the video that

25   was also referred to on Page 2 of the government's detention

1    memorandum that was also from ProPublica, and it was time-

2    stamped 3:08 p.m., so just a few minutes prior to the

3    incident.  I'll just start the file here.

4              (Video playing)

5              MS. KUKOWSKI:  And so I've got it paused at 24

6    seconds here, and what we see is the defendant again wearing

7    this dark jacket.  You see the hint of his plaid shirt

8    underneath, and you hear the crowd talking about traitors,

9    and you see him wandering through the hallways at this

10   point.

11             I'll restart at the 24-second mark.

12             (Video playing)

13             MS. KUKOWSKI:  So what the Court can see there is

14   that the defendant had appeared to have already been pepper-

15   sprayed at that point -- we saw him blinking -- which means

16   he persisted in going forth throughout the building

17   afterwards.  He knew he was not permitted to be there, yet

18   he continued going forth in the building, and then, as we'll

19   see in the subsequent clips, purposely trying to antagonize

20   and provoke law enforcement as he was there.

21             I'm going to pull up another video file that's

22   going to contain body-worn camera footage and then the

23   Capitol Police camera footage in the Hall of Columns, in the

24   vestibule just next to the Hall of Columns.

25             (Pause)

1          MS. KUKOWSKI:  I'll play the recording for the

2     Court.  What we see here is what has been referred to in the

3     government's April 12th opposition to the defense's memo,

4     Page 5.  This is body-worn camera footage of Officer MF.

5     And what the Court will see in the top right corner of the

6     file here is the time stamp 15:09:35, 3:09 p.m. and 35

7     seconds, so just about two minutes almost to the second

8     prior to the assault at play or at issue in this case.

9          So I'll start this file from the beginning.

10          (Video playing)

11          MS. KUKOWSKI:  I've paused it at the four-second

12     mark down at the bottom at 3:09 and 37 seconds, and what the

13     Court sees here in the bottom left corner of the screen is

14     the defendant.  He's going to walk up to the officers and

15     tell them that this is the United States of America, and

16     they are on the wrong side.

17          And then, as the Court watches it, what the Court

18     will see is after he walks past Officer MF and his partner,

19     he proceeds on to another set of officers where I submit he

20     attempts to antagonize them by the way he's getting in their

21     face and by the way that they're actually having to push him

22     away from themselves.

23          I'll restart at the four-second mark here.

24          (Video playing)

25          MS. KUKOWSKI:  At that point the defendant walked

1    off, and what we'll see next is Officer MD's body-worn

2    camera footage, who is one of the victims in this case, and

3    I'll note that this starts just a minute or two after that

4    incident that we just saw where the defendant is getting up

5    in the officers' faces telling them they're on the wrong

6    side.  They're in the Capitol trying to figure out how to

7    secure it from rioters who are attempting to gain entry, and

8    it happens immediately after we see the defendant there at

9    the end of that clip get in the face of the officers so that

10   they actually push him away from them and told him to leave

11   as was apparent by the way they were signaling.

12           I'll start here at the 28-second mark, and when we

13   start we'll be watching Officer MD's body-worn camera

14   footage, which is what is referred to on Page 3 of the

15   February 19th detention memo.

16           (Video playing)

17           MS. KUKOWSKI:  Now I'm going to pause it here, and

18   the Court will note again at the top right corner we see the

19   time stamp 15:11:39 -- sorry, 3:11 and 39 seconds -- and the

20   Court will see two individuals who are being directed out

21   the building through the Hall of Columns, and you'll see

22   those individuals again when the Court has the opportunity

23   to see the surveillance footage.

24           And what I want to note here is how they do follow

25   the directions.  They were told to leave the building and

1    did, in fact, leave it.  The defendant, on the other hand,

2    as we're about to see here, is going to start talking to

3    officers, and he's going to walk up to them, but then

4    they're going to instruct him to leave.  And we'll see that

5    he starts to leave, and then we'll see on the surveillance

6    footage that once he makes his way to the vestibule he turns

7    back around and tries to re-enter the building.

8           He's again directed by an officer who is standing

9    directly at the door.  You'll see -- even though there's no

10   sound, you will see him clearly point that the defendant

11   should leave.  The defendant ignores that and moves forward

12   yet again where he first encounters Officer MM, the female

13   officer from Capitol Police, who is in the blue bike

14   uniform.  And you'll see her direct him out, and then you'll

15   see him make the conscious decision one more time to keep

16   trying to go back into that building, at which point he

17   begins to assault her.  Others come to her aid, and he

18   continues.

19          I'm going to restart this here.  The time-stamp

20   here is 15:11:39.

21          (Video playing)

22          MS. KUKOWSKI:  Now I'm going to pause it here at

23   the 15:12:17 time stamp, and what you see here is that

24   another protester who was directed to leave the building

25   tried to re-enter, and we see Officer MM directing him back

1    out.  What you'll see soon after is that the defendant does

2    the same thing.  He's going to then start confronting

3    Officer MM and begin assaulting her.  As he's doing so, he's

4    going to implore her to shoot him, and then he's also going

5    to reference violations of the Constitution.

6              So clear statements of intent here.  He's trying

7    to provoke a reaction, and he's trying to aggressively take

8    on law enforcement.

9              Let me start at the time stamp at the top corner

10   here, 15:12:17.

11             (Video playing)

12             MS. KUKOWSKI:  I'm going to pause it here at the

13   15:12:43 mark.  Defense counsel has noted at multiple times

14   that there were no injuries and that officers were not

15   actually assaulted, and what you're going to hear, as

16   Officer MD continues to walk on, is he's going to reference

17   his right arm, and at one point he's actually going to tell

18   one of his colleague --

19             THE COURT:  Ms. Kukowski, you're cutting in and

20   out periodically.  If you could just make sure you speak

21   slowly and into the microphone.  I'm not sure if that's the

22   issue or whether it's from sharing the video.

23             MS. KUKOWSKI:  Thank you, Your Honor.  And if I do

24   continue to cut out or certainly if I speak too quickly for

25   the court reporter, please do let me know.

1          Now, I'll restart here at the 15:12:43, the 3:12

2     and 43-second mark.

3          (Video playing)

4          MS. KUKOWSKI:  Now, I'm going to pause at what's

5     15:13:29, 3:13:29, and what the Court's going to see here is

6     officers have been trying in this center area, as the Court

7     can see here, to get the defendant to stand up, and he's not

8     complying with them, and they're trying to remove him from

9     the building.

10          I'll start here at 15:13.

11          (Video playing)

12          MS. KUKOWSKI:  So that's the conclusion of Officer

13     MD's body-worn camera, and what I'm going to submit to the

14     Court is that the defendant there is yelling, but I'm

15     submitting that he's yelling because he is not willing to be

16     removed.  As the Court can see in the CCTV clips that are

17     about to be played now, he was still trying to get back into

18     the building.

19          So the first clip that we're going to see here is

20     going to be the clip that the screenshots in the initial

21     February 19th memo were taken from, the Exhibit 1

22     screenshots, the CCTV from the Hall of Columns.

23          (Video playing)

24          MS. KUKOWSKI:  So now I'll pause, and for the

25     purposes of the record, I'll pause this at three minutes and

1    two seconds.

2         And what the Court will see is the defendant in

3    the back of the Hall of Columns, and he's going to make his

4    way forward towards the exit.

5         Starting.

6         (Video playing)

7         MS. KUKOWSKI:  I've got it paused down at the

8    bottom here at the 3:21 mark, and what the Court has seen is

9    that the defendant has left or at least appears to have been

10   moving towards the exit.  The Court will see in a couple of

11   minutes that he makes a decision to come back into the

12   building or proceed further into the hallway, and he's going

13   to be directed by this officer or agent in the lower left

14   corner of the screen to leave once again.

15        (Video playing)

16        MS. KUKOWSKI:  I've got it paused at three minutes

17   and 38 seconds at the bottom right-hand corner, and so what

18   I want to highlight there is that the officers who were

19   there that day were not looking for confrontation

20   themselves.  They were trying to defend the Capitol and

21   remove the rioters from it.  And what you just saw prior to

22   the defendant re-entering the screen on the bottom left

23   corner is another rioter who is in the building started to

24   leave and then turned back to go back around.  He was turned

25   around by law enforcement without incident and directed back

1    out of the building.  It is the defendant that the Court

2    will see that chose to provoke and get aggressive and then

3    begin assaulting law enforcement officers, which is what led

4    to the conduct in this case.

5          And so the Court sees the defendant here at the

6    bottom left of the screen, and what the Court's going to see

7    again is this agent or officer standing directly next to him

8    clearly point the defendant to leave the building.

9          I'll start at the 3:38 mark.

10         (Video playing)

11         MS. KUKOWSKI:  Now it's paused at 3:43.

12         The Court saw the defendant clearly ignore the

13   orders to leave at the same time as other individuals.  The

14   rioter who I just spoke of is now following those orders to

15   leave, and Officer MM is continuing on in her duties and

16   telling the defendant not to enter the building, a building

17   he has no right to be in in the first place.

18         I'm going to restart at three minutes and 43

19   seconds.

20         (Video playing)

21         MS. KUKOWSKI:  So what the Court saw there is the

22   defendant pushing up against Officer MM.  We saw from the

23   body-worn camera from Officer MD that he was yelling at her

24   that she was in violation of the Constitution.  Other

25   officers are forced to intervene, and the defendant persists

1    and then continues to charge forward at Officer MM and

2    further -- trying to further enter the building.

3              Let me start at the three-minute-and-49-second

4    mark.

5              (Video playing)

6              MS. KUKOWSKI:  I've got it paused at four minutes

7    and two seconds.

8              So what the Court just saw was the defendant

9    continuing to charge at Officer MM when multiple officers

10   are trying to pull him back and trying to stop him from

11   doing so.  Eventually he falls and takes down Officer MD,

12   injuring Officer MD in the process.  And you see here

13   Officer MM immediately reaches down to him.  You see the

14   other officers as they do stand by.  The defendant is not

15   trying to get up as they're trying to assist him, and he was

16   refusing to leave.

17             Let me start here at the four-minute-and-two-

18   second mark on the screen.

19             (Video playing)

20             MS. KUKOWSKI:  And so now what we transition to is

21   the second set of CCTV from the vestibule, the exit

22   vestibule that's attached to the Hall of Columns there.

23   This is what's referred to as the source file for the

24   Exhibit 2 screen shots in the government's detention memo

25   from February 19th.  And what we'll see first are those

 1    protesters that were leaving the building just ahead of the

 2    defendant when the defendant was first walking down, and

 3    you'll see them leave, and they leave without issue.  They

 4    understand they are not welcome in that building, and

 5    they're not permitted to be there.  And you'll see them

 6    pause as they're getting ready to leave as though they're

 7    talking or having some sort of interaction with somebody.

 8    It very well could be the defendant.  But what you'll see

 9    then is the defendant is eventually expelled from the

10    building after he tried to re-enter the Hall of Columns.

11          Let me start down here at the four-minute-and-14-

12    second mark.

13          (Video playing)

14          MS. KUKOWSKI:  That's paused at four minutes and

15    40 seconds at the bottom, according to the time.  So the

16    Court saw the individuals made the conscious decision to

17    leave whereas the defendant made that decision to re-engage

18    with law enforcement officers and try to re-enter the

19    building.

20          I'm going to skip ahead to six minutes and restart

21    down here at six minutes and one second, and what you'll see

22    now is when the defendant has to be physically ejected from

23    the building by law enforcement.  When he gets back up, he

24    tries to re-enter and again assaults Officer MM.

25          (Video playing)

1          MS. KUKOWSKI:  I've got it paused here at the

2     seven-minute mark down at the bottom time stamp, and what

3     the Court sees here is Officer MM going back out to the

4     defendant while he's on the ground.  She's going to attempt

5     to hold the door open while they try to get him back up to

6     his feet, and at that point that is when the defendant is

7     going to try to push through her again to try to get back

8     into the building.

9          (Video playing)

10          MS. KUKOWSKI:  I've got that paused at the seven-

11     minute-and-30-second mark, so here the defendant is poised

12     to try to re-enter the building.  Officer MM is making clear

13     he is not permitted in, and he's going to persist in trying

14     to move through her into the building.

15          (Video playing)

16          MS. KUKOWSKI:  I'll restart at the seven-minute-

17     and-seven-second mark.

18          (Video playing)

19          MS. KUKOWSKI:  I've got it paused at 7:44, and

20     what the Court just saw there is the defendant again swipe

21     her arms out of the way as he's trying to enter back into

22     the building.

23          I'll start at seven minutes and 44 seconds here.

24          (Video playing)

25          MS. KUKOWSKI:  I'll pause at seven minutes and 57

1    seconds, and once again you saw the defendant yelling,

2    speaking animatedly and, I would say, aggressively as he's

3    pointing his finger at Officer MM.  He was at that point

4    removed from the building.  If the Court watched the

5    entirety of the clips that were provided, the Court will see

6    that he did continue to pace about amongst the outside.

7          I'm going to stop sharing this and pull up a

8    compilation of the two interviews that the defendant gave;

9    one while he was still in the building, and one while he was

10   outside of the building, after we would submit he had been

11   expelled from the building and after he assaulted the

12   officers.  And what I want to highlight here in these two

13   clips is the defendant's state of mind where he believed

14   that others were being traitors -- "others" being law

15   enforcement, members of Congress, and those inside of the

16   building -- and that is why he is still a continued threat

17   not only to his community but also to the functioning of the

18   government because he still believes that.  We saw from his

19   letters that he wrote.

20          And so what we'll see in these two videos is the

21   defendant making statements about how we are or he perceives

22   us to be in treasonous times on January 6th.  He's going to

23   refer to law enforcement being -- and those in the Capitol

24   being in violation of the Constitution, which echos what we

25   heard him yell at Officer MM when we viewed Officer MD's

1    body-worn camera, and he's going to tell others to come down

2    to the Capitol, and he's going to reference traitors.

3            And that is his state of mind both before and

4    after these assaults and I would submit still to this day is

5    his state of mind.  It's what we saw in the letters that he

6    wrote after he had been arrested where he referred to

7    historical events that were currently -- and I emphasize the

8    word "currently" -- in play, and he, again, referred to

9    himself as a potential political prisoner in a foreign land.

10   And I submit that's why he continues to pose a threat to the

11   functioning of the government and to those who stand in what

12   he perceives is the way of what should be the people's

13   takeover of the government.

14           The Court's indulgence while I pull up this file

15   and share my screen.

16           (Pause)

17           MS. KUKOWSKI:  So now the first video clip that

18   the Court is going to see is referred to on Page 10 of the

19   government's February 19th detention memo.  This is his

20   interview with the individual who goes by the name of Baked

21   Alaska.  It was published on a streaming site DLive.

22           I'll start it from the very beginning here.

23           (Video playing)

24           MS. KUKOWSKI:  I'll pause it at the seven-second

25   mark.

 1          And so what the Court just heard was the defendant

 2     telling people to, quote, get in here now.  Again, he is

 3     trying in his mind to overthrow the current sitting U.S.

 4     government at this point.

 5          THE COURT:  Okay.  Just for the record, Counsel,

 6     we're not getting the audio.  I see the video.  But I've

 7     reviewed this clip a number of times in chambers.

 8          MS. KUKOWSKI:  Okay.  If the Court's reviewed this

 9     clip, let me skip ahead to see if the audio will work as we

10     continue on to the YouTube clip, which is the interview that

11     he gave afterwards.  But if not, the Court has had an

12     opportunity to review this.

13          (Video playing)

14          MS. KUKOWSKI:  Pausing it for -- can the Court

15     hear the audio?

16          THE COURT:  The audio's not coming through on this

17     one either.

18          MS. KUKOWSKI:  Okay.  Well, I will just --

19          THE COURT:  But he's saying everybody come on down

20     basically, right?

21          MS. KUKOWSKI:  Yes.  Yes, Your Honor, and this is

22     when he refers to those inside the Capitol as being in

23     violation of the Constitution.

24          So the final set of video exhibits that I do want

25     to share just briefly with the Court were provided to

1    defense counsel on Friday, April 9th.

2            And I'll note the government is continuing to

3    investigate this case and the many other cases, the hundreds

4    of other cases that originated from January 6th, and as a

5    result of that, we're continuing to come across new

6    evidence.  We've been providing it as we find it.

7            And this is evidence, body-worn camera footage,

8    that includes the defendant that we recently located after

9    the filings were submitted, and the reason why I want to

10   show these two brief clips, which I do hope we have audio

11   for, is to show that the defendant, after he was expelled

12   from the building and after he assaulted officers, did not

13   leave Capitol grounds, and he continued to engage with law

14   enforcement officers.  And so the first video clip is going

15   to be from an officer with the initials QW.

16           The Court's indulgence.  My co-counsel has an idea

17   about volume that might assist us here.

18           (Pause)

19           MS. KUKOWSKI:  So we hope we have a solution to

20   the audio issue.  Okay.  The Court's indulgence while I

21   share my screen.

22           (Pause)

23           MS. KUKOWSKI:  Your Honor, I've got it paused at

24   16:53:03, 4:53:03.  Was the Court able to hear the audio?

25           THE COURT:  Why don't you queue it up, and I'll

1     let you know.

2              MS. KUKOWSKI:  Okay.  And I'll restart the file

3     from the beginning.

4              (Video playing)

5              THE COURT:  No, still no audio.

6              MS. KUKOWSKI:  And the Court was not able to hear

7     that?

8              THE COURT:  No, I was not.

9              MS. KUKOWSKI:  All right.  What I can summarize

10    here is that the defendant continues to tell officers at

11    this point that they should not take the vaccine, and he

12    references -- he doesn't state specifically what vaccine,

13    but I would submit that the reference is he's referring to

14    the COVID vaccine -- and he talks about how ingredients of

15    the vaccine relate to Lucifer.

16             So what the Court can also see, though, clearly is

17    that at this point in time -- and there's no sound

18    necessary -- the defendant's doing quite fine.  He's

19    standing, and he's talking, and he's continuing to engage

20    with law enforcement officers, which I would submit shows

21    that any injuries he suffered at best were relatively minor.

22             The second video clip that I'll just fast forward

23    to that the Court will be able to see is from a second

24    officer with the initials of AA.

25             The Court's indulgence.

1          And so what you see here from the body-worn camera

2     footage -- and I can say this because I can narrate it; I

3     don't necessarily need the sound -- is that the defendant is

4     still present on the grounds at 5:30, as the Court can see

5     from the body-worn camera stamp, 17:30:32, 5:30:32, and has

6     not left and is still seeking to engage with law enforcement

7     officers.

8          So I'll restart this here at the time stamp --

9     this is from Officer AA's body-worn camera at 17:30:32,

10    5:30:32.

11         (Video playing)

12         MS. KUKOWSKI:  And so I've got it paused.  The

13    time stamp in the body-worn camera is 17:30:43.  The Court

14    sees the defendant here still engaging with law enforcement

15    and pushing up against the police line as late as 5:30 in

16    the evening.

17         I'm going to restart again at the 17:30:43 mark.

18         (Video playing)

19         MS. KUKOWSKI:  Now I've got it paused at 17:30:58,

20    and here you see the defendant once again, where my cursor

21    is, engaging with law enforcement, pushing up against them

22    to the point where they are going to be forced to push back

23    with their riot shields, push them away from him, and he's

24    going to fall to the ground yet again.  And what the Court

25    won't hear is that he yelps -- and we hear that same yelping

1    and crying voice that we heard during the course of the

2    body-worn camera video from Officer MD.

3           And I submit that the defendant is seeking out

4    both during the course of the assault that we saw earlier,

5    the assault that occurred at approximately 3:10, and now

6    hours later at 5:30, he is still seeking out opportunities

7    to provoke and instigate law enforcement and engage in

8    physical contact with them.

9           I'll restart it here at the 17:30:58 mark.

10          (Video playing)

11          MS. KUKOWSKI:  I'll pause that at the 17:31:11,

12   mark.  And so the Court can't hear the audio, but what the

13   Court saw was the officers were forced to push him back, the

14   defendant stumbled backwards, and then he again, what you

15   can't hear, is making that yelping noise.

16          And so I play this to show that the defendant,

17   throughout the course of the day on January 6th, was very

18   much the first aggressor, and he was trying to continually

19   provoke law enforcement and being aggressive towards law

20   enforcement and was doing so because they stood in the way

21   of his personal political agenda.  He still believes that

22   there are political or historical events at play, and he

23   believes that he's a prisoner, political prisoner, in a

24   foreign land, which I would submit is him continuing to not

25   recognize the government and continuing (video cuts out) --

1          THE COURT REPORTER:  I don't understand what she

2     just said.

3          THE COURT:  Counsel, if you could repeat that, the

4     court reporter could not get it.

5          MS. KUKOWSKI:  Certainly, I would submit that,

6     based upon this video evidence and his statements that he

7     makes in his letters after he is arrested, the defendant

8     very much still sees the, quote, historical events currently

9     in play and perceives of himself to be fighting against a

10     foreign land.  He was willing to engage in violence that

11     day, and what we saw from the altercation between him and

12     his brother and his mother when he was arrested is that when

13     he puts his mind to it, he simply cannot be stopped.

14          That's why he continues to pose a threat to the

15     functioning of our lawful government and those that stand to

16     protect it, and I would submit, as we addressed earlier,

17     that not only that, he is a threat or a flight risk in this

18     case.  We saw that he doesn't recognize the government.

19     He's not necessarily going to come back, and I would indeed

20     submit that he does not believe that if the -- if he does

21     not believe the federal government is lawful and

22     functioning, he's not going to believe this Court is lawful

23     and functioning, which is why no conditions of release

24     would, one, ensure the safety of the community but then,

25     two, ensure that he does return to court for these

1    proceedings.

2         THE COURT:  Okay.  Ms. Kukowski, I just have one

3    question, and then I want to hear briefly from Mr. Sidbury,

4    if he is still on the phone.

5         And I apologize, Mr. Sidbury, for not getting to

6    you before now.

7         And then perhaps we can take a five-minute break,

8    and I can give Ms. West a brief opportunity to respond to

9    what she sees in the videos.

10         But my question to you, Ms. Kukowski, is, you

11    know, one of the things that I take away from *Munchel* is,

12    you know, a fairly tight requirement to articulate a

13    concrete identifiable threat to public safety apart from

14    just, you know, someone who generally participated in the

15    January 6th events.  You know, someone who poses a

16    generalized threat.

17         What is it that I should be afraid that

18    Mr. Egtvedt will do if he is released on HISP, let's say,

19    between now and the time for his trial, if he elects to go

20    to trial?  Is it that he will participate in another

21    insurrection against the U.S. government or some state

22    government or that he will harm another member of the public

23    otherwise?  And given that he has no criminal history in his

24    56-60 years, why does that clear your burden of clear and

25    convincing evidence that he would be a threat?  What is it

1    precisely that you think I should be worried about?

2            MS. KUKOWSKI:  Yes, Your Honor.  And so what

3    *Munchel* directs the Courts to do and the government to do in

4    order to preventatively detain a defendant is to have the

5    Court and the government identify an articulable threat

6    posed by the defendant to an individual or the community,

7    and what *Munchel* says is that the threat, quote, need not be

8    of physical violence and may extend to nonphysical harms

9    such as corrupting a union.  And then it proceeds to say

10   *United States v. King* and says it must be clearly

11   identified.

12           And so here I would submit that the threat is very

13   much to the functioning government, whether it be the

14   federal government in Washington, D.C., but I would submit

15   also potentially to local government individuals who he

16   perceives are acting in violation of the Constitution.  And

17   we heard him invoke that phrase multiple times --

18           THE COURT:  So if I tell him, you know, you can't

19   leave Garrett County, Maryland, your fear is he's going to

20   either go to the county courthouse of Garrett County or the

21   police station or city hall and disrupt the proceedings

22   there in a violent way that's outside the bounds of his

23   First Amendment rights or that he's going to defy the

24   conditions and drive some place else and do the same thing?

25   Is that what I should fear?

1      MS. KUKOWSKI:  Yes, Your Honor, and I think that

2  fear is shown.  It's something that he's already done, and

3  based upon his language both on the events of January 6th

4  but then his language afterwards when he was arrested, it

5  shows he is still a continuing threat, which is something

6  that *Munchel* asked us to look at.

7      THE COURT:  Okay.

8      MS. KUKOWSKI:  And that he has not renounced any

9  of the positions or his essentially sort of take-no-

10  prisoners attitude towards those that he perceives to be in

11  violation of the Constitution.

12      THE COURT:  Okay.

13      Mr. Sidbury, are you still there?

14      PRETRIAL SERVICES:  Yes, Your Honor, I am.

15      THE COURT:  I apologize for making you wait so

16  long, and I don't want to keep you.  The defense in this

17  case has moved for the defendant's release based on the

18  argument that there are conditions of release that can

19  ensure that he not endanger the public.  I know that before

20  Judge Harvey, pretrial -- I don't know if you recommended

21  pretrial release, but you certainly suggested a set of

22  conditions that would satisfy pretrial if he were to be

23  released.  Does pretrial have a position?

24      I know that you probably don't have the benefit of

25  having viewed all of these videos and reviewed all the

1      pleadings in the case, but, A, does pretrial have a

2      recommendation, and B, if I were to grant the defense's

3      motion, what would you all have to do to assure yourselves

4      that he could abide by HISP conditions out in Maryland where

5      he's from?

6           PRETRIAL SERVICES:  Your Honor, initially we

7      did -- based off of the information that was provided to us,

8      we came up with conditions to basically have the defendant,

9      as was shown in the magistrate court, the basic conditions

10     of calling in once a week, contacting this area -- this

11     pretrial services agency regarding leaving the area.  He

12     would need to verify his address.  Also we would have had to

13     have an interview conducted.

14          However, since the defendant actually went before

15     the Court initially we have now been requesting that all

16     defendants that live in another jurisdiction, meaning

17     outside of the Washington, D.C., actual area, that they be

18     supervised by courtesy supervision.  So pretrial will have

19     to contact the District of Maryland, U.S. District of

20     Maryland, to have the defendant supervised there with

21     whatever conditions that you come up with.

22          But we were basically requesting initially that

23     the defendant report by telephone, verify his address, any

24     travel outside of the area, outside of the continental U.S.

25     You, being the Court, would have to allow him to do that,

1    and then he could notify PSA if he were to go outside of

2    this area.

3              THE COURT:  And does that -- I'm sorry, does that

4    continue to be PSA's recommendation, assuming that Maryland

5    will supervise him, or have you changed that recommendation?

6              PRETRIAL SERVICES:  Yes, Your Honor.  At this

7    point, based off of the information that we have, we would

8    still make that recommendation.

9              THE COURT:  Okay.  Very well.

10             We're going to take a five-minute break, and then

11   we'll hear from Ms. West briefly when we return, okay?

12             (Recess taken)

13             THE COURTROOM DEPUTY:  This Honorable Court is

14   back in session.  The Honorable Judge Cooper is presiding.

15             THE COURT:  All right.  We're back on the record.

16             Ms. West.

17             Ms. West, you're on mute.

18             MS. WEST:  Very briefly, Your Honor.

19             I'm not going to go through the videos and tell

20   you how I think they're different.  I think I've done some

21   of that already.

22             What I will say is what we saw was that

23   Mr. Egtvedt not only got two concussions, I'm certain, that

24   day -- once when his head ricochetted off the marble column,

25   which really wasn't clear from the video you saw but

1    hopefully it was from the video that was given to you on the

2    CD in chambers, and then he was thrown out of the Capitol --

3    and for good measure at the end of the day, he was hit with

4    a police shield again.  It's clear to me that anybody that

5    has had that happen to them it's not a, quote, minor injury,

6    as the AUSA just described.  That's completely wrong.

7            I'm very perplexed, like millions of Americans,

8    about what happened on January the 6th.  Who pepper-sprayed

9    whom?  Police officers letting people in, removing

10   barricades so the crowd can go past.  Things are very

11   confusing, and as the days and months wear on, we learn more

12   every day that this was not what the government has said

13   that it is, that everybody that was there was some sort of

14   domestic terrorist.

15           THE COURT:  Well, Ms. West, to be fair, I don't

16   think that that's what the government is saying, and I think

17   you know that, okay?  I don't see domestic terrorism

18   charges.  Many people the government has not moved to

19   detain.  So I think that's an overstatement, to be fair.

20           But go -- proceed.

21           MS. WEST:  Okay, Your Honor.  Yes, sir.

22           I think it's also unfair for the government to say

23   that at this time Mr. Egtvedt still says and believes a

24   certain thing on April 14th of 2021.  What he did with those

25   letters was over two months ago.  He sat in the Garrett

1        County jail for five days.  He's been in the D.C. jail for

2        two months without incident.  I think that is very telling

3        for the Court.

4                And I think that from the tapes, what you can see

5        is the police officer -- that's the bicycle officer in the

6        blue jacket -- she seems to be really personally invested in

7        whatever Mr. Egtvedt is doing.  Unfortunately we do not have

8        any audio because those types of officers, I'm told, the

9        bicycle officers, do not have body-worn camera.

10               I think that the Court, in asking what do I fear,

11       has hit the nail on the head.  The panel in *Munchel* --

12       Rogers, Wilkins, and Katsas -- said many different things in

13       the opinion, but they all agree that the case was decided

14       wrongly in the district court, and Judge Katsas, in his

15       defense, really lays out why a do-over, in his words, would

16       be incorrect.  Whether or not Mr. Egtvedt should be

17       detained, the answer to that question does not turn on any

18       generalized backward-looking assessment of the rioters or

19       the riot as the district court erroneously suggested.

20       Instead, it turns on a specific forward-looking assessment

21       of whether Munchel and Eisenhart, as individuals, currently

22       pose an unmitigable threat to public safety.  The ultimate

23       question in the case is whether no release conditions would

24       reasonably ensure public safety.

25               The district court in *Munchel* gave no plausible

1    explanation for why these stringent conditions that were set

2    for pretrial services would not reasonably ensure public

3    safety.  And I'm telling this Court that if you give

4    Mr. Egtvedt a bond, here's what he'll do.  He will help his

5    brother take care of his mother.  He will see a doctor and

6    take his medication.  He'll go to church.  He'll consult

7    with his lawyer.  He'll be in contact with pretrial

8    services.  He will not commit another crime, and he will do

9    anything that this Court asks him to do to remain free on

10   any kind of HISP that the Court orders in this case.

11        Thank you.

12        THE COURT:  Okay.  All right.  So the standard

13   that the Court is bound to apply is set forth in 18 USC

14   3142(e), and that is whether the government has proven by

15   clear and convincing evidence that no condition or

16   combination of conditions can assure the defendant's

17   continued presence and the safety of the community.  And in

18   applying that standard, the Court is to consider four

19   factors:  first, the nature and circumstances of the

20   offense; second, the weight of the evidence; third, the

21   history and the characteristics of the defendant; and

22   finally, the nature and seriousness of the danger posed to

23   the community.

24        And as a general backdrop to applying those four

25   factors, the circuit has reminded us in *Munchel* of a couple

1    of background principles:  first, that liberty is the norm;

2    detention prior to trial is the carefully limited exception.

3    Second, simply participating in the events of January 6th,

4    as serious and misguided and illegal and dangerous as they

5    might have been, is not sufficient by itself to justify

6    pretrial detention.  And third, the relevant inquiry is

7    whether the government has shown that there is a concrete

8    identified and articulable threat to public safety or

9    obviously a flight risk as well.

10           So moving on to those four factors.  And at this

11   juncture I'd like, you know, just to note that in the couple

12   of months since January 6th this Court has gained more

13   experience and the benefit of the views of various judges in

14   applying these standards to requests for pretrial detention

15   from the government.  There have been a number of decisions

16   by fellow district courts, including the *Munchel* decision

17   from the Court of Appeals, that have sort of tried to set

18   forth some principles to guide other Courts in applying

19   these factors specifically in the context of the January 6th

20   incidents.

21           Chief Judge Howell, in the *Chrestman* case, set

22   forth a number of considerations in assessing how to apply

23   the relevant factors, which Judge Bates, as Ms. West

24   mentioned, thoughtfully applied in the *Klein* case, which he

25   issued just a couple of days ago.

1              And with respect to the first factor, which in

2       many ways is the most important, the nature and

3       circumstances of the offense, Judge Howell identified

4       several factors.  First, whether the defendant is charged

5       with a felony or a misdemeanor.  That cuts both ways here.

6       He is charged with four felonies and three misdemeanors, but

7       as the government acknowledged at the outset of the hearing,

8       none of the felonies charged are codified as or defined as

9       crimes of violence under the Bail Reform Act.  I'm not sure

10      that that's right, but that's the government's position in

11      this case.

12              The second factor is prior planning.  That does

13      not seem to be present here.  Mr. Egtvedt seems to have

14      come -- other than him coming to Washington the night before

15      and getting a hotel room and then returning to either West

16      Virginia or Maryland afterwards.

17              The third factor, whether the defendant carried or

18      used a dangerous weapon.  There's no evidence of any of that

19      in this case.

20              Fourth, whether he coordinated with any other

21      participants.  I don't see that to any significant degree.

22      He seems to have been by himself during the whole time.  He

23      wasn't with anyone else.  He didn't travel with anyone else,

24      as far as the Court knows.  He was certainly at the

25      periphery of one of the first groups that forcibly gained

1    entry into the Capitol, but it did not strike me from the

2    video that he led or organized that effort at all.  He

3    didn't seem to be pushing.  He didn't seem to be giving

4    instructions.  He didn't personally, you know, break any

5    windows or knock down any doors and seemed to be more

6    concerned with wiping his eyes from the pepper spray than he

7    was at helping the group ahead of him gain access to the

8    Capitol.  At least that's my interpretation of the brief

9    video clips that have been submitted.  I do not think that

10   his call to others to come join us after he got tossed out

11   of the building -- and rightfully so, I might add -- rises

12   to the type of organizational activity that this factor was

13   designed to capture.

14          The next factor is whether he assumed a leadership

15   role, and, again, I don't see much evidence of any

16   leadership on Mr. Egtvedt's part.  He seemed to be perhaps

17   not a follower, but, you know, he certainly wasn't leading

18   anybody.

19          And the next factor that perhaps is the most

20   important in the context of this case is the nature of

21   the defendant's words and movements -- and I'm quoting

22   *Chrestman* -- during the riot including whether he threatened

23   or confronted law enforcement or otherwise promoted or

24   celebrated the efforts to disrupt the certification or the

25   vote count.  As Ms. West said, there's no evidence that he

1    managed to get into the Senate chamber to disrupt the vote

2    count in any way.

3           It's really his confrontation and altercation with

4    law enforcement that is the key consideration here, as the

5    videos show.  And I have viewed all the videos.  And based

6    on my review, it is clear that Mr. Egtvedt resisted orders,

7    that he was belligerent, that he was provocative, and that

8    he instigated the altercation with the officers in the Hall

9    of Columns.  One could take issue with the characterization

10   that he charged the officers.  Perhaps he charged the

11   officers; perhaps he stumbled into them; perhaps he leaned

12   into them with his 350-pound some-odd frame.  But clearly,

13   however one characterized it, he certainly initiated it and

14   was the instigator.

15          That said, he was not overtly violent in the sense

16   that he caused any injuries affirmatively to the officers,

17   at least as it appeared on the video.  There's a suggestion

18   by one officer that he may have hurt his shoulder, but that

19   seems to have come from the officer attempting to tackle

20   Mr. Egtvedt as opposed to anything that Mr. Egtvedt

21   personally did.  He certainly swatted and may have grabbed

22   MF's arm, but he didn't throw any punches, he didn't tackle

23   anybody, and, again, he didn't have a weapon.

24          None of that is to excuse his entry into the

25   Capitol or his obvious refusal to leave after several

1    commands by numerous officers or his attempts to make his

2    way back into the Capitol.  Ms. Kukowski accurately

3    described all of those actions, and they are all illegal and

4    reprehensible and should not be tolerated.  But in terms of

5    physical violence or force, I don't know if -- I would take

6    issue at least with some of the government's

7    characterization of what he actually did based on my view of

8    the video.  And apart from the scuffle, you know, being a

9    jerk or a loud mouth or belligerent is a different matter

10   than exerting violent force on an officer.  And frankly,

11   based on my view of the video, he looked somewhat

12   disoriented and detached from reality in the course of all

13   of his interactions on video, and perhaps that's due to the

14   fact that he was pepper-sprayed.  Perhaps it's due to the

15   fact that he had not taken his medicine.  I don't know.  But

16   he seemed kind of out of it and disoriented.

17           The next factor is the weight of the evidence.  It

18   is obviously strong that he trespassed, that he was

19   disobedient, that he resisted orders, that he was there to

20   obstruct legitimate government operations.  Why else would

21   you make illegal entry into the Capitol in the context of

22   the events of January 6th?  And it is strong that he at

23   least resisted and impeded, if not assaulted, at least by

24   the legal definition, the officers who sought to prevent him

25   from gaining entry and asked him to leave.

1   In terms of the history and characteristics of the

2 defendant, he's a college graduate, no criminal history, let

3 alone violent criminal history.  He was at least recently

4 employed and seems to have a long history of employment

5 throughout his life.  His family situation I don't know much

6 about, but based on the testimony of his brother they seem

7 to have at least a cordial and a close-enough relationship

8 so as to live in the same house or on the same property

9 without any incident, notwithstanding the domestic issue

10 related to his mother's vaccination.

11   He seems to have at least some mental health

12 issues based on the brother's testimony regarding his

13 medications, but not so severe or well-documented that

14 despite his years of law-abiding that he can be expected to

15 harm others physically.  That just doesn't seem to be in his

16 history.

17   And finally, the last factor, nature and

18 seriousness of the danger posed to the community, this

19 encompasses much of the previously discussed considerations.

20 As we've said a number of times, *Munchel* requires that there

21 be a concrete, specific, and articulable threat posed, and

22 frankly, I find this a very difficult and close issue here.

23 All of the actions that the government has highlighted shows

24 a disrespect for the law, a disregard for public safety;

25 but, again, he was not an organizer, he was not a leader, he

1   had no weapons.  There don't seem to be any documented

2   connections with any of the groups that appear to have or at

3   least have been alleged to have organized the so-called

4   insurrection on January 6th.

5          And, again, while he was on the periphery of one

6   of the first groups to gain access, he didn't break any

7   windows or knock down any doors himself.  And while

8   reasonable minds might argue about what happened in the

9   video, he did not affirmatively injure any officers.

10         So weighed against what the defendant is shown on

11  video doing is the fact that he has no prior record of

12  violence or any criminality, for that matter, and as

13  Ms. West noted, he was taken into custody in relation to

14  this incident without any violence or other incident.

15         So striking that balance, I am not clearly

16  convinced that if Mr. Egtvedt is released under appropriate

17  conditions he would go back to Maryland and assault another

18  law enforcement officer or storm the Garrett County City

19  Hall or police station or courthouse or that he would engage

20  in any other violent protests that would put the community

21  at risk.  I respect Judge Harvey's decision otherwise, but

22  he did not have the benefit of *Munchel*, nor did he appear to

23  have viewed any of the videos.

24         Mr. Egtvedt, let me just make a couple of comments

25  directly to you.

 1          You are not a political prisoner, sir.  You are

 2   sitting where you are based on what you did, not on what you

 3   may believe, not on your political views.  Okay?  I believe

 4   you understand that; and therefore, I believe that you will

 5   respect this Court and its orders, and when we tell you that

 6   you have to comply with conditions and show up on a certain

 7   date, that you will do so.  And I think that you are smart

 8   enough to understand that if you do not do so, the

 9   consequences will be severe, and you will be in a much more

10   difficult situation than you find yourself in now.

11          I will also tell you that my ruling on this

12   motion, which is based on a standard that I am required to

13   apply where the government has the burden of proof on

14   certain issues, does not indicate my views on whether you

15   are guilty of or innocent of the offenses with which you

16   have been charged, and it also does not reflect my views on

17   what an appropriate sentence would be in this case if you

18   were to choose to enter a guilty plea or if you were

19   convicted after a trial by jury.

20          I also take into account and give some weight to

21   the recommendation of pretrial services, who have indicated

22   that they believe that the defendant can be trusted to

23   comply with conditions of release.

24          What I'm going to do is ask that pretrial services

25   coordinate with their counterpart in Maryland.  Maryland

1   will supervise your supervision, but I will order that you

2   be released once I get a set of recommendations from

3   pretrial services to the HISP program, which is the high-

4   intensity supervision program.

5           You are likely to be required to wear an ankle

6   bracelet.  You will be required to live with your brother in

7   his house.  You will be required not to leave that house

8   except for certain prescribed activities at certain

9   prescribed times.

10          And I'm going to be the guy to sentence you,

11  Mr. Egtvedt, if you are convicted of any of these charges,

12  and one of the things that I do in every case where I have

13  to sentence someone who has been released pretrial is I take

14  into account whether they've complied with those conditions

15  or not, because whether you comply now will tell me whether

16  I think you'll be able to comply at some point down the

17  road.  Do you follow me?

18          THE DEFENDANT:  (Nodding).

19          THE COURT:  Okay.  I'll also just note that, you

20  know, it's important that there is some uniformity in these

21  decisions across the judges of our courthouse, and in

22  deciding what to do in this case I've been giving some

23  weight to the decisions that I mentioned earlier, Judge

24  Bates's decision in *Klein* and Judge Howell's decision in

25  *Chrestman*, and I do think that it is important that judges

1    at least try to apply some uniform standards in this case

2    because there are so many defendants involved.

3              Anything else from the parties?

4              PRETRIAL SERVICES:  Your Honor, Andre Sidbury from

5    pretrial.

6              THE COURT:  Mr. Sidbury, I didn't know you were

7    still on.  If you could coordinate with Maryland, and I

8    would like a list of conditions consistent with the HISP

9    program, and then we will order Mr. Egtvedt released once I

10   get those and approve those and sign the order, okay?

11             PRETRIAL SERVICES:  Your Honor, I would like to

12   present you with some of the conditions that other judges

13   have requested that are that they want to be electronically

14   monitored.  So would you rather me send it to the deputy

15   clerk, or would you like me to --

16             THE COURT:  Please give those to the deputy clerk.

17   And put them in writing, and I will issue the standard form

18   written order, okay?

19             PRETRIAL SERVICES:  Thank you, Your Honor.

20             THE COURT:  You're welcome.

21             MR. LIEBMAN:  And, Your Honor, you asked about

22   other things.  Are we going to set a status date for

23   sometime in the --

24             THE COURT:  Still no plea offer, I suspect,

25   correct?  Correct, Mr. Liebman?

 1              MS. WEST:  They have not.

 2              MR. LIEBMAN:  I was just asking if we're going to

 3     set a status date further out.  I would recommend 45 days,

 4     Your Honor.

 5              THE COURT:  All right.  Why don't we set a status

 6     45 days out.  Unfortunately my normal courtroom deputy is

 7     not here so I'm not sure if I have access to my calendar.

 8     Do you want to suggest a date?  And if that date is not

 9     available to the Court, we can change it.  Do you want to go

10     ahead and set a date now?

11              MR. LIEBMAN:  Yes, Your Honor, I think that's a

12     good idea.  And so 45 days is approximately late May or

13     early June.  Why don't I suggest -- can we do Friday, June

14     4th, Your Honor?

15              THE COURTROOM DEPUTY:  Your Honor, I can see some

16     things.

17              THE COURT:  I know Friday, June 4th, will not

18     work.

19              THE COURTROOM DEPUTY:  You do have morning

20     matters.

21              MR. LIEBMAN:  Is the Court available earlier that

22     same week?

23              THE COURT:  I believe so.

24              THE COURTROOM DEPUTY:  I believe so.

25              MR. LIEBMAN:  Because we can do the 3rd.  Yes,

1   1st, 2nd, or 3rd are fine, Your Honor, that week.

2                THE COURT:  Thursday, June 3rd?

3                THE COURTROOM DEPUTY:  How about Thursday, June

4   3rd, at 10:00 a.m.?

5                THE COURT:  At 10:00 a.m., Ms. West?

6                MS. WEST:  I have an under seal matter before

7   Judge Kollar-Kotelly at 10:00.  I can probably do 10:30 --

8                THE COURTROOM DEPUTY:  That's fine.

9                MS. WEST:  -- or 11:00?

10               THE COURT:  Let's set it for 11:00.

11               MS. WEST:  Okay.

12               THE COURT:  All right.  The Court will defer this

13  matter for a further status conference on Thursday -- what

14  did we say? -- June 3rd at 11:00 a.m.

15               Any objection to tolling speedy trial, Ms. West?

16               MS. WEST:  Absolutely not, Your Honor.

17               THE COURT:  Okay.  The Court will exclude the time

18  between now and then from the otherwise applicable speedy

19  trial calculations in the interests of justice to enable the

20  defense to continue to receive discovery in this case as

21  well as for the parties to potentially discuss a pretrial

22  resolution as well as in light of the complexity of the

23  January 6th cases in general.

24               Anything else, Counsel?

25               MS. WEST:  Your Honor, may I ask your courtroom

1    deputy to put me in a room for two minutes with Mr. Egtvedt

2    so that I can talk to him?

3                    THE COURT:  She will do that.

4                    Okay.  Mr. Egtvedt, I will see you on June 3rd.

5    If there would happen to be any violations of your release

6    conditions, I will get a prompt report of that.  Don't put

7    me in that position.  You don't want to put me in that

8    position.  You don't want to put yourself in that position.

9    Do you understand that?

10                   THE DEFENDANT:  Yes, Your Honor.

11                   THE COURT:  Okay.  We'll see you on June 3rd.

12   We're adjourned.

13                        (Whereupon the hearing was

14                         concluded at 3:38 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8         **NOTE:**  This hearing was held during the COVID-19

9     pandemic stay-at-home restrictions and is subject to the

10    technological limitations of court reporting remotely.

11              Dated this 17th day of April, 2021.

12

13

14                          <u>/s/Lisa A. Moreira, RDR, CRR</u>
                            Official Court Reporter
15                          United States Courthouse
                            Room 6718
16                          333 Constitution Avenue, NW
                            Washington, DC 20001

17

18

19

20

21

22

23

24

25