**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CASE NO. 1:21-cr-00177 (CRC)** |
| | : | |
| **DANIEL DEAN EGTVEDT** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS CELL
PHONE EVIDENCE**

The United States, by and through its attorney, the United States Attorney for the District

of Columbia, respectfully submits this Opposition to the Defendant's March 28, 2022 Motion to

Suppress Statements and Cell Phone Evidence ("Defendant's Motion").   In his Motion, Daniel

Egtvedt (hereinafter, "Egtvedt" or "the Defendant") moves to suppress evidence recovered from a

cell phone that was seized from him during a search incident to his arrest, and searched pursuant

to a search warrant that signed by U.S. Magistrate Judge G. Michael Harvey on March 23, 2021

(Attached hereto as Exhibit 1).[1]   The Defendant claims that (1) his cell phone was seized in

violation of the Fourth Amendment; and (2) the warrant at issue lacks probable cause and is

overbroad.

To the contrary, the cell phone at issue was lawfully seized from the defendant during a

search incident to his lawful arrest.   Consistent with *Riley v. California*, 573 U.S. 373 (2014), the

---

[1] The defendant's motion (ECF no. 50) seeks to suppress both "statements and phone evidence."   The challenged statements, consisting of verbal statements Egtvedt made on February 13, 2021 when state and local law enforcement interacted with him at his brother's residence in Oakland, Maryland; verbal statements made in connection with his arrest in Oakland later the same day; written and verbal statements he made during his detention at the Garrett County (Md.) Detention Center during the period February 13–16, 2021; and verbal statements he made while being transported to D.C. on February 16, 2021, will be addressed in a separate opposition.

government then applied for and received a search warrant to search and seize the contents of the defendant's phone.   The warrant affidavit in this case contained specific facts and evidence developed during the investigation of both the January 6th riots of the U.S. Capitol and the defendant's specific role in the riots.   The affidavit had sufficient information to support a probable cause finding and was narrowly tailored to the specifics of this case.   As grounds for this Opposition, the United States relies on the following points and authorities and such other points and authorities as may be cited at a hearing on the motion.

## INTRODUCTION AND BACKGROUND

### I.   January 6, 2021

Defendant Egtvedt is one of hundreds of individuals charged with crimes relating to the riot at the U.S. Capitol that took place on January 6, 2021, when Congress was in session to certify the results of the 2020 election for president and vice-president.

On that date, at approximately 2:49 p.m., Egtvedt forced his way into the Capitol building, through the Senate wing doorway located on the northern end of the upper west terrace.   That doorway had been initially breached by rioters at approximately 2:13 p.m.   Several minutes later law enforcement members were able to re-secure it, until it was breached again by other rioters at approximately 2:48 p.m., just before Egtvedt himself made entry.

Once inside the building Egtvedt proceeded down a hallway, heading south.   In the hallway he sat down on a bench for several minutes while dozens of other rioters milled about. The government has recovered a social media, audio-video recording of Egtvedt while he was in this area of the Capitol.   On this recording Egtvedt speaks to another rioter, who is apparently live streaming the events, and states:

> Tell everybody that's outside, tell them to get in here now! . . . This
> is our country.   We need to reclaim it.   We're not going to let the
> globalists take our country.   This is America.   Everybody, if
> you're seeing this, come down here now!   We're not backing away.
> This is our house.   Congressmen, grow a spine or f***ing resign!

A few minutes later on the recording Egtvedt starts shouting:   "Police are traitors!   Police are traitors!   Police are traitors!"

After a few more minutes, Egtvedt resumed walking southward in the building, and made his way to a room known as the Crypt.   In the Crypt, he verbally berated multiple police officers, yelling at them that they were "on the wrong f***ing side."

A few minutes later Egtvedt exited the Crypt and resumed walking south, toward the Hall of Columns.   When Egtvedt arrived in the Hall of Columns, at about 3:11 p.m., numerous law enforcement members, all in uniform, were standing along either side.   As Egtvedt walked down the middle of the hall, heading in the general direction of an exit doorway, he pointed to several of them and stated, "God bless all of you."   One officer responded, "Keep going, sir."[2]

As Egtvedt neared the end of the hall, about 20 feet from the exit, another law enforcement member, an FBI agent dressed in tactical gear, motioned for him to continue in that direction. Egtvedt walked a few more feet toward the doorway.   However, he then abruptly turned around and began walking back down the Hall of Columns toward the building's interior.[3]   As Egtvedt

---

[2]   The defense motion incorrectly states (Def. Motion at page 4) that Egtvedt's remark was recorded on "CCTV video."   Although the moment was captured on a U.S. Capitol Police (USCP) closed-circuit video (CCV) camera, that system does not have an audio component.   Rather, Egtvedt's remark, along with the officer's response, were captured on body-worn cameras (BWCs), which record both audio and video, worn by several of the D.C. Metropolitan Police Department (MPD) officers standing in the Hall of Columns.

[3]   Contrary to the statement in the defense motion (Def. Motion at page 4), Egtvedt did not "exit[] through the doors" and then "[f]ifteen seconds later . . . enter[] back in through the doors."   The USCP CCV camera referred to in the defense motion, number 0177, does not cover the doors themselves,   which are about 10 feet outside that camera's coverage.   Egtvedt does walk out of the coverage area toward the doors and then reappears back in the frame several moments later   heading the other direction.   However, a review of the recording for the same period from USCP CCV

passed by the same agent, that agent once again motioned for him to proceed to the doorway. Egtvedt ignored the agent and continued walking away from the doorway.

As Egtvedt, who is listed in driver's license records from 2020 as 6'2" tall and weighing 320 pounds, continued toward the interior of the building, U.S. Capitol Police (USCP) Officer M.M.--a woman about half his size who was in full uniform--stepped in front of him to block his path.   When he continued walking toward her, Officer M.M. placed her right hand on his upper left shoulder, to direct him back toward the doorway.   When Egtvedt did not comply, two more uniformed USCP officers positioned themselves around Egtvedt.

Egtvedt continued to walk away from the doorway and loudly stated, "You shoot me! Shoot me!   You guys are violating the Constitution of the United States of America!"   He then swung his left hand around and swatted Officer M.M.'s right hand off his shoulder.   Officer M.M. then raised her left hand and placed it on Egtvedt's upper chest area.   Egtvedt then rotated his body and pinned the officer's left hand in the crook of his right elbow.   Officer M.M. swung her right hand against Egtvedt's right arm in order to free her other hand.

As this was happening the two other USCP officers were attempting to subdue Egtvedt. In addition, D.C. Metropolitan Police Department (MPD) Officer M.D., also in full uniform, positioned himself behind Egtvedt and pulled him by his jacket back toward the doorway. Egtvedt then began to yell, "You work for us!   You work for us!"   He then twisted around, removing first his left arm and then his right from his jacket, which fell to the floor.   He continued in his effort to move forward, away from the doorway.

Two more officers, again in full uniform, surrounded and pushed against Egtvedt, as he

---

camera 0181, which does cover the doors, shows that he never got to the doors before he turned around and headed back toward the interior.

continued struggling, still trying to move forward.   With the weight of four male officers against him, including Officer M.D., Egtvedt could no longer move forward and fell backwards to the floor.   As he hit the floor, the back of his head struck one of the columns.   He also landed partly on top of Officer M.D.

For the next two minutes or so, Egtvedt lay on the floor.   Although conscious and alert he refused to comply with officers' demands and stated he would not leave.   The officers also asked him whether he wanted medical assistance, which he declined.   Finally, two male USCP officers lifted Egtvedt to his feet and half-carried, half pushed him toward and out the doorway.   Egtvedt fell to the floor again, immediately outside the doorway.   Officers again tried to convince him to stand up and leave.   He would not.   The officers again offered to get him medical assistance.   He again declined.

After about two more minutes the officers helped Egtvedt to his feet.   Now standing immediately outside the doorway Egtvedt promptly attempted to re-enter the building.   Once again uniformed officers, including Officer M.M., physically blocked him, and once again Egtvedt swatted at Officer M.M.'s hand as she pushed against his chest.

After a few more moments of confrontation, Egtvedt relented and, at 3:18 p.m., began walking away from the doorway.   At this point Egtvedt was on a raised outdoor terrace with several sets of steps leading down to a concrete area on the south side of the building.   As he walked toward the steps on the western end of the terrace, an MPD officer called up to him and told him he needed to go the opposite direction, toward the steps on the eastern end.   Egtvedt ignored the officer and continued toward and then walked down the steps on the western end.

As he neared the bottom of those steps, the same officer approached him and once again told him he needed to head the opposite direction.   He responded, "I don't want to go over there."

The officer, a female, repeated her command.   He refused and came to the bottom of the steps. The officer, joined by a male MPD officer, then physically turned Egtvedt around and began to push against Egtvedt's back, forcing him to walk toward the east.   As he walked, he leaned back against them to resist, and shouted, "This is tyranny!"

When the officers reached an area just outside the southeast corner of the building, other officers opened up a set of metal barriers and Egtvedt was directed to the other side of them. Thereafter, Egtvedt remained on the grounds of the Capitol for several more hours, outside the barriers, attempting at various points to engage verbally with law enforcement members.[4]

## II.        Egtvedt's Arrest and Cell Phone Seizure

On February 9, 2021, an arrest warrant for Egtvedt was issued by the Hon. Z.M. Faruqui for the crimes Egtvedt committed at the Capitol.

Unrelated to the warrant, local law enforcement happened to encounter Egtvedt at the residence of his brother, in Oakland, Maryland, on the morning of February 13, 2021.   Egtvedt's brother had called 911 when Egtvedt came to the residence and tried to prevent his brother from taking their mother to get a COVID-19 vaccination.   Three officers responded, two from the Garrett County Sheriff's Office and one from the Maryland State Police.

Egtvedt explained to the officers that he wanted them to prevent his mother from getting the vaccine, because, according to Egtvedt, the vaccine was actually detrimental to people's health. He also told the officers that the vaccine would change a person's DNA and was part of a

---

[4]  Egtvedt was recorded at several points during this period on MPD BWC.   In their motion (Def. motion at 2, 3 & 8) the defense claims that Egtvedt suffered a "severe concussion" as a result of his confrontations with the police while inside the building.   The government, however, is not aware of any moment during the period after the police removed him from the building where Egtvedt behaves as if he has a head injury or makes any statement indicating he has such an injury.

government plot to kill people.   Egtvedt also at one point stated that he would not talk to the trooper because, as Egtvedt explained, only a county sheriff and his deputies could legitimately exercise law enforcement duties.   The incident ended when the officers were able to distract Egtvedt by conversing with him, which allowed the brother to leave the house and take the mother to get the vaccine.

The state trooper who had responded to Egtvedt's brother's residence also became aware the same day that Egtvedt was wanted on the federal warrant.   Working with the FBI, Maryland State Police that afternoon conducted a traffic stop of a Gold GMC Yukon that Egtvedt was suspected of operating, traveling on a road in Oakland.   Egtvedt was indeed operating the vehicle and he was placed under arrest without incident.   His mother was present in the vehicle at the time of his arrest.

Shortly after being arrested Egtvedt remarked to an FBI agent, who was present for the arrest, "What's this all about?", or words to the same effect.   The agent then played an audio-video recording for Egtvedt that the Bureau had obtained from YouTube, apparently showing Egtvedt outside the Capitol on January 6, 2021.   In the 11-second recording Egtvedt looks directly into the camera and states:   "We're in treasonous situations here people.   Please come down to the United States Capitol right now, everybody.   Please come."[5]   After watching the recording Egtvedt asked the agent:   "Was that you that was filming me?"   The agent responded, "No," and told him it was on YouTube.   Egtvedt then stated he wanted an attorney and no more questions were asked of him.

At the time of his arrest, Egtvedt's cell phone was sitting in the cupholder of the Gold GMC

---

[5]   There is no timestamp on this video.   Most likely, this video was recorded after police officers had removed Egtvedt from the Capitol building.

Yukon Egtvedt was driving.   Egtvedt referred to a "broken phone," which Special Agent Smith-Shimer believed was a reference to the fact that the screen of the cell phone was cracked. Maryland State Police retrieved the cell phone from the vehicle and, at Egtvedt's request, placed it in his jacket pocket. [6] The Maryland troopers then transported Egtvedt to the Garrett County Commissioner's Office, about nine miles away.   Later the same day Egtvedt appeared before a Maryland District Court Commissioner who advised him of the nature of the charges against him, his right to remain silent, his right to an attorney, and his right to an appointed attorney if he cannot afford one.   The Commissioner then ordered him detained until February 16, 2021, when he would be transferred to D.C. for an appearance in federal court.   Egtvedt was then searched, processed, and detained in the Garrett County Detention Center, where his cell phone was seized from him by Maryland State Police and placed in evidence. On February 15, 2021, FBI took possession of the cell phone, and it has been stored in FBI possession since then.

## III.   The Cell Phone Search Warrant

On March 1, 2021, the government applied for a search warrant for Egtvedt's cell phone. By inadvertence, the application for the warrant set out an incorrect IMEI number, 359474138351384339, that substituted "13" in two positions where, in the correct IMEI number gleaned from the AT&T records for the defendant's phone, "0" appeared. The warrant was nonetheless issued (1:21-sc-58) by the Hon. Z.M. Faruqui, M.J. The error was discovered when the warrant began to be executed and the back of the Device was removed, revealing an imprinted IMEI number with "0" in those two positions. As a result of this discovery, all

---

[6] It is the standard practice of Maryland State Trooper Brennan, who was involved in the defendant's arrest, to ensure that a defendant has his/her phone on his/her person when the defendant is brought before the Maryland District Court Commissioner so that the defendant is able to call a contact after the defendant's proceedings before the Commissioner conclude.

efforts to search the cell phone ceased.   No data from the cell phone was accessed.

The government then applied for a second search warrant of the cell phone with the IMEI number imprinted on the Device, which reads 359474083508436.[7]   This warrant was issued by the Hon. G. Michael Harvey, M.J., on March 23, 2021.   Attachment A of the warrant specified the cell phone to be searched:

> **ATTACHMENT A**
>
> **Property to Be Searched**
>
> The property to be searched is a black Apple iPhone 7 Plus, Model A1661, bearing IMEI: 359474083508436 (hereinafter the "Device").  The Device is currently in FBI custody, in Washington, D.C.

Attachment B of the warrant specified the items to be searched and seized.   The first set of items to be searched and seized were records and information related to the defendant's identity, including clothing and other items depicted in photographs that were believed to be on the defendant's person on January 6, 2021. The second set of items included a list of specific records and information related to the offenses Egtvedt was charged with committing on January 6, 2021.

## ARGUMENT

### I.   THE DEFENDANT'S PHONE WAS LAWFULLY SEIZED IN A SEARCH INCIDENT TO HIS ARREST.

Once an accused, like Egtvedt, has been lawfully arrested, "the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may be lawfully

---

[7] The IMEI number imprinted on the Device reads 359474083508436. This number has 15 digits while the IMEI number from the AT&T records for the Defendant's phone number, 3594740835084339, has 16 digits, although the first 14 digits are identical. According to the advice of the FBI CAST agent, because the first 14 digits are identical, the Device is the same device referenced in the AT&T records for the Defendant's phone number.

searched and seized without a warrant." *United States v. Edwards*, 415 U.S. 800, 807-08 (1974).

"The search-incident-to-arrest doctrine has an ancient pedigree*." Birchfield v. North Dakota*, 136 S. Ct. 2160, 2174 (2016).   In *Birchfield*, the Supreme Court recounted the history of the search incident to arrest doctrine, and explained that an officer's authority to make a warrantless search of a person lawfully arrested precedes the founding of this country.   *Id*.   The   justification   for the warrantless search is based on both the need to disarm the suspect to take him into custody *and* the need to preserve evidence on his person for later use in trial.   *United States v. Robinson*, 414 U.S. 218, 234 (1973) (emphasis added).

In *United States v. Abdul-Saboor*, the D.C. Circuit held "even though the reasons for conducting a search incident to arrest, namely to disarm and to discover evidence, may be stronger in some situations than others, the Government is not obliged to justify each such search in the particular context in which it occurs." 85 F.3d 664, 667 (D.C. Cir. 1996).   In *Chimel v. California*, the Supreme Court held that a search incident to arrest may only include "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."   395 U.S. 752, 763 (1969). And, as noted by the *Edwards* Court, "[w]hile the legal arrest of a person should not destroy the privacy of his premises, it does – for at least a reasonable time and to a reasonable extent – take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence." 415 U.S. at 808-09 (quoting *United States v. DeLeo*, 422 F.2d 487, 493 (1st Cir. 1970)) (emphasis added).

In *Arizona v. Gant*, 556 U.S. 332 (2009), the Supreme Court articulated the scope of a search incident to arrest when the arrestee is arrested in a vehicle. "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the

passenger compartment at the time of the search *or* it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id*. at 351 (emphasis added).   In reaching its holding, the *Gant* Court relied on *Thornton v. United States*, 541 U.S. 615 (2004), to conclude that the "circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle."   *Id*. at 335.

In this case, once the officers arrested Egtvedt pursuant to the arrest warrant, they had grounds to seize anything on his person in a search incident to arrest.   And, under *Arizona v. Gant*, they had authority to conduct a warrantless search of the vehicle Egtvedt was in at the time of his arrest for evidence of the offenses of the arrest – namely, Egtvedt's actions at the U.S. Capitol on January 6, 2021.   The defendant's cell phone was located in plain view in the center console of the vehicle that he was driving at the time of his arrest, and at the defendant's request, was placed in his jacket pocket.   The defendant also made statements to law enforcement at the time of his arrest indicating that the phone with the cracked screen – the cell phone that was seized – was his cell phone.   Moreover, it was known to law enforcement that cell phone records obtained during the course off the investigation showed that a phone assigned to a phone number registered to Egtvedt was present at the U.S. Capitol on January 6, 2021; therefore, it was reasonable to infer the phone that was in his immediate control at the time of his arrest contained evidence of the offenses Egtvedt was being arrested for.   Law enforcement thus had authority to seize the cell phone without a warrant, whether they seized the warrant directly from his vehicle,[8]  or they seized

---

[8]  The defendant claims that there is a "dispute as to whether the phone was left in the defendant's car or the officers put the phone in the defendant's pocket," Defense Motion at 10, however, the Defendant cites to no evidence indicating that officers fabricated their statements that the phone was given to the defendant and seized from him at the Garrett County Detention Center.

11

it from Egtvedt's person when he was searched and processed at the Garrett County Detention Center, as the evidence will show.

As noted above, the phone was seized from Egtvedt's person after he appeared before the Maryland District Court Commissioner.  In *United States v. Edwards*, 415 U.S. 800, 807-08 (1974), the Court acknowledged that once an accused has been lawfully arrested and is in custody, effects in his possession at place of detention that were subject to search at time and place of arrest may lawfully be searched and seized without warrant even after substantial time lapse following arrest and later administrative processing. The *Edwards* Court specifically acknowledged that this is true in situations where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the 'property room' of the jail, and at a later time searched and taken for use at the subsequent criminal trial.  *Id.*  The defendant's phone was similarly seized the same day of his arrest, when he was taken to the Garrett County Detention Center and was undergoing administrative processing.  However, as discussed below, upon seizing Egtvedt's phone, law enforcement abided by the requirements of the Fourth Amendment and sought a search warrant to search the contents of the phone.

## II.   THE DEFENDANT'S CELLPHONE WAS LAWFULLY SEARCHED PURSUANT TO A SEARCH WARRANT

### a.   THE CELL PHONE WARRANT IS SUPPORTED BY PROBABLE CAUSE.

The Fourth Amendment provides that "[t]he right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "As the text makes clear, the ultimate touchstone of the Fourth Amendment is 'reasonableness.'"  *Riley v. California*,

573 U.S. 373, 381-82 (2014) (internal citation omitted).   "Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant," *id.* at 382 (internal citation omitted), and "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall," *United States v. Ventresca*, 380 U.S. 102, 106 (1965).   In *Riley*, the Supreme Court held that after the lawful seizure of a cell phone during a search incident to arrest, law enforcement would need to obtain a warrant before searching the cell phone. 573 U.S. at 401.

   Determining whether probable cause exists is "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).   In other words, the affidavit "must demonstrate cause to believe that evidence is likely to be found at the place to be searched" and a "nexus between the item to be seized and the criminal behavior." *United States v. Griffith*, 867 F.3d 1265, 1272 (D.C. Cir. 2017) (quoting *Groh v. Ramirez*, 540 U.S. 551, 568 (2004) (alterations omitted)); *Warden v. Hayden*, 387 U.S. 294, 307 (1967)). To evaluate the existence of probable cause, the Supreme Court has explained:

> Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules. It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. Probable cause is not a high bar.

*District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotation marks and citations omitted).

   As Chief Judge Beryl Howell recently explained, a district court's task when it reviews a magistrate judge's determination that a warrant is supported by probable cause "is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed*." United*

13

*States v. Thorne*, 548 F. Supp. 3d 70, 94 (D.D.C. 2021), as corrected (July 16, 2021) (citing *Gates*, 462 U.S. at 238–39 (alteration and omission in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).   Thus, in reviewing whether an authorized search warrant is supported by probable cause, the issuing judge's or magistrate judge's "determination of probable cause should be paid great deference by reviewing courts."   *Illinois v. Gates*, 462 U.S. 213, 236 (1983).   There is "a presumption of validity with respect to the affidavit supporting the search warrant."   *Franks v. Delaware*, 438 U.S. 154, 171 (1978).

The warrant application submitted by Special Agent Smith-Shimer provides ample probable cause that the defendant's cell phone contains evidence of the crimes the defendant is alleged to have committed on January 6, 2021: violations of 18 U.S.C. §§ 111(b)(assaulting a federal officer), 231(a)(3)(impeding, obstructing, or interfering with a law enforcement officer during the commission of a of civil disorder), 1512(c)(2)(obstruction of an official proceeding), 1752(a), (b) (knowingly entering or remaining in any restricted building without lawful authority), and 40 U.S.C. § 5104(e)(2) (violent entry and disorderly conduct on Capitol grounds) (hereinafter, the "Target Offense").   As an initial matter, the warrant affidavit establishes not only Special Agent Smith-Shimer's experience as an agent with the FBI, but his specific experience in investigating the riots and civil disorder that occurred at the Capitol on January 6, 2021.   *See* Ex. 1, Para. 10.   The facts contained in the warrant are not his generalized assumptions based upon prior riot or civil disorder investigations; they are based on his personal review and investigation of the facts of this unprecedent set of events on January 6, 2021.

During the course of investigating the January 6, 2021 riots, Special Agent Smith-Shimer observed video footage showing individuals who were inside the Capitol building, without authority to be there, using their mobile devices.   *Id*. at Para. 35.   Special Agent Smith-Shimer

also observed video footage that appears to have been captured by rioters on their mobile devices.

Not only did some of the rioters take photographs and video footage, some appeared to live-stream

their activities.   *Id*.   The warrant application includes photographs from publicly available news,

social media, and other media showing some of the subjects within the Capitol during the riot,

holding and using cell phones, including to take pictures and/or videos.   *Id*. at Para. 36.   There is

little dispute that cell phones were not only present and in the possession of the January 6th rioters,

but cell phones were also being actively used by rioters as they were perpetrating offenses at the

Capitol.   Based upon the information contained in the warrant affidavit about the January 6th

rioters use of cell phones as they were in and around the Capitol building, it was reasonable to

infer that Egtvedt similarly used his cell phone while he was committing the Target Offense on

January 6, 2021.[9]

Indeed, Special Agent Smith-Shimer observed what appeared to be cell phone videos

posted to Parler, a social media application, taken on January 6 at the Capitol that show Egtvedt

both entering the Capitol Building as a part of a mob, and then walking the hallways of the Capitol

building.   *Id*. at Para. 37-38.   Egtvedt also participated in live stream video interviews that were

posted online by a fellow rioter.   *Id*. at Para 58.   Egtvedt was thus interacting with those who

were actively using their phones to document their crimes on   January 6, 2021.   And, critically,

Special Agent Smith-Shimer observed footage of Egtvedt standing outside closed doors with his

cell phone in his hand, appearing to take a picture of a video of the occasion.   *Id*. at Para 60. Thus,

---

[9] The defendant cites to logic concepts such as the fallacy of composition and "begging the question" as proof that the warrant lacks probable cause.   In doing so, the defendant overlooks the fact that probable cause "is not a high bar." *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018) (citing *Kaley v. United States*, 571 U.S. 320, 338 (2014)).   As discussed above, the probable cause standard only requires that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

there is probable cause to believe that Egtvedt acted consistent with his fellow rioters in that he too used his cell phone to capture his actions and the riots at the Capitol on January 6, 2021.

Most notably, however, the affidavit establishes that a cell phone device assigned to a phone number, "Phone Number Two," which was registered to the defendant, was present at the Capitol on January 6, 2021.   Specifically, AT&T records for Phone Number Two show that the device first appeared in or near the Capitol at 2:37 pm and appeared to remain in or near the Capitol until 3:31 pm on January 6.   *Id.* at Para 69.   Based upon those AT&T records alone, there is probable cause that the defendant not only had a cell phone on his person on January 6, 2021, like many of his fellow rioters, but also that the defendant's cell phone contained location data that would prove that the defendant was present at the Capitol on January 6, 2021.[10]   That location data is critical evidence in the prosecution of the defendant for the Target Offenses, as it helps prove his identity as the suspect seen assaulting Officer M.M. and Officer M.D. in USCP closed-circuit video footage and MPD body-worn camera footage.   Moreover, the fact that Egtvedt's phone was transmitting location data at the time of the offenses – namely from 2:37 pm to 3:31 pm, it is reasonable to infer that it would be transmitting or contain location data from when the defendant traveled to Washington, D.C. and the Capitol.

The warrant affidavit also discusses photographs of the defendant that Special Agent Smith-Shimer located on Facebook and Twitter.   Ex. 1, Para 66 – 67.   These photographs show images of Egtvedt that are consistent with the images of the defendant from the Capitol on January 6,

---

[10] The defendant asserts that because the affidavit stated that it had these cell phone records, along with a single photograph from a license plate reader, the warrant was overbroad because the government already had the information it sought.   Defense Motion at 12 – 13.   The defendant, however, cites no authority for the principal that a warrant is overbroad because it seeks additional evidence to corroborate other sources of evidence that have been gathered during the course of the government's investigation.   Indeed, the Fourth Amendment places no such limitation confining the government to rely on a single source of evidence to prove up a critical element of the offense, such as the identity of the perpetrator.

2021, and in one case, a "selfie" styled photograph showed him to be wearing a shirt that is consistent in color and pattern with the shirt worn by the defendant during his interview that was livestreamed inside the Capitol building.   It was a reasonable inference at the time that this warrant was issued, and still today, that an individual will use his or her cell phone to access social media, and upload images and videos from their cell phone to social media.   Additionally, "selfie" photographs, such as the one showing Egtvedt wearing the shirt consistent with the shirt he wore on January 6, 2021, are traditionally taken by a person on their cell phone. The fact that these photographs, which are further evidence proving Egtvedt's identity as the defendant, were on Egtvedt's social media provide further probable cause that the defendant's cell phone contained evidence of the crime – namely photographs that will prove Egtvedt's presence at the Capitol and his identity as the defendant.

In its totality, the warrant application submitted by Special Agent Smith-Shimer outlines more than enough facts to support probable cause that the defendant's cell phone contained evidence of the Target Offenses.

### b. THE WARRANT DID NOT VIOLATE THE PARTICULARITY REQUIREMENT OF THE WARRANT CLAUSE OF THE FOURTH AMENDMENT.

"[A] warrant may not be issued unless probable cause is properly established *and* the scope of the authorized search is set out with particularity."   *Kentucky v. King*, 563 U.S. 452, 459 (2011) (emphasis added).   As a matter of law, "[a] warrant that empowers police to search for something satisfies the particularity requirement if its text constrains the search to evidence of a specific crime."   *United States v. Castro*, 881 F.3d 961, 964-65 (6th Cir. 2018) (citing *Andresen v. Maryland*, 427 U.S. 463, 481-82 (1976)).   For those reasons, the U.S. Supreme Court and federal circuits have consistently upheld warrants that let the police search a cell phone for "evidence" of

a specified crime.[11]   *See Andresen*, 427 U.S. at 479-82; *Castro*, 881 F.3d at 964-65; *United States v. Bishop*, 910 F.3d 335, 337 (7th Cir. 2018); *United States v. Russian*, 848 F.3d 1239, 1245 (10th Cir. 2017); *United States v. Bass*, 785 F.3d 1043, 1049-50 (6th Cir. 2015); *United States v. Christie*, 717 F.3d 1156, 1165 (10th Cir. 2013) (computer warrants "may pass the particularity test if they limit their scope either *to evidence of specific federal crimes* or [to] specific types of material").

The warrant application here was "strictly limited" in scope because Attachment B was narrowly tailored to the probable cause described in the affidavit for searching this particular phone.   As discussed above, Special Agent Smith-Shimer's affidavit outlined information learned

---

[11]  This is likely because of the practical consequences of limiting cell phone searches by date range rather than a specific crime.   Many of the categories of data on a Cellebrite report will have associated dates indicating when the item was created, modified, accessed, or deleted during a particular date range.   However, depending on the phone and the type of data involved, a default date (like the year 1900) is sometimes put into all phones by the software designers of the phone for the dates of particular events.   For example, these dates might be the default dates placed in the phone for applications installed on the phone during manufacturing.   Because of such default dates, dates regarding some types of data, such as application installation dates, may not be reliable or accurate.   Moreover, not all categories of data typically include dates.   In particular, (1) ***Contact lists***: Dates related to the presence of a contact in a cell phone *do not* appear in the report. That is, one cannot typically tell whether the cellular phone contained a particular contact by relying on dates generated in the report.   Many phones do not list any date whatsoever for contacts in the phone.   And if a date is associated, it will only be the date the contact was added to the phone. As such, if the forensic analyst attempts to produce a report of only contacts from a particular date range, and the phone includes dates for the creation of the contact only, the report would then exclude all contacts that were in the phone during that requested time frame but added to the phone at an earlier time; (2) ***Deleted items*** which are often highly relevant to criminal investigations – including deleted texts, searches, photos, videos – typically have no date associated with when they were deleted or when the original item was entered into the phone.   As a result, a phone analyst cannot accurately limit records of deleted items to a particular time frame; (3) ***Apps used***: The wide variety of applications used to communicate often make it difficult to limit by date, as sometimes the current tools are unable to pull the underlying communications from the application even when the application was being regularly used during the relevant date range.   Rather, in many cell phones just the date of application installation appears and in other cell phones, no dates are associated with the application installation; (4) ***Photos and videos***: Although some photos or videos include dates indicating when the item was accessed, modified, created, or deleted, many photos and videos, particularly thumbnails, will have no associated date listed.   Or they might list only partial information: such as modified date but no creation date, a creation date but no dates regarding access, or a deleted date but no creation date. Additionally, photos and videos stored in an online platform (the "cloud") but viewed on the phone may have no date at all or may only list a date that the item was last modified.   As a result, by limiting to images or videos within a particular date range, it is likely that relevant evidence will be inadvertently excluded from analysis.   Limiting the search to evidence of a *specific crime* ensures that the particularity requirement is met without providing individuals an incentive to delete and destroy evidence with no consequences.   This is consistent with premises search warrants: just as a residential search warrant covers the entire house (not specific rooms, cabinets, or containers), a cell phone warrant covers the entire phone where evidence may be stored in various formats.

from *this* investigation, the witnesses in *this* case, and *this* defendant, and established probable cause that there is information and other data related to the Target Offense from January 6, 2021, inside of the phone.    Attachment B then listed the particular items to be searched within the phone, which were also tailored to *this* specific crime.    *See* Ex. 1, Attachment B.

Rather than requesting the entirety of certain categories of records or information on Egtvedt's phone – such as all of the defendant's contact, all of his internet search history, or all of the location data on the phone – Attachment B specifies records and information that are directly relevant to the Target Offenses.    For example, rather than seeking to search and seize all photographs of the defendant's clothing, Attachment B seeks authority to search and seize "[c]lothing and other items depicted in photographs or otherwise believed to be on Egtvedt's person on January 6, 2021."   Ex. 1 at 5.    Similarly, the warrant seeks to search and seize all photographs or videos documenting Egtvedt's travel to and presence in Washington, D.C., on January 6, 2021, or that contains photographs or videos documenting the actions and presence of others at or near the U.S. Capitol on January 6, 2021.    *Id*. at 5-7.    It does not seek to seize videos or photographs of the defendant visiting Washington, D.C. on occasions other than January 6, 2021, or videos of the defendant traveling to places other than Washington, D.C.

Additionally, in many of the videos of the defendant outside of the Capitol, and the live streamed interview Egtvedt gave while inside the Capitol, he is associating with other individuals, and acting in concert with others in a mob.    The warrant accordingly seeks information relating to those who may have conspired and collaborated with the Egtvedt in planning or committing the Target Offenses, or communications that the defendant may have had with others about the Target Offenses.    *See* Id. at 6, Items n, o, and p.

Indeed, each of the items listed in Attachment B is tailored to the Target Offenses.   For example, Egtvedt is charged with Obstruction of an Official Proceeding; accordingly, Attachment B seeks records and information about his awareness of the official proceedings that were to take place at Congress on January 6, efforts to disrupt those proceedings, and other records and information related to efforts to illegally enter and occupy the Capitol and the civil disorder at the Capitol.  *Id*. at 5-6, Items b – g.   Other items requested are narrowly tailored to the defendant's state of mind with respect to members of Congress, U.S. Government officials, and the 2020 presidential election.  *See id*. at 6, Items j, l, and m.   These items are again narrowly tailed to the Target Offenses, which require, among other things, that the government prove that the defendant "corruptly" obstructed, influenced, and impeded the official proceedings before Congress on January 6, 2021, and "knowingly" entered and remained in restricted grounds (the Capitol), engaged in disorder and disruptive conduct in restricted grounds, and knowingly engaged in acts of physical violence on the restricted grounds.

As required by law, the affidavit in this case clearly established probable cause that there was particular evidence related to the offense of Target Offenses inside of the phone.   Moreover, the warrant application was "strictly limited" to the information for which probable cause was properly established.   In all events, the warrant plainly complies with the Fourth Amendment's particularity requirement.

## III. THE "GOOD FAITH" DOCTRINE OUTLINED IN *UNITED STATES V. LEON* IS APPLICABLE IN THIS CASE

Even if the Court were to find the warrant lacked probable cause or was overbroad, suppression is unnecessary because the police reasonably relied on the warrant in good faith. "When police obtain evidence by way of an unlawful search, the exclusionary rule may require

exclusion of that evidence in some circumstances." *United States v. Glover*, 681 F.3d 411, 418 (D.C. Cir. 2012).   However, the exclusionary rule is not the default remedy when a Fourth Amendment violation occurs.   "Indeed, exclusion has always been [the Court's] last resort, not our first impulse[.]" *Herring v. United States*, 555 U.S. 135, 140 (2009) (internal quotation marks and citations omitted) (noting that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on" warrants that are subsequently invalidated or recalled "cannot justify the substantial costs of exclusion"). *See also Illinois v. Krull*, 480 U.S. 340, 346 (1987) (confirming that the purpose of the exclusionary rule is not to remedy a violation of an individual's rights, but rather to deter future unlawful police conduct).

In *United States v. Leon*, the Supreme Court established the "good faith" exclusionary rule of the Fourth Amendment for evidence obtained where officers acted in "objectively reasonable reliance" on a search warrant issued by "detached and neutral magistrate" that was subsequently found invalid.   468 U.S. 897, 913 (1984).   The Supreme Court then identified only four exceptions to the "good faith" doctrine:

1.  The judge who issued the warrant "was misled by information in an affidavit that the affiant knew was false or would have known was false except for [the affiant's] reckless disregard of the truth."

2.  "[T]he issuing judge wholly abandoned his neutral and detached judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979); in such circumstances, no reasonably well trained officer should rely on the warrant."

3.  The affidavit submitted in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."

4.  The warrant was "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers [could not] reasonably presume it to be valid."

*Id.* at 923.

An officer's decision to obtain a search warrant is the "clearest indication" that he or she was acting in good faith. *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012); *see also Leon*, 468 U.S. at 921 ("[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law). Thus, when police obtain a warrant signed by a judge, the "good faith" doctrine bars suppression unless the affidavit submitted in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923; *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("good faith" doctrine bars suppression unless "it is obvious that no reasonably competent officer would have concluded that a warrant should issue").

The threshold for establishing an exception to the "good faith" doctrine "is a high one, and it should be," *Messerschmidt*, 565 U.S. at 547, as the Supreme Court has warned that excluding evidence should be a last resort as "[e]xclusion exacts a heavy toll on both the judicial system and society at large" as it "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence," *Davis v. United States*, 564 U.S. 229, 236-37 (2011). "The calculus is simple: The suppression of evidence that is otherwise probative and reliable results in substantial social costs." *Griffith*, 867 F.3d at 1283 (dissenting, Brown J.) (quoting *Leon*, 468 U.S. at 907). "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free – something that offends basic concepts of the criminal justice system. *Herring*, 555 U.S. at 141. Society, the Supreme Court has held, "must swallow this bitter pill" only "as a last resort." *Davis*, 564 U.S. at 237.

The warrant in this case does not meet the high bar required to merit application of the exclusionary rule. There is no claim that the judge was misled or abandoned his/her neutral role and, as discussed above in Section II, ample probable cause existed to search the device(s) for the

items listed in Attachment B.   Moreover, there is no claim, nor could there be, that the warrant was so facially deficient in identifying probable cause or stating with particularity the place to be searched or the things to be seized that the officers' reliance on the warrant was entirely unreasonable.   To the contrary, the warrant clearly described the place to be searched in Attachment A:   a black Apple iPhone 7 Plus, Model A1661, bearing IMEI: 359474083508436 – and the items to be seized, as outlined in Attachment B.

The defendant claims that the warrant affidavit is "so lacking in the indicia of probable cause as to render official belief in its existence entirely unreasonable," Defense Motion at 14, but does not state how it is lacking in probable cause.   In making this claim, Egtvedt ignores the 31 paragraphs in the affidavit discussing the specific facts of the riots that occurred at the Capitol on January 6, 2021, and the 32 paragraphs that are specific to the defendant's actions at the Capitol on January 6, 2021, that outline the evidence that support a probable cause finding.   These paragraphs discuss specific facts from a variety of evidentiary sources, including (1) witness statements from Officers M.M., M.D. and A.D.; (2) video footage from U.S. Capitol Police showing the defendant being present in the Capitol and assaulting law enforcement; (3) video footage from Officer M.D.'s body-worn camera showing the defendant assaulting law enforcement; (4) statements from Egtvedt himself that were captured and broadcast on social media; and (5) phone records that show a cell phone assigned to Egtvedt's phone number was physically present at the U.S. Capitol.   The firsthand accounts of the victims in this case, the objective video evidence, photographs and phone records, and indeed, the defendant's own statements provided the reviewing judge with ample basis to find that probable cause existed.

Notably, the affidavit in this case stands in stark contrast to an affidavit considered "bare bones" by a divided D.C. Circuit in *Griffith*, 867 F.3d 1265.   In *Griffith*, the majority first

explained that the affidavit did not outline any particularized basis to establish the defendant even owned a cell phone, let alone that his cell phone would be found within the home authorized to be searched.  *Griffith*, 867 F.3d at 1272-73.  The D.C. Circuit further found that the warrant was overbroad because it allowed the seizure of all electronic devices found in the residence, not just the defendant's, including six (6) cell phones and one tablet computer.  *Id.* at 1275.  In so finding, the D.C. Circuit clarified:  "Of course, even with searches of lawful objects, we may allow a broader sweep when a reasonable investigation cannot produce a more particular description."  *Id.* at 1276 (citing *Andreson*, 427 U.S. at 480 n.10)).  "But even then, it is no answer to confer [ ] blanket authorization to search for and seize all electronic devices.  The warrant must be tailored to the justifications for entering the home.  In this case, the warrant should have limited the scope of permissible seizure to devices owned by Griffith, or devices linked to the shooting."  *Id.* Ultimately, the D.C. Circuit held that the "good faith" exception did not apply because the affidavit, which did not tie the defendant to a phone inside the home to be searched, "fell short to an extent precluding good-faith reliance on the warrant."  *Id.* at 1278 (citing third *Leon* exception).

Unlike in *Griffith*, the affidavit in this case plainly established that the defendant owned a cell phone – AT&T phone records showed that the defendant was the subscriber of Phone Number Two, and that the cell phone device that was assigned Phone Number Two was present at the U.S. Capitol.  Moreover, the warrant in this case did not authorize a sweeping search inside a home, which the Court treats as the "first among equals" when it comes to the Fourth Amendment.  *Id.* at 1275 (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)).  Rather, the search warrant here was limited to the phone itself, which was seized from the defendant incident to arrest.  Finally, the police only seized one phone in this case, not the six (6) phones and tablet seized in *Griffith*.  In short, the probable cause outlined in this affidavit is far stronger than that in the affidavit in *Griffith*,

24

and the warrant here was much more particularized.

Also of note, Special Agent Smith-Shimer took effort to ensure that the warrant specified the precise item to be searched.   When he discovered that the IMEI set out in the warrant signed by Magistrate Judge Faruqui, on March 1, 2021, was incorrect, he immediately stopped any search of the defendant's phone before the digital contents of the phone were accessed and applied for a new search warrant.   On March 23, 2021, Magistrate Judge Harvey reviewed the warrant again, which contained the same information as the prior warrant and additional information regarding the phone's IMEI, and also found that probable cause existed.   Accordingly, it is hard to see how the Special Agent could be faulted, let alone be found "entirely unreasonable," for reaching the same conclusion as both judges that the warrant established probable cause.   *See United States v. Glovers*, 755 F.3d 811, 818 (7th Cir. 2014) ("When an officer acts within the scope of a search warrant, penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.") (alterations and internal citations omitted).

Simply, a reasonable officer would have concluded in this case that the scope of the warrant at issue was limited to materials that were likely to contain evidence of the Target Offenses.   This is particularly true given the references to the crime being investigated; here, in the description of the items to be seized and referenced throughout the affidavit, Paragraph 1 of Attachment B.   As detailed above, the affidavit in this case was not bare bones, and Special Agent Smith-Shimer acted in good faith when he submitted and executed the warrant.   Again, "[t]he principal cost of applying the [exclusionary] rule is, of course, letting guilty and possibly dangerous defendants go free – something that offends basic concepts of the criminal justice system.   *Herring*, 555 U.S. at 141.   Because the exclusionary rule serves no deterrent purpose in this case, no evidence should

be suppressed in light of the eminently reasonable reliance on such a warrant.

## **CONCLUSION**

WHEREFORE, the Government respectfully requests that the Court deny the defendant's motion.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

 */s/ Colleen D. Kukowski*
Colleen D. Kukowski
Assistant United States Attorney
D.C. Bar No. 1012458
Colleen.Kukowski@usdoj.gov
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2646 (Kukowski)

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the Government's Opposition to the Defendant's Motion to

Suppress Statements and Cell Phone Evidence was served on all counsel of record via the

Court's electronic filing service.


 <u>/s/ Colleen D. Kukowski</u>
COLLEEN D. KUKOWSKI
Assistant United States Attorney


Date:   April 11, 2022