**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA     )
                               )
           v.            ) No. 1:21-cr-00177-CRC
                               )
DANIEL D. EGTVEDT,          )
                               )
             Defendant.     )

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS
STATEMENTS

The United States of America, by and through the United
States Attorney for the District of Columbia, hereby opposes
defendant Daniel D. Egtvedts's motion to suppress statements
(ECF no. 50).[1]  Each of the challenged statements--consisting of
verbal statements Egtvedt made on February 13, 2021 when state
and local law enforcement interacted with him at his brother's
residence in Oakland, Maryland; verbal statements made in
connection with his arrest in Oakland later the same day;
written statements he made during his detention at the Garrett
County (Md.) Detention Center during the period February 13–16,
2021; and verbal statements he made while being transported to
D.C. on February 16, 2021--is fully admissible.

Introduction and Background

---

[1]The defendant's motion (ECF no. 50) seeks to suppress "statements and
phone evidence."  The challenged phone evidence, which consists of the
results of a forensic search of the defendant's cell phone, will be addressed
in a separate opposition.

January 6, 2021[2]

Defendant Egtvedt is one of hundreds of individuals charged with crimes relating to the riot at the U.S. Capitol that took place on January 6, 2021, when Congress was in session to certify the results of the 2020 election for president and vice-president.

On that date, at approximately 2:49 p.m., Egtvedt forced his way into the Capitol building, through the Senate wing doorway located on the northern end of the upper west terrace. That doorway had been initially breached by rioters at approximately 2:13 p.m.  Several minutes later law enforcement members were able to re-secure it, until it was breached again by other rioters at approximately 2:48 p.m., just before Egtvedt himself made entry.

Once inside the building Egtvedt proceeded down a hallway, heading south.  In the hallway he sat down on a bench for several minutes while dozens of other rioters milled about.  The government has recovered a social media, audio-video recording

---

[2]The defense motion recounts at one point that Egtvedt "made numerous statements on the grounds of the capitol [on January 6, 2021] which were recorded by various people, including police officers wearing body worn cameras."  Defendant's Motion at 1-2.  The government nonetheless reads the motion as challenging only those statements Egtvedt made during the period February 13-16, 2021. *See id.* at 2.

of Egtvedt while he was in this area of the Capitol.  On this
recording Egtvedt speaks to another rioter, who is apparently
live streaming the events, and states:

> Tell everybody that's outside, tell them to
> get in here now! . . .  This is our country.
> We need to reclaim it.  We're not going to
> let the globalists take our country.  This
> is America.  Everybody, if you're seeing
> this, come down here now!  We're not backing
> away.  This is our house.  Congressmen, grow
> a spine or f***ing resign!

A few minutes later on the recording Egtvedt starts shouting:
"Police are traitors!  Police are traitors!  Police are
traitors!"

    After a few more minutes, Egtvedt resumed walking southward
in the building, and made his way to a room known as the Crypt.
In the Crypt, he verbally berated multiple police officers,
yelling at them that they were "on the wrong f***ing side."

    A few minutes later Egtvedt exited the Crypt and resumed
walking south, toward the Hall of Columns.  When Egtvedt arrived
in the Hall of Columns, at about 3:11 p.m., numerous law
enforcement members, all in uniform, were standing along either
side.  As Egtvedt walked down the middle of the hall, heading in
the general direction of an exit doorway, he pointed to several

of them and stated, "God bless all of you."  One officer responded, "Keep going, sir."[3]

As Egtvedt neared the end of the hall, about 20 feet from the exit, another law enforcement member, an FBI agent dressed in tactical gear, motioned for him to continue in that direction.  Egtvedt walked a few more feet toward the doorway.  However, he then abruptly turned around and began walking back down the Hall of Columns toward the building's interior.[4]  As Egtvedt passed by the same agent, that agent once again motioned for him to proceed to the doorway.  Egtvedt ignored the agent and continued walking away from the doorway.

As Egtvedt, who is listed in driver's license records from 2020 as 6'2" in height and weighing 320 pounds, continued toward the interior of the building, U.S. Capitol Police (USCP) Officer M.M.--a woman about half his size who was in full uniform--

---

[3]The defense motion incorrectly states (Def. Motion at page 4) that Egtvedt's remark was recorded on "CCTV video."  Although the moment was captured on a U.S. Capitol Police (USCP) closed-circuit video (CCV) camera, that system does not have an audio component.  Rather, Egtvedt's remark, along with the officer's response, were captured on body-worn cameras (BWCs), which record both audio and video, worn by several of the D.C. Metropolitan Police Department (MPD) officers standing in the Hall of Columns.

[4]Contrary to the statement in the defense motion (Def. Motion at page 4), Egtvedt did not "exit[] through the doors" and then "[f]ifteen seconds later . . . enter[] back in through the doors."  The USCP CCV camera referred to in the defense motion, number 0177, does not cover the doors themselves, which are about 10 feet outside that camera's coverage.  Egtvedt does walk out of the coverage area toward the doors and then reappears back in the frame several moments later heading the other direction.  However, a review of the recording for the same period from USCP CCV camera 0181, which does cover the doors, shows that he never got to the doors before he turned around and headed back toward the interior.

stepped in front of him to block his path.  When he continued walking toward her, Officer M.M. placed her right hand on his upper left shoulder, to direct him back toward the doorway. When Egtvedt did not comply, two more uniformed USCP officers positioned themselves around Egtvedt.

Egtvedt continued to walk away from the doorway and loudly stated, "You shoot me!  Shoot me!  You guys are violating the Constitution of the United States of America!"  He then swung his left hand around and swatted Officer M.M.'s right hand off his shoulder.  Officer M.M. then raised her left hand and placed it on Egtvedt's upper chest area.  Egtvedt then rotated his body and pinned the officer's left hand in the crook of his right elbow.  Officer M.M. swung her right hand against Egtvedt's right arm in order to free her other hand.

As this was happening the two other USCP officers were attempting to subdue Egtvedt.  In addition, D.C. Metropolitan Police Department (MPD) Officer M.D., also in full uniform, positioned himself behind Egtvedt and pulled him by his jacket back toward the doorway.  Egtvedt then began to yell, "You work for us!  You work for us!"  He then twisted around, removing first his left arm and then his right from his jacket, which fell to the floor.  He continued in his effort to move forward, away from the doorway.

Two more officers, again in full uniform, surrounded and pushed against Egtvedt, as he continued struggling, still trying to move forward.  With the weight of four male officers against him, including Officer M.D., Egtvedt could no longer move forward and fell backwards to the floor.  As he hit the floor, the back of his head struck one of the columns.  He also landed partly on top of Officer M.D.

For the next two minutes or so, Egtvedt lay on the floor. Although conscious and alert he refused to comply with officers' demands and stated he would not leave.  The officers also asked him whether he wanted medical assistance, which he declined. Finally, two male USCP officers lifted Egtvedt to his feet and half-carried, half pushed him toward and out the doorway.

Egtvedt fell to the floor again, immediately outside the doorway.  Officers again tried to convince him to stand up and leave.  He would not.  The officers again offered to get him medical assistance.  He again declined.

After about two more minutes the officers helped Egtvedt to his feet.  Now standing immediately outside the doorway Egtvedt promptly attempted to re-enter the building.  Once again uniformed officers, including Officer M.M., physically blocked him, and once again Egtvedt swatted at Officer M.M.'s hand as she pushed against his chest.

After a few more moments of confrontation, Egtvedt relented and, at 3:18 p.m., began walking away from the doorway.  At this point Egtvedt was on a raised outdoor terrace with several sets of steps leading down to a concrete area on the south side of the building.  As he walked toward the steps on the western end of the terrace, an MPD officer called up to him and told him he needed to go the opposite direction, toward the steps on the eastern end.  Egtvedt ignored the officer and continued toward, and then walked down, the steps on the western end.

As he neared the bottom of those steps, the same officer approached him and once again told him he needed to head the opposite direction.  He responded, "I don't want to go over there."  The officer, a female, repeated her command.  Egtvedt refused to comply and came to the bottom of the steps.  The officer, joined by a male MPD officer, then physically turned Egtvedt around and began to push against Egtvedt's back, forcing him to walk toward the east.  As he walked, he leaned back against them to resist, and shouted, "This is tyranny!"

When the officers reached an area just outside the southeast corner of the building, other officers opened up a set of metal barriers and Egtvedt was directed to the other side of them.  Thereafter, Egtvedt remained on the grounds of the Capitol for several more hours.  During this period he at one point used his cell phone to record other rioters attempting to

pry open a door to the Capitol building and at another used a megaphone in an attempt to verbally engage with police officers protecting the building.[5]

### Egtvedt's Contact with Police on February 13, 2021, and His Subsequent Arrest and Detention in Oakland, Maryland

On February 9, 2021, an arrest warrant for Egtvedt was issued by the Hon. Z.M. Faruqui for the crimes Egtvedt committed at the Capitol.

Unrelated to the warrant, local law enforcement happened to encounter Egtvedt at the residence of his brother, in Oakland, Maryland, on the morning of February 13, 2021.  Egtvedt's brother had called 911 when Egtvedt came to the residence and tried to prevent his brother from taking their mother to get a COVID-19 vaccination.  Three officers responded, two from the Garrett County Sheriff's Office and one from the Maryland State Police.

Egtvedt explained to the officers that he wanted them to prevent his mother from getting the vaccine, because, according to Egtvedt, the vaccine was actually detrimental to people's health.  He also told the officers that the vaccine would change

---

[5]Egtvedt was recorded at several points during this period on MPD BWC. In their motion (Def. motion at 2, 3 & 8) the defense claims that Egtvedt suffered a "severe concussion" as a result of his confrontations with the police while inside the building.  The government, however, is not aware of any moment during the period after the police removed him from the building where Egtvedt behaves as if he has a head injury or makes any statement indicating he has such an injury.

a person's DNA and was part of a government plot to kill people.
Egtvedt also at one point stated that he would not talk to the
trooper because, as Egtvedt explained, only a county sheriff and
his deputies could legitimately exercise law enforcement duties.
The incident ended when the officers were able to distract
Egtvedt by conversing with him, which allowed the brother to
leave the house and take the mother to get the vaccine.

The state trooper who had responded to Egtvedt's brother's
residence also became aware the same day that Egtvedt was wanted
on the federal warrant.  Working with the FBI, Maryland State
Police that afternoon conducted a traffic stop of a Gold GMC
Yukon that Egtvedt was suspected of operating, traveling on a
road in Oakland.

Egtvedt was indeed operating the vehicle and he was placed
under arrest without incident.  At the time of his arrest,
Egtvedt's cell phone was sitting in the vehicle's cupholder.  In
his interaction with the arresting officers, Egtvedt referred to
a "broken phone," which an FBI special agent on the scene
believed was a reference to the fact that the screen on
Egtvedt's phone was cracked.  Maryland State Police retrieved
Egtvedt's phone from the vehicle and, at Egtvedt's request,
placed it in his jacket pocket.[6]

---

[6]It is the standard practice of Maryland State Sr. Trooper Brian
Brennan, who was involved in the defendant's arrest, to ensure that an
arrestee has his/her phone on his/her person after an arrest.  This is so the

9

Shortly after being arrested Egtvedt remarked to an FBI agent, who was present for the arrest, "What's this all about?", or words to the same effect.  The agent then played an audio-video recording for Egtvedt that the Bureau had obtained from YouTube, apparently showing Egtvedt outside the Capitol on January 6, 2021.  In the 11-second recording Egtvedt looks directly into the camera and states:  "We're in treasonous situations here people.  Please come down to the United States Capitol right now, everybody.  Please come."[7]

After watching the recording Egtvedt asked the agent:  "Was that you that was filming me?"  The agent responded, "No," and told him it was on YouTube.  Egtvedt then stated he wanted an attorney and no more questions were asked of him.

The Maryland troopers then transported Egtvedt to the Garrett County Commissioner's Office, about 9 miles away.  Later the same day Egtvedt appeared before a Maryland District Court Commissioner who advised him of the nature of the charges against him, his right to remain silent, his right to an attorney, and his right to an appointed attorney if he cannot afford one.  The Commissioner then ordered him detained until February 16, 2021, when he would be transferred to D.C. for an

---

arrestee can call a contact if and when, after appearing before a Maryland District Court Commissioner, they are released on bond.

[7]There is no timestamp on this video.  Most likely, this video was recorded after police officers had removed Egtvedt from the Capitol building.

appearance in federal court.[8]  The Commissioner further advised Egtvedt that he would be afforded a hearing on release conditions by the federal court.

After the hearing, the state trooper brought Egtvedt to the Garrett County Detention Center, which is in a separate building across the street from where the hearing occurred.  During the walk to the detention center, Egtvedt told the trooper they would need multiple officers to take him to D.C. and that he would fight to prevent them from taking him.

Egtvedt was held at the detention center for three days, until February 16, 2021.  While held at that facility Egtvedt handwrote letters intended for the Garrett County Sheriff that he not be sent to D.C.  Copies of those letters are attached here as Exhibit B.

On February 16, 2021, Egtvedt was picked up at the detention center without incident and driven to D.C.  During the trip Egtvedt at one point asked an FBI agent what "port" he was being taken to, and also made a reference to "maritime law." The agent told Egtvedt in response that he did not understand what he was asking.

<u>Argument</u>

---

[8]The brief hearing was not electronically recorded and was not conducted in the presence of a court reporter.  However, the defendant was provided a document, a copy of which is attached here as Exhibit A, advising him of his rights.

1. <u>None of the challenged statements of the defendant is</u>
<u>barred by the Due Process Clause.</u>

The Due Process Clause of the Fifth Amendment provides in
pertinent part that "No person shall . . . be deprived of life,
liberty, or property, without due process of law."  Separate and
apart from the Amendment's Self-incrimination Clause (discussed
*infra*), due process principles govern law enforcement's "tactics
for eliciting inculpatory statements" from suspects.  *Miller v.
Fenton*, 474 U.S. 104, 109 (1985).  As the Court of Appeals for
this circuit has held, "[a] confession is inadmissible as a
matter of due process if under the totality of circumstances it
was involuntarily obtained."  *United States v. Bradshaw*, 290
U.S. App. D.C. 129, 133, 935 F.2d 295, 299 (1991).

Whether a defendant's statement was voluntarily made "turns
on whether the defendant's will was overborne when he gave his
statement, and the test for this is whether the statement was a
product of an essentially free and unconstrained choice by its
maker."  *United States v. Murdock*, 399 U.S. App. D.C. 153, 156,
667 F.3d 1302, 1305 (2012) (internal quotation and alteration
marks, and citations omitted).  As the court in *Murdock* further
explained:

> The ultimate issue of "voluntariness" is a
> legal question that requires a careful
> evaluation of all the circumstances of the
> interrogation, including but not limited to
> the defendant's age and education, the

12

> length of detention, whether the defendant
> was advised of his rights, and the nature of
> the questioning.

*Id.* at 156-57, 667 F.3d at 1305-06 (internal quotation and alteration marks, and citations omitted).

In addition, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' under due process principles." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164.[9]

Finally, the Court of Appeals has strongly suggested that "egregious facts" are necessary to establish that a defendant's statements were involuntary. *United States v. Mohammed*, 402 U.S. App. D.C. 330, 336, 693 F.3d 192, 198 (2012).

a. The defendant's age, education and background

At the time of his arrest Egtvedt was 57 years old. He has a bachelor's degree from Michigan State University. According to his LinkedIn page, he worked as a professional in sales and business consulting from 1999 to 2018, including security consulting, and has a license from the Virginia Department of

---

[9]As the cases cited in the text show, courts analyzing this issue refer to a "confession" and to a mere "statement" by a defendant interchangeably. There is no difference as to how the issue is considered.

Criminal Justice Services.  He has also served on the Loudoun County, Virginia Board of Supervisors.

The government submits that the defendant's maturity and his educational and professional background make it highly unlikely that any statement he made to the police was a product of his will being overborne.

      b. <u>The defendant's statements on 2/13/2021 at his brother's Oakland, Md. residence</u>

As set out above, the defendant made a number of statements to and in the presence of police, after his brother called 911 of the morning of February 13, 2021.  Although the brother's call related to the defendant being in the residence without his (the brother's) consent, the officers who responded to the residence neither detained nor arrested him, and treated him respectfully.  The officers questioned the defendant, as well as the brother and their elderly mother, in an attempt to resolve a dispute between the brothers as to whether their mother should get a COVID-19 vaccine.  The dispute was resolved when the brother and mother left the residence, after which the police also left.

The police had arrived at the residence at 10:27 a.m. and departed at 11:38 a.m.

Based on these facts, the government submits that any statements the defendant made to or in the presence of the

14

police were made voluntarily.  There are no egregious facts to justify suppression of these statements on due process grounds.

        c. The defendant's statement during his arrest

The defendant was arrested on the afternoon of February 13, 2021, after his vehicle was stopped by Maryland State Police. Immediately following the arrest, as recounted above, the defendant made a remark about his phone being broken an asked that it be placed in his pocket.

The defendant asked an FBI agent, "What's this all about?," or using words to the same effect, asked the agent why he was being arrested.  To inform the defendant as to the reason for his arrest, the agent played an 11-second audio-video file on the agent's phone, showing the defendant outside the Capitol building on January 6, 2021, urging others to come to the Capitol.  Which prompted the defendant to ask the agent if that had been him, the agent, who recorded him.

These brief exchanges were not in the context of formal questioning by the agent or any other law enforcement officers. It followed shortly after a non-violent traffic stop and an incident-free arrest.

The government submits that on these facts there are no grounds to find that the statement was made involuntarily.  Once again, there is no evidence of egregious facts to support such a finding.

d. The defendant's threat to physically resist being taken to D.C., and his writings to the Sheriff

As discussed above, after the brief appearance before the District Court Commissioner, the defendant was on notice that he would be transferred to the District of Columbia.  He had also been advised during the proceeding of his right to remain silent and his right to representation by an attorney.

The defendant's verbal statement, shortly thereafter, that he would physically resist being transferred to D.C., was not made in response to any police questioning.  Similarly, his handwritten statements intended for the Sheriff, which he wrote while held at the detention center, explaining that he should not be transferred to D.C., were also not made in response to police questioning.

Given the defendant's age and background, given that he had been advised of his rights, and given that none of these statements was the product of any coercive conduct by the police, the Court should find them to have been voluntarily made.

2. None of the challenged statements is barred under *Miranda v. Arizona.*

The Fifth Amendment's Self-incrimination Clause provides that "No person shall be . . . compelled in any criminal case to be a witness against himself."  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the prosecution may not

use in evidence "statements, whether inculpatory or exculpatory, stemming from custodial interrogation of the defendant, unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. The *Miranda* Court further held that, "unless other fully effective means are devised," the following "procedural safeguards" were required: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

The *Miranda* Court further held, however, that these now-familiar warnings need only be given when a suspect has been "taken into custody or otherwise deprived of freedom of action in any significant way." *Id.* The Court later made clear that as suspect is "in custody" for *Miranda* purposes only after a "formal arrest or [a] restraint on freedom of movement to a degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted).

In addition *Miranda* applies only to statements made in response to police interrogation; it does not apply to "volunteered" statements made by a suspect. *Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980). Nonetheless, "police interrogation extend[s] . . . to words or actions on the part of

17

police officers that they *should have known* were reasonably likely to elicit an incriminating response" from the suspect. *Id.*

Finally, it is not necessary that a suspect expressly waive his rights under *Miranda* for his statements to be admissible. If the *Miranda* warnings are given, and if it is established that the suspect understood them, he is deemed to have implicitly waived his rights under *Miranda* by thereafter answering questions during interrogation. *Berghuis v. Tompkins*, 560 U.S. 370, 384-85 (2010).

Under these set of principles, the statements the defendant made at this brother's residence, on the morning of February 13, 2021, are fully admissible because at no time during that incident was the defendant in custody. As discussed above, for the hour or so he was in the presence of the police, he was never arrested nor detained. In fact, not only was he free to leave the house--where he did not reside--he was actively encouraged to do so.[10]

The other challenged statements--the defendant's remarks about his phone, the question to the agent whether the agent had

---

[10]The Court need not reach this issue, as the government does not intend to use this set of statements in its case in chief. The government may, however, use them during cross-examination of the defendant, should he testify, or in a rebuttal case. *See Harris v. New York*, 401 U.S. 222, 222-25 (1971) (per curiam) (holding that statements of a defendant elicited in violation of *Miranda* may be used to impeach the defendant if he testifies).

recorded him at the Capitol; the defendant's verbal threat to physically resist being transferred to D.C.; his letters to the Sheriff; his remarks to the agent about the port he was being taken to and maritime law--are all volunteered statements not made in response to police questioning and therefore not barred under *Miranda*.  In the government's view, only the defendant's question to the agent about whether the agent filmed him, made moments after the arrest, requires any detailed analysis.[11]

Although no court in this Circuit has apparently addressed the issue, most courts have held that it does not constitute interrogation, under *Miranda* and *Innis*, for the police to advise a suspect about the facts or status of the investigation against him.

That is the view, for example, in the Eighth Circuit.  *See United States v. Allen*, 247 F.3d 741, 765-66 (8th Cir. 2001), *judgment vacated on other grounds*, 536 U.S. 953 (2002).  In *Allen* the suspect, arrested for his involvement in a violent bank robbery, invoked his *Miranda* rights.  *Id.* at 756-57, 764. Detectives then conducted a line-up where three out of four eyewitnesses placed Allen on the scene of the robbery, which had

---

[11]In addition, the threat, the written letters, and the remark about a port and maritime law were all made after the defendant had been advised of his *Miranda* rights by the Commissioner.  Even if these statements were the product of interrogation, which they are not, the government submits the defendant was aware of his rights under *Miranda* and therefore implicitly waived them by making these statements.  *See Tompkins*, 560 U.S. at 384-85.

occurred the previous day.  *Id.* at 764.  The detectives
thereafter "informed him of the results of the line-up."  *Id.*
Allen then requested to speak with a particular police officer
whom he knew from a previous case, which was arranged.  *Id.*
That officer advised Allen again of his *Miranda* rights.  *Id.*
After waiving his rights, Allen confessed his involvement in the
armed robbery.  *Id.* at 764-65.

On appeal following his conviction, Allen argued his
confession should have been suppressed because he had invoked
his right to counsel under *Miranda* before meeting with the
officer to whom he confessed.  *Id.* at 764.  In rejecting Allen's
appeal, the court focused on whether informing Allen of the
results of the line-up constituted interrogation under *Innis*.
*Id.* at 765-66.  The court ruled it did not.  As the court
explained:

> It was a simple description of the status of
> the ongoing investigation which, according
> to the government, is a routine practice for
> suspects in custody in this particular
> jurisdiction.  More importantly, it was not
> designed to, nor was it reasonably likely
> to, elicit an incriminating response from
> Allen.  This was a statement of fact and not
> a plea to conscience.  *See Innis,* 446 U.S.
> at 294-95, 302-03.  Rather, the officer
> simply described the results of the lineup,
> unaccompanied by any threats or other
> compelling pressure.  Informing a suspect
> that he has been identified in a lineup
> contributes to the intelligent exercise of
> his judgment and may likely make firm his

> resolve to refuse to talk to the police
> without counsel.

*Id.* at 765 (citations omitted).  The court further held that "[k]eeping a suspect informed of the progress of the investigation and the status of the charges against him should be encouraged rather than discouraged, so long as the communication is truthful, and is not designed, nor is it likely to elicit, an incriminating response."  *Id.* at 765-66.

The Court of Appeals for the Fourth Circuit reached a similar conclusion in *United States v. Payne*, 954 F.2d 199 (4th Cir.), *cert. denied*, 503 U.S. 988 (1992).  In *Payne* the suspect had been arrested after making sales of cocaine to an undercover police officer.  *Id.* at 200-01.  While Payne was in custody, the police executed a search warrant at his residence and recovered a firearm.  *Id.* at 201.  When Payne was later being transported to an FBI office, an agent with him was advised of the results of the search in a phone call.  *Id.*  Shortly thereafter, the agent told Payne that "they found a gun in your house."  *Id.* According to the court, "Payne responded, 'I just had it for my protection.'"  *Id.*

On appeal following his conviction for drug and weapons offenses, the Fourth Circuit rejected Payne's argument that the agent's statement about the recovery of the gun was the functional equivalent of interrogation, and that therefore his

response should have been suppressed.  *Id.* at 202.  The court
further held:

> That no comment on the evidence in a case
> will ever issue in the presence of a
> criminal suspect seems to us neither
> realistic nor desirable . . .  Indeed, it
> may even be in the interest of a defendant
> to be kept informed about matters relating
> to the charges against him.  Here, for
> example, Agent Martin had [earlier]informed
> Payne that the government was going to
> search his residence and permitted him to
> call his family in order to minimize their
> apprehension.  Information about the
> evidence against a suspect may also
> contribute to the intelligent exercise of
> his judgment regarding what course of
> conduct to follow.

*Id.; see also United States v. Collins*, 683 F.3d 697, 702-03 (6th
Cir.) ("An accurate statement made by an officer to an
individual in custody concerning the nature of the charges to be
brought against the individual cannot reasonably be expected to
elicit an incriminating response."), *cert. denied*, 568 U.S. 988
(2012).

Moreover, these considerations have particular force where
the officer is providing information about the case against a
suspect in response to the suspect's direct inquiry, as there is
no doubt in such circumstances that the suspect wants
information to help him assess his situation.  In this respect
the facts at issue in *United States v. Conley*, 156 F.3d 78 (1st

Cir. 1998), are particularly pertinent to the facts involving
Egtvedt.

In *Conley* a U.S. Postal Inspector arrested the suspect and
told him he was under arrest for "drug trafficking."  *Id.* at 81.
The suspect then "beseech[ed the inspector] to tell him 'what is
going on' and [asked] 'what have you guys got on me, what's this
all about?'."  *Id.*  The inspector complied with Conley's
requests and began explaining the evidence against him.  *Id.*  As
he was doing so, Conley "blurted out" and "injected" statements
to the effect that he was involved in marijuana distribution.
*Id.*

On appeal following Conley's conviction for drug offenses,
the Court of Appeals for the First Circuit upheld the admission
of the statements, ruling that:  "A law enforcement officer's
mere description of the evidence and of potential charges
against a suspect, in direct response to the suspect's
importuning, hardly can be classified as interrogatory."  *Id.* at
83.

Finally, these holdings are supported by the Supreme
Court's decision in *Arizona v. Roberson*, 486 U.S. 675 (1988).
In *Roberson* the Court held that when a suspect in custody
invokes his *Miranda* right to counsel, the police cannot
thereafter initiate interrogation even if the subject of the new
interrogation concerns a separate investigation.  *Id.* at 682-87.

23

The police are permitted, however, "to inform the suspect of the facts of the second investigation as long as such communication does not constitute interrogation." *Id.* at 687. As the Fourth Circuit noted in *Payne*: "If providing such information need not constitute interrogation in the circumstances of two investigations, we discern no reason why the rule would be any different when a suspect is the subject of only one investigation." 954 F.2d at 202.

In this case, just like the appellant in *Conley*, Egtvedt, after being arrested, wanted to know "what this was all about." The agent responded by showing Egtvedt an 11-second audio-video recording that concisely encapsulated why Egtvedt was being arrested. There was no reason at all for the agent to expect Egtvedt to provide an incriminating response upon being shown the recording, let alone any response at all. Indeed, the particular response Egtvedt made--indicating Egtvedt thought it might have been the agent himself who recorded him at the Capitol urging others to join the mob attacking the building-- was far and away beyond what any reasonable person would expect.

## Conclusion

For the reasons set forth above, and for any other reason the government might offer at a hearing on the defendant's motion, the defendant's motion to suppress statements should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

by:  /s/*Michael C. Liebman*
     Michael C. Liebman
     Assistant United States Attorney
     D.C. Bar no. 479562
     601 D Street, N.W., room 4-1501
     Washington, D.C.  20530
     (202) 252-7243
     michael.liebman@usdoj.gov