AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* ) | Case No.  21-SW-83 |
| OF A BLACK IPHONE 7 PLUS, MODEL A1661, BEARING ) | |
| IMEI: 359474083508436 ) | |
| ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

Located in the_____District of Columbia_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| | |

18 U.S.C. § 231(a)(3) - Obstruction of Law Enforcement During Civil Disorder; 18 U.S.C. § 1752(a)(1) and (2) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; 40 U.S.C. § 5104(e)(2) - Violent Entry and Disorderly Conduct on Capitol Grounds; 18 U.S.C. § 1512(c)(2) - Obstruction of Justice/Congress;  18 U.S.C. § 111(a)(1) -Assaulting, Resisting, or Impeding Certain Officers; 18 U.S.C. § 1752(a)(4) - Engaging in physical violence in restricted building or on restricted grounds.

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____

*Applicant's signature*

_____Joshua L. Smith-Shiner, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_Telephone_____ *(specify reliable electronic means)*.

Date:  _____3/23/2021_____          _____

*Judge's signature*

City and state:  _____Washington, D.C._____          G. Michael Harvey

United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means        ☑ Original            ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>OF A BLACK IPHONE 7 PLUS, MODEL A1661, BEARING<br>IMEI: 359474083508436 | )<br>)<br>)     Case No.  21-SW-83<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of Columbia _____ .
*(identify the person or describe the property to be searched and give its location):*

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ April 6, 2021 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ G. Michael Harvey _____ .
                                                                                                              *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for _____ days *(not to exceed 30)*   ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 3/23/2021 _____          _____
                                                                                          *Judge's signature*

City and state: _____ Washington, D.C. _____          _____
                                                                                          G. Michael Harvey
                                                                                          United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>21-SW-83 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

 

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

**Property to Be Searched**

The property to be searched is a black Apple iPhone 7 Plus, Model A1661, bearing IMEI:

359474083508436 (hereinafter the "Device").  The Device is currently in FBI custody, in

Washington, D.C.

**ATTACHMENT B**

**Description of Items To Be Searched and Seized**

The information and data to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. §§ 111(b)(assaulting a federal officer), 231(a)(3)(impeding, obstructing, or interfering with a law enforcement officer during the commission of a of civil disorder), 1512(c)(2)(obstruction of an official proceeding), 1752(a), (b) (knowingly entering or remaining in any restricted building without lawful authority), and 40 U.S.C. § 5104(e)(2) (violent entry and disorderly conduct on Capitol grounds), among others, (the **TARGET OFFENSES**), as described in the search warrant affidavit, including, but not limited to:

1.      Records and information regarding identity, including, but not limited to:

     a.   Clothing and other items depicted in photographs or otherwise believed to be on EGTVEDT's person on January 6, 2021; and

     b.   Indicia of occupancy, including bank statements, utilities bills, vehicle registration and vehicle insurance documents.

2.      Records and Information regarding the **TARGET OFFENSES** as follows:

     a.   Records and information relating to travel to the Washington D.C. area on or about January 6, 2021, including but not limited to evidence of gasoline and restaurant receipts;

     b.   Records and information relating to unlawfully entering the U.S. Capitol, including any photographs and videos of the property of the U.S. Capitol Building or Grounds, and any maps or diagrams of the same;

     c.   Records and information relating to awareness of the official proceeding that was to take place at Congress on January 6, 2021, *i.e.,* the certification process of the 2020 Presidential Election;

     d.   Records and information relating to efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, *i.e.,* the certification process of the 2020 Presidential Election;

e.  Records and information relating to a conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

f.  Records and information relating to the breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

g.  Records and information relating to the riot and/or civil disorder at the United States Capitol on January 6, 2021;

h.  Records and information relating to the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

i.  Records and information relating to any conspiracy, planning, or preparation to commit the Target Offenses;

j.  Records and information relating to EGTVEDT's state of mind with respect to members of the United States Congress and Senate, law enforcement in Washington, D.C., and/or United States Government officials;

k.  Records and information relating to the layout of the U.S. Capitol and other United States Government buildings in Washington, D.C.;

l.  Records and information relating to EGTVEDT's state of mind with respect to the U.S. Congress, the 2020 presidential election, the January 6, 2021 certification of the 2020 presidential election, and the January 20, 2021 presidential Inauguration;

m.  Other evidence of the state of mind of EGTVEDT and/or co-conspirators, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the **TARGET OFFENSES**; and

n.  Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the **TARGET OFFENSES**, including records and information that help reveal their whereabouts.

o.  Records and information relating to interest or participation in, or associations with other individuals, to include communications between EGTVEDT and other individuals who may have assisted or provided support which would constitute evidence of the **TARGET OFFENSES**;

p.  Communications relating to conspiracy, interest, planning or preparation to commit the **TARGET OFFENSES**, to include communications between EGTVEDT and other individuals who may have collaborated, conspired assisted (knowingly or unknowingly) or otherwise provided support to EGTVEDT and/or

2

his co-actors in committing the target offenses, or communicated with EGTVEDT about matter relating to the **TARGET OFFENSES**;

q.  Photographs or videos documenting EGTVEDT's presence in Washington, D.C., on January 6, 2021, or that contains photographs or videos documenting the actions and presence of others at or near the U.S. Capitol on January 6, 2021.

r.  evidence of who used, owned, or controlled the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

s.  evidence of software, or the lack thereof, that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

t.  evidence of the attachment to the Device of other storage devices or similar containers for electronic evidence;

u.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device;

v.  evidence of the times the Device was used;

w.  passwords, encryption keys, and other access devices that may be necessary to access the Device;

x.  documentation and manuals that may be necessary to access the Device or to conduct a forensic examination of the Device;

y.  records of or information about Internet Protocol addresses used by the Device;

z.  records of or information about the Device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.   Definitions

a.   As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

b.   The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN THE MATTER OF THE SEARCH    \*
OF A BLACK IPHONE 7 PLUS,    \*
MODEL A1661, BEARING IMEI:    \*
359474083508436    \*
        \*    **CASE NO. _____**
        \*
        \*
        \*
        \*
        \*

**<u>AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT</u>**

     Joshua Smith-Shimer, a Special Agent with the Federal Bureau of Investigation

("FBI"), being duly sworn, deposes and states under penalty of perjury that the following is

true to the best of my information, knowledge, and belief.

**<u>Introduction and Agent Background</u>**

     1.      I make this Affidavit in support of an application for search warrant under Federal

Rule of Criminal Procedure 41 authorizing the examination of property -- a digital device currently

in law enforcement possession -- further identified at Attachment A (the "Device"), and the

extraction from that property of electronically stored information as described in Attachment B.

     2.      I have been a Special Agent with the FBI, in Washington, D.C., for the past six

years.  I am currently assigned to an ongoing investigation by the FBI, United States Capitol

Police ("USCP"), Metropolitan Police Department ("MPD"), and other law enforcement

agencies, of riots and civil disorder that occurred on January 6, 2021, in and around the United

States Capitol. Since I became involved in this investigation on January 6, 2021, I have

conducted interviews, reviewed public tips, reviewed publicly available photos and video, and

reviewed relevant documents, among other things.

3.     The facts in this affidavit come from my personal observations, my training and experience, my review of documents and other material, and information obtained from other agents, task force officers, and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on the facts set forth below, I respectfully submit there is probable cause that violations of 18 U.S.C. §§ 111(a)(1), 231(a)(3), 1512(c)(2), 1752(a) and 40 U.S.C. § 5104(e)(2)(hereinafter the "**TARGET OFFENSES**") have been committed by DANIEL DEAN EGTVEDT ("EGTVEDT").  There is also probable cause to search the Device, further described below and in Attachment A, for the things described in Attachment B.

### Identification of The Device to Be Examined

5.     The property to be searched is a black iPhone 7 Plus, Model Model A1661 (the "Device").  The Device is currently in FBI custody in Washington, D.C.  The Device was seized during a search of EGTVEDT incident to his arrest on February 13, 2021 (as detailed below).

### Probable Cause

*Background – The U.S. Capitol on January 6, 2021*

6.     The USCP, the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C.  20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.     At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor

2

Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

8.      The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

10.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

11.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

12.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

13.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

14.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

15.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S.

Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

16.     Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.

17.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.  USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

18.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained.  .  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers.  They also took police equipment from overrun police including shields and police batons.  At least one of

5

the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

19.     Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

20.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

21.     At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.

22.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



23.     An unknown subject left a note on the podium on the floor of the Senate

Chamber.  This note, captured by the filming reporter, stated "A Matter of Time Justice is

Coming."



24.     During the time when the subjects were inside the Capitol building, multiple

subjects were observed inside the US Capitol wearing what appears to be, based upon my

training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge,

training, and experience, I know that flex cuffs are a manner of restraint that are designed to be

carried in situations where a large number of individuals were expected to be taken into custody.





25.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide

curfew beginning at 6:00 p.m.

26.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

27.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

28.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

29.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

30.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

31.     Beginning around 9:00 p.m., the House resumed work on the Certification.

32.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

33.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

34.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

35.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

36.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:





[1] https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/
[2] https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.

*Probable Cause Specific to This Application*

37.      At approximately 2:47 p.m., an individual subsequently identified as EGTVEDT is first observed on the Capitol Grounds.  He is seen standing at the threshold of an exterior door to the United States Capitol building, appearing to nuzzle, or rub his face and nose on the back of the man in front of him.  EGTVEDT appeared to have been recently sprayed with some type of chemical irritant and was attempting to wipe it off.  The video, which was obtained from the social networking application Parler, and published by Pro Publica, shows EGTVEDT among a group of individuals who are attempting to gain entry to the United States Capitol building by pushing their way through a line of USCP officers.  Others rioters nearby are heard saying "here we go, here's the next rush . . . there's a push inside, with resistance," as the rioters continue to push futher inside.

38.    At approximately 3:08 p.m., EGTVEDT was observed on additional Parler video footage from inside the United States Capitol building.  In that video, EGTVEDT was seen walking through the hallway of the United States Capitol building with other rioters who had gained entry to the building.  EGTVEDT is the male in the dark top, directly beneath the blue arrow below.



39.    Shortly after Officer M.D. entered the Capitol, he encountered EGTVEDT in the Hall of Columns, on the south side of the United States Capitol building, directly under the House Chamber.  Officer M.D. told your affiant that EGTVEDT appeared to be leaving; however, EGTVEDT then decided to come back down the corridor.

40.    Officer M.D. recalled seeing several other officers attempting to stop EGTVEDT and keep him from going back in the direction of the Rotunda.  One of those officers, USCP Officer M.M., recalled EGTVEDT rushed at her while he screamed at her to shoot him on three occasions.

41.    EGTVEDT grabbed Officer M.M. with both of his hands and gained control of her left arm.  EGTVEDT would not let go, therefore, Officer M.M. swung her right arm in a downward motion to break EGTVEDT's grip on her.

42.    Officer M.D. described EGTVEDT as "generally non-compliant, screaming, and incoherent" and "screaming at the top of his lungs."  Officer M.D. tried to grab EGTVEDT below the waist but could not, due to EGTVEDT's size.  He then attempted to push EGTVEDT back in the direction of the south exit door and "held on for dear life" due to EGTVEDT's size.

13

43.     As more officers came to assist in moving EGTVEDT toward the exit, EGTVEDT fell backwards and Officer M.D. was dragged down with him.  Officer M.D. did not recall being pulled.  Officer M.D. fell after attempting to push EGTVEDT toward the door and his momentum carried him forward once EGTVEDT fell.  Officer M.D., who was still holding onto EGTVEDT as he fell, injured his shoulder in the fall.  Officer M.D. then left EGTVEDT to seek treatment from other MPD officers on scene.

44.     One of the other officers who assisted in removing EGTVEDT from the United States Capitol building, USCP Officer A.D., also recounted non-complaint actions by EGTVEDT.  Officer A.D. recalled that EGTVEDT swung his right hand, however, based upon your affiant's viewing of video, as discussed below, it appears as though EGTVEDT swung his left hand at Officer A.D.  Officer A.D. was able to "move into" EGTVEDT to avoid being hit.

45.     EGTVEDT was on the ground in the Hall of Columns for several minutes before plain clothes law enforcement officers came over to advise that other individuals were being removed from the United States Capitol building and they would need to exit, and EGTVEDT was blocking the hallway those officers planned to use to removed them from the United States Capitol building.  Therefore, Officer A.D. and USCP Officer C.R. attempted to pick EGTVEDT up and move him outside.  EGTVEDT again became non-compliant and "then fought again." According to Officer M.M., EGTVEDT said he wasn't going to leave and splayed out his arms and legs while lying on his back in an effort to inhibit law enforcement from picking him up.

46.     Officers eventually moved EGTVEDT towards the south side door where he fell again. Officers asked EGTVEDT if he needed medical treatment, which he declined. Officer A.D. then returned inside to further assist law enforcement in securing the United States Capitol building.

14

*Video Footage Review*

47.     Your affiant reviewed video footage from various sources, as detailed below, showing EGTVEDT's actions during the riot.  Your affiant has included, where applicable, references to the type of video footage, whether fixed post surveillance camera footage, body-worn camera (BWC) footage from officers, or video posted to social media.  As part of the security apparatus at the United States Capitol building, the USCP maintain numerous fixed post security cameras in the buildings and on the grounds.  EGTVEDT was captured on several cameras inside the United States Capitol building, specifically, inside the Hall of Columns and the vestibule separating the Hall of Columns from the south side entrance door (respectively hereinafter, Hall of Columns camera and Vestibule camera).

**Hall of Columns Camera**

48.     In the video, which was reviewed by your affiant and is described in more detail below, EGTVEDT is observed walking south through the Hall of Columns at approximately 3:11 p.m.  EGTVEDT appeared to be walking toward the exit and traveled out of view.  Other individuals were leaving the Capitol building at the same time.



49.     Approximately 16 seconds after he left the Hall of Columns, EGTVEDT reappeared and tried to walk further back into the United States Capitol building in the direction of the Rotunda when he is engaged by law enforcement, who ordered EGTVEDT to leave the premises.  Specifically, as shown in the lower left corner of the image below, which comes from that video, an FBI Special Agent dressed in tactical gear is directing EGTVEDT toward the exit.



50.     EGTVEDT shook his head and proceeded to continue farther back into the United States Capitol building, where he was stopped by Officer M.M. who was wearing her USCP bicycle uniform.  EGTVEDT disregarded Officer M.M.'s commands, swatted at her outstretched arm, and as mentioned above, grabbed at her left arm and held on with both of his hands.  After Officer M.M. was able to break free, EGTVEDT continued to proceed forward in the direction of other officers.  EGTVEDT was then approached by Officer A.D., whom he appeared to shove backward.

 

51.     As more officers came to assist, EGTVEDT further resisted and violently flailed his arms at officers as they attempted to subdue him.  Finally, with approximately five officers attempting to hold him back, EGTVEDT attempted to charge at Officer M.M.  At this point, as shown in the image below, MPD Officer M.D. can be seen attempting to grab EGTVEDT by his waist to stop him from advancing.



52.     While officers attempted to push EGTVEDT away from Officer M.M.,

EGTVEDT and Officer M.D. fell against a column and into the ground as a result, causing

injuries to Officer M.D.'s right shoulder.  EGTVEDT appeared to grab at his neck after he hit the

column.

 

**Body-Worn Camera**

53.     Review of Officer M.D.'s body-worn camera from the incident showed additional

footage of EGTVEDT physically resisting officers' attempts to keep him from traveling further

down the Hall of Columns.  At one point, as officers moved forward to interdict, EGTVEDT was

heard shouting "you shoot me; shoot me" at the officers present.

 



**Vestibule Camera**

54.     Several minutes later, Officer A.D. and Officer C.R. assisted EGTVEDT to his

feet and tried to walk him through the south side vestibule and out through the south side door.

EGTVEDT then fell to the ground as he was being walked out.  After several more minutes,

other officers attempted to pick EGTVEDT up and further remove him from the United States

Capitol building.  EGTVEDT again attempted to gain entry, and further fought with law

enforcement.

      55.     Specifically, after offering him medical assistance, Officer A.D. and Officer C.R.

helped EGTVEDT to his feet.  As soon as he got to his feet, EGTVEDT again attempted to gain

access to the building and proceeded to swat Officer M.M.'s hand as she attempted to stop him.

EGTVEDT further grabbed Officer M.M. by the wrist.  EGTVEDT then tried to further push

past Officer M.M. while making continued physical contact as she was standing in his way.

Officer M.M. viewed the video footage from the vestibule camera and identified herself as the

officer in the USCP bike officer uniform in the pictures below; however, she acknowledged that

she could not recall details of her second encounter with EGTVEDT at the vestibule door.



      56.     Eventually, EGTVEDT is walked down an exterior ramp outside of the south

entrance door.  For several more minutes, EGTVEDT can be seen on camera pacing back and

forth on the exterior ramp, appearing to yell at passing law enforcement.



57.     Following his removal from the building at approximately 3:14 p.m., EGTVEDT is no longer observed via time-stamped surveillance footage from inside the United States Capitol building; however, there are several additional instances where he is captured on video or interviewed throughout his time on the Capitol Grounds on January 6, 2021.

### *Identification of EGTVEDT*

58.     While EGTVEDT was in the Capitol, he provided an interview to an individual who was livestreaming from inside the United States Capitol building.  The livestream video, posted to DLive – a blockchain livestreaming community – by Tim Gionet AKA "Baked Alaska," captured EGTVEDT inside the United States Capitol building appearing to still suffer from the aforementioned chemical irritant.

59.     During the interview, EGTVEDT told the cameraman:  "everyone that's outside, tell them to get in here now"; he further stated that they "shot me in the eyes twice" and said "everybody, if you're seeing this, come down here now.  We're not backing away; this is our

house." EGTVEDT ends the interview by screaming that members of Congress should "grow a spine or fucking resign!" into the camera.



60.    EGTVEDT was observed on several other occasions around the exterior of the United States Capitol building. In one instance, he was standing in front of a closed door as others attempted to pry it open. EGTVEDT was standing with his cell phone, appearing to take pictures or a video of the occasion. In a separate incident, EGTVEDT was observed with a megaphone, standing at the base of the Capitol steps yelling at officers standing on the exterior stairs.

61.    Law enforcement included a picture of EGTVEDT from that DLive interview in an FBI Seeking Information poster as "BOLO 76." The "BOLO 76" photo was widely disseminated to the public by the FBI Public Affairs Office on January 14, 2021, as shown below.



Photograph #76



62.     On January 20, 2021, W-1 contacted the FBI National Threat Operations Center
(NTOC) in reference to FBI "BOLO 76."  W-1 reported that the individual in "BOLO 76" is
Daniel Egtvedt, and provided a telephone number ("PHONE NUMBER ONE") and an Oakland,
Maryland address ("OAKLAND ADDRESS") for EGTVEDT.

63.     On January 21, 2021, your affiant telephonically interviewed W-1.  W-1
confirmed EGTVEDT's identity as the individual in the FBI "BOLO 76" as well as the contact
information provided in "its" January 20, 2021, tip to NTOC.  W-1 indicated "it" had wished to
remain anonymous.  Nonetheless, W-1 provided "its" own name and explained that "it" had
known EGTVEDT for over 10 years, and that Egtvedt had been in W-1's home in the past.

64.     W-1 recounted that, on the evening of January 6th, "it" had seen video on social
media where EGTVEDT appeared and talked about being sprayed twice and stated that people
need to come to the Capitol.

65.     Following the interview, your affiant discovered a Facebook (profile name
dan.egtvedt), Pinterest (profile name dane0039), Twitter (profile name @DanEgtvedt), and

23

LinkedIn (profile name danegtvedt) account for a Daniel Egtvedt, with ties to Oakland,

Maryland.  Specifically, several of the photos posted by EGTVEDT have "tagged" a named

individual, which public record searches confirmed to be EGTVEDT's close relative.  Searches

of Maryland property records show that the identified close relative owns the property at the

OAKLAND ADDRESS.

66.     Each of the social media accounts referenced above is public and contains either

a profile picture of EGTVEDT or photo of EGTVEDT posted to the account.  Below are two

photos obtained from Facebook and Twitter, respectively:

 

67.     Your affiant conducted a comparison of the various social media accounts

associated with the name provided by W-1 and the photographs in FBI "BOLO 76," as well as

video from the aforementioned livestream inside the United States Capitol building.  Your

affiant, concluded that the photographs and video all depict the same person.  Furthermore, the

multi-colored dress shirt worn in a photo posted to EGTVEDT's public Facebook page on

October 29, 2020, is consistent in color and pattern with the shirt worn by EGTVEDT during his

interview that was livestreamed inside the United States Capitol building.  The Facebook

photograph and a still image from the livestream is attached below.

 

68.     Maryland driver's license records show that a "Daniel Dean Egtvedt," white male,

6' 2", 320 pounds, was issued a Maryland driver's license on June 23, 2020, and list him as

residing at the OAKLAND ADDRESS.  The records provide a specific date of birth for one

"Daniel Dean Egtvedt," which is consistent with the apparent age of EGTVEDT in the social

media videos images from January 6, and include a photograph that is very similar in appearance

to those video and images.

***Probable Cause Evidence Will Be Found on the Device***

69.     Public record checks of PHONE NUMBER ONE indicate that PHONE

NUMBER ONE was disconnected.  However, AT&T records confirmed that a second telephone

number ("PHONE NUMBER TWO") is registered to EGTVEDT at the OAKLAND ADDRESS.

AT&T records also show that a device assigned PHONE NUMBER TWO was in or near the

U.S. Capitol on January 6, 2021.  Specifically, the PHONE NUMBER TWO device first appears

in or near the U.S. Capitol at 2:37 p.m., and appears to remain in or near the U.S. Capitol until

3:31 p.m.

70.     AT&T Wireless records demonstrate that the cellular phone associated with PHONE NUMBER TWO is an Apple iPhone 7 Plus, Model A1661.  According to the AT&T records, the IMEI for PHONE NUMBER TWO is 3594740835084339.  Your affiant has reviewed advice from an agent in FBI's CAST unit, which is the unit that provides expert testimony for cellsite location data.  According to the CAST agent, the IMEI listed in subscriber records always has 16 digits, with the last two digits consisting of a "software version number."  The IMEI number imprinted on a device, however, has 15 digits, with the last digit consisting of a "check digit."  According to the CAST expert, if the first 14 digits of the IMEI imprinted on a device correspond to the first 14 digits of an IMEI shown in subscriber records, the IMEIs pertain to the same device.

71.     As described above, there is evidence that EGTVEDT had the Device in his possession while at the U.S. Capitol on January 6, 2021.  In addition, based on photos and videos of the offenses that date, I know numerous persons committing the **TARGET OFFENSES** possessed digital devices that they used to record and post photos and videos of themselves and others committing those offenses.  Further, based on the investigation, numerous persons committing the **TARGET OFFENSES** possessed digital devices to communicate with other individuals to plan their attendance at the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

72.     Records of the Maryland Motor Vehicle Administration (MVA) show that EGTVEDT provided the OAKLAND ADDRESS when he registered a 2011 Toyota Highlander in October 2020.[3]  The MVA records your affiant examined do not list the model of the 2011

---

[3]According to the MVA's website a Maryland vehicle registration is good for two years. The MVA records your affiant reviewed indicated the registration expires in October 2022.  On this basis, I believe Egtvedt registered this vehicle in October 2020.

Toyota; however, they list the Vehicle Identification Number (VIN).  I determined the car was

the Highlander model based upon the first 12 digits in the vehicle identification number (VIN).

Your affiant checked a frequently relied upon database to determine that those 12 digits identify

the vehicle as a Toyota Highlander.  The MVA records show EGTVEDT's vehicle bears license

plate 8EH0702.

73.     Drug Enforcement Administration records indicate that a vehicle consistent with a

Toyota Highlander, bearing Maryland license plate 8EH0702, crossed the Key Bridge into the

District of Columbia on January 5, 2021.  Based on Oakland, Maryland's proximity to

Washington, D.C., and the lack of other available means of transportation, I have probable cause

to believe that EGTVEDT travelled by motor vehicle from Oakland, Maryland, to Washington,

D.C., on January 5, 2021, to participate in the events at the U.S. Capitol described above.  Thus,

the Device should contain evidence as to when he traveled, the route used, and the Device's

geolocation data would be evidence of his presence at the U.S. Capitol and Grounds.

74.     Based on the above information, your affiant believes that the Device will contain

evidence of the **TARGET OFFENSES**.

75.     The Device is currently in the lawful possession of the FBI in Washington, D.C.

The Device came into the FBI's possession following EGTVEDT's arrest.   On February 9,

2021, the Honorable Zia M. Faruqui issued an arrest warrant for EGTVEDT based on a Criminal

Complaint for violations of 18 U.S.C. §§ 111(a)(1), 231(a)(3), 1512(c)(2), 1752(a), and 40

U.S.C. § 5104(e)(2).

76.     On the morning of February 13, 2021, before the arrest warrant was executed,

Maryland State Police (MSP) responded to a domestic incident at the OAKLAND ADDRESS.

EGTVEDT was present at the OAKLAND ADDRESS and advised MSP that while he received

mail at the OAKLAND ADDRESS, he lived at another nearby residence.  Several hours later, after confirming with the FBI that EGTVEDT had an active warrant for his arrest, MSP returned to the area and arrested EGTVEDT near the OAKLAND ADDRESS, when they stopped the vehicle he was driving, which was a different vehicle from the 2011 Toyota Highlander registered to EGTVEDT.

77.     At the time of his arrest, the Device was sitting in the cupholder of the vehicle EGTVEDT was driving.   EGTVEDT referred to a "broken phone," which I believe was a reference to the fact that the screen of the Device is cracked.  MSP retrieved the Device from the vehicle and, at EGTVEDT's request, placed it in his jacket pocket.  EGTVEDT was temporarily detained in the Garrett County Detention Center, where the Device was seized from him by MSP and placed in evidence.  On February 15, 2021, FBI took possession of the Device, and it has been stored in FBI temporary storage since then.

78.     On March 1, 2021, your affiant applied for a search warrant for the Device.  By inadvertence, the application for the warrant set out an incorrect IMEI number, 3594747*13*835*13*84339, that substituted "13" in two positions where, in the correct IMEI number gleaned from the AT&T records for PHONE NUMBER TWO, "0" appeared.  The warrant was nonetheless issued (1:21-sc-58) by the Hon. Z.M. Faruqui, M.J.  The error was discovered when the warrant began to be executed and the back of the Device was removed, revealing an imprinted IMEI number with "0" in those two positions.  As a result of this discovery, all further efforts to search the Device ceased.

79.     The IMEI number imprinted on the Device reads 359474083508436.  This number has 15 digits while the IMEI number from the AT&T records for PHONE NUMBER TWO, 3594740835084339, has 16 digits, although the first 14 digits are identical.  As discussed

above, according to the advice of the FBI CAST agent, because the first 14 digits are identical, the Device is the same device referenced in the AT&T records for PHONE NUMBER TWO.

## TECHNICAL TERMS

80.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic,

29

or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

        b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities.  These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

        c.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location,

and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    d.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  Some PDAs include a memory card or other removable storage media for storing data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.

    e.  "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit

boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of

149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

j.    "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

k.    "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

81.    Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://support.apple.com/kb/SP744?locale=en_US, I know that the iPhone 7 Plus has

capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.   In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense(s) under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

83.    As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the Device.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the items described in Attachment B will be stored in the Device for at least the following reasons:

a.    Based on my training and experience, I know that crimes carried out by more than one person often involve some amount of communication among those involved.  This may involve working out details of and preparing to carry out a premeditated crime, working together to cover up the crime afterwards, or simply arranging to meet up someplace where an unplanned crime would later occur.  Either way, I know from training and experience that electronic devices are often used for this purpose and electronic devices used by a participant in such criminal activity often contains evidence of communication among accomplices.  For instance, communication logs indicate who the device user was communicating with both immediately before and after the crime.  Similarly, your affiant has seen multiple examples of suspects communicating after a crime via text (or other online chat functions) to discuss where incriminating items have been hidden, where and what the police are doing to investigate the

crime, and whether any witnesses have implicated them. This case involves many different people, including EGTVEDT, working together to breach the Capitol and attack the officers defending the Capitol on January 6, 2020.  For instance, thus far multiple individuals have been identified as having participated in the attacks on the officers by the lower west terrace door of the Capitol.  By its very nature, such concerted actions amongst multiple people in varying locations involves discussion and planning which is regularly done by online chats or texts. Indeed, law enforcement has already identified multiple social media postings and text communications in other cases regarding plans for activity at the U.S. Capitol on January 6, 2021.  Such electronic discussions often involve discussions on social media about the account user's specific plans and state of mind regarding the events on January 6, 2021, as well as evidence of co-conspirators.

   b. Based on my training and experience, I know that witnesses, and even perpetrators, often record criminal activity.  For example, witnesses have recorded school fights, attacks on public transportation, and police shootings and assaults.  Law enforcement has seen such videos shared and discussed amongst co-conspirators or friends on sites like Instagram. These videos have proven extremely crucial in investigations by depicting the crime itself. Similarly, law enforcement has seen criminals take photographs of their victims and of themselves with the proceeds of a crime shortly after committing it.  In this case in particular, your affiant has already identified multiple photos and what appear to be video recordings of individuals involved in the storming of the Capitol on January 6, 2021.  Your affiant believes that it is likely to find similar photographs or videos on the devices of this nature.  Your affiant also knows through training and experience that, just like most people, criminals often keep photos and videos of themselves on their devices.  These photos and videos capture the clothes they own and wear at

the time of the photograph, which is relevant in identifying the individual in videos and photographs from the breach of the Capitol.

      c.   Based on my training and experience, I know that people who commit crimes like the **TARGET OFFENSES**, often use their cell phones in ways that reveal their location and/or activities before, after, or while engaging in criminal activity. For example, this may include location information (*e.g.*, GPS data), app usage information (*e.g.*, Internet search inquiries), and images or video recordings relevant to the criminal activity. Specifically, law enforcement has repeatedly seen videos or photos on a suspect's phone taken at or near key points in the crime. Such video and image files often include identifying landmarks, buildings, or backgrounds that help place the suspect at an important location related to the crime or have even exculpated the individual by placing the individual at a different location at the time of the crime. Such videos or selfies that were taken at or near the time of the crime inculpate or exculpate the suspect by identifying the phone user's precise location at the time the photo or video was taken. Similarly, such videos and photos often have geotags, or GPS data embedded in the file, enabling law enforcement to identify the precise location where the photo was taken. Similarly, law enforcement has found evidence of suspects searching for directions to a relevant location by using Google maps or using applications like Waze to avoid traffic. Other phones record the directions and GPS information provided to the phone user when travelling from one location to another. Furthermore, I know from training and experience that text messages and any app enabling communication with others often include communications that shed light on the cell phone user's location and activity during a particular time period. For example, just as people making plans often update each other via text regarding when they will arrive somewhere or where they will meet, suspects often text with co-conspirators, friends, or other confidants

regarding where they are going or when they plan on arriving to a location.  Similarly, if a suspect uses a ride-sharing application, data on the suspect's phone can indicate where and when the suspect travelled based on texts from the service.

   d. Based on my training and experience, I know that individuals involved in criminal activity, such as the **TARGET OFFENSES**, often use their cell phones to search the internet to learn the status of a criminal investigation, *i.e.,* look up the newspaper articles about the crime, determine if the police have suspects, and learn the identity of witnesses.  For example, law enforcement has regularly seen suspects look up articles chronicling developments in the case, reward posters, news about the particular location the crime occurred, news about the type of crime committed, and YouTube videos posted by law enforcement.  Similarly, based on my training and experience, I know that individuals involved in criminal activity often use their cell phones to search the internet in preparation for a crime, such as researching new weapons or looking up information on victims or witnesses.  For example, law enforcement has seen Google searches by suspects trying to learn how to load a newly acquired weapon in the weeks preceding a crime committed with that weapon or repeated Google searching regarding shootings in a particular neighborhood in the hours after the crime occurred.

   e. Based on my training and experience, I know that phones typically list device information (such as the associated IMEI, Phone Number, Android or Apple ID) and linked user accounts.  The device information includes, for instance, the phone numbers associated with the phone, the IMEI, and sometimes even includes the name of the phone as provided by the phone user (such as "JohnDoe's I-phone").  Linked user accounts include account names and handles used to log in to Apps regularly used on the phone, such as the account names used on social media sites like Instagram, email accounts used, or online communication platforms, like

37

Textnow and Snapchat.  Both device information and linked accounts are key both for identifying the phone user's location during the crime and for identifying the user of the phone. Device information and linked accounts are typically then the basis of key additional investigative steps that allow law enforcement to identify the phone user's location at the time of the crime.  For example, once the active phone number used by the suspect is identified, law enforcement can then apply for a cell site warrant, which provides location data on the phone user.  Similarly, once an email account or Apple ID is identified, law enforcement may be able to apply for a warrant for location data stored by that online provider, such as Google location records.  Based on my training and experience, I know that linked accounts, such as a cell phone number or a related email account, also provide key information to indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, if the phone number associated with the phone is a number frequently used by friends or associates of the suspect to contact him or her, the government's identification of the phone number will assist in proving who was using the phone at the time key activity on the phone occurred.  Similarly, your affiant has regularly seen the suspect's full name be listed in the email address linked to a phone, which clearly helps identify the user of the phone.

    f.  Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

    g.  Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or

viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

84.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination

of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in the iPhone at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point

toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

       b.     Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

       c.     A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

       d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

       e.     Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs,

41

anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.      I know that when an individual uses a digital device to coordinate or plan the **TARGET OFFENSES**, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

85.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have

specific expertise in the types of digital devices, operating systems, or software applications that

are being searched, and to obtain specialized hardware and software solutions to meet the needs

of a particular forensic analysis.

      b.    Digital data is particularly vulnerable to inadvertent or intentional

modification or destruction.  Searching digital devices can require the use of precise, scientific

procedures that are designed to maintain the integrity of digital data and to recover "hidden,"

erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic

files from digital devices also requires specialized tools and often substantial time.  As a result, a

controlled environment, such as a law enforcement laboratory or similar facility, is often

essential to conducting a complete and accurate analysis of data stored on digital devices.

      c.    Further, as discussed above, evidence of how a digital device has been

used, the purposes for which it has been used, and who has used it, may be reflected in the

absence of particular data on a digital device.  For example, to rebut a claim that the owner of a

digital device was not responsible for a particular use because the device was being controlled

remotely by malicious software, it may be necessary to show that malicious software that allows

someone else to control the digital device remotely is not present on the digital device.  Evidence

of the absence of particular data or software on a digital device is not segregable from the digital

device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular

data or software requires specialized tools and a controlled laboratory environment, and can

require substantial time.

      d.    Digital device users can attempt to conceal data within digital devices

through a number of methods, including the use of innocuous or misleading filenames and

extensions.  For example, files with the extension ".jpg" often are image files; however, a user

can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

      e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and

sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

    f. Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

86.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.     The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.     The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.     In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment

46

B.  Any search techniques or protocols used in searching the contents of the Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

87.     Because forensic examiners will be conducting their search of the Device in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## **CONCLUSION**

84.     Based on the forgoing, your affiant requests that the Court issue

the proposed search warrant.

Respectfully submitted,

_____
Joshua Smith-Shimer
Special Agent
Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1
and 41(d)(3) on March __23__, 2021.

_____
 G. Michael Harvey
United States Magistrate Judge

48