IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | CASE NO. 1:21-cr-00177 (CRC) |
| | : | |
| **DANIEL DEAN EGTVEDT** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ACCESS TO NON-PUBLIC AREAS OF THE CAPITOL

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Opposition to the Defendant's June 8, 2022 Motion to Compel Access to Non-Public Areas of the Capitol ("Defendant's Motion"). In his Motion, Daniel Egtvedt (hereinafter, "Egtvedt" or "the Defendant") moves the Court to compel the government to allow the defense to access and be permitted to inspect, photograph, and video tape certain non-public areas of the United States Capitol Building ("the Capitol") for preparation in his defense.

The government does not oppose the defendant's request to inspect the areas of the Capitol where the defendant was present on January 6th. Indeed, the government provided the defense with multiple opportunities – and the defense took advantage of two of them – to participate in U.S. Capitol Police ("USCP") guided crime scene walkthroughs of the Capitol. The government also provided the defense with thousands of hours of video footage from January 6th showing the areas of the Capitol that the defendant was present in, and directed the defense to specific video files showing the defendant's movements on January 6th.

The government does oppose the defense's additional requests to photograph, record, and measure non-public areas, as well as to measure public areas of the Capitol. The defendant fails to show how, in light of the government's substantial discovery of video footage and the opportunities for in-person inspection afforded on the USCP walkthroughs, these additional items are material to preparing the defense. Moreover, the defendant's requests would create a risk to the continued security of the Capitol. Protecting the Capitol building and those within the building is good cause for the Court to deny the defendant's request.

## INTRODUCTION AND BACKGROUND

1. *Case Facts*

Defendant Egtvedt is one of hundreds of individuals charged with crimes relating to the riot at the U.S. Capitol that took place on January 6, 2021, when Congress was in session to certify the results of the 2020 election for president and vice-president. On January 6, 2021, the defendant forced his way into the Capitol building through the Senate wing doorway located on the northern end of the upper west terrace. That doorway was initially breached by rioters at approximately 2:13 p.m. Several minutes later law enforcement members were able to re-secure the door and stop the flow of rioters in through the doorway.

After law enforcement secured the door, rioters broke the glass panes in the door and began reaching through the broken window panes. Law enforcement inside the building moved furniture in front of the doorway to create a makeshift barrier. At approximately 2:38 p.m., the defendant was positioned directly behind the broken window panes and can be seen speaking in the direction of law enforcement officers.



Shortly thereafter, it appears that an officer sprayed OC spray in the direction of the defendant.

By 2:47:25 p.m., rioters overpowered the officers and barricades and forced their way through the Senate Wing Doors into the Capitol. Egtvedt crossed the threshold into the Capitol at approximately 2:48:44 p.m.



Once inside the building Egtvedt proceeded down a hallway, heading south. In the hallway he sat down on a bench for several minutes while dozens of other rioters milled about. The government has recovered a social media, audio-video recording of Egtvedt while he was in this area of the Capitol. On this recording Egtvedt speaks to another rioter, who is apparently live streaming the events, and states:

> Tell everybody that's outside, tell them to get in here now! . . . This is our country. We need to reclaim it. We're not going to let the globalists take our country. This is America. Everybody, if you're seeing this, come down here now! We're not backing away. This is our house. Congressmen, grow a spine or f***ing resign!

A few minutes later on the recording Egtvedt starts shouting: "Police are traitors! Police are traitors! Police are traitors!"

After a few more minutes, Egtvedt resumed walking southward in the building, and made his way to a room known as the Crypt. In the Crypt, he verbally berated multiple police officers,

4

yelling at them that they were "on the wrong f***ing side."

A few minutes later Egtvedt exited the Crypt and resumed walking south, toward the Hall of Columns. When Egtvedt arrived in the Hall of Columns, at about 3:11 p.m., numerous law enforcement members, all in uniform, were standing along either side. As Egtvedt walked down the middle of the hall, heading in the general direction of an exit doorway, he pointed to several of them and stated, "God bless all of you." One officer responded, "Keep going, sir."

As Egtvedt neared the end of the hall, about 20 feet from the exit, another law enforcement member, an FBI agent dressed in tactical gear, motioned for him to continue in that direction. Egtvedt walked a few more feet toward the doorway. However, he then abruptly turned around and began walking back down the Hall of Columns toward the building's interior. As Egtvedt passed by the same agent, that agent once again motioned for him to proceed to the doorway. Egtvedt ignored the agent and continued walking away from the doorway.

As Egtvedt, who is listed in driver's license records from 2020 as 6'2" tall and weighing 320 pounds, continued toward the interior of the building, USCP Officer M.M.--a woman about half his size who was in full uniform--stepped in front of him to block his path. When he continued walking toward her, Officer M.M. placed her right hand on his upper left shoulder, to direct him back toward the doorway. When Egtvedt did not comply, two more uniformed USCP officers positioned themselves around Egtvedt.

Egtvedt continued to walk away from the doorway and loudly stated, "You shoot me! Shoot me! You guys are violating the Constitution of the United States of America!" He then swung his left hand around and swatted Officer M.M.'s right hand off his shoulder. Officer M.M. then raised her left hand and placed it on Egtvedt's upper chest area. Egtvedt then rotated his body and pinned the officer's left hand in the crook of his right elbow. Officer M.M. swung her

5

right hand against Egtvedt's right arm in order to free her other hand.

As this was happening, the two other USCP officers were attempting to subdue Egtvedt. In addition, D.C. Metropolitan Police Department ("MPD") Officer M.D., also in full uniform, positioned himself behind Egtvedt and pulled him by his jacket back toward the doorway. Egtvedt then began to yell, "You work for us! You work for us!" He then twisted around, removing first his left arm and then his right from his jacket, which fell to the floor. He continued in his effort to move forward, away from the doorway.

Two more officers, again in full uniform, surrounded and pushed against Egtvedt, as he continued struggling, still trying to move forward. With the weight of four male officers against him, including Officer M.D., Egtvedt could no longer move forward and fell backwards to the floor. As he hit the floor, the back of his head struck one of the columns. He also landed partly on top of Officer M.D.

For the next two minutes or so, Egtvedt lay on the floor. Although conscious and alert he refused to comply with officers' demands and stated he would not leave. The officers also asked him whether he wanted medical assistance, which he declined. Finally, two male USCP officers lifted Egtvedt to his feet and half-carried, half pushed him toward and out the doorway. Egtvedt fell to the floor again, immediately outside the doorway. Officers again tried to convince him to stand up and leave. He would not. The officers again offered to get him medical assistance. He again declined.

After about two more minutes the officers helped Egtvedt to his feet. Now standing immediately outside the doorway, Egtvedt promptly attempted to re-enter the building. Once again uniformed officers, including Officer M.M., physically blocked him, and once again Egtvedt swatted at Officer M.M.'s hand as she pushed against his chest.

After a few more moments of confrontation, Egtvedt relented and, at 3:18 p.m., began walking away from the doorway. At this point Egtvedt was on a raised outdoor terrace with several sets of steps leading down to a concrete area on the south side of the building. As he walked toward the steps on the western end of the terrace, an MPD officer called up to him and told him he needed to go the opposite direction, toward the steps on the eastern end. Egtvedt ignored the officer and continued toward and then walked down the steps on the western end.

As he neared the bottom of those steps, the same officer approached him and once again told him he needed to head the opposite direction. He responded, "I don't want to go over there." The officer, a female, repeated her command. He refused and came to the bottom of the steps. The officer, joined by a male MPD officer, then physically turned Egtvedt around and began to push against Egtvedt's back, forcing him to walk toward the east. As he walked, he leaned back against them to resist, and shouted, "This is tyranny!"

When the officers reached an area just outside the southeast corner of the building, other officers opened up a set of metal barriers and Egtvedt was directed to the other side of them. Thereafter, Egtvedt remained on the grounds of the Capitol for several more hours, outside the barriers, attempting at various points to engage verbally with law enforcement members.

2. *Discovery Related to the U.S. Capitol Building*

The government has provided the defense with extensive discovery, in the form of organized crime scene walk throughs and thousands of hours of video footage from January 6, 2021, that enable the defendant to "inspect" the U.S. Capitol. In this case, and in all January 6th cases, the government has provided the defense with access to over 24,000 files consisting of USCP closed circuit video ("CCV") footage, body-worn cameras ("BWC") from multiple law enforcement agencies, and USSS surveillance footage. For context, the video files, which were

provided to the defense via evidence.com, amount to over nine terabytes of information and would take 102 days to view. To find relevant footage from the Capitol Police's surveillance system and adequately prepare for trial, one would need to use maps which display the locations of the interior and exterior cameras. The government therefore provided the defense with maps that display these locations. The government provided fifteen camera maps of the interior of the Capitol Visitor's Center and the interior of the Capitol, and one camera map of the Capitol grounds. The maps depict the general location of the cameras that are identified by unique number in each USCP CCV video filename.

In the instant case, the government provided the defense with information indicating which specific USCP CCV video files (with time stamps) show the defendant as he entered the U.S. Capitol through the Senate Wing Doors, walked through the hallways to the Crypt and Hall of Columns, engaged with Officers M.M. and M.D. in the Hall of Columns, and was removed from Capitol at the doorway adjacent to the Hall of Columns.[1] The government also specified for the defense which MPD BWC files capture the defendant as he walked through the Crypt and Hall of Columns and interacted with Officers M.M. and M.D.[2]

Finally, USCP provided multiple "crime scene walkthroughs" for defense counsel involved in January 6th riot cases. Defense counsel were notified of the scheduled walkthrough dates ahead of time. The tours were approximately two hours long and went to a predetermined list of public

---

[1] The government also provided information indicating which USCP CCV videos capture the defendant as he remained on the Capitol grounds after being removed from the building.
[2] The government identified and provided the defense with BWC files from two officers who the defendant interacted with in the Crypt, from nine officers who interacted with or captured the defendant when he was in the Hall of Columns, and from three officers who interacted with or captured the defendant as he was being removed from the doors leading to the Hall of Columns and moved away from the Capitol building. Additionally, while it is not relevant to the Defendant's Motion, the government has been providing the defense with BWC files from officers who interacted with or captured the defendant when he remained on the Capitol grounds after being expelled.

and non-public areas within the Capitol. Defense counsel were permitted to bring one defense investigator so that the investigator can provide trial testimony about the tour and what was seen. As detailed in the Declaration of Sean Gallagher, USCP Acting Assistant Chief for Uniformed Services (Exhibit 1), the walkthroughs were designed to ensure defendants are able to prepare for their defense while also protecting the continued security of the U.S. Capitol. Accordingly, there were certain conditions in place for those participating in the walkthroughs. For example, defense counsel were permitted to take photographs in public areas of the Capitol but were not permitted to do so in non-public areas of the Capitol. Counsel for the defendant indicate that they have gone on two of the Capitol walkthroughs.

3. *The Defense Request*

The Defendant requests the Court to compel the government to both provide the defense with access to specific areas of the Capitol (which the government has done) and to permit the photographing, videotaping, and measuring of those specified areas. Specifically, the defense requests access to and permission to photograph, videotape, and record the following areas of the Capitol: (1) the Senate Wing Doors (inside and out); (2) the atrium of the Senate Wing Doors; (3) the interior pathway from the Senate Wing Doors to the Crypt and continuing on to the Hall of Columns; (4) the Hall of Columns; and (5) the vestibule and exterior pathways leading to the Hall of Columns. The Senate Wing Doors and the atrium by the Senate Wing Doors are the only areas that have been designated as non-public; however, the defendant asserts that the defense was told that it could not photograph the Hall of Columns during previous Defense Counsel Capitol Walkthroughs.

**ARGUMENT**

The Federal Rules of Criminal Procedure provide that upon a defendant's request, the government must permit the defendant to "inspect and to copy or photograph" documents or objects, including buildings or places, that are within the government's possession, custody or control. Fed. R. Crim. P. 16(a)(1)(E). Rule 16 establishes "the minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases." *United States v. Karake*, 281 F.Supp.2d 302, 306 (D.D.C. 2003) (quoting Fed. R. Crim. P 16 advisory committee's note to the 1974 amendments). Rule 16 does not, however, bestow on the defendant a right to unrestricted access to all documents and objects within the government's possession, custody, or control. *See United States v. Maranzino*, 860 F.2d 981, 985–86 (10th Cir. 1988) ("Rule 16 does not authorize a blanket request to see the prosecution's file"). Rather, it applies to those documents and objects that (1) are "material to preparing the defense;" (2) the government intends to use in its case-in-chief at trial; or (3) were obtained from or belong to the defendant. Fed. R. Crim. P. 16(a)(1)(E). Rule 16 also provides mechanisms for a judge to regulate discovery. "At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." Fed. R. Crim. P. 16(d)(1).

Demonstrating materiality under Rule 16 "is not a heavy burden." *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993). Evidence is material under Rule 16 "as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *United States v. Marshall,* 132 F.3d 63, 68 (D.C. Cir. 1998) (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)). Material evidence includes both exculpatory and inculpatory evidence. *Id*.

Nevertheless, to show materiality, the defense must demonstrate that the evidence bears "some abstract logical relationship to the issues in the case" and would enable "the defendant significantly to alter the quantum of proof in his favor." *Lloyd* at 351 (internal quotation omitted); *see also United States v. Slough*, 22 F. Supp. 3d at 4-5 (observing that the movant bears the burden of demonstrating that the requested discovery bears "more than some abstract logical relationship to the issues in the case").

1. *The Requested Photographs, Recordings, and Measurements Are Not Material.*

The photographs, recordings, and measurements that the defendant seeks are not materials that the government will use in its case-in-chief and are not materials that were obtained from or belong to the defendant. As a result, the defendant must show that these items are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E). The defendant fails to do so. The CCV and BWC showing where the defendant and relevant officers were on January 6th remains the most accurate evidence; any additional videos taken after January 6th would not add to the "quantum of proof" in the defendant's favor. *See United States v. Sutton*, No. CR 21-0598 (PLF), 2022 WL 1202741, at *11 (D.D.C. Apr. 22, 2022) (denying defendant's request for recordings from "any and all cameras" maintained by law enforcement to monitor the area a crew operated in when the government already collected and disclosed all video footage of the incident for which the defendant was charged). The defendant claims that the CCV distorts distances between objects in an "unreliable way," but fails to state *how* the CCV distorts the distance and how its own recordings or photographs would be any more accurate. Defense Motion at Para. 8. It is also unclear what "objects" the defense is referring to and how the measurement of those objects is relevant to the charges at issue. The defendant is charged with offenses related to his presence in the Capitol building, his intent to obstruct an official proceeding, and his assaults, resisting, and

11

impeding law enforcement officers. The distance between the columns in the Hall of Columns, for example, has no bearing on whether the defendant ignored officers' commands to leave the building or whether the defendant swung his left hand and swatted Officer M.M.'s right hand off his shoulder (all of which can be clearly seen on USCP CCV and MPD BWC).

Similarly, the defense does not explain how its estimation of where the defendant or a given officer was located, and the defense's subsequent measurements based on those estimates, is any more accurate than the original CCV and BWC videos. The defense focuses on the need for measurements and photographs to accurately show the distance between the defendant and an officer when the defendant was sprayed with OC spray. Defense Motion at Para. 9.[3] If the exact distance of the officer using OC spray from the defendant cannot be assessed in the video, then how will coming to the Capitol and taking measurements help? The defense will still be playing a guessing game as to the respective distances, as neither the officer nor the defendant will be standing at the Capitol in the exact same positions they were in on January 6th. The measurements and photographs also would not provide any further information on the quantum of OC spray that the defendant was sprayed with, or how long he was subject to the spray – something that again is most clearly seen on the USCP CCV video.

Additionally, the USCP crime scene walkthroughs enable a defense investigator to inspect the exact area where the spraying occurred (the Senate Wing Doors), and then to testify about that at trial. The investigator can speak firsthand about the size of the space, for example, hypothetically explaining that the size of the atrium in the Senate Wing Door was approximately

---

[3] It should be noted that this spraying occurred approximately ten minutes before the defendant forced his way into the building, and over thirty minutes before the defendant berated officers in the Crypt and made his way to the Hall of Columns, where he engaged in the altercation with Officers M.M. and M.D.

the same distance from the witness box to where a given juror sits. The investigator can also testify about his or her ability to move in the space, and what he or she could observe from the space. The crime scene walkthroughs – without the requested measurements or photographs and recordings of non-public areas – thus provide a sufficient opportunity for the defense to uncover admissible evidence, aid in witness preparation, corroborate testimony, or assist with impeachment or rebuttal. *Marshall*, 132 F.3d at 68. Unreliable measurements based upon estimates the defense makes from the CCV and BWC videos, on the other hand, do not add to the "quantum of proof" in the defendant's favor.

2. *Ensuring the Security of the Capitol Is Good Cause to Deny the Defendant's Request.*

Protecting the Capitol building and those within the building is good cause for the Court to deny the defendant's request. Courts in this Circuit have consistently held that the protection of the Capitol Building and prominent government officials constitutes a significant government interest. *See, e.g.*, *United States v. Mahoney*, 247 F.3d 279, 286 (D.C. Cir. 2001) (stating that the government has a significant interest in "'ensuring public safety and order'"); *Mahoney v. U.S. Marshals Serv.*, 454 F. Supp. 2d 21, 33 (D.D.C. 2006) (noting that "armed gunmen have stormed the Capitol building more than once") (citing *United States v. Grace*, 461 U.S. 171, 182 (1983))). The photographs, recordings, and measurements the defendant seeks also fall within the definition of "security information." Pursuant to 2 U.S.C. §1979, any "security information" related to the Capitol Police can only be released to third parties with the approval of the Capitol Police Board. Security information is defined as "information that-(1) is sensitive with respect to the policing, protection, physical security, intelligence, counterterrorism actions, or emergency preparedness and response relating to Congress, any statutory protectee of the Capitol Police, and the Capitol buildings and grounds."

The defendant's requests would create a risk to the continued security of the Capitol. The Capitol, which is under the control of the Legislative Branch, is one of the most secure buildings in the country. The crime scene walkthroughs for the defense – and the walkthroughs for Assistant United States Attorneys – require permissions from numerous officials in the Legislative Branch.[4] Information related to the measurements and photographs of the non-public areas of the Capitol would clearly be considered security information and subject to the approval requirements required by 2 U.S.C. § 1979. Additionally, as discussed in Exhibit 1, permitting the measurements that the defendant seeks, such measuring distances from wall to wall, from wall to door and vice versa, would provide a wealth of information to an adversary who might wish to calculate blast distances,[5] the ability to fly a drone within the building,[6] or how large of a group could quickly pass through the hallways,[7] to name but a few security risks. Allowing measurements and photographs and recordings of non-public areas of the Capitol will also expose security features that are embedded in the physical structure of the Capitol – including features that had to be changed after the January 6th riots.

Finally, providing the defense with the opportunity to take measurements and photographs and recordings in non-public areas of the Capitol would be a heavy burden on USCP and consume USCP resources that should instead be devoted to the protection, security, and safety of the U.S. Capitol and those within the Capitol. The Capitol is not open to the general public[8] and is a 24

---

[4] Although USCP is part of the prosecution team in January 6th cases, the Capitol itself is not in the Executive Branch's control. As a result, the Assistant United States Attorneys prosecuting January 6th cases and the federal agents investigating the cases need to ask for official tours of the building and are subject to restrictions in the building.
[5] The U.S. Capitol was bombed on November 7, 1983.
[6] A Massachusetts man was arrested in September of 2011 for planning to fly a drone into the U.S. Capitol and the Pentagon.
[7] Defendants in current January 6 cases have been accused of using a "stack formation" to move up the steps of the Capitol.
[8] In order to enter the Capitol, one must either be a Member of Congress, Congressional staff, or be escorted by one.

hours a day, 7 days a week work place for members of Congress and their staff. The Capitol is therefore protected 24 hours a day, 7 days a week, both inside and outside, by the USCP. The time spent by USCP officers in arranging for the defendant's taking of measurements and photographs is time that would otherwise be devoted to protecting the Capitol and those inside of it. Furthermore, if the Court were to order that the defendant must be permitted to take the requested measurements and photographs and recordings of non-public areas of the Capitol, it is highly likely that many other January 6th defendants would seek similar orders, and USCP would have to spend valuable hours and manpower to provide for each individual defendant's requested measurements, photographs, and recordings. In light of these significant security concerns and risks regarding the Capitol, there is good cause to deny the defendant's motion.

## **CONCLUSION**

WHEREFORE, the Government respectfully requests that the Court deny the defendant's motion.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

 /s/ Colleen D. Kukowski
Colleen D. Kukowski
Assistant United States Attorney
D.C. Bar No. 1012458
Colleen.Kukowski@usdoj.gov
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2646 (Kukowski)

---

Any visitors on official business must proceed to the Appointments Desk where their visit will be verified. With the exception of Members, their spouses or official law enforcement, all visitors to the U.S. Capitol, including staff, must go through security screening that includes a search for weapons. The U.S. Capitol is not open to the general public without an appointment and tours of the U.S. Capitol are on a pre-determined route by credentialed tour guides.

CERTIFICATE OF SERVICE

I certify that a copy of the Government's Opposition to the Defendant's Motion to Compel Access to Non-Public Areas of the Capitol was served on all counsel of record via the Court's electronic filing service.

                                            */s/ Colleen D. Kukowski*
                                            COLLEEN D. KUKOWSKI
                                            Assistant United States Attorney

Date:   July 5, 2022