**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**DANIEL D. EGTVEDT**,<br><br>Defendant. | Case No. 21-cr-177 (CRC) |

**OPINION AND ORDER**

Daniel D. Egtvedt has been charged in a nine-count indictment for his participation in the events at the U.S. Capitol on January 6, 2021.  See Superseding Indictment, ECF No. 43.  A bench trial is scheduled for December 5, 2022.  In advance of that trial, the parties have filed a variety of pretrial motions—seeking to dismiss certain counts, asking to suppress or otherwise limit the evidence that can be presented at trial, and requesting certain discovery-related relief. The Court discussed some of the motions at an April 28, 2022 hearing and held an evidentiary hearing on Mr. Egtvedt's motion to suppress on June 2, 2022.  The Court denied various portions of the parties' motions at those hearings but reserved judgment on other issues.  In this Order, the Court will resolve most of the parties' remaining pretrial motions.

**I.     Background**

In November 2020, Americans awarded Joseph Biden 306 votes in the Electoral College and selected him as the next President.  See United States v. Robertson, 588 F. Supp. 3d 114, 117 (D.D.C. 2022).  The process for officially certifying those results is laid out in the Twelfth Amendment and the Electoral Count Act of 1887.  As relevant here, these provisions require Congress meet in joint session "on the sixth day of January" to present the votes of each state's slate of electors, handle any objections, and ultimately count and certify the choice of President and Vice President.  See U.S. Const. amend. XII; 3 U.S.C. § 15.  So, around 1 p.m. on January 6,

2021, a joint session of the U.S. Congress convened to certify the Electoral College vote count, with then-Vice President Michael Pence presiding.  See Aff. in Supp. of Criminal Compl. ("Compl. Aff.") ¶¶ 4, 6, ECF No. 1-1.  About thirty minutes later, the House and Senate adjourned to their separate chambers to resolve an objection.  Id. ¶ 6.

By that point, a large crowd of people had made its way to the Capitol from a rally hosted by then-President Donald Trump, who claimed that the election results were fraudulent and the election had been stolen.  See Trump v. Thompson, 20 F.4th 10, 17–18 (D.C. Cir. 2021).  At the end of his speech, President Trump had called on attendees to "walk down Pennsylvania Avenue" to "give our Republicans . . . the kind of pride and boldness that they need to take back our country."  Id. at 18.  The crowd soon overwhelmed the permanent and temporary security barriers, as well as the line of U.S. Capitol Police, cordoning off the grounds and building from the public that day.  Compl. Aff. ¶¶ 5, 8.  Shortly after 2 p.m., the crowd breached the building. Id. ¶ 8; see also Robertson, 588 F. Supp. 3d at 118.  The chaos forced members of Congress, as well as Vice President Pence, to evacuate the chambers and suspend the joint session, which did not ultimately reconvene until after 8 p.m.  Compl. Aff. ¶ 9.  All told, the breach of the Capitol led to several deaths, the injury of approximately 140 members of law enforcement, and millions of dollars in damage to the building and grounds.  Trump, 20 F.4th at 15–16, 18–19.

The government alleges that defendant Daniel Egtvedt was among the crowd that breached the Capitol that day.  Videos on social media show Egtvedt as part of a group attempting to push through a line of police officers into the Capitol, and walking through the Capitol once he made his way inside.  Compl. Aff. ¶¶ 12–13.  The affidavit supporting the criminal complaint also describes several physical altercations between law enforcement and Egtvedt, who, the government alleges, was "non-compliant" and "fought" attempts to remove

him from the building.  Id. ¶¶ 15–21.  The government filed a criminal complaint against Egtvedt

in February and ultimately secured an indictment on March 3, 2021.  See Criminal Compl., ECF

No. 1; Indictment, ECF No. 9.  A superseding indictment now charges Egtvedt with nine counts.

Egtvedt and the government have consented to a bench trial.  See Waiver of Jury Trial,

ECF No. 83; Notice of Hearing, June 8, 2022.  The parties have filed a variety of motions

seeking pretrial relief.  The Court will describe the specific requests in the following sections.

## II.  Defendant's Pretrial Motions

### A.  Motions to Dismiss

Egtvedt has moved to dismiss two groups of charges: *first*, for obstruction of an official

proceeding and aiding and abetting the same, in violation of 18 U.S.C. §§ 1512(c)(2); *second*, for

engaging in certain prohibited acts "in a restricted building or grounds," in violation of 18 U.S.C.

§ 1752(a)(1), (2), and (4).  These statutes, as well as the specific arguments Egtvedt raises in

favor of dismissal, are by now well-trodden ground.  As explained below, the Court agrees with

the many judges in this district who have nearly uniformly rejected similar attempts to dismiss

charges under §§ 1512 and 1752 arising out of the January 6th breach of the Capitol.  The Court

will therefore deny the two motions to dismiss.

#### 1.  Legal Standards

A criminal defendant "may raise by pretrial motion any defense, objection, or request that

the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  Among other

things, defendants may challenge "a defect in the indictment," including "failure to state an

offense."  Fed. R. Crim. P. 12(b)(3)(B)(v).  Because pretrial dismissal of an indictment "directly

encroaches upon the fundamental role of the grand jury, dismissal is granted only in unusual

circumstances."  United States v. Ballestas, 795 F.3d 138, 148 (D.C. Cir. 2015) (internal

quotation marks omitted).  "The operative question is whether the allegations" in the indictment, "if proven, would be sufficient to permit a jury to find that the crimes charged were committed."  United States v. Sanford, Ltd., 859 F. Supp. 2d 102, 107 (D.D.C. 2012).

       *2.  Section 1512 Charge (Count Four)*

In Count Four, the Superseding Indictment alleges that Mr. Egtvedt "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18," in violation of 18 U.S.C. §§ 1512(c)(2).  Superseding Indictment at 3.  Section 1512 provides in relevant part that:

> (c) Whoever corruptly—
>
> > (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with intent to impair the object's integrity or availability for use in an official proceeding; or
> >
> > (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c).

Egtvedt asks to dismiss Count Four on two grounds.  See Mot. Dismiss Count Four, ECF No. 60 ("1512 Mot.").  First, he contends that the congressional proceeding to certify the Electoral College vote is not an "official proceeding" within the meaning of § 1512(c).  Id. at 4–11.  Second, he maintains that his conduct at the Capitol on January 6th does not fall within § 1512(c)(2)'s definition of "obstruct[], influence[], or impede[]," which, he says, covers only "action with respect to a document, record or other object . . . ."  Id. at 11–12.  Neither argument is persuasive.

4

a.   Official Proceeding

The certification of the Electoral College vote is an official proceeding for the purposes of § 1512(c).  The Court has already dealt with this issue at some length in proceedings against another January 6th defendant, and it adopts in full the reasoning in that prior opinion.  See Robertson, 588 F. Supp. 3d at 120-22.  As the Court explained there, the statute's definition of "official proceeding" expressly includes "a proceeding before the Congress."  Id. at 120 (quoting 18 U.S.C. § 1515(a)(1)(B)).  To determine whether a given event qualifies as a proceeding before Congress, "[c]ourts have coalesced around 'the legal—rather than the lay—understanding'" of the term "proceeding."  Id. (quoting United States v. Ermoian, 752 F.3d 1165, 1170 (9th Cir. 2013)).  That definition looks to whether the event is part of "[t]he business conducted by a[n] . . . official body."  Id. (quoting Proceeding, Black's Law Dictionary (11th ed. 2019)).  Because the "proceeding" must be an "official" one, courts look as well for a "sense of formality."  Id. (citing United States v. Sandlin, 575 F. Supp. 3d 16, 21-23 (D.D.C. 2021)).

The certification of the Electoral College has all the hallmarks of an official proceeding: the Constitution mandates that it occur, the Electoral Count Act details formal procedures to follow, and the results are documented in the Congressional Record.  Id. at 121 (citing U.S. Const. art. II, § 1, cl. 3; U.S. Const. amend. XII; 3 U.S.C. §§ 15–18; 167 Cong. Rec. H75, S13 (daily ed. Jan. 6, 2021) (House and Senate Sections)); see also United States v. Grider, 585 F. Supp. 3d 21, 28 (D.D.C. 2022) ("Few Congressional events could be more ceremonious and formal than the quadrennial Joint Session of Congress mandated by the Constitution and federal statute.").  The vote count is plainly an official proceeding.

Egtvedt raises several objections to this self-evident conclusion.  Most significantly, he avers that only "judicial or quasi-judicial" proceedings that "affect the administration of justice"

qualify under § 1512(c).  See 1512 Mot. at 4–7.  The Court has rejected this argument before.

Robertson, 588 F. Supp. 3d at 121.  Courts "ordinarily resist reading words or elements into a

statute that do not appear on its face," and § 1512(c) by its terms does not contain any of the

"extra requirements" Egtvedt tries to read in.  Sandlin, 575 F. Supp. 3d at 24 (quoting Bates

v. United States, 522 U.S. 23, 29 (1997)).  Egtvedt points out that other sections of the statute

focus on "very specific subjects and settlings related to the administration of justice," with

provisions focusing, for example, on influencing or injuring jurors, and obstructing a federal

audit.  1512 Mot. at 7–8; see 18 U.S.C. §§ 1503, 1516.  But the narrow focus of those provisions

cuts the other way.  Section 1512(c) contains no such limiting language, suggesting that it

instead "targets official proceedings more broadly."  Sandlin, 575 F. Supp. 3d at 24.  Finally,

even if the Court were to adopt Egtvedt's narrow definition of the phrase "official proceeding,"

the certification of the Electoral College vote would qualify because it *is* quasi-adjudicatory.

Robertson, 588 F. Supp. 3d at 121.  As this Court has previously explained, it "has the familiar

features of a formal hearing," including the raising and debating of objections and the rendering

of final decisions to accept or reject the presented votes.  See id.

    None of Egtvedt's other arguments hold water.  For example, Egtvedt points out that the

Department of Justice's Criminal Resource Manual interprets § 1512 to focus on "the

presentation of evidence in Federal proceedings or the communication of information to Federal

law enforcement officers."  See 1512 Mot. at 10 (quoting 1729. Protection of Government

Processes – Tampering with Victims, Witnesses, or Informants – 18 U.S.C. 1512, Dep't Just.

Archives, https://www.justice.gov/archives/jm/criminal-resource-manual-1729-protection-

government-processes-tampering-victims-witnesses-or (last updated Jan. 17, 2020)).  This

argument is unavailing because "the Manual's generalized statements cannot alter the plain

meaning of the statutory text." United States v. Caldwell, 581 F. Supp. 3d 1, 14 (D.D.C. 2021),

reconsideration denied, 2022 WL 203456 (D.D.C. Jan. 24, 2022).  Egtvedt also asserts that the

counting of the Electoral College cannot be an "official proceeding" because it is more properly

understood as either "a federally protected function" under 18 U.S.C. § 231(a)(3) or "official

business" of Congress under 40 U.S.C. § 5104(e)(2)(C).  See 1512 Mot. at 10–11.  The Court

sees no reason why the same event could not meet more than one of these statutory definitions.[1]

See Caldwell, 581 F. Supp. 3d at 13; Russello v. United States, 464 U.S. 16, 25 (1983)

("[L]anguage in one statute usually sheds little light upon the meaning of different language in

another statute . . . .").  After all, "[s]ome overlap in criminal provisions is . . . inevitable."

Marinello v. United States, 138 S. Ct. 1101, 1107 (2018).

       For all these reasons, the Court again holds that certification of the Electoral College vote

is an official proceeding for the purposes of Count Four.

### b.  Qualifying Conduct

       Egtvedt next claims that § 1512(c)(2) only covers conduct "with respect to a document,

record or other object," and so his charged conduct on January 6th does not fall within the

statute's ambit.  See 1512 Mot. at 11–12.  For support, Egtvedt relies exclusively on the

reasoning in United States v. Miller, where Judge Nichols dismissed an analogous obstruction

charge for failure to state a claim based on this limited reading of § 1512(c)(2).  See 589 F. Supp.

3d 60 (D.D.C. 2022), reconsideration denied, 2022 WL 1718984 (D.D.C. May 27, 2022).  Every

other judge in this district to consider the question has rejected this limiting construction of

---

[1] The joint session of Congress likely is not a "federally protected function," as that
statutory definition "appears to focus on the activities of federal agencies and law enforcement
officials as opposed to Congress."  United States v. Williams, 21-cr-618 (ABJ), 2022 WL
2237301, at *12 (D.D.C. June 22, 2022) (discussing 18 U.S.C. § 232(3)).

§ 1512(c)(2), both before and after Judge Nichols's ruling.  See, e.g., United States v. Bingert, No. 21-cr-91 (RCL), 2022 WL 1659163, at *7–11 (D.D.C. May 25, 2022); United States v. Reffitt, No. 21-cr-32 (DLF), 2022 WL 1404247, at *7–10 (D.D.C. May 4, 2022); United States v. McHugh, No. 21-cr-453 (JDB), 2022 WL 1302880, at *4–12 (D.D.C. May 2, 2022); United States v. Puma, No. 21-cr-454 (PLF), 2022 WL 823079, at *13 (D.D.C. Mar. 19, 2022); United States v. Montgomery, 578 F. Supp. 3d 54, 72-79 (D.D.C. 2021).  This Court has also weighed in before, and it likewise concluded that "the statute's plain meaning 'cover[s] more than just acts affecting evidence.'"  See Robertson II, 2022 WL 2438546, at *3 (alteration in original) (quoting Reffitt, 2022 WL 1404247, at *7); see also United States v. Strand, No. 21-cr-85 (CRC), ECF No. 88 at 7 (concluding that "an indictment on [§ 1512(c)(2)] need not allege that a defendant took an action with respect to a document, record, or other object").  The Court adopts in full its reasoning in the Robertson opinion, and will deny Egtvedt's motion to dismiss on those grounds.

In short, the Court thinks that a broader reading of § 1512(c)(2)—and not the limited version put forward by Judge Nichols and the defendant here—is the natural one.  Miller links two subsections in § 1512— (c)(1), which covers altering evidence and hindering its use in an official proceeding, and (c)(2), which covers "otherwise obstruct[ing], influenc[ing], or imped[ing] any official proceeding"—and concludes that the conduct covered by the two must be similar in kind.  Miller, 589 F. Supp. 3d at 73–74.  The Court disagrees.  Although contained in the same statutory section, the two provisions cover different substance—with different verbs ("alter[], destroy[], mutilate[], or conceal," versus "obstruct[], influence[], or impede[]"), directed at different objects ("a record, document, or other object," versus "any official proceeding").  See 18 U.S.C. § 1512(c)(1), (2).  The word "otherwise" links the two provisions not to limit the scope of subsection (c)(2), but to "signal[] a shift in emphasis, . . . from actions

directed at evidence to actions directed at the official proceeding itself." Montgomery, 578 F. Supp. 3d at 72 (internal citation and quotation marks omitted).

Egtvedt maintains that this broader application of § 1512(c)(2) was "far from clear," and thus did not give him "fair warning of what conduct is illegal." 1512 Mot. at 12. With this argument, Egtvedt appears to invoke the rule of lenity, which "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." United States v. Lanier, 520 U.S. 259, 266 (1997). Lenity, however, only comes into play "if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute." Barber v. Thomas, 560 U.S. 474, 488 (2010) (internal quotation marks omitted). And, as the Court has just held, § 1512(c)(2) may be broad, but it does not contain any ambiguity. See Yates v. United States, 574 U.S. 528, 566 (2015) (Kagan, J., dissenting) ("Lenity offers no proper refuge from [a] straightforward (even though capacious) construction."). Egtvedt's alleged conduct thus does not fall outside the scope of § 1512(c)(2).

### 3. Section 1752 Charges (Counts Five, Six, and Seven)

Counts Five, Six, and Seven of the Superseding Indictment charge Egtvedt with, respectively, entering and remaining in a restricted building or grounds, disorderly and disruptive conduct in a restricted building or grounds, and engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1), (2), and (4). See Superseding Indictment at 3–4. Each count identifies the "restricted building and grounds" as "any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was temporarily visiting." Id.

Egtvedt seeks dismissal of all three counts. In his view, the areas of the Capitol building and grounds cordoned off by the Capitol Police on January 6th do not qualify as a "restricted"

area for the purposes of § 1752 because only the U.S. Secret Service may make such a designation.  See Mot. Dismiss Counts Five–Seven ("1752 Mot.") at 17–20, ECF No. 64.  In addition, he claims that any broader reading of § 1752 would be void for vagueness, id. at 20–27, invokes the rule of lenity, id. at 27–28, and contends that the government's "novel" application of the statute presents *ex post facto* concerns, id. at 28–30.  Once again, the Court joins the chorus of district judges rejecting this challenge to the application of § 1752 to those charged for their actions in the U.S. Capitol on January 6, 2021.  See, e.g., Bingert, 2022 WL 1659163, at *14; Puma, 2022 WL 823079, at *14–16; United States v. Andries, No. 21-cr-93-(RC), 2022 WL 768684, at *14–16 (D.D.C. Mar. 14, 2022); United States v. Griffin, 549 F. Supp. 3d 49, 53–57 (D.D.C. 2021).

As relevant here, § 1752 criminalizes certain conduct in "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting."  18 U.S.C. § 1752(c)(1)(B). The only reference in the statute to the Secret Service "is to its protectees"; it "says nothing about who must do the restricting."  Griffin, 549 F. Supp. 3d at 54.  As other judges in this district have noted, "[t]his flexible approach" to designating a restricted area "reflects the various temporary and permanent ways an area may be restricted[,]" as well as the Secret Service's "invariabl[e] reli[ance] on other law enforcement agencies for support."  Id.; see also Andries, 2022 WL 768684, at *15.  While the statute does not limit who may restrict an area, that is not a failure the Court must step in to fix.

Resisting the straightforward implications of the text, Egtvedt suggests that this "absurd" outcome will lead inevitably to intrusion into the Secret Service's work by competing law enforcement agencies.  See 1752 Mot. at 17.  As just noted, however, law enforcement often

cooperates—rather than competes—to protect high-level officials.  The statute's flexibility may be a reasonable accommodation of that fact.  The Court is not convinced by Egtvedt's slippery slope hypothetical.  He suggests that, under the government's reading, the U.S. Postal Inspection Service could designate large swathes of downtown D.C. as part of the restricted area necessary to protect the President, overriding the Secret Service's judgment about "the appropriate size of the restricted area" surrounding the White House.  Id. at 18.  This argument ignores the statute's built-in limitations.  See Griffin, 549 F. Supp. 3d at 57.  In every definition of "restricted area," the statute confines the "posted, cordoned off, or otherwise restricted area" to a building or its grounds.  18 U.S.C. § 1752(c)(1)(A) ("of the White House or its grounds"); id. § 1752(c)(1)(B) ("of a building or grounds where . . . [a] person protected by the Secret Service is or will be temporarily visiting"); id. § 1752(c)(1)(C) ("of a building or grounds so restricted in conjunction with an event designated as a special event of national significance").  Those geographic limitations at least minimize whatever potential exists for conflict among law enforcement.

Turning away from the text, Egtvedt points to the statutory history of § 1752 and the relatively limited case law applying it in this and other courts.  Neither help his case.

Given the straightforward reading outlined above, the Court sees little reason to "look beyond the text for other indicia of congressional intent."  United States v. Villanueva-Sotelo, 515 F.3d 1234, 1237 (D.C. Cir. 2008).  Regardless, the history of § 1752 does not support Egtvedt.  As Judge McFadden has explained, earlier versions of the statute authorized the Treasury Department—the former home of the Secret Service—"to 'designate by regulations the buildings and grounds which constitute the' protected residences or offices of Secret Service protectees and 'prescribe regulations governing'" access to "posted, cordoned off, or otherwise restricted areas."  Griffin, 549 F. Supp. 3d at 55 (quoting 18 U.S.C. § 1752(d) (1970)).  But this

grant of authority still "did not say *who* must restrict an area of a building or grounds." Id. (emphasis in original). And even if the older version of the statute had contained such a limitation, "[b]y 2006 Congress rewrote the statute, in the process eliminating reference to the Treasury Department and to any 'regulations' from any executive branch agency." Id. (citing 18 U.S.C. § 1752 (2006)). The statutory history thus provides no support for Egtvedt's proposed limitation.

The relevant case law likewise does not support his case. Egtvedt points first to United States v. Bursey, where the Fourth Circuit affirmed a § 1752 conviction of a protester who entered an airport hangar restricted in advance of a political rally. 416 F.3d 301, 304 (4th Cir. 2005). Egtvedt emphasizes the opinion's discussion of the hangar as a "federally restricted zone, so designated by the Secret Service." 1752 Mot. at 19 (quoting Bursey, 416 F.3d at 308). But the issue in that case was not how a restricted area could be designated; instead, it was whether the defendant's conduct satisfied the willfulness standard in the then-applicable version of the statute. Bursey, 416 F.3d at 308–09. The court recounted evidence that Bursey knew he was in an area the Secret Service had restricted to bolster that intent analysis, not because it believed only the Secret Service could designate an area as restricted. Id.; see also Griffin, 549 F. Supp. 3d at 56. A similar problem dooms his citation to Wilson v. DNC Servs. Corp., 417 F. Supp. 3d 86, 98 (D.D.C. 2019), where Judge McFadden considered a civil conspiracy claim by a candidate excluded from a political event. The discussion of § 1752 appeared in a section of the opinion evaluating whether the plaintiff could establish that he had been prevented from supporting his campaign in a legal manner. Id. Concluding he had not, the opinion reasoned that the plaintiff did not have needed authorization from the Secret Service to enter the restricted area. Id. Yet

again, the court did not discuss whether the Secret Service had designated the area as restricted—nor hold that it was the *only* entity that could do so.

Finally, the Court is unconvinced by the grab bag of doctrines Egtvedt raises to challenge application of § 1752 to his case, including vagueness, lenity, and the novel construction principle. See 1752 Mot. at 20–30. All these challenges do little more than rehash Egtvedt's textual argument about the role of the Secret Service. See United States v. Mostofsky, 579 F. Supp. 3d 9, 28 (D.D.C. 2021). The Court has already explained that the statute is unambiguous, and it gives the Secret Service no special role in delineating restricted areas. The law may be "capacious," but it lays no "trap awaiting the unwary."[2] Griffin, 549 F. Supp. 3d at 57–58 (rejecting similar challenge); see also id. (noting that lenity only comes into play when the court is otherwise unable "to resolve 'grievous ambiguity'" (quoting Barber, 560 U.S. at 488)).

The government's charging decisions—whether historically or in the wake of January 6th—likewise do not indicate that it has improperly expanded the law beyond prior bounds or taken advantage of some impermissible vagueness. Section 1752 is indeed a "rarely charged statute," but there has never been a "prevailing practice of courts forgoing or rejecting the interpretation that the Government now advances," as required for an *ex post facto* challenge. Id. at 58. The government may also choose to enforce the statute only against some of the trespassers at the Capitol on January 6th without raising the specter of arbitrary enforcement.

---

[2] Egtvedt mounts a narrower vagueness challenge to the charge under § 1752(a)(2)—Count Six—which criminalizes certain disorderly or disruptive conduct "in, or within such proximity to, any restricted building or grounds." See 1752 Mot. at 24–27. Egtvedt suggests that "proximity" is an unconstitutionally vague standard. But as the government points out, Count Six charges Egtvedt with disorderly conduct *in* a restricted area. See Opp'n to 1752 Mot. at 18, ECF No. 72. Whatever "fuzzy boundary" the concept of proximity holds is irrelevant as applied here. United States v. Nordean, 579 F. Supp. 3d 28, 60 n.16 (D.D.C. 2021).

The executive's "discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made," is generally not an appropriate subject for judicial review. United States v. Fokker Servs. B.V., 818 F.3d 733, 741 (D.C. Cir. 2016) (quotation omitted). And specific features of individual defendants—including their background, motivations in going to the Capitol, and specific conduct while there—could all provide "rational[]" explanations for charging only a subset of those who allegedly engaged in misconduct in a restricted area with violations of § 1752. Griffin, 549 F. Supp. 3d at 58. The law presents neither *ex post facto* nor vagueness problems.

Because Egtvedt has offered no valid bases for dismissing them, the Court will deny the motion to dismiss Counts Five, Six, and Seven.

B. Motion to Suppress

The Court next turns to what remains of Mr. Egtvedt's motion to suppress. See Mot. Suppress, ECF No. 50. That motion sought to exclude several statements Egtvedt made in the presence of law enforcement before and after his arrest, as well as the contents of a cell phone seized at the time of his arrest and searched pursuant to a warrant. The Court held an evidentiary hearing on this motion, and it has already denied most of the requests. See Suppression Hr'g Tr. at 181:22–182:2 (denying motion to suppress statements on morning of arrest); id. at 192:6–194:14 (denying motion to suppress seizure of cell phone); id. at 202:18–203:16 (denying motion to suppress certain statements and letters). But the Court reserved one issue for later resolution: Egtvedt's request to suppress statements made in the minutes following his arrest on February 13, 2021. See id. at 201:19–24. He contends that they were elicited in violation of Miranda v. Arizona, 384 U.S. 436 (1966), and were not given voluntarily. See Mot. Suppress at 8. The Court takes up those issues now and, for the reasons below, denies the motion.

14

### 1. Relevant Facts

Egtvedt was arrested pursuant to a warrant on February 13, 2021.  Suppression Hr'g Tr. at 84:9–13, 172:4.  Earlier that day, a trooper from the Maryland State Police had discovered the warrant after responding to a 911 call for a disturbance involving Mr. Egtvedt at his brother's house.  Id. at 15:5–17:2, 171:2–9, 172:25–173:3.  As a result of that discovery, officers from the Maryland State Police, in concert with the FBI agent on Mr. Egtvedt's case, conducted a traffic stop of Egtvedt's vehicle.  Id. at 87:2–89:18, 172:9–11.  After officers ordered the car to stop, Egtvedt pulled over, exited the vehicle, and was handcuffed and told he was under arrest.  Id. at 39:9–40:21, 173:12–16.  Officers did not issue a Miranda warning at that time.  Id. at 178:17–24.

As a state trooper led him to a police car, Mr. Egtvedt asked the surrounding officers generally what this was "all about."  Id. at 95:12–16, 173:21–25.  Special Agent Joshua Smith-Shimer—an agent from the FBI's Washington Field Office working on the case—was among the group of officers, and he responded to Egtvedt's question.  Id. 80:2–5, 81:11–82:1, 95:15–22, 174:23–25.  Rather than giving a verbal response, Agent Smith-Shimer showed Egtvedt a YouTube video he had uncovered in his investigation, which depicted Egtvedt speaking outside the Capitol on January 6th.  Id. at 95:20–96:3, 173:25–174:5.  Without any other questioning by the officers present, Egtvedt asked Agent Smith-Shimer words to the effect of "was that you filming me?"  Id. at 97:16, 175:6–7.  Agent Smith-Shimer responded "no."  Id. at 97:17–18, 175:8–10.  Egtvedt then requested an attorney.  Id. at 97:22, 174:12.  The officers did not offer or solicit any additional information.  Id. at 97:23–98:9, 174:12–13.

### 2. Miranda Violation

Egtvedt first challenges the admissibility of his statements shortly after his arrest— "what's this all about" and "was that you filming me"—under Miranda.  A "suspect in custody

. . . must be advised of [his] <u>Miranda</u> rights" before he may be "interrogated." <u>United States v.</u> <u>Cooper</u>, 949 F.3d 744, 748 (D.C. Cir. 2020). "If the interrogating officers do not provide <u>Miranda</u> warnings, any statements the suspect makes are generally inadmissible at trial." <u>Id.</u> Because Egtvedt had been placed under arrest shortly before this interaction, there is no dispute that he was "in custody" for the purposes of <u>Miranda</u>. <u>See</u> <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994). The only question, then, is whether either statement was elicited via "interrogation."

In <u>Rhode Island v. Innis</u>, the Supreme Court held that "the term 'interrogation' under <u>Miranda</u> refers not only to express questioning" but also to its "functional equivalent." 446 U.S. 291, 300–01 (1980). The police's words or actions qualify as the "functional equivalent" of express questioning if "the police should know [they] are reasonably likely to elicit an incriminating response from the suspect." <u>Id.</u> "The words or coercive pressure must be 'above and beyond that inherent in custody itself.'" <u>United States v. Sheffield</u>, 832 F.3d 296, 306 (D.C. Cir. 2016) (quoting <u>Innis</u>, 446 U.S. at 300). This inquiry "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." <u>Innis</u>, 446 U.S. at 301.

Egtvedt's first statement to the police—asking the crowd of officers what this was "all about"—is not the product of interrogation because he volunteered the statement without any prompting.[3] There were no "words or coercive pressure . . . above and beyond that inherent in custody itself" to trigger Egtvedt's question. <u>Sheffield</u>, 832 F.3d at 306 (internal quotation

---

[3] The Court also doubts that the question Egtvedt asked contains any incriminating statement. <u>See</u> <u>Innis</u>, 446 U.S. at 301 n.5 (defining incriminating response as any "inculpatory or exculpatory" statement "that the prosecution may seek to introduce at trial"). But the parties discussed this statement at the hearing, so the Court evaluates it here as well. <u>See</u> Suppression Hr'g Tr. at 194:15–17.

omitted).  "Such spontaneous statements are admissible without <u>Miranda</u> warnings."  <u>United States v. Samuels</u>, 938 F.2d 210, 214 (D.C. Cir. 1991).

Egtvedt's second comment, after viewing the video that Agent Smith-Shimer showed him in response, is a closer call.  The D.C. Circuit has at least twice taken up statements offered by criminal defendants in similar situations:  where a defendant initiated a conversation with a question about the nature or logistics of his arrest, law enforcement offered a response, and the defendant volunteered additional statements after hearing what the police had to say.  <u>See</u> <u>Sheffield</u>, 832 F.3d at 306; <u>United States v. Morton</u>, 391 F.3d 274, 275–76 (D.C. Cir. 2004).  Particularly analogous is <u>Sheffield</u>, where police had placed the defendant under arrest after finding PCP in a car during a traffic stop.  832 F.3d at 300.  Sheffield asked what he was "getting arrested for" and was told it was for "[w]hat was in the car."  <u>Id.</u> at 306.  He then declared, "Everything is mine."  <u>Id.</u>  The D.C. Circuit held that the interaction did not qualify as interrogation because Sheffield "was not being questioned at the time."  <u>Id.</u>  The detective's "matter-of-fact statement" answering the initial question—"[w]hat was in the car"—did not qualify.  <u>Id.</u>  Similarly, the D.C. Circuit held in <u>Morton</u> that the police did not interrogate a suspect by offering a "directly responsive" statement to her question about what would happen to the car she'd been driving at the time of her arrest.  391 F.3d at 276.  As the Sixth Circuit has put it, "[a]n accurate statement made by an officer to an individual in custody concerning the nature of the charges to be brought against the individual cannot reasonably be expected to elicit an incriminating response."  <u>United States v. Collins</u>, 683 F.3d 697, 703 (6th Cir. 2012); <u>see also</u> <u>United States v. Payne</u>, 954 F.2d 199, 202 (4th Cir. 1992).

Unlike the officers in <u>Sheffield</u> and <u>Morton</u>, though, Agent Smith-Shimer did not offer any matter-of-fact *verbal* statement to Egtvedt's question upon arrest.  Rather, the agent played a

video of Mr. Egtvedt at the Capitol on January 6th, in which Egtvedt described violent altercations between police and members of the crowd, called the acts of law enforcement a "treasonous situation[]," and beseeched viewers to come to the Capitol.  See Suppression Hr'g Ex. 5 at 0:59-1:00.  The Court must decide whether the video was akin to a matter-of-fact statement about the nature of the charges or was the functional equivalent of express questioning. Under the circumstances here, the Court concludes that it is closer to the former, and so does not constitute interrogation.

To be sure, "[s]everal courts have asserted that, under certain circumstances, showing evidence to the defendant may be the functional equivalent of custodial interrogation."  United States v. Stroman, 420 F. App'x 100, 103 (2d Cir. 2011) (gathering cases).  For instance, in an unpublished opinion, the Ninth Circuit required suppression of an incriminating statement—"[y]ou got me"—that a defendant offered "immediately after the playing of . . . incriminating audiotapes."  United States v. Collins, 43 F. App'x 99, 101 (9th Cir. 2002).  Other courts have likewise reasoned that police "should have known that [a] suspect was reasonably likely to make incriminating statements when confronted with a crucial piece of evidence."  United States v. Lovell, 317 F. Supp. 2d 663, 669 (W.D. Va. 2004) (suppressing statements made after police showed suspect a recovered stolen weapon); see also United States v. Green, 541 F.3d 176, 187 (3d Cir. 2008), rh'g granted and vacated, 304 F. App'x 981, 982 (3d Cir. 2008) ("[W]e can hardly imagine a more prototypical example of the 'functional equivalent' of interrogation than when a suspect is shown a video in which he is depicted as engaging in a criminal act.").

But in all those cases, the surrounding context more closely resembled a classic jailhouse interrogation, and there was more indication that law enforcement had offered up the evidence for the purpose of eliciting an incriminating response.  For instance, in Collins, the FBI played

the incriminating audiotape for the suspect as part of a longer custodial interrogation.  43 F. App'x at 101.  The suspect's inculpatory statements—"I've heard enough. You got me"—also "demonstrated that he perceived himself as having been interrogated."  Id.  In that context, the court found it "hard to see any purpose" for playing the tape *other than* to elicit incrimination responses."  Id. (emphasis added).  In Lovell, too, the court emphasized that the evidence police proffered—a recovered stolen gun—revealed to the suspect "both that the investigators had located one of the stolen weapons and that they had secured the cooperation of at least one if not two individuals who could incriminate [them]."  317 F. Supp. 2d at 669.  Indeed, the officers there testified that they hoped, after seeing the gun, that the suspect would understand "the nature of the evidence against him and the likelihood that he would be charged."  Id.

The circumstances here do not exhibit the same indicia of coercion or subterfuge on the part of the police.  As already noted, it was Egtvedt who initiated the exchange with officers. See United States v. Thomas, 11 F.3d 1392, 1397 (7th Cir. 1993) (holding that informing suspect that evidence contradicted alibi was not interrogation because suspect had asked for "the results of [the] investigation").  And Egtvedt did so just moments after his arrest, suggesting that the agent's decision to play the video was not part of some pre-planned interrogation strategy, nor would it reasonably be perceived that way.  The contents of the video also do not support Egtvedt's argument.  The video does not show anything particularly incriminating or inflammatory, or anything unique about the strength of the case against him.  Cf. Lovell, 317 F. Supp. 2d at 669.  While Egtvedt's reference to "treason" in the clip perhaps shows a conspiratorial mindset with respect to the events of January 6th, it gave the agent no indication that he would be particularly susceptible to pressure from law enforcement.  See Innis, 446 U.S. at 302 n.8.

Of course, the Court could imagine an even more matter-of-fact response to Egtvedt's question—say, reading the charges in the indictment or simply stating that the arrest was for his conduct on January 6th.  But cases applying Innis generally do not impose a requirement of pure neutrality to avoid a finding that interrogation occurred.  See Morton, 391 F.3d at 275–76 (holding that police statement that charge was "serious" and that defendant "might not be getting out as quickly as she thinks" was not interrogation); United States v. Henry, 940 F. Supp. 342, 346 (D.D.C. 1996) (determining that "officer's statement that 'I get pissed off when someone shoots at me'" was not interrogation, even though it "went beyond a simple answer to Defendant's query").  Because playing the video was more akin "to a statement of fact" than "a plea to conscience," the Court concludes that it did not constitute interrogation.  United States v. Allen, 247 F.3d 741, 765 (8th Cir. 2001), vacated on other grounds, 536 U.S. 953 (2002).  The Court will therefore not suppress the second statement under Miranda.

### 3.  Voluntariness

Egtvedt also challenges generally the voluntariness of his statements to the police following his arrest.  He alleges that he had suffered a "severe concussion" at the Capitol on January 6th, and that this injury precludes a finding "that the statements were voluntarily given under the totality of the circumstances."  Mot. Suppress at 8.  The government disagrees, contending that the defendant's background, as well as the lack of any misconduct or coercion by the police, all support a finding that his statements were voluntary.  See Opp'n to Mot. Suppress Statements at 13–15, ECF No. 54.  The government has the better of this argument.

"In order to introduce statements at trial—whether in its case in chief or as impeachment evidence—the government bears the burden of proving that the statements were voluntary." United States v. Murdock, 667 F.3d 1302, 1305 (D.C. Cir. 2012).  "Voluntariness turns on

whether the defendant's will was overborne when he gave his statement, . . . and the test for this is whether the statement was a product of an essentially free and unconstrained choice by its maker."  Id. (internal citation and quotation marks omitted).  Courts take a "totality-of-the-circumstances approach," inquiring "into the defendant's age, experience, education, background, intelligence, and the circumstances surrounding the interrogation, among other factors."  United States v. Wright, 233 F. Supp. 3d 165, 176 (D.D.C. 2017).

Egtvedt's voluntariness challenge fails because of the total absence of coercive pressure from Agent Smith-Shimer (or the other officers present) during their interaction.  Generally, "coercive police activity," is necessary to find an inculpatory statement was involuntarily made.  Colorado v. Connelly, 479 U.S. 157, 167 (1986); see also United States v. Mohammed, 693 F.3d 192, 198 (D.C. Cir. 2012) (suggesting that "egregious facts" are "necessary to establish that" statements made during interrogation were involuntary).  As the court has just explained, Agent Smith-Shimer did not put any pressure on Egtvedt—proper or improper.  The only potentially coercive aspect of the interaction is the fact of Egtvedt's arrest.  But an arrest is insufficient to render a statement involuntary, as custody is, by definition, "inherent in any custodial interrogation."  Murdock, 667 F.3d at 1306.

Egtvedt's later diagnosis with a concussion, which he says was the result of altercations with the police on January 6th, does not undermine this conclusion.  In some cases, an injury affecting mental capacity—including a concussion—could weaken a suspect's ability to understand the nature of his statements and affect the ultimate voluntariness of his choice to speak.  See, e.g., Pea v. United States, 397 F.2d 627, 633–35 (D.C. Cir. 1967) (holding, under more rigorous reasonable doubt standard, that suspect's responses were not voluntary when he was questioned at the hospital while suffering from a bullet wound to the head and concussion).

This is not one of those cases.  Here, more than a month separated the event that purportedly caused the concussion and Egtvedt's statements.  He has not put forward any evidence of how that concussion may have affected his judgment, other than medical records from several months later reporting "brain . . . fog," "periods of forgetfulness," and "a persistent headache." Suppression Hr'g, Gov. Ex. 10 at 1.  And even if Egtvedt had successfully linked his concussion to his mental capacity, "'a defendant's mental condition, by itself and apart from its relation to official coercion,' cannot 'dispose of the inquiry into constitutional voluntariness.'"  United States v. Hallford, 816 F.3d 850, 859 (D.C. Cir. 2016) (quoting Connelly, 479 U.S. at 164). Because Agent Smith-Shimer's response put no pressure on Egtvedt, Egtvedt's subsequent statement was not involuntary.  Accordingly, the Court will deny the motion to suppress.

     C.  <u>Motion in Limine</u>

     Egtvedt has filed a motion in limine seeking to exclude certain evidence from consideration by this Court during the upcoming bench trial.  <u>See</u> Mot. in Limine, ECF No. 61. The government has agreed not to seek introduction of several of the challenged categories of evidence, so the Court will deny those portions of the defendant's motion as moot.  <u>See</u> Opp'n to Mot. in Limine at 1, ECF No. 75 (evidence of clothing on January 6th and hotel receipts); <u>id.</u> at 3 (evidence of other medical conditions beyond concussion, except as relevant on cross-examination of any medical expert); <u>id.</u> at 4 (labels on video evidence); <u>id.</u> at 5 (cell site evidence).  The Court will consider the remaining disputes below.

     Egtvedt first seeks to exclude "all evidence and statements that are the subject of the previously filed motion to suppress . . . ."  Mot. in Limine at 1.  By this, the Court takes Egtvedt to mean that he would seek to exclude the statements he made to police before and after his February arrest, as well as the results of the search of his cell phone.  He argues only that this

material is "not more probative than prejudicial" under Federal Rule of Evidence 403.  Id.  The

Court agrees with the government that, with this "perfunctory and undeveloped argument[]",

Egtvedt has not established that the probative value of this material is substantially outweighed

by unfair prejudice, or any of the other grounds for exclusion under Rule 403.  See Sherrod v.

McHugh, 334 F. Supp. 3d 219, 265 (D.D.C. 2018).  The Court will therefore deny this portion of

the motion, without prejudice to Egtvedt raising more specific 403 objections to particular pieces

of evidence as they are introduced.

Egtvedt next asks to exclude two summary videos that the government has presented at

several January 6th trials:  one showing violence and property destruction by the crowd at the

Capitol on January 6th (the "U.S. Capitol Police Montage"), and one detailing the joint session

of Congress scheduled to take place that day (the "Official Proceeding Montage").  See Mot. in

Limine at 3–4.  Egtvedt does not tie his argument to any specific evidentiary rules, but he

suggests that the montages are irrelevant and improperly seek to punish him for the crimes of

others in the crowd that day.  Id.

The Court agrees with the government, however, that each montage is relevant to an

element of a charged crime, and so should not be excluded.  The U.S. Capitol Police Montage

depicts damage to the building and injury to officers during the January 6th breach.  That

evidence bears directly on Count Three of the Superseding Indictment, which requires the

government to establish that Egtvedt interfered with law enforcement officers' performance of

their duties during a "civil disorder."  Superseding Indictment at 2–3; see also 18 U.S.C. § 232(1)

(defining civil disorder as "any public disturbance involving acts of violence by assemblages of

three or more persons, which causes an immediate danger of or results in damage or injury to the

property or person of any other individual").  The Official Proceeding Montage shows recordings

23

of the Electoral College certification proceedings that took place in the Capitol on January 6, 2021. That evidence goes directly to whether Egtvedt obstructed an "official proceeding"—a necessary element of Count Four of the Superseding Indictment. Superseding Indictment at 3; see also supra Part II.A.2.a.

Finally, Egtvedt states that he will object to evidence of violence "that improperly inflames the jury, such as" the much-publicized assault of then-Metropolitan Police Officer Michael Fanone. Mot. in Limine at 6. The government has stated that it will not offer evidence of the assault on Officer Fanone, but it contends that none of its other evidence is likely to inflame the Court during what is now scheduled to be a bench trial. See Opp'n to Mot. in Limine at 10. The Court agrees with the government. As just explained, evidence of violence at the Capitol is directly relevant to at least one element of the charged crime. And, now that the parties have consented to a bench trial, there is little risk of inflaming the trier of fact or need to exclude evidence as unfairly prejudicial. See United States ex rel. Morsell v. NortonLifeLock, Inc., 567 F. Supp. 3d 248, 258 (D.D.C. 2021).

D. Motion to Compel Identification of Police Officers

Egtvedt has filed a motion to compel the government to identify certain officers stationed at the Senate Wing Doors on January 6, 2021, including the officer responsible for spraying him with a chemical agent, and to produce any reports filed by those officers regarding the events of that day. Mot. to Compel, ECF No. 62. Since that filing, the government has undertaken efforts to identify the officers and successfully identified two of the four requested individuals. Opp'n to Mot. to Compel at 1, ECF No. 73. Because the government was unable to identify the remaining officers despite conducting a good faith investigation, the Court will deny Egtvedt's motion to compel their identify.

The government's obligation to produce discovery in a criminal case is limited to information within its "possession, custody, or control."  Fed. R. Crim. P. 16(a); United States v. Marshall, 132 F.3d 63, 68 (D.C. Cir. 1998) ("[T]he government cannot be required to disclose evidence that it neither possesses nor controls.").  Here, the chaotic nature of January 6th has prevented the government from identifying all of the requested officers, even after a reasonable investigation.

To start, photos and videos of the officers in question have offered little by way of identifying features.  The faces of the unidentified officers are obscured by gas masks, face shields, and helmets.  Opp'n to Mot. to Compel at 5.  Further, there are "no readily apparent name tags, badges, or helmet numbers on these officers to assist in identifying them," nor were they wearing body cameras that would have produced footage to aid the government in its search.  Id. at 3. Still, the government has undertaken reasonable efforts to identify the designated officers, including showing screenshots of the unidentified officers to members of the U.S. Attorney's Office and U.S. Capitol Police.  Id.  Through those efforts and with the assistance of a photograph shared by Egtvedt, the government was able to identify and subsequently interview U.S. Capitol Police Officer D. Amendola, who was present at the Senate Wing Doors that day.  Id. at 3–4.  Officer Amendola helped identify two of the four requested officers, and the government turned over all relevant information to the defense.  Id. at 4–5.  The government asserts that it has no further leads on the two remaining officers but will share anything relevant that it learns with Egtvedt.  Id. at 5.  Given that the government does not know the identities of the two remaining officers, even after a diligent investigation, the Court will deny Egtvedt's motion to compel their identity.  The government cannot produce what it doesn't have.

### III.  Government's Pretrial Motions

The government has filed three motions in limine.  One seeks to preclude cross-examination of Secret Service witnesses on certain topics.  <u>See</u> ECF No. 66.  The second asks to exclude evidence about the location of security cameras in the Capitol.  <u>See</u> ECF No. 67.  The defense has conceded that it does not plan to ask about either of those subjects at trial.  <u>See</u> Apr. 28, 2022 Hr'g Tr. at 16:19–22.  The Court will therefore deny these two motions as moot.

The government's final pretrial motion seeks to preclude Egtvedt from mounting a claim of self-defense at trial.  <u>See</u> Mot. to Preclude Claim of Self Defense, ECF No. 68.  Egtvedt has not filed any opposition to this motion.  The Court will take this issue up at the pretrial conference.

### IV.  Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [50] Defendant's Motion to Suppress is DENIED.  It is further

**ORDERED** that [60] Defendant's Motion to Dismiss Count Four is DENIED.  It is further

**ORDERED** that [61] Defendant's Motion in Limine is DENIED, in part without prejudice.  It is further

**ORDERED** that [62] Defendant's Motion to Compel Identification of Police Officers is DENIED.  It is further

**ORDERED** that [63] Defendant's Motion to Transfer Venue is DENIED without prejudice upon defendant's withdrawal of the motion, as stated on the record at the April 28, 2022, hearing.  <u>See</u> Apr. 28, 2022 Hr'g Tr. at 16:8–10.  It is further

      **ORDERED** that [64] Defendant's Motion to Dismiss Counts Five, Six, and Seven is

DENIED.  It is further

      **ORDERED** that [66] the Government's Motion in Limine to Limit Cross-Examination

of United States Secret Service Witness is DENIED as moot.  It is further

      **ORDERED** that [67] the Government's Motion in Limine Regarding Evidence About

the Specific Locations of U.S. Capitol Police Surveillance Cameras is DENIED as moot.

      **SO ORDERED**.


                                        _____

                                        CHRISTOPHER R. COOPER
                                        United States District Judge

Date:  November 4, 2022