## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 21-CR-177(CRC)** |
| **DANIEL EGTVEDT,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

The defendant, Daniel Egtvedt,  through his attorney,  Kira Anne West, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), respectfully submits this memorandum to aid the Court at sentencing and hereby notifies the Court that she has received and reviewed the Presentence Report ("PSR") prepared in this case.  After carefully reviewing the PSR with Mr. Egtvedt, the defense has filed minimal objections. This is the rare case where the defendant has accepted responsibility despite having exercised his constitutional right to a trial.  The defendant maintains that he has accepted responsibility and the adjusted offense level should be 17 (24-30 months) and respectfully requests a variance from the PSR Guideline range of 30-37  months. *See* PSR paragraph 117. For the reasons set forth herein, Mr. Egtvedt requests that this Honorable Court

1

impose a sentence of a period of time served,[1] home confinement,[2] two years supervised release,  60  hours of community service and $2,000 restitution to account for:

1.    His lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach and his peaceful, non-destructive and non-violent behavior that day both outside and inside the Capitol building, and his sincere remorse in this regard;

2.    His long history of a strong work ethic which has allowed him to be a productive member of society for many years; and

3.    His unwavering commitment and ongoing responsibility to care for his mother who suffers from Alzheimers disease; and

---

[1] Mr. Egtvedt was arrested February 13, 2021 and released by this Court on April 15, 2021. Mr. Egtvedt was not released until April 16, 2021.
[2] 18 U.S.C. 3582 provides that the imposition of a term of imprisonment is subject to the following limitation: "in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation.

4.       His current medical condition which would not be treated in the

BOP.[3]

---

[3] Mr. Egtvedt would like his therapist to testify under seal and via zoom. The government has no objection to this. Because of the distance she would have to travel, Mr. Egtvedt respectfully requests permission for this testimony to be via zoom. Undersigned counsel is also concerned about the weather. It seems every time there is a hearing, it snows in Garrett County and the weather forecast for March 16, 2023 currently is calling for snow.



## I. __Background__

Mr. Egtvedt comes before the Court having gone to trial before this Court in December, 2022. This case was one of the very first to waive a jury trial.  Although the Court made certain findings about Mr. Egtvedt's conduct, which will not be recounted here, this Court must consider Mr. Egtvedt's conduct as a whole. Although his conduct is regrettable, the sentence the government seeks is excessive.  Mr. Egtvedt is a father, brother and son.[4]From the very beginning of this case, the government has argued that Mr. Egtvedt is a danger to the community and likely to flee. Neither turned out to be true.[5] First, as the Court will remember from  Mr. Egtvedt's closing argument, we wouldn't be here if Mr. Egtvedt had not been sprayed point blank in the fact by a still unidentified Capitol police officer. Mr. Egtvedt did not cause any damage, nor did he engage in violence; he did not enter the House or Senate Room floor, nor did he engage in actively encouraging violence. He did make several regrettable statements after he was pepper sprayed. He did tell people to come down to the Capital but not to engage in any nefarious or illegal activity, but simply to protest. Since released, first from the D.C. jail and second after the verdict, he has followed the Court's orders. This has been no small task. Each day, Mr. Egtvedt sends an email

[4] Letters from his family are attached as exhibits 1, 2 and 3.
[5] One of the FBI 302's written before Mr. Egtvedt's arrest described him as "armed and dangerous." Pure fantasy.

to undersigned counsel and his pretrial officer reporting what he's done that day. Each week he sends undersigned counsel and his pretrial officer his weekly schedule. He takes his meds daily under supervision. Each time Mr. Egtvedt needs to travel to come to Court and/or meet with his lawyer, undersigned counsel has to file a motion.[6] This is highly unusual, yet Mr. Egtvedt has sailed through this constant reporting with flying colors.[7] He is grateful to the Court for giving him the opportunity to prove that he can be a productive member of society.  When this Court considers the behavior of other criminal defendants charged with crimes stemming from January 6, 2021,  including hose that this court has sentenced, the Court should find that  Mr. Egtvedt should not be incarcerated again, and he respectfully asks the Court to credit him for the time he has already spent incarcerated, which was a bit more than two months' time.

## A. **Media reports of stolen election**

After the presidential election, Donald Trump (hereinafter "Trump") and his inner circle began spreading the word that the election was "stolen" from him by Democrats and others.   https://www.washingtonpost.com/politics/trump-election-voter-trust/2020/12/20/00282aa6-407a-11eb-8db8-395dedaaa036_story.html.  This

---

[6] The Court may recall the difficulty in getting the gps installed in the rural county where Mr. Egtvedt lives.
[7] Unbelievably, while Mr. Egtvedt was meeting with his lawyers at a law firm in Fairfax, Virginia last year preparing for a pretrial hearing, the pretrial services officer surprised everyone with an in person visit at the law firm. And Mr. Egtvedt never gave the pretrial officer any reason to think Mr. Egtvedt was not being honest. Again, highly unusual and punitive conduct.

was a lie and he refused to concede. Conflicting claims were made on media sources, as well as by the President himself, that the election system had been corrupted and that the integrity of the election should be questioned.

Amazingly, Trumps willingness to undermine confidence in the democratic process infected millions of his supporters and they were convinced that the loser was actually the winner. Now we know that before the January 6th riot, Trump White House officials strategized about a plan to direct thousands of angry protesters to the Capitol Building. On the planning call were Mark Meadows, the white House chief of staff, Rudy Giuliani -Mr. Trump's personal lawyer, and Representative Jim Jordan, Republican of Ohio, among others. Now we know the "stop the steal" rally at the Ellipse to the capitol was not accidental but a well-planned scheme urging the crowd to violence.  According to Representative Liz Cheney,  Vice Chair of the House Select Committee investigating January 6, "President Trump invested millions of dollars of campaign funds purposely spreading false information, running ads he knew were false, and convincing millions of Americans that the election was corrupt and that he was the true President." *See* https://www.npr.org/2022/06/10/1104156949/jan-6-committee-hearing-transcript.

According to a Washington Post Article from June 13, 2022, many in Trump's inner circle, including  his White House Counsel, informed Trump that

there was no basis for overturning the election results but that Trump ignored those voices. While most of these high profile lawyers and advisers to the President testified to the January 6th committee that they told the President personally the facts about the election results and their discomfort with his claims that the election had been stolen, most did not "correct the public record on the issue or speak out against Trump's false claims." https://www.washingtonpost.com/national-security/2022/06/13/jan-6-committee-hearings-live/ When these high level government advisors failed to correct the narrative, it left a huge informational void that was filled with the likes of conspiracy theorists and online extremists willing to manipulate public opinion for their own purposes. And the President himself added fuel to the fire by declaring that he was trying to actually protect the democratic process.[8] People like Mr. Egtvedt stood no chance at truly grasping the gravity or reality of the situation, let alone know what the facts truly were before January 6, 2021. And as the Court probably knows, we are actually still finding out new facts every day in these cases.

This Court can only understand why Mr. Egtvedt came to D.C. to attend the Trump Rally by taking into account the enormous influence the President, the

---

[8] On January 4th, 2021 at 10:07 a.m. EST Donald Trump tweeted: "How can you certify an election when the numbers being certified are verifiably WRONG. You will see the real numbers tonight during my speech, but especially on JANUARY 6th…" https://www.presidency.ucsb.edu/documents/tweets-january-4-2021 (last visited August 28, 2022).

media, and the lack of accurate and truthful information played in the months leading up to January 6, 2021.   Thinking he was attending a speech, Mr. Egtvedt brought his elderly dog[9] with him, further indication he had no plans to enter the Capitol or commit any violence. While consumption of media news is no excuse for bad behavior, it does demonstrate the powerful impact news stories, fake or real, have on the citizens of this country, not just Mr. Egtvedt.  The media sets the tenor for how people feel about their rights and freedoms and can also plant notions (often false) of discontent or even outrage.  After months of watching our major cities burn, many people became convinced that vocal displays of outrage in the form of protesting was the only way to make their voices heard.

Mr. Egtvedt, like millions of other Americans, tried to make sense of the media coverage surrounding the events of 2020.  He ate up the online and televised media coverage of these events in the Summer of 2020, and was filled with a narrative that ANTIFA and other groups had it out for President Trump's supporters.  He tried to determine what was actually happening in our country and which media outlets were telling the truth When Mr. Egtvedt turned  to media sources they often reported totally opposite facts.  There didn't seem to be any middle ground.   Either you were with the President or against him. There was no apparent way to tell which side was backed with evidence and facts.

---

[9] This is an important point. You can't leave an old dog by itself in a hotel room for hours on end.

When faced with this void of reliable information, Mr. Egtvedt chose to listen to the President of the United States.  He based this decision on the fact that if anyone had the best and most reliable information, it would be the Commander in Chief.  He also trusted that he had the right kind of people surrounding him and advising him about this topic and surely they must know more than the average person.  All these factors were in play when he decided to come to D.C. to hear the President at the rally and to *peacefully* protest the results of the election and the lack of attention to alleged voting irregularities (emphasis added).

As we are slowly learning through the hearings that have taken place and through other investigative reports, such as the one from the New York Times linked herein, there were two types of protestors in the crowd on January 6th. https://www.nytimes.com/2022/06/17/us/politics/proud-boys-jan-6.html  There were ones initially who waited outside barricades and peacefully assembled with the intent just to exercise their First Amendment rights and others there with a plan to incite the crowd and to breach the Capitol building.  The regular folks, like Mr. Egtvedt, were referred to by some of the planners, including the Proud Boys, as the "normies."  The "normies" were used as unwitting pawns in the plans of the Proud Boys and others that day.



*Id.* The plan depended on  creating chaos and whipping up the "normies" into a patriotic frenzy.   The groundwork for this frenzy had been laid in the weeks before January 6th by Trump propaganda about election fraud and had been fueled by Trump himself at the rally on the mall.  The Proud Boys intended to use the large crowd to distract and overwhelm as they went to the work of breaking into the Capitol.

Mr. Egtvedt had no idea he was being used as a pawn in a game far more sophisticated and complex than anyone could imagine.  Consider that it has taken the January 6th House Select Committee more than a 1000 individual interviews and nearly 2 years  of investigation, to parse through to what they believe  is some truth about what transpired that day.   How could Mr. Egtvedt, or any "normie" that day have known what was to happen?   He came to the Capitol with no intent to do anything but to have his voice heard.  He merely wanted to show support to President Trump at the rally.   He did not suit up for combat.  He did not obscure

his face.  He was not armed.  He wore street clothing. He did not carry anything.
He came to D.C. with his dog,  not as part of an organized group.  He committed
no violent actions in his peaceful protest.  He did not destroy anything. His only
desire was to participate in a democratic process that is protected under the First
amendment of our Constitution. Unfortunately, he now understands that going into
the Capitol that day was not part of that general democratic process and regrets the
circumstances he caused.  He now stands before the Court and asks for mercy.

II.        **THE TRIP TO THE CAPITOL AND JANUARY 6, 2021**

    A.  **Mr. Egtvedt's trip to D.C. and his walk to the Capitol**

Mr. Egtvedt  believed he should show his support for the soon to be former
President by attending his rally scheduled for January 6, 2021, at the Ellipse on the
Mall.  At no time did he ever think he was going to the Capitol, let alone inside the
Capitol. Not until Trump's speech and the crowd headed toward the Capitol,  did
he have any intention of  going anywhere other than the Ellipse area.   He followed
the large crowd there that day with no intention of doing anything but having his
voice join those of thousands of other peaceful protestors. Now, after seeing what
really happened that day by watching film on numerous platforms, he deeply
regrets going into the Capitol.

    B.  **Mr. Egtvedt's activities inside and outside the Capitol.**

For some time, police were able to fend off the crowd, but as we now know, some rioters instigated a push to overwhelm the few, undertrained, under equipped and unprepared police.[10] Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. This breach was several minutes before Mr. Egtvedt actually entered the Capitol.  Hundreds preceded him in entering.  Video shows that Mr. Egtvedt stood on the steps outside the Capitol for many minutes as hundreds of others passed him by.

Mr. Egtvedt was not in this first wave of protesters to reach the building after the officers on the steps were overwhelmed and retreated.

At 2:13 p.m. someone, not anyone Mr. Egtvedt knew or saw, breached the Senate Wing Entrance window on the right hand  side.  Others then jumped in and broke the doors open.  Mr. Egtvedt was not near the doors or windows at that time.

Many people crowded around the Senate Wing Doors during this crucial time period.   By the time Mr. Egtvedt reached the window area people had already started to flood into the Capitol through the doors and the broken window.  He

---

[10] See Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the Capitol, The Washington Post (Jan. 9, 2021), available at
https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

could now see the people entering freely through the doors at a rapid pace. He

walked into the Capitol encouraged by those behind him.

Mr. Egtvedt had been so far behind the first people in those doors that he

had no idea how the door was opened or who opened it.   He had not seen the first

steps taken to open the doors only that people were rushing in when he got there.

Though many others were violent, breaking the windows, pushing officers, and

pushing others,  Mr. Egtvedt was not violent.  Once inside the Capitol, he was

peaceful and followed the crowd.  He journeyed down hallways with crowds of

people with no real purpose or intent.  He spent time taking photos and video,

talked to a reporter about being sprayed in the eyes, and generally had no real

agenda.

### C. **Hindsight is 20/20.**

After hearing news reports following January 6, and seeing the violence

engaged in by some of the protestors, Mr. Egtvedt was shocked.

Mr. Egtvedt has absolutely no history of political extremism.   In fact, the

decision to go to the District of Columbia was not planned ahead of time.  He had

absolutely no expectation or knowledge of the consequences of others' actions that

day, nor the consequences that their actions would have on his being present.  He

was supporting the President in what he claimed were legitimate efforts to claim

victory in the Presidential election.

14

While he did not personally destroy anything, he unfortunately played a part in an unmanageable mob. According to Ed Maguire, a criminologist at Arizona State University, security forces are trained to ignore yelled insults and small acts of hostility, like pushes and thrown water bottles. And they receive training in absorbing surges in a crowd, moving people as gently as possible, and quickly responding to pockets of violence and isolating agitators. Benedict Carey, Making Sense of the 'Mob' Mentality, New York Times (Jan. 12, 2021), available at https://www.nytimes.com/2021/01/12/science/crowds-mob-psychology.html Mr. Egtevdt did not commit any of those actions. On January 6 there was "[n]o clear structure in the crowd and absolute chaos on the police side: no clear sense of credible incident command, of wearing the right gear, carrying the right weapons. All of that seemed to be missing." Id.

Importantly, as for persons in the mob "With no apparent structure or strategy, the crowd had no shared goal or common plan." Id. Dr. James Jasper, a sociologist at City University of New York, noted, "Crowds do not act with one irrational mind... There are many groups, doing different things, for different reasons." He further said, "There are great shots from the hall of statues, where protesters stayed inside the velvet ropes, like tourists, looking around sort of in awe." Id.

Unfortunately, Mr. Egtvedt followed a large crowd rather than leave; he

was partially blinded and did not know how violent as a whole the mob would be independently of his own actions. Others who were also part of the mob, had different and more violent plans that day of which Mr. Egtvedt is now being associated with.

## IV. LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense.   Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets forth the factors that the Court must consider in fulfilling this provision.[11]

---

[11] 1.   The nature and circumstances of the offense and the history and characteristics of the defendant;
2.   The need for the sentence imposed;
3.    The kinds of sentences available;
4.   The kinds of sentence and the sentencing range…;
5.    Any pertinent policy statements issued by the Sentencing Commission;
6.   The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.   The need to provide restitution to any victims of the offense.
18 U.S.C. § 3553(a)(1-7).

## V.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a).   *United States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A. Nature & circumstances of the Offense & the History and Characteristics of Mr. Egtvedt

First, the defense is not aware of any evidence that defendant's entry into the Capitol was violent in any way.  Second,  Mr. Egtvedt did not attempt to add to the violence of the mob. For example, he didn't chant "whose house, our house" or "USA, USA" like literally thousands of other protesters.  Third, there is no evidence that he engaged in any violence  towards law enforcement. This Court has previously stated that Mr. Egtvedt did not use any violence.

 Fourth, the defense is not aware of any evidence that he destroyed or stole any property from the Capitol. Fifth, based on the Government's investigation, it appears that he remained in the Capitol building much less than an hour.  The defense is not aware of any evidence that he entered the Senate or House Chamber.

The government must concede that he committed no violent acts and destroyed no property. His actions within the Capitol have been tracked on the CCTV footage and this footage supports the Court's finding that he was unlawfully

present in the Capitol, he did not destroy property or commit violent acts.      He

did not suit up for combat.  He did not obscure his face.  He was not armed. He

wore everyday clothing.  As born out through the testimony of Monique Moore, by

the time Mr. Egtvedt arrived at the U.S. Capitol the barriers that had been erected

along the perimeter of the building were no longer present. He met no resistance in

his walk to and inside the Capitol. At the time, Mr. Egtvedt didn't dream he'd be

charged for going into the Capitol.

He has never violated  his conditions of release.    He did not post anything

on social media or brag to friends after January 6— in fact, he was filled with

regret after his arrest. He was confused more than anything.


This has obviously been a tough road for Mr. Egtvedt.   Since being

charged with this crime, he has done everything he can to assist his brother with

the care of his mother. He has no criminal history.  It is of utmost importance to

Mr. Egtvedt that this Court understand that he is incredibly remorseful for his

actions on January 6, 2021.  None of his actions will be erased from the internet.

It's there forever.  He has fully accepted responsibility for his bad judgement in

entering the Capitol building.  He has been the subject of a number of media

accounts lumping him with others that were there on January 6, 2021 for violent

purposes. His personal character and reputation will forever be tarnished.  In fact,

the Department of Justice issued a press release that said Mr. Egtvedt had been

convicted of assault on a police officer. *See* https://www.justice.gov/usao-dc/pr/maryland-man-found-guilty-felony-and-misdemeanor-charges-related-capitol-breach. Undersigned counsel contacted opposing counsel so that this could be immediately corrected but was told that it was "technically correct" so no revision or retraction would be done. This is just flat out wrong and why so many Americans do not trust what the government is telling them about these January 6 cases.[12]

Mr. Egtvedt does not seek to minimize the harm caused by his behavior by the explanations in this sentence memo.  His past behavior and his post arrest behavior show that he is capable of being a very productive citizen and the Court can rely on that as a basis to sentence  him  to a term of home confinement and probation considering the 3553 factors.

## B. Need for the Sentence imposed

### 1.  General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  He has already

---

[12] Undersigned counsel got carried away during her closing argument and said something to the effect that the reason Mr. Egtvedt was prosecuted was because he was a Trump supporter. What is more accurate is that he was overcharged in the case and it makes one wonder if this is because he was a Trump supporter. After all, the Court made reference in rendering the verdict to defense counsel's point that the officers who allegedly claimed to be assaulted never said anything about being assaulted until the FBI called them and told them they were assaulted. This is extremely troubling conduct by the FBI and lends credibility to the argument that the reason many people are being prosecuted for violent felonies is simply because of their political affiliation.

been severely punished as noted *supra*.  The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a person unable to work and care for his family when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to  be counterproductive, and labeled as political posturing.  A sentence of  home detention and probation does constitute punishment  and  it will deter others as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms. He has been on pretrial release for almost two years with many restrictions.  The National Institute of Justice, Department of Justice, issued a summary of the current state of empirical research stating that "prison sentences are unlikely to deter future crime," and "increasing the severity of punishment does little to deter crime."  U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42

Crime & Justice in America 199 (2013)), available at

https://ncjrs.gov/pdffiles1/njj/247350.pdf.

2. **Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant**

Mr. Egtvedt's stay at the D.C. jail was no picnic. In fact, it was detrimental to his physical and mental health. His brother, Brother Rick Egtvedt, spent weeks trying to get Dan his medical necessities. Mr. Egtvedt cannot eat gluten, yet the jail would not give him gluten free meals. After this experience, it's safe to say that his likelihood of recidivism is really non-existent. He has expressed genuine remorse and contrition for his behavior that day.  Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id*.; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id*. at 1. It examined the effects of changes to both the

certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. Given his  current age  and other issues consistent with what is mentioned above, the likelihood that he would ever re-offend is as close to zero as one might come.[13] A punishment of any more  jail time in this case is going to have the exact opposite effect than what is in the interest of justice.  The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice.  Mr. Egtvedt urges the Court to impose a sentence of home detention in  this case in light of his sincere acceptance of responsibility,  his non-violent conduct at the Capitol, and the lack of a need to further deter him.

### 3.  Just Punishment

Particularly during this pandemic, it is best for the community, as well as for Mr. Egtvedt's health, that he serve a sentence of home confinement. He is

---

[13] For defendants in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* (May 2004).

obese and unvaccinated. If he contracted Covid-19 in the D.C. Jail, he may not make it out.  He has a felony conviction which, in and of itself, is quite punitive.  The conviction affects future job opportunities, and will remain with him for the rest of his life.  He has been reporting daily now for nearly two years.  But home confinement and/or probation will allow him to continue to look for work and to help support his family with the care of his mother.

Home confinement involves significant restraints on a defendant's liberty. Defendants must periodically report to the probation officer, permit the officer to visit their homes and jobs at any time, and follow the officer's advice. *Jones v. Cunningham,* 371 US 236, 242 (1963).  Defendants are admonished to keep good company and good hours, work regularly, keep away from undesirable places, and live clean, honest, and temperate lives.  *Ibid*.  Not only must they faithfully obey these restrictions and conditions, but they also live in constant fear that a single deviation, however slight, might result in being sent to prison. *Ibid*.

Defendants might be rearrested any time the probation officer only believes they have violated a term or condition of probation.  *Ibid*.  They might have to serve all of the time that was suspended with few, if any, of the procedural safeguards that normally must be provided to those charged with crime.  *Ibid*.

Probation significantly restrains defendants' liberty to do the things that free people in this country are entitled to do.  *Ibid*.

### C.  The kinds of sentences available

A sentence of  incarceration would result in sentencing disparity with other individuals who behaved similarly but were not similarly charged . *See infra*.[14]

Imposition of a fine is discretionary, and, defendant respectfully submits, may be appropriate in this case.  Defendant's financial condition is modest as outlined in the PSR but he does have the ability to pay a fine.

Mr. Egtvedt respectfully requests two levels off for acceptance of responsibility. Pursuant to USSG 3E1.1 "if the defendant clearly demonstrates acceptance of responsibility for his offense," the offense level is decreased by 2 levels. The commentary to the guideline recognizes that, ordinarily, the adjustment is not intended to apply to a "defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted and then only admits guilt and expresses remorse." Cmt. 2. In that same comment, the Commission explicitly recognized that conviction by trial does not automatically preclude a defendant from receiving the adjustment. For example, a defendant who goes to trial "to preserve issues that do not relate to factual guilt," may warrant granting the adjustment. Because this Court is in a unique position to assess Mr. Egtvedt's acceptance of responsibility, "the determination of the sentencing judge is entitled to great deference on review." Cmt. 5. It was reasonable for defense counsel to conclude that the government could not prove the 1512 count because Mr. Egtvedt

---

[14] This does not include every case, just a sampling.

never mentioned the certification of the vote. There was no evidence during his ramblings while he was incarcerated about the vote. However, Mr. Egtvedt respects the Court's verdict.

The government asks this Court to impose three enhancements. With regard to counts one and two, the 3 level obstruction enhancement under USSG 2A2.4(b)(1)(A),  ECF No. 116, p.3-4, the Court can dismiss this quickly.  Mr. Egtvedt did not create the physical contact, rather MM and MD did. Moreover, Mr. Egtvedt did not swat officer MM's hand and he was trying to balance himself as he was unsteady on his feet, as MM testified to at her deposition.  The government also requests in count two a 2 level enhancement under USSG 2A2.4(b)(2) because the victim sustained bodily injury. *Id.* at p.4.  Again, the injury of MD was not caused by Mr. Egtvedt, and surely the spirit of this guideline applies only if the defendant caused the injury, which he did not. With regard to Count three, again, the government asks for the 3 level increase and again, the defendant did not cause "physical contact with several of them."

Likewise, the 8 level enhancement for causing or threatening to cause physical injury to a person in order to obstruct the administration of justice should not be applied under U.S.S.G. 2J1.2(b)(1)(B) regarding count 4. Here again, the defendant did not cause the injury. The Court will recall the testimony that MD fell due to the size of the defendant, not because the defendant intentionally caused

him to fall. This Court did not find that MD suffered a physical injury "in order to obstruct an official proceeding." ECF No 116, p. 5. And while reasonable minds may differ about what happened here, Mr. Egtvedt did not affirmatively seek to injure any officers nor did he cause the injury. Nor did Mr. Egtvedt's conduct did not involve the substantial interference with the "administration of justice."

In *U.S .v. Seefried* 21-287 (TNM) the  Court held that  these enhancements didn't apply because they do not involve the "administration of justice." *See* memorandum opinion, ECF 123*,* P.3. Judge McFadden goes on to explain that Section 1503 would have been a better statute for the government to charge, and that the "certification is largely a ceremonial proceeding" *Id.* at p. 4, and therefore not an "administration of justice."  The Court concludes by saying that if the commission wanted to include the words "official proceeding" in the guideline, they should have, but they did not. *Id.* at 21. Finally, the Court attaches a lengthy chart giving examples of proceedings that are defined as the "administration of justice." The electoral college is not amongst them.[15]

The pushing and chaos between the rioters was not only physical, but mental too. Critically, no other January 6th defendant or police officer has identified Mr. Egtvedt as being violent that day.  The government's accusation of his violence is a

---

[15] At least two  judges in this district have applied the specific offense characteristics in U.S.S.G. §2J1.2(b) to January 6 defendants convicted under § 1512(c)(2). *United States v. Reffitt*, 21-cr32-DLF (D.D.C. Aug. 1, 2022); *United States v. Rubenacker*, 21-cr-193-BAH (D.D.C. May 26, 2022).

fiction made up by the government and they make these many assumptions from CCV video that unfortunately does not have any sound. Defense counsel agrees that Mr. Egtvedt behaved badly on January 6th.  But as previously argued, this was due in large part to being sprayed in the eyes with some strong chemical irritant and suffering a concussion no long after.  However, there is a big difference between bad behavior and violent extremism.  The government does not seem to be able to differentiate between the immature and non-violent actions of Mr. Egtvedt and the violent and extreme behaviors of many others that day.

### D. The need to avoid unwarranted sentence disparities

Given sentences imposed in comparative cases, a sentence of time served and home detention  is  unusual perhaps but not unheard of and is appropriate here. This Court decided *United States v. Michetti*, 21CR232 (CRC). Here the  defendant was convicted by plea of obstruction and sentenced to 9 months incarceration, 36 months of supervised release for entering the Capitol two minutes after the breach. Unlike Mr. Egtvedt, this defendant was part of a mob trying to force its way past a line of police officers in the hallway by the Senate Chamber. He was captured on video yelling various insults at officers including, "we pay you," and calling police "fucking animals." MPD officers used tear gas to push Michetti out of the hallway after which he returned and shouted, "you are starting a civil war," at the officers. Michetti left only after officers deployed tear

gas on him Prior to and after attending the rally, Michetti texted messages such as "Gotta stop the vote it's fraud this is our country." While in the building, he posted on social media that "we had breached the building." *See* Gov't. Sentencing Memo, ECF. No. 46. More in line with this case is the case *United States v. Gold*, 21 CR 85 (CRC). Here, the defendant entered the Capitol and proceeded to give a speech. She too disregarded officers requests for her to leave, and she had to be physically ushered out of the Capitol by those officers. But unlike Mr. Egtvedt, she has a huge following on the internet where she posts prolifically. Mr. Egtvedt does none of this. This Court will recall she was given a sentence of 2 months in prison. But particularly troubling is that defendant Gold was initially charged with a felony-obstruction under 18 USC 1512(c)(2), yet was allowed to plead to a class A misdemeanor. It's arguable that her conduct was more egregious than the case here for multiple reasons.

If this Court were to impose a sentence greater than home confinement, time served, community service, and/or restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing  or are pending in this Court.  The following cases are a sampling where a class B misdemeanor was charged and pled to and resulted in little to no incarceration with facts that often were more egregious than Mr. Egtvedt's:

**United States v. Jessica Bustle and Joshua Bustle,* 21-cr-00238 (TFH), ECF Nos. 42 & 44 (sentenced to supervised release with home confinement even though

Ms. Bustle 1) posted on social media that Mike Pence was a traitor, 2) denied media accounts of violence were accurate, minimized the conduct of all of the rioters, 3) called for a revolution even after the events of January 6, 4) encouraged the rioters to be proud of their actions, and 5) minimized the impact of that day on lawmakers and democracy. Judge Hogan imposed a probationary sentence with a short period of home confinement for Ms. Bustle and an even shorter period of home confinement for Mr. Bustle. The government recommended probation in this case.

**United States v. Andrew Bennett,* Crim. No. 21-227 (JEB)(sentenced to three months home confinement and two years' probation). According to the government, who recommended probation with a short term of home confinement*, Mr. Bennett espoused conspiracy theories about the election, was an admirer, albeit not a member of the Proud Boys, and boasted about his conduct. According to the government, Mr. Bennett did not come to the rally in D.C. on a whim, but rather planned it for months. He posted numerous times about conspiracy theories and a fraudulent election. On January 4, 2021, he posted to his Facebook page, "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my freedom!". On January 6, according to the government, Bennet began livestreaming video to his Facebook page from outside the Capitol as early as 1:00 p.m. He was in the middle of the growing crowd on the West Front of the Capitol, where some taunted police officers and sporadically threw objects at them. The government alleges that someone near Bennett exhorted others to "move forward" and that Bennett yelled at a police officer. Bennett also filmed assaults on the police officers and continued to livestream events inside the building.[16]

 **United States v. Weisbecker*, 21 CR 682(TFH) Judge Hogan ordered 30 days of intermittent confinement as a condition of 24 months' probation.  Mr. Weisbecker's conduct and treatment towards law enforcement was much more severe than the instant case. He entered the Speaker's suite of offices, he posted multiple videos and photos on Facebook and other media cites for days,  and repeatedly berated federal border patrol officer at checkpoints multiple times. The language is so bad it can't be repeated here.

***United States v. Carlton*, 21 CR 247 (TFH), Judge Hogan sentenced the defendant to 36 months' probation. As the government pointed out in their sentence memo, Mr. Carlton: (1) made two separate entries into the Capitol; (2) chose to enter the Capitol Building after watching rioters climb the scaffolding, smelling tear gas, and seeing billows of smoke rise around him and from the Lower

---

[16] None of this is to suggest that Mr. Bennett should have received a sentence of incarceration, only to suggest that the distinctions the government draws are hard to justify.

West Terrace, where rioters were clashing with law enforcement; (3) initially lied to law enforcement officials about his activity on January 6, 2021; (4) admitted he "may have" deleted some texts related to January 6; (5) filmed the chaos around him rather than choosing to leave; (6) has not expressed since remorse for his crimes on January 6, and (7) as a corrections officer, Carlton should have recognized the dangers that he and his fellow rioters' presence at the Capitol posed to public safety. *See  Gov't sent. Memo,* ECF No. 47, p. 2. Mr. Egtvedt engaged in none of this conduct.

** *United States v. Reeder,* 21 CR 166 (TFH). Critically, this J6 defendant pushed police officers and made contact with them yet the government chose not to pursue those charges and he was given 3 months incarceration and allowed to keep his class B misdemeanor deal. Here's what he posted: "was there for over a half hour. I got gassed several times inside, many times outside the Capitol. Got shot with peppers balls. Its fucking nuts. We had to battle the police inside. It was crazy. Absolutely insane." *See* ECF No. 26, p.1. Later a group unaffiliated with the government brought to their attention additional violent conduct by Mr. Reeder, and the government asked to continue the sentencing hearing. Ultimately, despite concrete evidence of violence, the government chose not to bring additional charges. *See* ECF No. 33; 35, exhibit 1, power point, pages 30-41.


        In *United States v. Youngers*, 21 CR 640 (TFH), Judge Hogan again gave a

probationary sentence despite that defendant's conduct as outlined by the

government:

Aware that he was facing arrest, Youngers scaled a wall to reach the Capitol Building, filmed a confrontation between rioters and police, and entered through the Senate Wing Door within ten minutes of the initial breach. After filming himself declaring "this is what a revolution motherfucking looks like," and collecting a souvenir piece of broken glass, he and codefendant George Tenney proceeded to the Rotunda Doors, which had not yet been breached. Tenney opened the door for rioters, instigating the breach of the Capitol from the east side. Youngers tried to open one of the doors too, encouraged entering rioters, and swatted at a police officer, but then took some steps to assist the now-outnumbered police, untangling an officer's radio from a bench and temporarily keeping some rioters away from that officer. Before leaving the area, Youngers filmed another video celebrating the breach of the Capitol. Back at a hotel, he filmed a video

denying that there was violence at the Capitol and gave an interview wearing a full-face mask to conceal his identity.

See ECF No. 55, Gov't sent. memo at p. 2.
Read more at: https://www.kansascity.com/news/politics-government/article268291057.html#storylink=cpy

Where a defendant pled to a class A misdemeanor charge:

**United States v. Jenny Louise Cudd*, 21-cr-00068 (TFM) (sentenced to 2 months probation)(defendant wore a bullet proof sweatshirt, engaged in a push against law enforcement officers while yell "go" and "charge" and celebrated property destruction and lacked remorse) *See* ECF 90.

**United States v. Jennifer Ryan* 21-cr-00050(CRC)(sentenced to 2 months incarceration)(the defendant posted and live streamed her activity; she was "publicly cheerleading on a violent attack"(See ECF 48); she said the events were "a prelude to war" she shouted "fight for Trump" and "Hang Mike Pence"; she tweeted a photograph of a broken window that encouraged additional violence and she had no remorse;

**United States v. Scirica*, 21-cr-000457 (CRC) (sentenced to 15 days incarceration). Here, remarkably, the defense agreed with the government's 15 day recommendation of incarceration. The defendant was not remorseful, close to chamber where vote took place, close to police line, chanted USA at police, and directed the crowd inside the capitol. He also took photos and video of himself. See ECF 17.

**United States v. Courtright*, 21-cr-00072 (CRC) (sentenced to 30 days incarceration)(the defendant went onto the Senate floor; picked up a "members only" sign and only returned it because an officer ordered her to; posted on social media that showed a complete lack of remorse; and chanted at a line of police officers "whose house, our house and USA, USA.").

In *U.S. v. John George Todd* 22-166 (BAH) is the typical 4 misdemeanor

charge case-2 class B's and 2 class A's. Mr. Todd is reported as saying : "At one

point inside the rotunda, while near a law enforcement officer, Todd III yelled at

the officer, 'I swear to God, I'll hip toss your ass into the f------ crowd, mother -----

-!'" *See* Criminal complaint. ECF No. 1. He also is accused of smoking a

marijuana cigarette inside the Capitol. Yet, the government does not believe that his conduct rises to the level of a felony charge. In the first 1512 case to be sentenced, Judge Moss varied down from a guideline range of 15-21 months and gave Paul Hodgkins 8 months incarceration, but Mr. Hodgkins walked onto the floor of the U.S. Senate-anathema to the Government. *See US v. Hodgkins*, 21-188 (RDM).

Consider the sentence imposed in *United States v. Mark Leffingwell*, 21-cr-5-ABJ (D.D.C. 2021). Leffingwell entered the Capitol Building. *Id.,* ECF No. 31, p. 2. But "Leffingwell was not content to merely stand inside the threshold": Positioned at the front of the line of rioters stacked hundreds deep behind him, Leffingwell chanted at the officers standing before him to "join us!" in the rioters' efforts to assault the Capitol. When some in the crowd shouted for the rest of the crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll never get back in!" When U.S. Capitol Police Officers D.A and W.H tried to repel Leffingwell and the gathering crowd, Leffingwell struck both officers in the head. *Id.,* p. 2 (emphasis added). Specifically, Leffingwell "first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more." *Id.,* p. 8. His conduct was so brazen that he was one of the few protesters arrested on the scene. Id., p. 9. Leffingwell pled guilty to a felony offense under § 111(a)(1). *Id.* The government

sought a sentence of 27 months' incarceration. *Id.,* p. 2. The Court imposed a

sentence of six months' incarceration with credit for time served, followed by 24

months of supervised release.  Mr. Egtvedt's conduct was nowhere near this.

Consider *United States v. David Blair*, 21-cr-186-CRC (D.D.C. 2021).

Carrying a Confederate flag, Blair walked up to a police line outside the Capitol.

He turned towards an officer and said, "What's up motherfucker, what's up, what's

up bitch?" 21-cr-186, ECF No. 55, p. 8. When the officer came close to Blair, the

defendant jabbed him with a lacrosse stick. *Id.* A search incident to arrest

recovered a knife in the defendant's backpack. 21-cr-186, ECF No. 55, p. 8. Blair

pled guilty to a § 231(a)(3) offense. This defendant was sentenced to five months'

incarceration. Just as in *Leffingwell,* Blair's acts could only be interpreted as

intended to inflict bodily injury or to threaten it. Again, Mr. Egtvedt's conduct not

even close to this.

All told, the facts of the offense conduct and characteristics of the

defendants who garnered little or no incarceration  and were charged with only

misdemeanors were starkly different than Mr. Egtvedt's conduct and

characteristics. His  culpability appears to be minimal in contrast with rioters who

posted hateful messages, destroyed or stole government property and assaulted or

threatened the law enforcement officers on that date.  While Mr. Egtvedt accepts

complete responsibility for his actions, he was guided and urged every step of the

way by no less of an authority than the former President of the United States and a majority of Republican Senators and Congressman that continued to repeat the 'Big Lie' that the election had been stolen by the Democrats.

This Court should look to a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; *through a door after many others had breached the Capitol* (2) whether the defendant encouraged violence; *absolutely not. He was a follower, not a leader.* (3) whether the defendant encouraged property destruction; *none* (4) the defendant's reaction to acts of violence or destruction; *he was never around violence but in a prayer circle* (5) whether during or after the riot, the defendant destroyed evidence; *none* (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; *About a ½ hour*; (7) the defendant's statements in person or on social media; *none on social media and in person only on January 6th;* (8) whether the defendant cooperated with, or ignored commands from law enforcement officials;  As the Court held, Mr. Egtvedt did not follow instructions to leave the Capitol. 9) whether the defendant demonstrated sincere remorse or contrition; and the defendant's conduct after January 6, 2021. *Yes, he has demonstrated sincere remorse.  See*  attached letter from Mr. Egtvedt, Exhibit 4. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.  This Court should

34

not allow the government to engage in such posturing.  Rather, as the Court's history shows, this Court should mete out a punishment commensurate with the behavior of Mr. Egtvedt compared to other rioters that day.

## VI. CONCLUSION

Considering all the applicable factors the Court will consider,  Mr. Egtvedt respectfully moves this court to impose a sentence of  home confinement, 24 months supervised release, 60 hours of community service,  and $2,000 restitution. This sentence  is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a).  It would be a sentence in the best tradition of federal judicial discretion, that would consider Mr. Egtvedt as an individual and account for his unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,


By:   _____/s/_____
      Kira Anne West
      DC Bar No. 993523
      712 H. St. N.E., Unit #509
      Washington, D.C. 20005
      Phone: 202-236-2042
      kiraannewest@gmail.com

CERTIFICATE OF SERVICE

I hereby certify on the 9th  day of March, 2023 a copy of same was delivered

to the parties of record, by email  pursuant to the Covid standing order and the

rules of the Clerk of Court.

_____ /S/
                   Kira Anne West