**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-177-CRC** |
| **DANIEL DEAN EGTVEDT** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Daniel Dean Egtvedt to a total of 64 months' incarceration, three years of supervised release, $2,000 restitution, and the mandatory assessment of $100 for each felony conviction (Counts One through Four), $25 for each Class A misdemeanor (Counts Five and Six) and $10 for the Class B misdemeanor (Count Eight). The government's recommendation is at the midpoint of the advisory United States Sentencing Guidelines range of 57 – 71 months' incarceration, which the government submits is the correct overall Guidelines calculation for the offense of conviction.

## I.    INTRODUCTION

The defendant, Daniel Egtvedt, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in

1

losses.[1]

In the early afternoon of January 6, 2021, Egtvedt marched from former President Trump's rally to the northwest corner of the U.S. Capitol Grounds. When Egtvedt arrived on the restricted Capitol Grounds, he watched the unfolding chaos and chose to be an active participant in the attempted insurrection. Egtvedt made his way to the Senate Wing Doors, where he antagonized officers who were attempting to prevent rioters from breaching the Senate Wing Doors for a second time that day. Notwithstanding the fact that an officer pepper sprayed him, Egtvedt joined the rioters who overran those officers and breached the Senate Wing Doors at approximately 2:48 p.m.

Once inside the Capitol, Egtvedt gave a recorded interview to another rioter in which he implored others to "*come down here now*" and pronounced, "*Congressmen… grow a spine or fucking resign*!" Egtvedt remained inside the Capitol for approximately 27 minutes, during which time he confronted, verbally berated, and physically resisted and impeded police officers, all in an effort to stop the certification of the election. In doing so, he caused an injury to one officer's shoulder. Egtvedt remained on the Capitol Grounds even after he was forcibly removed from the Capitol, and gave a second recorded interview in which he yet again implored others to join in the riots. In his second interview, Egtvedt announced, "*We are in treasonous situations here. People, please come down to the United States Capitol, right now*."

The government recommends that the Court sentence Egtvedt to 64 months' incarceration, which is within the advisory Guidelines' range of 57 – 71 months, which the government submits

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

is the correct Guidelines calculation. A 64 month sentence reflects both the gravity of Egtvedt's conduct and his refusal to accept responsibility for his actions.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the Affidavit in Support of Criminal Complaint and Arrest Warrant filed in this case, ECF 1-1, paragraphs 4 – 11, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Egtvedt's Role in the January 6, 2021 Attack on the Capitol

#### *Egtvedt's Entry Into to the Capitol*

On the morning of January 6, 2021, Egtvedt attended former President Trump's rally and joined in the crowd of protestors marching to the Capitol. By 2:19 p.m., six minutes after rioters first breached the Senate Wing Doors, Egtvedt was on the northwest corner of the restricted Capitol Grounds. The coalescing attack on the Capitol was apparent – Egtvedt could see, and indeed, he photographed – rioters scaling the walls of the Capitol.



*Gov. Ex. 101.256 from Egtvedt's iPhone*

As Secret Service and U.S. Capitol Police ("USCP") were rapidly moving Vice President Pence and lawmakers to safety, Egtvedt ascended from the west front of the Capitol Grounds to the Upper West Terrace.[2]  At 2:32 p.m., Egtvedt stood outside the Senate Wing Doors. He saw and photographed yet another rioter scaling the Capitol Building. *See* Gov. Ex. 101.286. Not content to remain on the periphery of the riots, Egtvedt continued on to the entry at the Senate Wing Doors.

By 2:37 p.m., Egtvedt was at the forefront of the mob that was trying to force entry at the Senate Wing Doors. The windows were broken, and officers had erected makeshift barricades of furniture to stop rioters from breaching the entrance a second time.[3] USCP Officer Daniel Amendola, one of the officers standing behind the barricades, recalled the scene was "very loud and chaotic," with alarms and strobes going off. Trial Tr. 12/5/22, at 144-145 (Amendola test.). The smell of gas and smoke was in the air. *Id*. at 154 (Amendola test.); Trial Tr. 12/6/22, at 282 (Wetzel test.). As the officers tried to use the barricades to prevent the crowd from gaining further access to the Capitol, rioters threw objects at them through the broken windows. *Id*. at 148 – 150 (Amendola test.). USCP Officer Wetzel recalled being hit with a flagpole as he tried to prevent rioters from coming in a broken window. Trial Tr. 12/6/22 at 289 – 290 (Wetzel test.); Gov. Ex. 202b at 2:47:30 – 20:47:40. The rioters also yelled at the officers, calling them traitors, and telling them that they were "on the wrong side of history." *Id*. at 153 (Amendola test.). USCP Lt. Scott Grossi, who was also at the Senate Wing Doors, described feeling "verbally assaulted" by the

---

[2] The defendant's iPhone contained one image showing rioters walking up what appear to be the Northwest Stairs, and another image that appears to be taken from within the scaffolding, looking at the Northwest Stairs.  Based upon these two images, it appears that the defendant took the Northwest Stairs to the Upper West Terrace.

[3] Rioters first breached the Senate Wing Doors at approximately 2:13 p.m. *See* Gov. Ex. 201. Law enforcement eventually resecured the doors and held a police line there until the 2:48 p.m. breach.

words the rioters hurled at him on January 6. Trial Tr. 12/6/22 at 479 (Grossi test.); *cf*. Trial Tr. 12/6/22 at 281 (Wetzel test.) (describing some rioters calling officers "traitors" and others stating, "we're with you.").

Egtvedt saw Officer Amendola and his fellow officers, many in riot gear, standing behind the barricades. Rioters who had previously entered the Capitol were being escorted out. Rather than heeding these unambiguous signs that he was not permitted to be there and leaving, Egtvedt photographed the officers and harangued them through the broken glass.

 

*Gov. Ex. 101.343*
*from Egtvedt's iPhone*

*Still from Gov. Ex. 202a*

An unidentified officer pepper sprayed Egtvedt as Egtvedt leaned in through the broken windows, but Egtvedt remained undeterred. He actively participated in the push to overrun the police line, *see* Gov. Ex. 401, and at 2:48 p.m., he and other rioters succeeded in breaching the Senate Wing Doors. As a result of Egtvedt's efforts, rioters began streaming into the Capitol.



*Still from Gov. Ex. 202a*

### *Egtvedt's Actions Inside the Capitol*

Once inside the Capitol, Egtvedt approached USCP Officer Tony Wetzel. Officer Wetzel recognized that he and the other officers had been overrun by the rioters at this point, Trial Tr. 12/6/22 at 295 – 296 (Wetzel test.), and saw that Egtvedt was upset. *Id*. at 292 – 293. Officer Wetzel tried to calm Egtvedt down, and prevent Egtvedt from going further into the Senate halls behind him. *Id*. at 297 – 298. Egtvedt eventually turned away from Officer Wetzel and walked over to a ledge in an alcove by the Senate Wing Doors.

As he sat in the alcove, Egtvedt gave an interview to Anthime Gionet, a social media figure known as "Baked Alaska," who was broadcasting the riots live on the D-Live platform. Gov. Ex. 402.[4] Egtvedt complained about being pepper sprayed by law enforcement and encouraged other

---

[4] Gionet pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). *United States v. Anthime Gionet,* 22-cr-132 (TNF).

rioters to follow him, stating "*Tell everybody that is outside, tell them to get in here now*."   Egtvedt continued, "*This is our country. We need to reclaim it. We are not going to let the globalists take our country*." *Id*. When Gionet stated that it was a fraudulent election, Egtvedt responded, "*Everybody, if you are seeing this, come down here now. We are not backing away. This is our house*!" *Id*. Gionet began to walk away, and Egtvedt called out to him. When Gionet turned his camera back to Egtvedt, Egtvedt announced, "*Congressmen. Grow a spine or fucking resign*!" *Id*.

At approximately 3:06 p.m., Egtvedt got off the alcove ledge and joined in the chant of "Police are traitors" as he walked down the hallway to the Crypt. Gov. Ex. 202c, 403. Metropolitan Police Department ("MPD") Officers Michael Fanone and James Albright were in the Crypt when Egtvedt arrived, trying to orient themselves and struggling to hear their police radios over the reverberating screams of rioters. Trial Tr. 12/5/22, at 218-220 (Albright test.). Egtvedt sought the officers out and berated them, yelling, "*This is the United States of America. And you are on the wrong fucking side!*" Gov. Ex. 301.



*Still from Gov. Ex. 301*

Egtvedt's anger was palpable as he "spat the words out" at the officers. Trial Tr. 12/5/22 at 222 (Albright test.). Immediately after berating Officers Fanone and Albright, Egtvedt engaged and screamed in the face of yet another law enforcement officer in the Crypt. Gov. Ex. 301 at 15:09:44.

### Egtvedt's Actions in the Hall of Columns

Egtvedt walked from the Crypt to the Hall of Columns, arriving in the Hall of Columns at approximately 3:11 p.m. The Hall of Columns was full of uniformed officers who were both removing rioters from the Capitol and preserving evidence of a shooting that had occurred elsewhere inside the Capitol. Gov. Ex. 714, Deposition Tr. 11/17/22 at 24 – 25 (Marshall test.); Trial Tr. 12/7/22 at 336 – 340, 352 (Koenig test.). As Egtvedt walked down the hall and toward the exit, he pointed to several of them and stated, "God bless all of you." One officer clearly replied, "Keep going, sir."   *See, e.g.,* Gov. Ex. 304 at 15:11:45.



*Still from Gov. Ex. 208*

As Egtvedt neared the exit, FBI Special Agent Stewart Curcio motioned for him to continue to the exit.[5] Egtvedt walked a few more feet toward the doorway, then abruptly turned around and began walking back towards the interior of the Capitol. As Egtvedt passed by Special Agent Curcio, Special Agent Curcio "pointed and told him he needed to go outside." Trial Tr. 12/7/22 at 540-541 (Curcio test.). Special Agent Curcio recalled, "It was clear to me that he heard what I said and decided to not follow the direction that I gave him." *Id*. at 541.



*Still from Gov. Ex. 208*

As Egtvedt, who is 6'2" in height and 370 pounds, PSR ¶ 92, continued past Special

Agent Curcio and toward the interior of the building, uniformed USCP Officer Melissa Marshall

---

[5] Special Agent Curcio, a member of the FBI's SWAT team, was providing security for medics who were treating individuals who were injured. Trial Tr. 12/7/22 at 530 (Curcio test.). Prior to Egtvedt's arrival in the Hall of Columns, medics were attending to an individual who had been shot in the Capitol and moved to the Hall of Columns for medical treatment and transportation.

– who is less than half of Egtvedt's size – stepped in front of Egtvedt to block his path.



*Still from Gov. Ex. 208*

When Egtvedt continued walking toward her, Officer Marshall placed her right hand on his upper left shoulder to direct him back toward the doorway. Egtvedt charged towards Officer Marshall, yelling, "You shoot me! Shoot me! You guys are violating the Constitution of the United States of America!" Gov. Ex. 304 at 15:12:20. Egtvedt then swung his left hand and swatted Officer Marshall's right hand off his shoulder. Gov. Ex. 303 at 15:12:22. Officer Marshall then raised her left hand and placed it on Egtvedt's upper chest area. *Id*. at 15:12:23. Egtvedt grabbed hold of Officer Marshall's left arm, forcing Officer Marshall to swing her right hand against his right arm to free her other hand. *Id*. at 15:12:25; Gov. Ex. 714, Deposition Tr. 11/17/22 at 29 (Marshall test.)

As this was happening, other officers attempted to intervene. MPD Officer Michel DaCruz also jumped in to assist and tried to pull Egtvedt back toward the exit. Trial Tr. 12/7/22 at 645 (DaCruz test.). Egtvedt began to yell, "You work for us! You work for us!" as he continued to try

and move further into the Capitol. Gov. Ex. 303 at 15:12:26. Two more officers surrounded and pushed against Egtvedt, as he continued struggling, still trying to move forward.



*Still from Gov. Ex. 208*

With the weight of at least four officers against him, including Officer DaCruz, Egtvedt could no longer move forward and fell backwards to the floor. As he hit the floor, the back of his head struck one of the columns. Egtvedt also landed partly on top of Officer Michel DaCruz, injuring Officer DaCruz's right shoulder rotator cuff. Trial Tr. 12/7/22 at 646 (DaCruz test.). At trial, Officer DaCruz recalled that his arm was in "complete and utter pain." *Id.*

For the next two minutes or so, Egtvedt lay on the floor. He declined any medical assistance and stated he would not leave. Trial Tr. 12/7/22 at 776-578 (Durrette test.). USCP Officers Adam Durrette and Connor Rhodes eventually lifted Egtvedt to his feet and half-carried, half pushed him toward and out the doorway. Egtvedt fell to the floor again, immediately outside the doorway. Officers again tried to convince Egtvedt to stand up and leave. He refused. The officers again

offered to get Egtvedt medical assistance. He again declined. After about two more minutes the officers helped Egtvedt to his feet. Egtvedt promptly attempted to re-enter the building. Once again officers, including Officer Marshall, physically blocked Egtvedt, and once again Egtvedt swatted at Officer Marshall's hand as she prevented him from reentering. After a few more moments of confrontation, Egtvedt relented and, at 3:18 p.m., began walking away from the doorway.

### *Egtvedt's Actions After He Is Expelled from the Capitol*

After he was expelled from the Capitol building, Egtvedt started to walk towards the western end of the upper terrace. MPD Officer Marina Bronstein noticed Egtvedt and walked toward him.  Officer Bronstein told Egtvedt he needed to go the opposite direction, behind the police line on the east side of the terrace. Egtvedt ignored Officer Bronstein, telling her, "I don't want to go over there." Gov. Ex. 306 at 15:19:14. Egtvedt continued to refuse to comply with her commands to leave, forcing Officer Bronstein and a male MPD officer to physically turn Egtvedt around and push against Egtvedt's back, making him to walk toward the east. As Egtvedt walked, he leaned back against them to resist, shouting, "You are violating the Constitution. This is tyranny!" *Id*. at 15:19:25. The officers eventually succeeded in walking Egtvedt through a set of metal barriers and beyond the police line on the east end of the terrace.

Egtvedt remained on the Capitol grounds for several more hours, during which time he gave another recorded interview. During this second interview, Egtvedt told the cameraman, "*I told them, I said you are in violation of the Constitution, this is the people's house, and it has been taken over.*" Gov. Ex. 404. The defendant then referenced being sprayed with pepper spray. As with his prior interview, the defendant concluded with a call to action, stating, "*We are in treasonous situations here. People, please come down to the United States Capitol, right now.*

*Everybody. Please come.*" *Id.* At approximately 4:30 p.m., Egtvedt continued to the Columbus

Doors of the Capitol, where he bellowed at officers on the others side, stating, "*Open the door.*

*This is our house, not yours*." Gov. Ex. 405 at 00:52. As alarms went off and his fellow rioters

yelled over megaphones, Egtvedt took photographs of the officers behind the doors. *Id.*, *see also*

Gov. Ex. 101.406.

Egtvedt eventually returned to his hotel room at the Willard Intercontinental. The following

morning, he proudly posed for a "selfie" photograph in his room. As the defendant beamed into a

mirror, he wore a t-shirt that read, "God gave his archangels weapons because even the Almighty

knew you don't fight evil with tolerance & understanding." The "angel" on the shirt was holding

a long firearm.



*Gov. Ex. 101.424*

### *Injuries*

Egtvedt inflicted both emotional and physical injuries on the officers he forcibly resisted

and impeded. Officer Marshall was diagnosed with post-traumatic stress disorder ("PTSD")

13

because of her experiences on January 6, 2021. Gov. Ex. 714, Deposition Tr. 11/17/21, at 37 (Marshall test.). Additionally, Officer DaCruz had to seek medical treatment for his shoulder injury and undergo physical therapy. Gov. Ex. 501 (Injury Report); Gov. Ex. 502 (Medical records). Minutes after he sustained the injury, Officer DaCruz's pain was so sharp that he asked another officer to pull on his arm in attempt to alleviate the pain. Trial Tr. 12/7/22 at 648 (DaCruz test.) ("I was hopefully going to alleviate some pain if I maybe pulled my arm. I don't know if some kind of joint was stuck in there, but maybe I could pull something out."); Gov. Ex. 302 at 15:13:15. MPD had to place Officer DaCruz on limited duty as he recovered from his injury. Gov. Ex. 502.

### Egtvedt's Arrest and Transport to Washington, D.C.

Egtvedt was arrested on February 13, 2021, after Maryland State Police ("MSP") and Garrett County (MD) sheriff's officers responded to a domestic incident at the Oakland, MD residence of Egtvedt's relative, Witness 2. Gov. Ex. 713, Suppression Hrg. Tr. 6/2/22, at 16-30 (Brennan test.). When MSP arrived at Witness 2's residence, Witness 2 advised them that IT was trying to take an elderly relative to receive a COVID-19 vaccination; however, the defendant was attempting to prevent them from leaving the residence. Egtvedt, who was present, told MSP that he wanted to stop Witness 2 from taking the elderly relative to get vaccinated. Egtvedt explained to MSP that he had worked in the pharmaceutical industry and that he did not want the elderly relative to get the COVID vaccine because the government was changing people's DNA and was going to kill a lot of people within the next few years. *Id*. at 24. Several hours later, MSP confirmed Egtvedt had an active warrant for his arrest, returned to the area and arrested the defendant near Witness 2's residence.

Egtvedt was subsequently detained at the Garrett County Detention Center, where he wrote

two highly concerning letters to the Garrett County Sheriff. Gov. Ex. 505 and 506.   In the first letter, the defendant referred to his rights under the "organic" Constitution of 1776. Gov. Ex. 505. Egtvedt concluded the letter by stating, "If you release me to federal agents at this moment you could place me as a political prisoner in a foreign land." *Id*. In the second letter, Egtvedt referred to himself as having extenuating circumstances in "historical events currently in play." Gov. Ex. 506. Egtvedt concluded the second letter in the same manner as his first, stating, "If you release me to federal agents at this time, I could be placed in a situation of being a political prisoner in a foreign land." *Id*. On February 16, 2021, FBI agents transported Egtvedt to Washington, D.C. As they pulled into Washington, D.C., Egtvedt asked an FBI agent what "port" he was being taken to. Gov. Ex. 713, Suppression Hrg. Tr. 6/2/22, at 102 (Smith-Shimer test.).

## III.    THE CHARGES AND CONVICTION

On November 10, 2021, a federal grand jury returned a superseding indictment charging Egtvedt with nine counts: Count One, Assaulting, Resisting, or Impeding Officer M.M., in violation of 18 U.S.C. § 111(a)(1); Count Two, Assaulting, Resisting, or Impeding Officer M.D., in violation of 18 U.S.C. § 111(a)(1); Count Three, Interfering with Law Enforcement During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Count Four, Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Count Five, Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Count Six, Disorderly or Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Count Seven, Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. 1752(a)(4); Count Eight, Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Count Nine, Engaging in Act of Physical Violence in a Capitol

Building, in violation of 40 U.S.C. 5104(e)(2)(F) (Count Nine). ECF No. 43.

On December 16, 2022, after a bench trial, the Court returned a verdict of guilty on seven of the nine counts, specifically: Count One, Assaulting, Resisting, or Impeding Officer M.M; Count Two, Assaulting, Resisting, or Impeding Officer M.D.; Count Three, Interfering with Law Enforcement During a Civil Disorder; Count Four, Obstruction of an Official Proceeding; Count Five, Entering or Remaining in a Restricted Building or Grounds; Count Six, Disorderly or Disruptive Conduct in a Restricted Building or Grounds; and Count Eight, Disorderly Conduct in a Capitol Building.

## IV.     STATUTORY PENALTIES

Egtvedt now faces sentencing on Counts One through Six and Count Eight. The statutory maximum term of imprisonment is eight years each for Counts One and Two (Assaulting, Resisting, Or Impeding Certain Officers); five years for Count Three (Civil Disorder); 20 years for Count Four (Obstruction of an Official Proceeding); one year each for Count Five (Entering or Remaining in a Restricted Building or Grounds) and Count Six (Disorderly or Disruptive Conduct in a Restricted Building or Grounds); and six months for Count Eight (Disorderly Conduct in a Capitol Building). For Counts One through Four, the defendant also faces a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100. For Counts Five and Six, the defendant also faces a term of supervised release of not more than one year, a fine up to $1,000, and a mandatory special assessment of $25. For Count Eight, the defendant also faces a fine up to $5,000, and a mandatory special assessment of $10.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

16

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The revised PSR includes three errors with respect to the Guidelines analysis. As a result, the U.S. Probation Office calculates the defendant's adjusted offense level to be 19, with a Guidelines range of 30 – 37 months incarceration, whereas the government submits the correct adjusted offense level should be 25, with a Guidelines range of 57 – 71 months incarceration.

First, the revised PSR does not include a Guidelines analysis for each count of conviction. *See* PSR ¶¶ 43-72. U.S.S.G. §§ 1B1.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not set forth the Guidelines calculation for each count as required under U.S.S.G. § 1B1.1(a)(4).

Second, the government disagrees with the PSR's failure to apply an eight-level enhancement under U.S.S.G. § 2J1.2(b)(1)(B) to Count Four. This specific offense characteristic applies for multiple reasons, including because the defendant's conduct "involved causing . . . physical injury to a person . . . in order to obstruct the administration of justice." The PSR references the Court's findings with respect to the defendant's conviction for Count One, Assaulting, Resisting or Impeding Officer M.M., but mistakenly conflates Officer DaCruz's shoulder injury with the Court's findings with respect to Officer Marshall. *See* Addendum to PSR

at p. 30. As discussed below, there are several different factual predicates for applying U.S.S.G. § 2J1.2(b)(1)(B) to Count Four.

Third, government submits that the convictions for all six counts to which the Guidelines apply comprise a single group, not two groups, as the PSR suggests. As there is only one group there is also only one unit, *see* U.S.S.G. § 3D1.4, which means that the Combined Offense Level for all of the counts is simply the offense level for the single group, i.e., level 25.

### A.    Guidelines Analysis for Each Count

The government submits that the following is the correct Guidelines analysis:

**Count One: 18 U.S.C. § 111(a)(1), Resisting or Impeding Certain Officers (Officer Marshall)**

| Base Offense Level: | 10 | USSG § 2A2.4 |
|---|---|---|
| Specific Offense Characteristic | +3 | USSG § 2A2.4(b)(1)(A):  "If  . . . the offense involved physical contact . . . increase by **3** levels." |
| Adjustments | (none) | |
| Adjusted Offense Level | **13** | |

**Count Two: 18 U.S.C. § 111(a)(1), Resisting or Impeding Certain Officers (Officer DaCruz)**

| Base Offense Level: | 10 | USSG § 2A2.4 |
|---|---|---|
| Specific Offense Characteristic | +3 | USSG § 2A2.4(b)(1)(A):  "If  . . . the offense involved physical contact . . . increase by **3** levels." |
| Specific Offense Characteristic | +2 | USSG §  2A2.4(b)(2):  "If the victim sustained bodily injury, increase by **2** levels." |
| Adjustments | (none) | |
| Adjusted Offense Level | **15** | |

**Count Three: 18 U.S.C. § 231(a)(3), Obstructing, Impeding, or Interfering with Officers During a Civil Disorder**

There is no assigned guideline section for this offense in the Guidelines' Statutory Appendix.   Under such circumstances, the Guidelines instruct that the "the most analogous

guideline" applies. U.S.S.G. § 2X5.1. Here, that is U.S.S.G. § 2A2.4, Obstructing or Impeding

Officers.

| Base Offense Level: | 10 | USSG § 2A2.4 |
|---|---|---|
| Specific Offense Characteristic | +3 | USSG § 2A2.4(b)(1)(A):  "If . . . the offense involved physical contact . . . increase by **3** levels." |
| Specific Offense Characteristic | +2 | USSG § 2A2.4(b)(2):   "If the victim [Officer M.D.] sustained bodily injury, increase by **2** levels." |
| Adjustments | (none) | |
| Adjusted Offense Level | **15** | |

**Count Four:   18 U.S.C. §§ 2 and 1512(c)(2), Aiding and Abetting the Obstruction of an Official Proceeding**

| Base offense level: | 14 | USSG § 2J1.2(a) |
|---|---|---|
| Specific offense characteristic | +8 | USSG § 2J1.2(b)(1)(B):   "If the offense involved causing or threatening to cause physical injury to a person . . . in order to obstruct the administration of justice, increase by 8 levels." |
| Specific offense characteristic | +3 | USSG § 2J1.2(b)(2):   "If the offense resulted in substantial interference with the administration of justice, increase by **3** levels." |
| Adjustments | (none) | |
| Adjusted Offense Level | **25** | |

**Count Five:   18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building**

| Base Offense Level | 4 | USSG § 2B2.3 |
|---|---|---|
| Specific Offense Characteristic | +2 | USSG § 2B2.3(b)(1)(A)(vii):   the trespass occurred "at any restricted building or grounds" |
| Cross reference | | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
| Base Offense Level (adjusted) | 25 (from Count One) | USSG 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended |

| | | |
|---|---|---|
| | | offense conduct that can be established with reasonable certainty. |
| Specific Offense Characteristics from USSG § 2X1.1 | (none) | |
| Other adjustments | (none) | |
| Adjusted Offense Level | **25** | |

**Count Six:   18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building**

| | | |
|---|---|---|
| Base Offense Level | 10 | USSG § 2A2.4(a) |
| Specific Offense Characteristic | +3 | USSG § 2A2.4(b)(1)(A):   "If  . . . the offense involved physical contact . . . increase by **3** levels." |
| Specific Offense Characteristic | +2 | USSG   2A2.4(b)(2):   "If the victim sustained bodily injury, increase by **2** levels." |
| Adjustments | (none) | |
| Adjusted Offense Level | **15** | |

**Count Eight:   40 U.S.C. § 5104(e)(2)(D), disorderly or disruptive conduct in the Capitol building or on the Capitol grounds**

Because this offense is a class B misdemeanor, the Guidelines do not apply to it.  *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

## B.  Count Four Specific Offense Characteristics

The applicability of a specific offense characteristic is determined based upon, among other things, "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," U.S.S.G. § 1B1.3(a)(1)(A), and "all harm" that resulted from those acts, *id*. § 1B1.3(a)(3). Application Note 6 of U.S.S.G. § 1B1.3 defines "harm" to include bodily injury, monetary loss, property damage, and any resulting harm. The Guidelines calculations above for Count Four, the most serious offense, include the specific offense

characteristics found in U.S.S.G. §§ 2J1.2(b)(1)(B) and 2J1.2(b)(2) to account for the severity and complexity of the defendant's behavior.

### a. Egtvedt's Conduct Resulted in Substantial Interference with the Administration of Justice

U.S.S.G. § 2J1.2(b)(2) applies to Count Four because the defendant's conduct "resulted in substantial interference with the administration of justice." As a result of the defendant's and other rioters' actions, the official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, were delayed for hours and legislators were physically evacuated for their own safety. Moreover, the actions of the defendant and his fellow rioters caused over $2,000,000 in loss to the federal government. Judges in this Court have applied § 2J1.2's "administration of justice" enhancements in Capitol breach cases, both in cases where the parties agreed to their application and where the application was contested. *See, e.g., United States v. Thomas Robertson*, 1:21-cr-00034 (CRC), Tr. 8/11/2022 at 19 ("The offense did result in a substantial interference given both the delay that the riot caused in the certification proceeding, which is the proceeding at issue, and the expenditure of substantial resources that was necessary to fix the damage that was done to the Capitol.") (Judge Cooper); *United States v. Wilson*, No. 21-cr-345 (Lamberth, J.); *United States v. Hodgkins*, No. 21-cr-188 (Moss, J.*); United States v. Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Chansley*, No. 21-cr-003, (Lamberth, J.); *United States v. Matthew Miller*, No. 21-cr-075 (Moss, J.) (uncontested, but independently addressed by the Court); *United States v. Rubenacker*, No. 21-cr-193 (contested); *United States v. Guy Reffitt*, No. 21-cr-032 (Friedrich, J.) (contested); *United States v. Pruitt*, No. 21-cr-23 (Kelly, J.). *But see United States v. Seefried*, No. 21-cr-287, ECF No. 123, at 1 (D.D.C. Oct. 29, 2022)

(TNM) (concluding that "administration of justice" in § 2J1.2 is limited to "a judicial or related proceeding that determines rights or obligations.") (McFadden, J.).

### b. Egtvedt Caused Physical Injury and Threatened the Safety of Officers as Part of His Effort to Obstruct the Certification

U.S.S.G. § 2J1.2(b)(1)(B) applies when an offense involves "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." As discussed above, for purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, 18 U.S.C. § 1515(a)(1)(B). In this case, there are multiple factual predicates to apply § 2J1.2(b)(1)(B).

First, the enhancement applies because Officer DaCruz suffered a physical injury to his right shoulder as a direct result of the defendant's conduct in the Hall of Columns. Egtvedt used his size and strength to physically resist the directives of officers to leave the Capitol, so that he could remain in the Capitol and continue obstructing the certification of the vote. Trial Tr. 12/16/2002 at 8-9 (Verdict). It was reasonably foreseeable that someone would be injured when Egtvedt tried to use his substantial size to push past Officer DaCruz (as Egtvedt taunted "shoot me") and the other officers that were trying to push and pull Egtvedt back towards the exit. Upon falling to the ground with Egtvedt, Officer DaCruz immediately felt sharp pain in his shoulder/arm. He reported the injury within seconds to his fellow officers and formally documented his injury at the end of his tour of duty. Officer DaCruz sought medical treatment from the Police and Fire Clinic, and then underwent physical therapy at MedStar Health's Irving Street Orthopedic Center.

22

As the Court specified when it announced its guilty verdict with respect to Count Two, the defendant "forcibly resist[ed] Officer DaCruz and imped[ed the officer's] efforts to restrain Mr. Egtvedt and usher him towards the exit." Trial Tr. 12/16/2002 at 8 (Verdict). The Court found that, with respect to Count Two, the defendant "resisted the officers [including Officer M.D.] so that he could remain in the Capitol so he could continue obstructing the certification of the [Electoral College] vote." *Id.* at 9 (emphasis added). Since the defendant's obstruction of the Electoral College vote was the basis for his conviction in Count Four, the defendant's conduct with respect to that count involved causing physical injury to a person in order to accomplish that goal, and therefore § 2J1.2(b)(1)(B) must be applied.

Second, the enhancement should apply because Egtvedt's behavior in the Hall of Columns threatened to cause physical injury to other officers. Just as Egtvedt's actions did in fact injure Officer DaCruz, his actions threatened injury to every other officer, including Officer Marshall – whose arm he forcibly grabbed – that he opposed in his physical struggle to proceed further into the Capitol and continue obstructing the certification of the 2020 Electoral College vote.

Third, § 2J1.2(b)(1)(B) applies because Egtvedt's actions as a part of the mob that overran the police line during the second breach of the Senate Wing Doors threatened the safety of officers, members of Congress, and their staff who were all inside the Capitol. Egtvedt's relevant conduct under U.S.S.G. § 1B1.3(a)(1)(A) encompasses both Egtvedt's own acts or omissions and those whom he aided, abetted, counseled, commanded, induced, procured, or willfully caused. By being an active member of the mob that pushed against, threw objects at, hurled threats at, and ultimately overran the officers at the Senate Wing Door at 2:48 p.m., Egtvedt at a minimum aided and abetted those rioters immediately around him who were threatening and assaulting those officers. *See*

*United States v. Anthony Williams*, 1:21-cr-00377 (BAH) Tr. 09/16/2022 at 42 ("Those actions of that mob were meant to be threatening and to overrun the police and stop the certification of the Electoral College vote, and they did succeed for a period of time."). Moreover, the evidence established that Egtvedt's own acts – his pushing against others – helped bring about the second breach of the Senate Wing Doors. *See* Gov. Ex. 401, 202b. As Chief Judge Howell remarked, "This was a catastrophic security breach that raised such threats to the security of the Vice President and Congress -- members of Congress, staff working -- and media -- working legitimately in the Capitol, that all of those people who were supposed to be doing the people's business on January 6th had to stop and be evacuated." *United States v. Matthew Bledsoe*, 1:21-cr-204 (BAH) Tr. 10/21/2022 at 65 (applying § 2J1.2(b)(1)(B)). And again, Egtvedt's own words – telling others that "we" need to "reclaim our country" and telling Congressmen to "grow a spine or fucking resign" – make it abundantly clear that his breach of the Senate Wing Doors was done in order to obstruct the certification of the Electoral College vote.

Finally, the ensuing 27 minutes Egtvedt spent inside the Capitol, and his actions once he was expelled from the Capitol, provide a factual predicate for applying the enhancement. Once Egtvedt was inside the Capitol, he aggressively engaged officers by the Senate Wing Doors (Officer Wetzel), in the Crypt (Officers Fanone, Albright, and an unidentified officer), the Hall of Columns (numerous officers) and the upper terrace (Officer Bronstein). After being expelled from the building, Egtvedt gave an additional interview to try and galvanize other rioters to join in the attacks on the Capitol, stating, "We are in treasonous situations here. People, please come down here to the United States Capitol." Gov. Ex. 404. Egtvedt's attempts to motivate even more rioters inherently contemplated violence and threatened the law enforcement officers defending the

Capitol and the lawmakers and staff within the Capitol. Additionally, Egtvedt's comments to officers at the Columbus Doors – when he stated, "This is our house, not yours," Gov. Ex. 405, were yet again threatening to the officers on the other sides of those doors, who were trying to prevent yet another wave of rioters from entering the building. Accordingly, Egtvedt's cumulative conduct while in the Capitol and after being expelled was threatening to law enforcement and those inside Capitol, was undertaken as a part of his efforts to obstruct the Electoral College vote, and supports the application of § 2J1.2(b)(1)(B). *See United States v. George Tenney*, 1:21-cr-640 (TFH) Tr. 12/5/2022 at 22 ("[B]ut there is no question that he was in contact with the police officers, there was physical contact; that his mannerisms were threatening; his intent to continue to go back to push the doors open to let more people in; he's encouraging the rioters to come in, patting them on the back -- it seems it all amounts to, certainly, sufficient evidence by a preponderance of the evidence that the 8-level enhancement to the offense level can apply to Mr. Tenney's behavior charged in Count 2") (Judge Hogan).

Furthermore, applying § 2J1.2(b)(1)(B) is consistent with other judges in this Court who have similarly applied § 2J1.2(b)(1)(B) in cases not involving assaultive conduct. *See, e.g. United States v. Anthony Williams*, 1:21-cr-00377 (BAH) Tr. 09/16/2022 at 41 (applying the § 2J1.2(b)(1)(B) because when the defendant "intentionally joined a mob – to quote him -- "to storm the swamp," when he entered the Capitol in violation of the law and, once inside, disobeyed police orders to leave and pressed forward with a threatening, yelling, loud, angry mob, he threatened the safety of the officers and everybody else inside the building given their overwhelming numbers of the mob") (Chief Judge Howell); *United States v. George Tenney*, 1:21-cr-640 (TFH) Tr. 12/5/2022 at 22 (Judge Hogan); *United States v. Matthew Bledsoe*, 1:21-cr-204 (BAH) Tr. 10/21/2022 at 64-66 (Chief Judge Howell), *United States*

*v. Joshua Pruitt*, 1:21-cr-23 (TJK) (applying the specific offense characteristic because the offense involved property damage) (Judge Kelly), *United States v. Thomas Robertson*, 1:21-cr-00034 (CRC) Tr. 8/11/2022 at 14-15 (Judge Cooper); *United States v. Erik Herrera*, 1:21-cr-619 (BAH). *But see United States v. Christian Secor*, 1:21-cr-00157 (TNF) Tr. 10/19/2022 at 17-20 (finding that § 2J1.2(b)(1)(B) and § 2J1.2(b)(2) do not apply because the January 6th election certification was not an administration of justice) (Judge McFadden).

### C.      Grouping Analysis

Under U.S.S.G. §§ 3D1.1(a)(1) and 3D1.2, "closely related counts" group. More specifically, under U.S.S.G. § 3D1.2(a) and (b), counts are grouped together when they "involve the same victim" and either the same "act or transaction" or "two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." Also, under U.S.S.G. § 3D1.2(c), a count that "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts," should be grouped with that other count.

Counts Four, Five and Six all involve the same victim, the U.S. Congress, and all also involve the same criminal objective or common scheme or plan. Accordingly, Counts Four, Five and Six group together.   In addition, the defendant's conduct underlying Counts One, Two and Three (physical contact with multiple victims; injury to one victim) embody specific offense characteristics for both Counts Four and Six. Accordingly, Counts One, Two and Three group with those offenses, which, as discussed above are already grouped with Count Five.

Therefore, there is only one group for all the counts. Under U.S.S.G. § 3D1.3(a), when counts are grouped together under U.S.S.G. §§ 3D1.2(a), (b) and/or (c), the offense level for the group is the same as the adjusted offense level for the most serious count in the group. Which in this case is Count Four, which has an adjusted offense level of 25. As there is only one group there is also only one unit, see U.S.S.G. § 3D1.4, which means that the Combined Offense Level for all the counts is simply the offense level for the group, i.e., level 25.

### D.    The Defendant's Guidelines' Range

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 75. Accordingly, based on the government's calculation of the defendant's total adjusted offense level of 25, the defendant faces an overall range of imprisonment of 57 to 71 months, *see id*. ch. 5, pt. A.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Egtvedt's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Egtvedt was an active member of the violent mob that overran officers to breach the Senate Wing Doors at 2:48 p.m. And it is apparent from Egtvedt's own statements on January 6, 2021 that his intent was to take over "the peoples' house." Once inside the Capitol, Egtvedt's actions became even more volatile. He engaged in 27 minutes of sustained

harassment of, physical resistance to, and impeding of law enforcement officers who were risking their lives to defend the Capitol and lawmakers within the Capitol. Moreover, Egtvedt tried to spur on the attempted insurrection by giving multiple interviews in which he implored others to join in the riots. The nature and circumstances of Egtvedt's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 64 months' incarceration.

### B.  The History and Characteristics of the Defendant

Egtvedt was a college educated, 56 year old former pharmaceutical sales manager when he participated in the attack on the Capitol.[6] He was fully capable of discerning right from wrong, yet he chose to violate the law and tried to defy democratic institutions. Additionally, Egtvedt's conduct at Witness 2's residence on February 13, 2021 further demonstrates that Egtvedt cannot control himself when he believes the government is engaging in illegitimate action – which on that occasion involved his patently false, conspiracy theory-based belief that the government was using COVID-19 vaccinations as a means of population control. The defendant's palpable rage while at the Capitol and the circumstances that led to MSP being called to Witness 2's residence one month later show that Egtvedt cannot control himself.

Furthermore, Egtvedt's statements after his arrest, where he wrote that releasing him to the FBI would place him in the situation of a "political prisoner in a foreign land," indicate that he does not recognize the current U.S. government. Gov. Ex. 505 and 506. The defendant's inability to control himself, his lack of recognition of the government, and his willingness to resist law

---

[6] Although the defendant worked in the pharmaceutical industry for over twenty years, he left the pharmaceutical industry in 2011 and changed jobs multiple times afterwards. Egtvedt has been unemployed since 2019. PSR ¶¶ 99-105.

28

enforcement, and indeed his own family members, in order to combat perceived government misdeeds, weighs heavily in favor of a lengthy term of incarceration.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Egtvedt's criminal conduct began when he crossed the Capitol grounds and joined the mob that overran a police line and breached the Senate Wing Doors. Once inside the Capitol, Egtvedt encouraged more rioters to come to the Capitol, berated law enforcement, and physically resisted police officers' commands to leave, injuring an officer in the process. It is highly ironic that Egtvedt undertook these actions as he accused law enforcement, who were protecting the Capitol, of violating the Constitution. In sum, the rule of law was not only disrespected; it was under attack that day, and Egtvedt's own conduct was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

weighs heavily in favor of a lengthy term of incarceration. Most notably, Egtvedt has not accepted any responsibility for his role in the January 6, 2021 attacks. Instead, Egtvedt claims his actions were a reaction to the "unjustified and unprovoked attack" on him by the officer who sprayed Egtvedt with pepper spray mere minutes before the mob overran the officers. PSR ¶42. Egtvedt's refusal to acknowledge that it was his own deeply flawed decision making and his own actions that brought about the situation are highly concerning.

Egtvedt's words and actions show that he does not recognize the current administration as the lawful government, and there is no indication that he has renounced that belief, despite his conviction. This dangerous confluence of antigovernment sentiment, volatile action, and refusal to accept any responsibility for his actions on January 6, 2021 both justifies and demands a lengthy term of incarceration to deter Egtvedt from committing future crimes.

### E. The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.  Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of

the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. The three cases below each involve defendants who were convicted of 18 U.S.C. § 1512(c)(2) and confronted law enforcement officers while they were at the Capitol. In each case, the Court applied U.S.S.G. §§ 2J1.2(b)(1)(B) and 2J1.2(b)(2).

First, in *United States v. Anthony Williams*, 21-cr-377 (BAH), a jury convicted the defendant of one count of 18 U.S.C. § 1512(c)(2) and four misdemeanor offenses (Williams was not charged with violating 18 U.S.C. § 111(a)(1) or § 231(a)(3)). Williams' total adjusted offense level was 25 and his Guideline range was 57 – 71 months. Chief Judge Howell sentenced Williams to 60 months on the § 1512(c)(2) count, and concurrent periods of incarceration for the misdemeanors.[10]

Both Williams and Egtvedt made their way from the west front of the Capitol Grounds to the Senate Wing Doors. Williams and Egtvedt were both part of mobs that overran police lines, though they did so in different manners. Williams was part of a mob of that overran police on the Northwest stairs leading up to the Upper West Terrace, while Egtvedt was part of a mob that overran the police during the second breach of the Senate Wing Doors. Additionally, once Williams entered the Capitol through the Senate Wing doors, he overran the police in the Crypt with other rioters, then resisted and mocked police when they tried to remove him from the building. Egtvedt, on the other hand, berated police in the Crypt and then physically resisted police when they tried to force him out of the building. Notably, neither defendant expressed any remorse

---

[10] In *Williams*, the government recommended, as we do for Egtvedt, that the Court sentence Williams to 64 months' incarceration.

for his actions on January 6. Their cases are not identical – Williams for example, smoked marijuana in the Capitol, and Egtvedt actually caused injury to an officer – but Williams and Egtvedt have comparable aggravating factors. Accordingly, it is appropriate for Egtvedt receive a sentence similar to Williams' sentence of 60 months.

Additionally, as this Court knows, in *United States v. Thomas Robertson*, 21-cr-34 (CRC), a jury convicted Robertson of charges to include 18 U.S.C. § 1512(c)(2) and § 231(a)(3). Robertson faced a Guidelines range of 87 to 108 months, and was sentenced to 87 months' imprisonment. The defendant, a Virginia police officer, attempted to block MPD officers from crossing the west lawn by holding a wooden stick across his chest in a tactical stance. Like Egtvedt, Robertson ascended from the west front of the Capitol Grounds to the Upper West Terrance and entered the Capitol through the Senate Wing Doors. Robertson, however, arrived at the Senate Wing Doors approximately three minutes after the first breach, whereas Egtvedt was part of the mob that forced the second breach. While Robertson was part of a mob in the Crypt who overran a line of USCP officers attempting to block rioters from pushing further into the building, Egtvedt tried to individually overrun officers who were preventing him from moving further into the building. Egtvedt and Robertson both bragged about their exploits on social media – though Egtvedt did so in interviews he gave at the Capitol and Robertson did so on his social media in the days following the riot.

The significant distinguishing factors between Egtvedt and Robertson are that Robertson possessed a weapon during his direct (though not physical) confrontation with police, whereas Egtvedt had no weapon on January 6, and Robertson violated the conditions of his release by purchasing firearms. Additionally, Egtvedt did not travel with or influence another rioter in the

34

manner Robertson did, and did not receive an enhancement for destroying evidence, as Robertson did. However, Egtvedt, unlike Robertson, put his hands on and physically engaged with multiple officers. In sum, it is appropriate for Egtvedt to receive a lesser, though still significant, custodial sentence as compared to Robertson.

Finally, the Court should consider and compare the sentences of defendants who pleaded guilty to violations of 18 U.S.C. § 1512(c)(2) and confronted law enforcement officers. For example, in *United States v. George Tenney*, the defendant pleaded guilty to one count of violating 18 U.S.C. § 1512(c)(2) and one count of violating 18 U.S.C. § 231(a)(3). Tenney faced a Guidelines range of 41-51 months' incarceration (which is what Egtvedt's range would have been calculated as if he had pleaded guilty) and was sentenced to 36 months' incarceration.

Tenney's conduct differed from Egtvedt's conduct leading up to January 6 in that Tenney used social media to discuss and engage in pre-planning to storm the Capitol. However, on January 6, Tenney and Egtvedt both entered the Capitol through the Senate Wing Doors and then engaged in similar courses of conduct. Tenney entered through the doors at 2:19 p.m., approximately six minutes after the first breach, whereas Egtvedt was part of the mob that caused the second breach at 2:48 p.m. Both Tenney and Egtvedt used their phones to capture images and videos of the riots. Tenney and Egtvedt both also tried to encourage other riots to participate in the assaults, though they did so in different manners. Egtvedt gave broadcasted interviews in which he implored other rioters to come down to the Capitol, while Tenney opened the doors to the Rotunda, allowing rioters to enter the building. Like Egtvedt, Tenney pushed, shoved, and grasped at least two USCP officers and one employee of the Sergeant at Arms while he was inside the Capitol. Tenney did not, however, cause physical injury to any of the officers he confronted, while Egtvedt physically

injured Officer DaCruz. In sum, Tenney and Egtvedt have similar, though not identical, aggravating factors. The critical difference between the two, which justifies Tenney receiving a lesser sentence than Egtvedt, is that Tenney (1) did not cause injury to law enforcement, and (2) accepted responsibility and made efforts to reform himself.

Williams and Robertson were both convicted at trial and received custodial sentences within the Guidelines, while Tenney, who pleaded guilty and expressed a change of heart, received a custodial sentence four months below the Guidelines range. The government requests that this Court impose a Guidelines sentence, consistent with those defendants who did not accept responsibility. Additionally, the government submits that a sentence at the midpoint of the Guidelines is appropriate for Egtvedt because unlike the comparable defendants, Egtvedt caused a physical injury to an officer. For the reasons stated above, granting the government's recommendation would not constitute an unwarranted sentencing disparity

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A),

"requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).[11]   Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[12]   *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'" *United States v. Ekanem*, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses

---

[11]  While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v. Zerba,* 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[12]  The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.  *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[13]  *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

    The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose

---

[13] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.  Here, the Court should find that Egtvedt's conduct in entering the Capitol building as part of a mob caused damage to that building.

restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[14]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

---

[14] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

More specifically, the Court should require Egtvedt to pay $2,000 in restitution for his convictions on Counts One through Six and Eight. This amount fairly reflects Egtvedt's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 64 months' incarceration, three years of supervised release, $2,000 restitution, and the mandatory assessment of $100 each of Counts One through Four, $25 for each of Counts Five and Six and $10 for Count Eight.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:      */s/ Colleen D. Kukowski*
Colleen D. Kukowski
Michael C. Liebman
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-2646 (Kukowski)
(202) 252-7243 (Liebman)
Colleen.Kukowski@usdoj.gov
Michael.Liebman@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the Government's Sentencing Memorandum was served on all

counsel of record via the Court's electronic filing service.


 */s/ Colleen D. Kukowski*
COLLEEN D. KUKOWSKI
Assistant United States Attorney

Date:   March 9, 2023

41