```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2        - - - - - - - - - - - - - - - x
         THE UNITED STATES OF AMERICA,
3                                          Criminal Action No.
                        Plaintiff,        1:21-cr-00177-CRC-1
4                                          Thursday, March 16, 2023
         vs.                               2:10 p.m.
5
         DANIEL DEAN EGTVEDT,
6
                        Defendant.
7        - - - - - - - - - - - - - - - x
         _____
8
                         TRANSCRIPT OF SENTENCING
9          HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                     UNITED STATES DISTRICT JUDGE
10       _____
         APPEARANCES:
11       For the United States:       MICHAEL CHARLES LIEBMAN, ESQ.
                                       COLLEEN KUKOWSKI, ESQ.
12                                     U.S. DEPARTMENT OF JUSTICE
                                       601 D Street, NW
13                                     Washington, D.C. 20530
                                       (202) 252-7243
14                                     michael.liebman@usdoj.gov
                                       colleen.kukowski@usdoj.gov
15
         For the Defendant:           KIRA ANNE WEST, ESQ.
16                                     LAW OFFICE OF KIRA WEST
                                       712 H Street, NE, Unit 509
17                                     Washington, DC 20002
                                       (202) 236-2042
18                                     kiraannewest@gmail.com

19                                     NICOLE ANN CUBBAGE, ESQ.
                                       LAW OFFICE OF NICOLE CUBBAGE
20                                     712 H Street NE, Unit 570
                                       Washington, DC 20002
21                                     (703) 209-4546
                                       cubbagelaw@gmail.com
22
         Court Reporter:              Lisa A. Moreira, RDR, CRR
23                                     Official Court Reporter
                                       U.S. Courthouse, Room 6718
24                                     333 Constitution Avenue, NW
                                       Washington, DC  20001
25                                     (202) 354-3187
```

1                          I N D E X

2

3    WITNESS                                          PAGE

KELLY ROCK, Ph.D.
4         (By Ms. West)......................................65
          (By Mr. Liebman)...................................68

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Your Honor, we're on the
 3     record for Criminal Case 21-177, United States of America
 4     vs. Daniel Dean Egtvedt.
 5              Counsel, please approach the lectern and identify
 6     yourselves for the record, starting with the government.
 7              MR. LIEBMAN:  Good afternoon, Your Honor; Michael
 8     Liebman on behalf of the United States.
 9              THE COURT:  Mr. Liebman, good to see you again.
10              MS. KUKOWSKI:  And Colleen Kukowski for the United
11     States.  Good afternoon, Your Honor.
12              THE COURT:  Ms. Kukowski, good to see you.
13              MS. WEST:  Good afternoon, Your Honor; Kira Anne
14     West for Mr. Daniel Dean Egtvedt.
15              MS. CUBBAGE:  Good afternoon, Your Honor; Nicole
16     Cubbage for Mr. Egtvedt.
17              THE COURT:  Okay.  Good afternoon, ladies.
18              And, Mr. Egtvedt, good to see you.
19              THE DEFENDANT:  Good to see you, Your Honor.
20              THE COURT:  All right.  I see we have two
21     witnesses on Zoom.  We're going to get to them in the
22     presentation of the 3553(a) factors.
23              MS. KUKOWSKI:  Yes, Your Honor.
24              THE COURT:  Okay.  And, Ms. West, is there a
25     request to seal the proceedings with respect to one of these
```

1    witnesses?

2              MS. WEST:  Yes, just -- the government has a

3    witness.  I have one witness; and that should be under seal

4    because it involves medical records and conditions.

5              THE COURT:  Both witnesses?

6              MS. WEST:  Just my witness.

7              MS. KUKOWSKI:  Just their witness.

8              THE COURT:  Just your witness?

9              MS. WEST:  Yes, sir.

10             MS. KUKOWSKI:  And just to make sure we're clear,

11   we have two witnesses.  Officer DaCruz is present here in

12   person, and then it's just former Officer Marshall who is on

13   the Zoom.

14             THE COURT:  Very well.  So we'll get to the

15   sealing when we get to Ms. Rock.

16             All right.  The Court has reviewed the presentence

17   investigation report, the recommendation from the probation

18   office, the memos that have been submitted by both sides in

19   aid of sentencing as well as the supporting exhibits.  I

20   have rewatched at least some of the videos, although I will

21   not admit -- I will admit that I have not seen them all, so

22   you all should feel free, to the extent you think you need

23   to, to play the videos again for me.  Obviously I sat

24   through trial and reviewed them all then.

25             I've received a number of letters on the

 1    defendant's behalf from his son, from the defendant himself,

 2    from his brothers Rick, Scott, and Randy, and his sister-in-

 3    law Christi, from two fellow parishioners at the Deep Creek

 4    Church in Maryland, and there are a number of letters

 5    referenced in the presentence report from his pastor and a

 6    number of professional acquaintances and at least one

 7    potential employer.

 8              Any other written materials for the Court's

 9    consideration?  I also received medical records, I believe,

10    relating to Officer DaCruz.

11              Anything else for the Court's consideration?

12              MS. WEST:  No, Your Honor, not from the defense.

13              MS. KUKOWSKI:  And nothing from the government,

14    Your Honor.

15              THE COURT:  All right.  And, Ms. West, are there

16    family members that you would like to acknowledge?

17              MS. WEST:  Yes, Your Honor.  Thank you very much.

18              With us today are, as the Court will probably

19    remember, Brother Rick Egtvedt is here and Mr. Egtvedt's

20    mother is here as well.  And they're standing so the Court

21    can see them.

22              THE COURT:  Okay.

23              MS. WEST:  And then behind them are a couple of

24    Mr. Egtvedt's friends.

25              THE COURT:  Okay.  Welcome, everybody.

1          All right.  Let's start with the unresolved

2     objections to the factual findings in the PSR before we get

3     to the guidelines calculations.  Are these all still

4     unresolved, Ms. West, the ones noted in the PSR?

5          MS. WEST:  I believe so, Your Honor, yes.

6          THE COURT:  Okay.  Well, let me just click through

7     them, and if I want anyone to be heard, I'll ask for that.

8          In Paragraph 7, the defense objects to the fact

9     that that paragraph does not indicate that the defendant was

10    found not guilty of assault in Counts 1 and 2.  Probation

11    responds that that information is reflected elsewhere so the

12    Court will leave Paragraph 7 as is.  And in any event, he

13    was not charged with assault in that count, although the

14    Court did make a finding that he did not commit an assault,

15    and there are other paragraphs in the PSR that reflect the

16    verdict; so Paragraph 7 will remain as is.

17         Paragraph 23, the defense would like to add that

18    the barriers referred to in that paragraph were down by a

19    certain time.  The report does not reference a specific

20    time; it just says that the barriers were up on January 6th.

21    The Court will leave that paragraph as is as well.

22         Paragraph 29, the defense objects to how the

23    paragraph describes Mr. Egtvedt's interactions with law

24    enforcement.  I did not parse that paragraph and compare it

25    to the videos and the other evidence, but the Court

1    obviously made findings with respect to his interactions, so

2    what I would suggest, Ms. -- and by the way, Ms. Gavito is

3    here from probation.

4              Ms. Gavito, if we could just strike that paragraph

5    and refer -- just reference the Court's verdict, which

6    describes the Court's findings with respect to his

7    interactions with law enforcement.  Okay?

8              THE PROBATION OFFICER:  Yes, Your Honor.

9              THE COURT:  Paragraph 42, this objection is not

10   entirely clear to me, but the defense seems to object to a

11   citation that is attached to a statement by Mr. Egtvedt that

12   the defense supplied.

13             MS. WEST:  It makes no sense, but no, I'm not

14   objecting to that.

15             THE COURT:  Okay.

16             MS. WEST:  There's no objection, I should have

17   said.

18             THE COURT:  Paragraph 42 stands.

19             MS. WEST:  Correct.

20             THE COURT:  And Paragraph 72, why don't we --

21   that's an objection to the fact that the probation -- that

22   the presentence report does not include a reduction in base

23   offense level for acceptance of responsibility.  We'll get

24   to that in connection with the guidelines.

25             Any other unresolved objections to the factual

1    narrative in the PSR?

2              MS. WEST:  No, Your Honor.

3              MS. KUKOWSKI:  No, Your Honor.

4              THE COURT:  Okay.  So subject to the Court's

5    rulings, the Court will accept the factual findings in the

6    PSR regarding the circumstances of the offenses, and

7    therefore those facts as stated in the PSR will be adopted

8    by the Court for purposes of sentencing.

9              All right.  There are a number of guidelines

10   issues that we need to deal with.  Why don't I just sort of

11   set the stage as I see it.

12             There were six counts of conviction.  Counts 1

13   through 6 and Count 8.  The defendant was acquitted of

14   Counts 7 and 9.

15             Six of those seven counts of conviction are

16   subject to the Sentencing Guidelines.  Count 8, which is

17   disorderly conduct, is a Class B misdemeanor, so it is not

18   covered.

19             Under Sections 3D1.2(a) and (c) the probation

20   office grouped two sets of those counts.  It placed in Group

21   1 Count 1, which was the assault or the assault or resisting

22   as to Officer Marshall, along with Counts 3 through 6, and

23   in Count 2 -- in Group 2, it placed Count 2, which is the

24   assault or impeding count as to Officer DaCruz, with those

25   same Counts 3 through 6.

1          Both groups were treated under the same guidelines

2     range, which is -- or the same guideline, which is 2J1.2,

3     the obstruction of justice guideline.  That carries a base

4     offense level of 14.

5          The probation department -- the probation office

6     then applied an enhancement for substantial interference

7     with justice, which took the offense level to 17, and then

8     added two units due to the grouping, which took the adjusted

9     offense level to 19.  And at Criminal History Category 1

10    that resulted in an advisory range of 30 to 37 months.

11         The government raises a number of objections to

12    the calculation in the presentence report.

13         First what I'll call an order of operations

14    objection.  The question is do you group first and then

15    calculate the range for each group or the offense level for

16    each group adding units as necessary, or do you calculate

17    the offense level for each offense and then group a second?

18         Probation, as I said, took the latter approach.

19    The government urges the former.

20         I've had this issue come up in other cases.  I'm

21    frankly not sure of the right approach, but I don't think

22    that it makes a difference to the ultimate range here, which

23    turns on whether the eight-level enhancement applies for

24    causing injury and whether the three-level enhancement

25    applies for substantial interference with the administration

1    of justice and whether the counts are grouped or not.  So

2    regardless of the order of operations, I think if we deal

3    with the grouping and the two disputed enhancements, then we

4    get to the same place.

5           Do you agree with that, Ms. Kukowski?

6           MS. KUKOWSKI:  Yes, Your Honor.

7           THE COURT:  Okay.

8           All right.  So as to the grouping, probation did

9    not group Counts 1 and 2 together because they involve

10   different victims:  Count 1, Officer Marshall; Count 2,

11   Officer DaCruz.

12          Ms. Kukowski, if you want to come to the lectern.

13   As I understand it, your argument is that under 3D1.2(c),

14   those counts should have been grouped together which

15   actually benefits the defendant because notwithstanding the

16   fact that they have different victims, there's a specific

17   offense characteristic embodied by the conduct involved in

18   both counts.

19          MS. KUKOWSKI:  And yes, Your Honor, that is

20   correct.  That's our position.

21          Mr. Liebman is actually ready to address it a

22   little more in detail, but I think the Court did summarize

23   it quite succinctly.

24          THE COURT:  Okay.  Educate me, Mr. Liebman.

25          MR. LIEBMAN:  Sure, Your Honor.  So the guidelines

1    do specifically say that counts involving different victims

2    shall be -- actually, I probably shouldn't paraphrase.

3              THE COURT:  Yes.

4              MR. LIEBMAN:  That counts involving the same

5    victim --

6              THE COURT:  And I'm sorry, just for the record,

7    it's 3D1.2(c)?

8              MR. LIEBMAN:  Yes.

9              THE COURT:  Okay.

10             MR. LIEBMAN:  3D1.2(a).  So it says there

11   affirmatively, when counts involve the same victim and the

12   same act or transaction, they shall be in the same group.

13   Right?

14             THE COURT:  Right.

15             MR. LIEBMAN:  But the converse is not there.  It

16   doesn't say that when there are different victims they must

17   be in different groups.  It doesn't say that.

18             So what we determined was that the -- I'll call

19   them the assault counts.  The assault counts for each

20   independent victim have an independent basis for being in

21   another group that makes up the other counts.  Therefore,

22   they are -- they end up in the same group, notwithstanding

23   3D1.2(a).

24             THE COURT:  Okay.  And what independent basis is

25   for there to group them?

1          MR. LIEBMAN:  Well, there is an issue as to Count

2     4.  If the Court disagrees with us about the level of --

3     about the eight-level enhancement, there is no component of

4     the count for a guideline that would address the grouping of

5     Counts 1 and 2.  However, Count 6 -- and by the way, I

6     should say we've made an effort, Your Honor, our office, to

7     try to be consistent across the board with these analyses in

8     all these cases, all these Capitol riot cases.

9          Count 6, our position is that there is a

10    guideline -- the guideline that applies to Count 6

11    incorporates the conduct that includes both what happened as

12    to Count 1 and as to Count 2.

13         THE COURT:  So let me stop there.  Before we talk

14    about Counts 4 and 6, why isn't the relevant question

15    whether Counts 1 and 2 group and under Subsection C and

16    Application Note 5, which deals with Subsection C, just on a

17    quick read, it seems that those two counts need to share a

18    specific offense characteristic, not that those two counts

19    can share a specific offense characteristic with some other

20    count.

21         MR. LIEBMAN:  So you're saying -- is the Court

22    asking, then, whether under 3D1.2(c) Counts 1 and 2 can

23    group together just on that analysis alone?

24         THE COURT:  Let's say the only two counts of

25    conviction were Counts 1 and 2.  The probation office's

1     position is those should not be grouped because they have

2     separate victims.

3               My question would then be, well, is there --

4     putting aside whether that's a mandatory rule or not, is

5     there something about Counts 1 and 2 that make them similar

6     under the guidelines such that they should be grouped?

7               MR. LIEBMAN:  I would say no, Your Honor.  If I

8     understand the Court correctly, I think what -- because

9     Counts 1 and 2 involve exactly the same elements.  There is

10    nothing in Count 1, the conduct associated with Count 1,

11    that would go to Count 2 and vice versa, it seems to me.

12              I've got to admit, I haven't thought about that.

13              THE COURT:  But don't they share a similar

14    specific offense characteristic?  Namely causing injury.

15              MR. LIEBMAN:  I'm just looking at it from

16    3D1.2(c), "when one of the counts embodies conduct that is

17    treated as a specific offense characteristic in, or other

18    adjustment to, the guideline applicable to another of the

19    counts."

20              See I always -- I interpret that, Your Honor --

21    and, again, I'm thinking about this for the first time right

22    now -- it kind of suggests that when the conduct associated

23    with one count is a lesser included offense for lack of a

24    better term of another count.

25              THE COURT:  Okay.

1          MR. LIEBMAN:  And since Counts 1 and 2, our

2     position is that they all have the same essential elements

3     and conduct associated with them, that would not apply.

4          THE COURT:  Okay.

5          MR. LIEBMAN:  I do think, though, it would get

6     probably to the same result that the government is

7     advocating for here because, again, our position is there's

8     one entire group.

9          THE COURT:  Okay.  Well, here's what I'm going to

10    do.  I'm not sure that we've fully come to ground on this.

11    I think it's a little more subtle than the government has

12    suggested, and I'm not sure I fully am comfortable with

13    making a ruling.

14          But since the government is recommending that

15    there just be one group, and that benefits the defendant,

16    and I assume Ms. West does not object to that --

17          MS. WEST:  Fabulous.

18          THE COURT:  -- let's consider them as one group.

19          MR. LIEBMAN:  And the other point, Your Honor, is

20    we have -- this particular question we did consult at some

21    length in our office, which is can one set of groups or even

22    one count -- one set of counts or even one count alone

23    cannot be in two separate groups the way the probation

24    office has done it.

25          We could not find a case saying that's prohibited

1    it, but it does seem counterintuitive to everything about

2    the grouping section in the guidelines.

3              THE COURT:  Right.  And the overall purpose of

4    this guideline is to group counts that are substantially --

5    that are related and that involve substantially the same

6    harm.  And it strikes me that Counts 1 and 2, even though

7    they involve different victims, are related because they all

8    took place near in time and involve the same general type of

9    conduct in the same place with the same motivation.

10             MR. LIEBMAN:  You're talking about Counts 1 and 2,

11   Your Honor, or all the counts?

12             THE COURT:  Counts 1 and 2.

13             MR. LIEBMAN:  Well, that's certainly a truthful,

14   factual position, Your Honor, but I think if those were

15   the only counts in this case and nothing else, we would

16   be arguing for separate groups because there's no other

17   group -- no other count or set of counts that those -- that

18   a two-count assault case could --

19             THE COURT:  Right, but the reason that there are

20   two separate groups in view of probation is because 1 and 2

21   don't group.

22             MR. LIEBMAN:  Understood, except --

23             THE COURT:  1 and 2 are not, in the words of the

24   guidelines, closely related.

25             MR. LIEBMAN:  Except for this, Your Honor.  The

1  reason they group is not because of the victim issue.  It's

2  because each of them has conduct associated with it that's

3  part of an offense characteristic in another count.

4           THE COURT:  And that's the causing physical

5  injury?

6           MR. LIEBMAN:  Yes, or physical contact.  It

7  escapes me right now at the moment.

8           So our position would be if there are only two

9  counts, the two assault counts involving different victims,

10 and no other count, there would be no basis for grouping

11 those counts together.

12          THE COURT:  All right.  Well, in any event, the

13 Court finds that they should not be grouped for purposes of

14 sentencing, and that's consistent with the position of both

15 parties in the case.

16          MR. LIEBMAN:  All right.

17          THE COURT:  All right.

18          All right.  Do you want to go to the enhancement

19 under 2J1.2(b)(1)(B), eight levels, because the offense

20 involved causing or threatening to cause physical injury?

21          Mr. Liebman, do you want to be heard on that?

22          MR. LIEBMAN:  I think Ms. Kukowski.

23          THE COURT:  Ms. Kukowski, okay.

24          MS. KUKOWSKI:  Thank you, Your Honor.

25          And so our position is that this eight-level

1    enhancement should apply here.  And not only is that

2    consistent with the facts in this case, it is consistent

3    with how the Courts have been treating January 6th cases

4    involving similar conduct.

5         And specifically we focused on cases that involved

6    1512 convictions, convictions where the defendant went

7    inside to the U.S. Capitol, and then we looked at

8    convictions where the defendant was not involved in

9    assaultive conduct but did have interactions with police.

10        And for those reasons we think it should apply.

11   We can think --

12        THE COURT:  We're talking about the eight-level.

13        MS. KUKOWSKI:  The eight-level, yes.

14        If the Court thinks it makes more sense to address

15   the three-level enhancement first, which is for the

16   substantial interference --

17        THE COURT:  Yes, why don't you do that.

18        MS. KUKOWSKI:  And so this Court has already found

19   that the three-level enhancement applies in the *Robertson*

20   case.  It's consistent with nearly every judge in this

21   courthouse, with the exception of Judge McFadden, and then

22   the one case I do need to note for the Court that just came

23   down actually the same day we filed our memorandum, Judge

24   Walton in *U.S. v. William Watson* did not apply either the

25   two enhancements, but I will note -- and this will be part

1    of our arguments later, if needed -- he did vary upwards

2    from the revised guidelines.

3              So in any case, two judges have found it does not

4    apply.  This Court in *Robertson* found that there was a

5    substantial interference in the administration of justice,

6    and I don't believe there's any reason here that that would

7    change.

8              THE COURT:  Okay.

9              MS. KUKOWSKI:  We know that the certification of

10   the vote was stopped.  It was stopped for several hours.  We

11   know that there were millions of dollars of physical damage

12   done to the Capitol as a result of the January 6th riots.

13             THE COURT:  Okay.  Ms. West.

14             MS. WEST:  I would just agree with what the

15   probation department stated on Page 30 of the final

16   presentence report and also what I stated in my sentencing

17   memorandum.

18             I have no further argument.

19             THE COURT:  And that's with respect to the three-

20   level enhancement?

21             MS. WEST:  Again, Your Honor, I would just state

22   what I have stated in my sentencing memorandum and have no

23   further argument.

24             THE COURT:  Okay.  Very well.

25             The Court will apply the three-level enhancement

1    under 2J1.(b)(2) -- 2J1.2(b)(2) because the offense resulted

2    in substantial interference with the administration of

3    justice.

4         The defendant was convicted of Count 4 of

5    obstructing an official proceeding, and that offense

6    resulted in substantial interference with both -- given both

7    the delay that the riot occurred -- that the riot caused in

8    the certification procedure and the expenditure of

9    substantial resources that was necessary to fix the damage

10   done to the Capitol, and that's consistent with the Court's

11   ruling in *Robertson*, which is on appeal now.

12        And, Ms. West, obviously you would get the benefit

13   of any ruling in the defense's favor on that issue in

14   *Robertson*.

15        All right.  With respect to Count 4, the Court

16   will also apply the eight-level enhancement under

17   2J1.2(b)(1)(B) because the offense involved causing or

18   threatening to cause physical injury to a person.  The Court

19   similarly applied this enhancement in the *Robertson* case.

20        Unlike Counts 7 and 9 for an act of physical

21   violence, which the Court acquitted Mr. Egtvedt on -- both

22   of those counts were premised on assaultive conduct which

23   requires an intent to inflict bodily harm -- this

24   enhancement does not require intent.  It simply requires a

25   showing that he caused physical injury.

1          And based on my findings on Count 1 and Count 2,

2     the defendant's action or conduct in trying to bully his way

3     through the officers after he was asked to leave the Capitol

4     clearly caused the scrum that then led to Officer DaCruz's

5     shoulder injury, as to which there is evidence in the

6     record, both the testimony of Officer DaCruz as well as the

7     medical records that have been submitted at Government

8     Exhibit 502 documenting Officer DaCruz's injury.

9          I'm sure we will get to this later.  That does not

10    mean that the defense cannot argue for a downward variance

11    based on the argument that that eight-level enhancement

12    might overstate the seriousness of Mr. Egtvedt's conduct.

13    But just going by the plain language of the enhancement, the

14    Court finds that it applies.

15          So with that, the Court finds that there is one

16    group; that that group carries a base offense level of 14;

17    that it is enhanced by three points for substantial

18    interference with the administration of justice, and by

19    eight points because the offense caused or threatened bodily

20    injury, leading to an adjusted offense level of 25.

21          The defendant does not have a criminal history, so

22    Level 25 at Criminal History Category 1 results in an

23    advisory guidelines range of 56 to 71 months.

24          The Court received a recommendation from the

25    probation office.  The probation office calculated the range

 1    differently at 30 to 37 and recommended a sentence near the

 2    top of that range of 36 months, all concurrent, with three

 3    years of supervised release and a $2,000 fine.

 4            All right.  With that -- and obviously, Ms. West,

 5    your objections to the two enhancements are noted.

 6            The Court also will overrule the objection that

 7    the acceptance of responsibility reduction was not applied.

 8    Generally speaking, that reduction is not available to

 9    defendants who put the government to their proof at trial.

10            This is not the rare case where a defendant goes

11    to trial, you know, in order to assert and preserve a

12    constitutional challenge that does not involve denial of the

13    factual basis for the charge as the defense's theory was.

14    So this is not the rare case where a defendant should get

15    acceptance of responsibility after having gone to trial and

16    been convicted and then only later expresses some remorse or

17    acceptance of responsibility.

18            So with that, I think we're ready for the 3553(a)

19    factors.

20            MR. LIEBMAN:  Actually, Your Honor.

21            THE COURT:  Unless I missed something?

22            MR. LIEBMAN:  It just might have been something I

23    heard, and this is actually -- it's been a point of debate

24    between the parties after the verdict.  I thought I heard

25    the Court talk -- reference an acquittal as to Counts 1 and

1    2 talking about the intent to injure.

2          The government's position, and I think the -- I

3    want the record to be clear that the defendant -- the Court

4    found the defendant guilty of Counts 1 and 2 but made a

5    specific finding as to both counts that the assault verb is

6    one of the options.  The government didn't prove that beyond

7    a reasonable doubt.

8          THE COURT:  That is what I intended to suggest.

9    If I suggested otherwise, I stand corrected.

10         MR. LIEBMAN:  All right.  Thank you, Your Honor.

11         MS. KUKOWSKI:  Your Honor, before I get started on

12   the 3553 factors, I did want to raise -- I know defense is

13   currently in trial at the moment, and I believe they had

14   some time constraints.  I don't know if it's appropriate to

15   raise them now or...?

16         MS. WEST:  No, let's go ahead.

17         MS. KUKOWSKI:  All right.  The Court's indulgence

18   here.  I do have a PowerPoint.  It's simply to help move

19   through some photos and videos a little bit quicker, so I'm

20   going to go ahead and share the screen.

21         (Pause)

22         MS. KUKOWSKI:  Daniel Egtvedt was a willing and

23   active participant in the civil disorder that occurred at

24   the U.S. Capitol on January 6th of 2021 when rioters tried

25   to derail a sacred element of our democracy, the peaceful

1      transition of power.

2              As the Court saw during the course of this trial,

3      the defendant attended the president's march early on in the

4      day and then proceeded down to the Capitol.  Once he arrived

5      at the Capitol around 2:19 p.m., he saw the unfurling chaos

6      around him.  At that point he made the conscious and willing

7      decision to go forward and join the riots.  He was a part of

8      the second breach of the Senate Wing Doors, a breach that

9      overran a line of police officers and opened the floodgates

10     for rioters to go into the Capitol, further disrupting the

11     congressional proceedings.

12             He stayed in the Capitol for more than 27 minutes

13     during which time he berated law enforcement officers; he

14     tried to galvanize additional rioters to come in and join in

15     the attacks; he physically resisted and impeded officers;

16     and he himself obstructed the certification of the

17     presidential election.

18             After he was physically expelled from the Capitol,

19     he stayed on the grounds, and he continued to try and rouse

20     up additional rioters to come down and come to the U.S.

21     Capitol.

22             For his efforts to impede law enforcement and

23     overturn the election, the government asks that the Court

24     sentence Defendant Egtvedt to a guidelines sentence of 64

25     months incarceration.  Specifically we'd ask that the Court

1    sentence the defendant to 64 months on the 1512 count, Count

2    4, and then concurrent time on the remaining counts of

3    convictions.

4         Now, this Court must consider the factors set

5    forth in 18 USC 3553(a) in crafting a sentence, and we

6    address each of these factors in our memorandum in support

7    of sentencing, but there's a few aspects I want to focus on

8    today in particular.

9         What I'd like to do is start with the nature and

10   circumstances of the offense, talk about some of the other

11   factors, and then I'm going to circle back and conclude

12   again with the nature and circumstances of the offense.

13        As we start talking about the nature and

14   circumstances of the offense, what I want to focus on,

15   knowing that the Court saw the evidence at trial, is how the

16   defendant was not a pawn, as he was presented in the defense

17   papers; that he was someone who chose repeatedly to violate

18   the law on January 6th.

19        In our criminal context, when we talk about

20   specific intent, there's concepts of premeditation and

21   deliberation.  "Premeditation," meaning the intent to --

22   forming the intent to commit an act, to give it thought

23   before acting, and then "deliberation," considering and

24   reflecting on that intent to commit the acts giving it a

25   second thought.

1          And here, when the Court looks back over the

2     evidence, the Court will see that the defendant clearly was

3     not -- he was someone who knew what he was doing.  He did so

4     with premeditation and deliberation.  He formed the intent

5     to go into the Capitol and disrupt the proceedings, and at

6     various points throughout the day, he also had that

7     deliberation, that opportunity to give it second thought,

8     and he went forward.

9          I have on the screen here a photograph the

10    defendant took.  Government's Exhibit 101.256.  This is a

11    photograph he took from his phone at approximately 2:19 p.m.

12         I think it's important to take a step back.  Those

13    of us who are litigating these cases, the January 6th cases,

14    and many of us who live in the D.C. area frankly are

15    inundated with images from January 6th.  And there is the

16    temptation to let ourselves grow numb to these images.

17         I'd ask the Court to think back to January 6th of

18    2021, when images not unlike the one that the defendant took

19    started flowing across breaking news and flowing across

20    social media.

21         When we saw these images with rioters scaling the

22    Capitol building, the average person was filled with shock

23    and disbelief.  This could not be the United States of

24    America.  This could not be real.  This is some dystopian

25    other country, not reality here in the United States.

1          When law enforcement officers -- officers who the

2     Court heard during the course of the trial -- saw these

3     images, heard those radio calls, their reaction wasn't one

4     of shock and disbelief.  They were the ones that ran down to

5     the Capitol to try and save democracy, to try and stop these

6     attacks.

7          And when the defendant saw this image unfurling

8     before him, his decision was to go forward, was to ascend

9     from this bottom ground on the Capitol or this bottom-most

10    layer of the Capitol grounds, ascend up to the upper

11    terrace, and go onto the Senate Wing Doors where he was met

12    yet again with more unfurling chaos, more rioters scaling

13    the U.S. Capitol building.  He's up close and can see this.

14    He made the conscious decision each and every time to go

15    forward, to join that mob.

16          We see here in Government's Exhibit 202A

17    surveillance footage from inside the United States Capitol.

18    And I'm going to play this video just briefly here, and what

19    I want to do is draw the Court's attention to this right

20    window.

21          What the Court will see is the defendant will come

22    up to the window, and he's going to start addressing

23    officers.  We don't have audio for this footage -- and I'll

24    play it here while I start talking.

25          (Video playing)

1          MS. KUKOWSKI:  And so the Court now is going to

2    see the defendant.  He's starting to walk up to those

3    windows on the right-most sound.  He's about two people back

4    right now.

5          And as he gets closer to the windows, he sees,

6    again, these officers standing behind those barricades, and

7    the Court can see how animated he is as he's addressing

8    them.

9          In the defense papers they talk about -- and the

10   defendant claims -- that he wasn't aware of the gravity of

11   the events that took place before he arrived on scene.

12   Regardless of whether or not he was aware of the gravity of

13   the events before he arrived on scene, he's certainly aware

14   here when he has seen multiple sets of rioters scaling the

15   building, when he makes his way up to the Senate Wing Doors,

16   when he stands there in that window and starts berating

17   officers.

18         And he stays there even after that cloud of gas or

19   smoke.  And you're going to see he's going to actually come

20   back to that window and continue berating them.

21         You see him there.  We don't know what he's

22   saying, but based upon his body language, him pointing like

23   he's doing, and based upon everything we've heard him say

24   once inside the Capitol, I assure you it is not a friendly

25   conversation.

1     And then he makes his way directly over to that
2   center doorway.
3           (Video playing)
4           MS. KUKOWSKI:  2:37 p.m.  He's now moved over so
5   he is, in fact, front and center at that line that's trying
6   to break through those doors.  Again, premeditation and
7   deliberation.  He knows exactly what he's trying to do.  He
8   leans in.  He takes this photo of officers standing on the
9   other side of those barricades.  He himself is pepper-
10  sprayed, but he remains undeterred.
11          And then he goes on to be a part of that line,
12  that breach, the line of rioters that overran officers.
13          And to be clear, it is, in fact, overrunning
14  officers.  As the Court's going to hear in this video that
15  was taken from outside those Senate Wing Doors, the rioters
16  are, in fact, trying to push.  They're meeting resistance,
17  and they are persisting in their aims of trying to overrun
18  the police line.
19          I'm just going to pause this for a second and turn
20  the volume back on.
21          (Video playing)
22          MS. KUKOWSKI:  The audio is not playing through,
23  but what the line is there we're going to push inside with
24  resistance.
25          And with that resistance, at 2:48 the rioters

1    overcame the police line.  Again, Daniel Egtvedt is there at

2    the forefront of the line.

3           And the reason why we emphasize this is because

4    this is one of the reasons why we believe not only was the

5    eight-point enhancement appropriate, but when it brings us

6    to our current guidelines level, which gives a range of 57

7    to 71 months incarceration, we do believe that midpoint,

8    that 64 months, is appropriate because --

9           THE COURT:  Well, let's stop there.

10          You haven't contended that anyone suffered

11   physical injury as a result of his conduct just pushing in

12   the building initially here in 202B.

13          MS. KUKOWSKI:  Our position is that physical

14   injury, there was a threat of it.

15          THE COURT:  Okay.

16          MS. KUKOWSKI:  And this also goes back to some of

17   the evidence we had at trial, Your Honor, where it was both

18   Officer Amendola --

19          THE COURT:  So you don't know what he said, so you

20   can't say it's a verbal threat.  The way I read that

21   enhancement, it's not just general conduct that someone

22   would deem to be threatening, but it actually involves a

23   threat, right?

24          So if you take the, you know, normal obstruction

25   of justice scenario where, you know, you don't want a

1    witness to testify, you can either, you know, go punch the

2    witness or shoot the witness or threaten the witness with

3    serious bodily harm, and that clearly would trigger the

4    eight levels.

5           Here I'm not sure that that enhancement bears the

6    weight of just someone being a jackass outside of the window

7    and pushing through.

8           Now, when you get to DaCruz and the injury, that

9    may be a different story, but...

10          MS. KUKOWSKI:  Right.  And what I would say, Your

11   Honor, is here, the fact that this line of officers was

12   overrun, they had to physically step back.  That action in

13   and of themselves -- and there's quite of bit of testimony

14   from -- to include Officer Wetzel, who acknowledged they

15   were overrun and they were outnumbered.

16          THE COURT:  No doubt.  But the question is whether

17   they suffered physical injury or were threatened with

18   physical injury for that eight levels.

19          MS. KUKOWSKI:  Right, and I think that is a threat

20   of physical injury, when they had to physically remove

21   themselves.  They were being hit with objects as that line

22   was coming at them.  That was testimony we had from both

23   Officer Amendola and from Officer Wetzel.  And the fact that

24   then the police line had been taken out of play, the line of

25   security for everyone within the building, when they then

1    have this group of rioters rushing in, all those

2    congressmen, all the law makers, staffers in there are

3    threatened.

4         And that was something Chief Judge Howell

5    addressed in the *Tenney* verdict.  And I can pull the

6    language for you there, but she noted that in particular,

7    when individuals are involved in the breach, they

8    contributed to the threat to safety.  Everyone inside that

9    building, who then had to be -- who is being evacuated, had

10   to be evacuated, had to hide in various offices while the

11   riots were ongoing.

12        THE COURT:  I don't doubt any of that.  My only

13   reservation is whether that guidelines provision involves

14   just conduct that is generally threatening in the common

15   sense nature of that term or whether it requires an actual

16   threat, and I would -- I tend to think it's the latter.

17        MS. KUKOWSKI:  And I think even with that, Your

18   Honor, this is something the Court can still consider an

19   aggravating factor.

20        THE COURT:  Let's talk about the eight-level

21   enhancement.  I mean, I've applied it because I think that

22   his conduct did both proximately and in a but-for sense

23   cause Officer DaCruz's injury, but that's a pretty big

24   hammer, eight points, right?  And without it, the range

25   would be 24 to 30, be at a Level 17 as opposed to a level

1    25, and so that's doing a lot of work in terms of the

2    guidelines calculation and the government's recommendation.

3          Clearly there's a range of behaviors that would

4    qualify for that eight-level enhancement, including, you

5    know, shooting a witness or kidnapping a witness or doing

6    something much more violent.  And we can argue about whether

7    his conduct could be termed violent or not, but, you know,

8    clearly obstructive conduct like that that results in injury

9    is -- there's a range of conduct, right?

10          I'm sure Ms. West is going to tell me that his

11    conduct is towards the low end of that range.

12          Why is that not correct?  Even considering how

13    you've characterized what he's done, which I don't quarrel

14    with.

15          MS. KUKOWSKI:  Right, Your Honor.  And so here I

16    would say first, as an initial point, his conduct here in

17    applying the eight-level range does put him on the same

18    level as many other defendants who are similarly situated,

19    and so I do think that is something that needs to be kept in

20    mind.

21          But with respect to the escalation of the

22    guidelines range due to the level of conduct, here I think

23    it's appropriate.  And frankly, if the Court had not applied

24    the eight-point enhancement, we would have been asking for

25    an upward variance.

1          And part of that is because of the level of

2     egregiousness of the defendant's conduct.  It wasn't just

3     overrunning the police line.  It was also trying to rouse

4     and galvanize more rioters to come into the United States

5     Capitol, which he did at multiple points on interviews that

6     were being broadcasted.

7          It was his repeated harassment, badgering, and

8     aggression towards law enforcement officers, officers that

9     he sought out that again is an aggravating factor, officers

10    who were risking their lives to defend those within the

11    Capitol, and he's calling them traitors.

12         Then we have his conduct in the Hall of Columns

13    where he is making the conscious decision to defy multiple

14    officers' commands and try to go back into the Capitol using

15    physical force to do so.

16         And the timing of that decision is particularly

17    relevant, Your Honor, because those officers were not only

18    trying to escort other rioters out of the building, they

19    were also tasked at that point with ensuring and preserving

20    the integrity of evidence of a shooting that happened.  So

21    they have multiple jobs that they're trying -- and

22    responsibilities at this point during the ongoing riots, and

23    they can't get to them because they have to deal with this

24    man who is trying to force his way, quite literally, through

25    them back into the Capitol.

1          Once he's outside the Capitol, he continues to try

2     to get back inside.  He goes back up to the Memorial Doors,

3     and he goes back up to the Columbus Doors.  He gives yet

4     another interview in which he's trying to bring rioters down

5     when he says, "Everybody please come down here.  We're in

6     treasonous situations."

7          So all those factors from his conduct there that

8     day, I believe, take him out of the range of someone who

9     did, in fact, go inside -- have enough conduct to merit the

10    eight-point enhancement, but then may have left.

11         I also think the fact he didn't accept

12    responsibility plays a big factor here.  And what I would

13    submit to the Court is not only did he not accept

14    responsibility for what he did, he hasn't shown a change of

15    heart, and we have significant deterrence concerns about

16    that.

17         Thinking back to his comments that the defendant

18    made or that he wrote in his letters when he was in the

19    Garrett County Jail -- and I'll skip ahead several slides

20    here -- where he wrote, "If you were to release me to

21    federal agents at this moment, you could be placing me as a

22    political prisoner in a foreign land."

23         He wrote that in two separate letters.  That's a

24    sign he does not recognize the federal government.  He is

25    someone who went to the Capitol, committed these really

1    egregious acts as a part of the riots, and persisted

2    afterwards in not recognizing the federal government, has

3    not made any attempts to disclaim these statements since or

4    say, "Oh, I've come around."

5            He simply says "I was a pawn" and trying to blame

6    others for his decision-making, but he doesn't say his

7    decisions or his thoughts have changed, and that presents a

8    real risk of recidivism here.  And for both specific and

9    general deterrence reasons, I think that is yet another

10   reason why a sentence not only within the guidelines but

11   within that midpoint is appropriate.

12           THE COURT:  I know this didn't come up at trial,

13   but any -- I mean, along the lines of the statements in the

14   letter, any suggestion that, you know, he's a sovereign

15   citizen or a QAnon supporter or some of the other folks who

16   we might see who clearly have, you know, a lack of sort of

17   recognition of the authority of these proceedings and the

18   Court?

19           MS. KUKOWSKI:  I think it's mainly --

20           THE COURT:  What do you make of the letter?  It

21   seems so kind of out of the blue, you know.

22           MS. KUKOWSKI:  Well -- and so, Your Honor, that is

23   exactly what we think.  So that is the sovereign citizen

24   ideology where he's referencing the organic Constitution of

25   1776.  I believe it was at the suppression hearing when

1    Special Agent Smith-Shimer testified about how he was

2    driving the defendant back to Washington, D.C., from Garrett

3    County, and the defendant made mention of "What port are you

4    taking me to?"  That is all along the lines of sovereign

5    citizen ideology.

6         THE COURT:  In my experience, those folks have a

7    much more extensive history, documented history, of that

8    sort of mindset that is -- you know, that it's perfectly

9    findable, right?

10        MS. KUKOWSKI:  Correct.  And I would agree with

11   the Court, and I would even acknowledge the defendant's

12   behavior in this courtroom is not consistent with those who

13   we typically categorize as sovereign citizens.

14        But it is still along that spectrum of not

15   recognizing the federal government or, at a minimum, having

16   a very distorted version of what the federal government does

17   and having a belief that if he does not agree with it, he

18   can obstruct it.  He can impede it.

19        Even thinking back to his arrest, when he -- or, I

20   guess, the circumstances leading up to his arrest, when

21   family members had to call for law enforcement to come and

22   assist in a domestic disturbance when a relative was going

23   to be taken to get the COVID vaccination.  What the

24   defendant told officers there -- and it's actually

25   consistent with what he told officers on January 6th and was

1    captured on their body-worn camera -- was that the COVID

2    vaccine was being used as a means of population control, and

3    it was going to kill people off.  That is his thought and

4    his warped understanding of what the federal government is.

5              So it might not be fully along that sovereign

6    citizen spectrum, but he's certainly not someone who can be

7    trusted, at least at this point, having no signs that he's

8    disclaimed any of these beliefs to not reoffend, and with

9    the next administration that may or may not come in not act

10   similarly.

11             I think we laid out most of the other factors I

12   wanted to talk about, Your Honor, in our papers, and

13   cognizant of the fact the Court did sit through this trial,

14   what I want to do now is switch gears and finish our

15   allocution with something that wasn't presented at trial.

16             THE COURT:  That was not presented?

17             MS. KUKOWSKI:  Correct, and this would be the

18   victim impact statements.

19             One of the things and reasons why we also think a

20   sentence within the midpoint of the guidelines is

21   appropriate here is that what the guidelines does is it

22   acknowledges physical injury as there is, in this case, a

23   specific enhancement applied.  It does not acknowledge the

24   emotional and psychological impact that the defendant and

25   his fellow rioters had on those members of law enforcement

1   on January 6th who went to the Capitol and who risked their

2   lives to defend not just those within the Capitol but defend

3   a core democratic function, the peaceful transition of

4   power.

5        The emotional and psychological impact doesn't fit

6   neatly within metrics and can't be quantified the way

7   physical injuries can, so it's understandable that it's hard

8   for the guidelines to tackle something like that.  But

9   particularly with January 6th, the effects that the

10  defendant and his fellow rioters had on the mental and

11  psychological welfare of law enforcement is something that

12  needs to be recognized, and the Court needs to hear about.

13  So we're going to hear about that from both Officer DaCruz

14  and Officer Marshall.

15       I'm going to turn, first, to Officer Marshall, who

16  is on the Zoom.

17       THE COURT:  I'm happy to do that.  One question

18  though.  Any idea what he took out of his pocket and threw

19  while he was on the ground?

20       MS. KUKOWSKI:  The defendant, while he was --

21  no, we have -- frankly, Your Honor, that is something

22  Mr. Liebman and I went through frame by frame many different

23  times.

24       So, Ms. Marshall, if you are able to unmute

25  yourself.

```
 1            THE COURT:  Ms. Marshall, how are you?

 2            MS. MARSHALL:  I'm good, sir.  How are you?

 3            THE COURT:  Tell us about New Zealand first.  Is

 4    it agreeing with you?

 5            MS. MARSHALL:  It is.

 6            THE COURT:  All right.

 7            MS. MARSHALL:  It is.

 8            THE COURT:  All right.  You can proceed,

 9    Ms. Kukowski.

10            MS. MARSHALL:  Thank you.

11            Good afternoon there.  It's kind of early in the

12    morning here, but I wanted to thank you for the opportunity

13    to address the Court, Your Honor, and thank you for allowing

14    me to give my statement from my new home in New Zealand.

15    Today I'm here to add to the historical account of January

16    6th and to stand in solidarity with the officers who have

17    spoken before me.

18            My name is Melissa Marshall, and I'm a former U.S.

19    Capitol Police officer.  I was raised in Maryland by a

20    strong and loving mother.  When I was 5, she married my step

21    dad, and together they created a supportive home where I

22    could thrive.

23            I started college in August of 2001, only a month

24    before the terrorist attacks of September 11th.  September

25    11th was the first time in my life that I was truly
```

1  terrified.  As I watched the scenes unfold on the television

2  in front of me, I began to realize that I was watching

3  people's lives unravel and people being destroyed.

4       After witnessing how fragile life truly is, I felt

5  the need to do whatever I could to help others.  That

6  horrific day inspired my future career in law enforcement.

7  Little did I know then that I would personally face another

8  terrorist attack almost 20 years later.

9       I want to be clear that what happened at the U.S.

10  Capitol on January 6, 2021, was a domestic terrorist attack,

11  and as someone who was motivated to join law enforcement

12  after the terrorist attack of 9/11, I believe the terrorist

13  attack on January 6, 2021, has changed and will continue to

14  change the course of people's lives, and it should remind us

15  of the extreme care that we must take to preserve our

16  democracy.

17       The attack on January 6, 2021, was a direct threat

18  to our democracy and the millions of votes cast in a fair

19  and free presidential election.  With the help of local and

20  federal law enforcement agencies and the unwavering support

21  of the MPD, the USCP accomplished its mission in protecting

22  the legislative process that day.

23       During my 13-year career with the United States

24  Capitol Police, I estimate I've policed hundreds of First

25  Amendment demonstrations while on duty, both inside and

1   outside of the buildings.  Needless to say, as a USCP

2   officer I was not only well-practiced but highly trained in

3   handling demonstrations of all sizes, including the mass

4   arrests that sometimes followed these events.  Marches and

5   demonstrations are a way of life on Capitol Hill, permitted

6   or not.

7          That being said, no amount of training,

8   experience, preparation, or protective gear could have

9   prepared me for thousands of Americans making the collective

10  decision to head to the U.S. Capitol building as a violent

11  mob chanting "Stop the Steal" all because of a lie that was

12  orchestrated and inflamed by members -- by some of the very

13  members of Congress who I swore to protect and also by the

14  president of the United States of America.

15         Now I'd like to speak about why we are all here

16  today, Daniel Dean Egtvedt.

17         By the time I came into contact with Daniel

18  Egtvedt, I had already spent hours fighting for my life and

19  experienced some of the most horrific situations of my

20  career.  My assignment on January 6, 2021, was the same as

21  the assignment I had fulfilled for the previous ten years on

22  the first responders unit, or FRU, to maintain the safety

23  and security of the exterior grounds of the U.S. Capitol

24  building.

25         My day began outside on the East Front of the

1  Capitol building where I responded to various calls and

2  helped escort motorcades, but I noticed the tone quickly

3  shifting.  The crowds were becoming more erratic and

4  animated.  Bright blues and reds from flags began to fog the

5  horizon.  People overflowed into the grassy spaces on the

6  Capitol grounds.  The scene began to resemble a sold-out

7  concert with people filling the front row space along the

8  fence line and even starting to occupy the large, raised,

9  marble planters to get a better view.

10        It felt like the crowd was waiting for a show to

11  start, and as if, on cue, I heard Trump's voice.  Using

12  megaphones, the people in the crowd were blasting audio of

13  his speech, which had just started 16 blocks away down at

14  the White House.

15        Around 12:53 hours, I heard the call on the radio

16  that changed everything, "The West Front has been breached."

17  My legs went into overdrive as I responded as quickly as I

18  could on my mountain bike to the Upper West Terrace up on

19  the House steps of the Capitol.  To my surprise, the terrace

20  was eerily still.  I couldn't see anyone on the steps below

21  because my view was blocked by the massive inauguration

22  stage, but I will never forget the deafening roar of the mob

23  below.

24        The sound was distinctly primal.  It rattled

25  inside my chest almost ricochetting between my sternum and

1   my ballistic vest.  This sound was the first sense I had of

2   how large the crowd was.

3         I remember reaching around and turning my radio up

4   as loud as it would go.  I jumped off my bike, and I began

5   setting up bike rack barricades along the top of the steps.

6         I spent the next two hours in only what I can

7   describe as hell on earth.  I evacuated terrified

8   construction workers from the inauguration stage.  I

9   scrambled to hide hammers, boxes of nails, screws, power

10  tools, two by fours, ladders, metal scaffolding, basically

11  anything that could be used as a weapon.

12        Though my fellow officers held the police line for

13  as long as they could, other terrorists repeatedly and

14  violently fought their way up the stairs.

15        Then I heard an explosion.  I remember looking up

16  at the flag on the West Front to gauge the direction of the

17  wind.  Unfortunately I was downwind.  All I could do was

18  hope that nothing harmful was sent airborne by the

19  explosion.

20        Injured officers began retreating from the police

21  line.  A tearing co-worker turned to me and said he was

22  sprayed in the face by WD-40.  Others complained of wasp

23  spray being used against them.  Soon I began coughing as a

24  cloud of irritants and blow-back made its way to me.  I saw

25  a USCP officer deploy PepperBalls in an attempt to slow one

of the terrorists.  Foaming at the mouth, the man seemed too
pumped up on adrenaline and hate for the PepperBalls to
deter him.

One officer stumbled towards me, visibly exhausted
and holding his head.  "Marshall, I was hit in the back of
the head with something hard.  Can you check to see if I'm
bleeding?"

He started to dry heave, and his speech began to
slur.  But I knew it would be impossible for D.C. Fire & EMS
to respond, so another officer and I carried this severely
injured co-worker inside the building in hopes of finding
triage.

Shortly after entering the building, I heard a
call come over the radio, one that never ceases to send a
shock down my spine.  "Shots fired."

In the roar of the terrorists yelling, megaphones
blaring, the alarms going off, I wasn't able to catch the
location of the shots.  I didn't even know who fired the
shots.  Was it an officer, or was it a terrorist?

When I saw plainclothes officers down the hall
with their guns drawn, I realized how close I was.  Within
seconds I saw an individual on the ground.  Blood was
everywhere.  Officers were performing CPR.  I can still hear
the AED prompts.

As the individual was carried out on the

1  stretcher, I made myself look at their face.  Thankfully I

2  didn't recognize the lifeless eyes staring back at me.

3         Terrorists still filled the Hall of Columns.  I

4  continued trying to move in and out of the building through

5  the South Door while keeping them away from the crime scene.

6         That is how I eventually ended up in the Hall of

7  Columns with Daniel Egtvedt.  He was able to wake -- he was

8  able to make his way to that location because he was part of

9  a mob that violently pushed through officers defending the

10  Senate Wing Door, and as we know now, Daniel Egtvedt refused

11  to leave the Capitol disregarding multiple officers

12  directing him to do so, including myself.  And although he's

13  described by his attorney as, quote, obese and unvaccinated,

14  end quote, with the help from multiple officers, I stopped

15  him twice.  His aggressive and unhinged behavior injured

16  multiple officers that day.

17         Daniel Egtvedt and his attorney claim that he was

18  peaceful and did not promote violence; however, seared into

19  my memory forever is the moment when he charged me, grabbed

20  me, and screamed into my face, "You shoot me, shoot me,"

21  just minutes after he had called police "traitors" on the

22  way from the Crypt.  I'll never forget how sweaty and puffy

23  he felt against my stiff arm as I kept him from entering

24  back into the Capitol through the South Door.

25         That being said, after watching video footage from

1    that day, I still struggle to remain -- I'm sorry, I still

2    struggle to remember everything.  Much of the interaction

3    Daniel Egtvedt and I had in the South Door corridor has been

4    erased from my memory, the trauma response from the horrors

5    of that day.

6              In the weeks and months following the attack, my

7    wife described my demeanor as zombie-like.  I couldn't find

8    joy in things that made me happy before the January 6th

9    attack.  I couldn't even bring myself to leave our home, let

10   alone walk our dog.  Those parts of my life I will never get

11   back.

12             Rage soon followed.  I trusted no one.  I believed

13   everyone was a threat assuming that every person I

14   encountered was at the Capitol on January 6th.  I was soon

15   diagnosed with PTSD.

16             Although it was comforting to have a name for my

17   struggles, the ride has been excruciating.  I couldn't

18   sleep.  My mind would race for hours.  I was prescribed

19   medication.  It didn't help.

20             The only thing that would help me sleep was

21   counting backwards from 100 while imagining writing the

22   numbers in my head.  The problem was I couldn't remember the

23   numbers.  Usually, though, by the second or third time

24   around I would be able to doze off.

25             To this day, noises shake me to my core.

1    Sometimes it's a loud truck or even a quiet sound that I

2    can't quickly identify.

3          I lost my career.  I returned to work on January

4    7th, but my knees buckled out from under me while I was on

5    post.  The room wouldn't stop spinning.  A co-worker

6    escorted me to the nurse's office, and my wife literally ran

7    from 4th Street SW, where we lived, to come pick me up.

8          Since January 6th I've felt guilt like my

9    experiences were a burden.  I felt like giving up.  I was at

10   the point where I just needed everything to stop forever.

11         And how do you think that made my family and

12   friends feel?  They've taken on burdens of their own through

13   my trauma, and we are still on a journey towards healing.

14         Being associated with the United States Capitol

15   Police has left me feeling ostracized and alone.  The

16   horrific things that we experienced while protecting

17   American democracy are being skewed and leveraged to feed

18   the monster of misinformation that caused this terror in the

19   first place.  Worst of all, I have felt forgotten; not by my

20   absolutely self-less wife, not by my incredibly loving

21   family, and not by my extremely supportive friends, and

22   certainly not by my co-workers.  I feel that January 6th has

23   been forgotten by the American people and by our elected

24   officials.

25         But today I seek justice for myself and for

1    democracy, and I ask the Court to strongly sentence Daniel

2    Egtvedt.

3              Thank you very much, Your Honor.

4              THE COURT:  Thank you, Ms. Marshall.

5              MS. KUKOWSKI:  Thank you, Your Honor.  And I would

6    ask Officer DaCruz to come up to the podium.

7              THE COURT:  Officer DaCruz, good to see you again.

8              OFFICER DaCRUZ:  Good afternoon, Your Honor.

9              THE COURT:  Good afternoon.

10             OFFICER DaCRUZ:  I want to just start with that I

11   do feel for the defendant.  I understand that he believes

12   himself a patriotic person; however, I have to speak to my

13   experiences.  I find myself also a patriotic person.

14             I was not born in this country.  I had to earn my

15   citizenship through the Marine Corps, and then afterward I

16   continued serving with MPD, so I just find it ironic that

17   throughout this whole ordeal on that day all the officers

18   and I were being called traitors, but we were there to

19   defend the Capitol.  You would never find me attacking the

20   U.S. Capitol as I was sworn to protect this nation to its

21   enemies foreign and domestic.

22             Since that day I've made some precautionary

23   measures.  I've moved my family further out from D.C.  In

24   today's age it seems like this nation is more divided more

25   than ever.  And as I said before, there's a lot of

1       misinformation about how our government works.

2               I still believe in the U.S. government, but one

3       thing you'll never find me -- just because I disagree with

4       the laws or the things or the politics, you'll never find me

5       attacking the U.S. government.

6               That's all I have to say.

7               THE COURT:  Thank you.

8               MS. KUKOWSKI:  So just to summarize, Your Honor,

9       for all the reasons and facts we discussed in our

10      memorandum, that we highlighted here for the Court, and that

11      the Court heard from both former Officer Marshall and

12      Officer DaCruz, we do think a guidelines sentence is

13      appropriate here, and to be more specific, a midpoint of the

14      guidelines sentence, the sentence of 64 months.

15              THE COURT:  Okay.  Thank you.

16              Ms. West.

17              MS. WEST:  Good afternoon, Your Honor.

18              THE COURT:  Good afternoon.

19              MS. WEST:  I want to start by answering a few of

20      the questions that the Court asked the government during

21      their recitation.  Ms. Kukowski said that his repeated

22      harassment and badgering towards law enforcement are factors

23      that you should consider.

24              I think it's really important that the Court

25      distinguish between Mr. Egtvedt calling them, quote-unquote,

1    traitors -- that's something really different than

2    saying something like, "I'm going to kick your butt."  I

3    mean, we've heard in other cases seriously, seriously

4    violent exclamations.  There are none of those here from

5    Mr. Egtvedt.

6              You also asked, Any statements in a letter about

7    him being a sovereign citizen?  You said, "What do you make

8    of the letter?"  Well, what I make of the letter and what we

9    argued to you before is it's kind of out there.  There's no

10   other evidence in emails or text messages or personal things

11   that they would have taken at the search warrant, there's

12   nothing to show -- other than these letters -- that there is

13   this sovereign citizen such and such.

14             THE COURT:  You dispute that he said that the

15   former companies and the government are exercising

16   population control through the vaccines?

17             MS. WEST:  I don't dispute that, Your Honor.

18             THE COURT:  That's in the same vein, isn't it?

19             MS. WEST:  Well, I believe that it could be in the

20   same vein, but what I think is interesting is that there's

21   no other evidence in this case from any other time period

22   about this sovereign citizen.  And as we argued previously,

23   we believe that that thought process was due from a lack of

24   medication -- the Court will remember that argument -- and

25   also the fact that he was not sleeping.

1        The Court might remember the testimony of his

2   brother, who said he was trying to get his sleep machine --

3   his CPAP machine -- to him; couldn't do it.  We believe that

4   those factors caused Mr. Egtvedt to write those letters.

5        THE COURT:  And the statement in the squad car on

6   the way to D.C.?  Same explanation?

7        MS. WEST:  Well, I can't say that the jail -- he

8   wasn't even in jail at that time, but we didn't admit that

9   he made those statements in the squad car.  There was no --

10  we believe that the agent misunderstood whatever it was that

11  he said.

12       I think the right -- in that squad car thing, that

13  we thought Mr. Egtvedt said "What court are you taking us

14  to?" is the fight there.

15       You asked what -- "Any idea what he took out of

16  his pocket and threw on the ground?"  So we wanted to know

17  that, too, so we asked Mr. Egtvedt.  And it was -- what he

18  remembers was a bloody bandage from somebody -- medical

19  refuse from somebody who had been treated earlier in that

20  room.  And he mentioned to us that he had blood on his

21  shirt, but there was no evidence during the trial or in any

22  of the videotapes that he caused anyone to bleed or that he

23  bled himself.  With the exception of the time when he was

24  thrown out the doors, he believes that, when he hit the

25  ground, he could have scratched himself.  So that answered

1    that.

2         I want to answer a few of the -- before I get to

3    my argument -- a few of the things that the government said

4    in their presentence memo.

5         On Page 5 the government says that the defendant

6    harangued officers.  He -- outside, right when he appears at

7    the Senate Wing Doors.  There's no evidence in the record

8    that what Mr. Egtvedt was doing was haranguing officers.

9    There is evidence in the record that he photographed an

10   officer, that he actively participated in the push to

11   overrun the police line.

12        This Court yourself said at his motion to suppress

13   hearing and at the trial that Mr. Egtvedt looked dazed and

14   confused because somebody had sprayed him and he was

15   clinging on to the back of the person.  And we just saw that

16   video again, where he's trying to steady himself while

17   hanging on to that man with the black jacket.

18        And in another classic government overreach, they

19   say, "As a result of Egtvedt's efforts, rioters began

20   streaming into the Capitol."  Like Mr. Egtvedt was the

21   pushing force of people getting through the Senate Wing

22   Doors, which, as the Court knows from the evidence, is

23   clearly not the case.

24        I'm going to give the government credit for their

25   statement on Page 10 for finally acknowledging that it was

1    Melissa Marshall who assaulted him first.

2              On Page 13, in an effort to insinuate to the Court

3    that Mr. Egtvedt is a danger, they insert a picture of him

4    with a T-shirt that has a gun on it.  I think there's --

5    the Court knows from hearing the evidence in this case that

6    Mr. Egtvedt -- there's no violence with regard to firearms

7    in this case.

8              On Pages 13 and 14, they say that Melissa

9    Marshall's emotional issues are caused by Dan's actions in

10   this case, which is an enormous fiction that this Court

11   should not allow.

12             The Court will recall the evidence during her

13   testimony when she was cross-examined; that she had had

14   mental health and emotional issues years before January 6th;

15   so for her to come and say that Dan Egtvedt caused it all

16   and for the government to perpetuate that in their sentence

17   memo is false.

18             In that vein, before I go on, the Court will --

19   this is a little different situation.  Katrina was a

20   horrible event in I think it was 2005, when the city of New

21   Orleans was flooded.  Federal agents who had lived in New

22   Orleans were asked to come to New Orleans to help.  There

23   were agents that were shot at repeatedly for days that went

24   without food, that slept on floors, that slept in the

25   bottoms of boats to rescue people.

1      It was Mother Nature creating havoc, not other

2   people, but I think I said at trial this is what law

3   enforcement officers do, is they help people.

4      Do you know how much time those federal agents got

5   off after being two weeks in Katrina?  Not a day.

6      Do you know how much vacation time they got extra?

7   Zero.

8      So I have a huge problem -- and I feel badly for

9   the officers that were hurt that day.  They're heros, in my

10  mind, trying to protect our Capitol.  No question about it.

11  But to put all that on Mr. Egtvedt?  That's just not fair.

12  That's just not fair.

13      Now, on Page 28 the government says releasing him

14  to the FBI would place him as a political prisoner in a

15  foreign land, which Your Honor just mentioned.  He has a

16  right, as a citizen and as an individual, to not recognize

17  the government as long as he abides by the law.  And I

18  concede that that would give the Court pause, that kind of

19  behavior, but what I think the Court should focus on --

20      THE COURT:  Does he still believe that, or did he

21  believe it; or was it a result of not having his sleep apnea

22  machine and his medication?  Which one is it?

23      I mean, does he share that belief then, or did he

24  have that belief then, and does he have it now?

25      MS. WEST:  That's an excellent question, which is

1   why we've --

2            THE COURT:  And you can't have it both ways.  You

3   can't explain it away, and then say he has a right to hold

4   the view.

5            MS. WEST:  I agree with the Court, which is why

6   we've asked for his expert witness to testify.

7            But I think that what the Court also said -- or

8   let me finish that thought.  I mean, he has to recognize the

9   government because this Court put him on pretrial release

10  almost two years ago, and he has had to abide by very

11  specific rules.  Where do those rules come from?  This

12  Court, which I say is the government.  He has abided by

13  every single one of those rules that this Court has put in

14  place.

15           And it hasn't been easy.  He has had serious -- as

16  the Court knows, he's on home confinement.  He's had serious

17  restrictions, and he has followed those rules to a T and has

18  tried not to ever go out of that sphere.

19           And why do I mention that?  Because that shows

20  that he, in fact, has definite respect for the government

21  and is going to do what he's told because clearly that's

22  what he's done to this -- for this Court.

23           This Court also said during the trial that we

24  punish people based on their actions, not their words.

25           In another sentencing I had in this court, I think

1     the quandary -- and when I say "this court," I don't mean

2     you; I mean Judge Mehta -- the quandary is unlike most

3     cases, criminal cases, where you sentence defendants, you

4     look at all these people who are before you who have usually

5     no criminal history you say, like Judge Mehta said in a

6     case, you know, "What do I do with somebody who has no

7     criminal history who has behaved in an irrational manner, in

8     a manner that's unlike anything they've ever done in their

9     life?  Do I send them to the penitentiary, and do I ruin

10    their lives?"  That's what Judge Mehta says.

11            I think that's the issue for this Court.  The

12    conduct that Dan engaged in, the conduct that you found him

13    guilty of, what kind of sentence does that require?

14            And another thing Judge Mehta said -- and this is

15    a sentence in *United States vs. Matthew Wood* -- is that

16    sentences -- in that case, the government was asking for 57

17    months.

18            In that case, Judge Mehta said those sentences of

19    years and years -- the sentence that the government was

20    asking for of 57 months -- those are the kind of sentences

21    that are reserved for the most violent criminals amongst us.

22    And that's what the government is asking here for, and I

23    submit to the Court that Mr. Egtvedt is not a violent

24    criminal.

25            I think that he recognizes -- as far as acceptance

1    of responsibility, he has written a letter to the Court.

2    That letter is sincere, and you'll hear from Mr. Egtvedt.

3         I agree with the government on restitution.  I

4    actually agree with Judge Howell, Chief Judge Howell, that

5    the restitution amounts in these cases should actually be

6    higher because of the damage that was done to the Capitol,

7    and I think in this case, although Dan did not engage in

8    anything to damage the Capitol -- and the Court will

9    remember the videos.  He went through the whole Capitol.

10   Never engaged in anything to hurt anything.  I think that

11   that's appropriate.

12        I cited in my sentencing memorandum -- I'm not

13   going to go through them -- many, many cases in the court as

14   a whole of people who have been sentenced and given the gift

15   of a misdemeanor plea with conduct that's way worse than

16   what Mr. Egtvedt engaged in.  And I cited a case, *USA vs.*

17   *Simone Gold*, a case that I had in front of this Court where

18   I felt that the behavior was somewhat similar in that both

19   defendants were asked to leave the Capitol building.

20        In our case, Mr. Egtvedt -- the FBI agent

21   testified that you can see him on the video pointing this

22   way, and Mr. Egtvedt went the other way.  There was some

23   discussion on whether or not he could hear him, but clearly

24   that agent pointed for him to go the other way.

25        And then Ms. Marshall, putting her hand on him;

1    and whether or not he could hear her is another question,

2    but he did go right past her.  Did not follow her

3    instructions.

4         Similarly, in the *Gold* case there were officers

5    that asked her to leave the building, tried to get her to

6    leave physically, and they did finally physically, I guess,

7    because she's much smaller, turn her around and get her out

8    of the building.

9         Dr. Gold was charged in that case with a felony

10   1512, the Court might remember, but she was given the

11   opportunity to plead to a misdemeanor offense, which she

12   did, and this Court sentenced her to 60 days.

13        We believe that that conduct is similar.

14        And as I said, I'm not going to go through all the

15   other many, many cases I cited in my brief, misdemeanor

16   cases where the conduct was violent.  Even conduct where the

17   person assaulted police officers were allowed to plead

18   guilty to misdemeanors and got very little time.  Those are

19   all at the end of my memo.

20        I don't doubt that Melissa Marshall is forever

21   changed by her January 6th experience.  I want the Court to

22   know that Mr. Egtvedt also is forever changed by his January

23   6th event.

24        As the Court heard, from the testimony of his

25   brother, that Dan had suffered that day a severe concussion

1    at the hands of Capitol Police officers trying to right him.

2    Unfortunately, that severe concussion went untreated for

3    over two months while Dan was incarcerated.  The effects

4    have been severe and may totally not ever be known, but

5    Mr. Egtvedt, I just found out today, is suffering more

6    medical issues.

7          We believe that the sentence we've asked for is

8    reasonable, a sentence of time served, so that Mr. Egtvedt

9    cannot only care for his ailing mother, who is present here

10   today, but so that he can get the medical help that he needs

11   because we are not at all positive that Mr. Egtvedt, if sent

12   to prison, would do well with the treatment that he would

13   receive.

14         And I think this Court knows from the opinions of

15   Royce Lamberth and Judge Kollar-Kotelly that the jail, the

16   D.C. Jail, when he was there, was no place for him to be.

17   And as I say, we believe that punishment of just even those

18   over two months there is severe, and we believe that the two

19   years that he has spent on home detention has been hard for

20   him.  But he's done it, and he's done it successfully; and

21   we'd ask the Court to consider that in sentencing.

22         THE COURT:  Okay.  Address the eight-level

23   enhancement with the government.

24         MS. WEST:  Oh, yes, Your Honor.  I apologize.

25         THE COURT:  Even if, just assuming for the sake of

1      argument, the Court discounted all eight levels, that still

2      gets you to 24 to 30 --

3              MS. WEST:  Right.

4              THE COURT:  -- okay, for felony convictions after

5      having gone to trial with no acceptance of responsibility.

6      All right.

7              MS. WEST:  Yes.

8              THE COURT:  What legal basis would there be for a

9      further variance below that linked to the guidelines?

10      Taking care of the mom?

11             MS. WEST:  Well, I think that what the Court said

12     was no one has suffered physical injury because of his push

13     with --

14             THE COURT:  But none of the counts of conviction

15     require physical injury, and so that's not included in the

16     guidelines.

17             If I were to discount the eight-level enhancement

18     for causing physical injury, that takes that completely off

19     the table.  You're still at 24 to 30.  What further legal

20     justification rooted in the guidelines would the Court

21     resort to?

22             MS. WEST:  Well --

23             THE COURT:  I know you're asking for time served,

24     but you've got to have a basis for that.

25             And so I've heard he's got to take care of the

 1     mom, and I have views on that.

 2                    MS. WEST:  Yes.

 3                    THE COURT:  Is there anything else?

 4                    MS. WEST:  Yes.  His own physical --

 5                    THE COURT:  So his inability to receive

 6     treatment -- and we'll hear from Dr. Rock --

 7                    MS. WEST:  Yes.

 8                    THE COURT:  -- in a BOP facility.  The D.C. Jail

 9     has nothing to do with it.  Okay?

10                    MS. WEST:  Correct.

11                    THE COURT:  And so, you know, under that scenario

12     you'd have to convince me of that.

13                    MS. WEST:  Yes, Your Honor.  And we believe,

14     although the Court did give him the eight-level enhancement,

15     his behavior was not, as the Court found, intentional.

16                    THE COURT:  But that's not required for the

17     enhancement.  You don't doubt that his conduct caused, at

18     the very least, Officer DaCruz's injury.

19                    If a perpetrator is running from a crime scene or

20     trying to run towards a victim, and an officer tackles that

21     perpetrator and breaks his arm, that injury is caused by the

22     defendant's action, correct?

23                    MS. WEST:  That's correct.

24                    THE COURT:  How is this any different?

25                    I found -- you may disagree, but after looking at

 1    those videos, he's trying to go back into the Capitol after

 2    being asked to leave, and the officers are trying to stop

 3    him.

 4            MS. WEST:  Right.

 5            THE COURT:  All right.

 6            MS. WEST:  Right.

 7            THE COURT:  And that's what ultimately caused the

 8    injury --

 9            MS. WEST:  Right, because the officer --

10            THE COURT:  -- that qualifies for the exception.

11            MS. WEST:  Right.

12            THE COURT:  So...?

13            MS. WEST:  As my sentencing memo said, Your

14    Honor, those are the reasons that we would ask for, is

15    Mr. Egtvedt's severe medical issues.

16            THE COURT:  Okay.

17            All right.  How do you want to do this?  Do you

18    want to clear the courtroom and hear from Dr. Rock now and

19    then the defendant?

20            MS. WEST:  Yes, Your Honor.

21            MR. LIEBMAN:  Your Honor, can we be heard briefly

22    on the issue of sealing the courtroom?

23            THE COURT:  Sure.

24            MR. LIEBMAN:  So, Your Honor, the government has

25    no objection to documents and records being kept under seal

1    that relate to the defendant's medical treatment, but if

2    we're going to have a witness testify that because of

3    certain medical conditions he should have -- this defendant

4    should have a lesser sentence than the Court may otherwise

5    impose, we don't think that's grounds for sealing the

6    courtroom, Your Honor, especially if it's going to require

7    the victims in this case, former Officer Marshall and

8    Officer DaCruz, to have to step outside.  They should be

9    allowed to hear that at the very least.

10            And as a general matter, I think the testimony

11   that they're sponsoring, that they're asking the Court to

12   consider in fashioning a sentence, ought to be heard by the

13   public.

14            THE COURT:  Even if it involves personal medical

15   diagnoses?

16            MR. LIEBMAN:  Yes.  Yes, Your Honor.

17            MS. WEST:  I would ask for the same -- first of

18   all, I brought this to the government's attention more than

19   a week ago.  They said they had no objection to it, so this

20   is a surprise.

21            Secondly, I would ask for the same courtesy that I

22   gave them with Melissa Marshall, putting all of her records

23   under seal.

24            THE COURT:  All right.  This should have been teed

25   up.  I didn't appreciate that the government would have an

1    objection to it.  You know, no one's obviously briefed this.

2            I mean, in other cases I have allowed both

3    testimony and medical records that would disclose private

4    medical diagnoses to the public.  I think we seal materials

5    in presentence reports along those lines not infrequently.

6            Obviously, if I take into account anything that I

7    hear from Dr. Rock in the sentence, I will put that on the

8    record to make sure that the public knows what, you know,

9    besides specific diagnoses, you know, the Court has taken

10   from that testimony.

11           So I will overrule the government's objections.

12   Let's hear from Dr. Rock.

13           Ladies and gentlemen, this will not take long.  If

14   you can just wait outside, and then we'll get word to you to

15   come back in, and then we'll hear from Mr. Egtvedt.

16           And can we put Ms. Marshall in a breakout room?

17           (The following portion has been sealed by

18            the Court and is unavailable to the public)

19   ████████████████████████████████████████████████

20   ████████████████████████████████

21   ██████████████████████████████████████████████████████

22   ██████████████████████████████████████████████████████

23   ██████████████████████████████████████████████

24   █████████████████

25   ██████████████████████████████████████████████████████























1

2

3

4

5

6

7

8

9

10

11

12

13

14          (This is the end of the sealed portion)

15          THE COURT:  All right.  Welcome back, everyone.

16   On the sealing issue, what I'd like to do is seal the

17   transcript or redact from the transcript just references to

18   diagnoses and specific medications, and the parties should

19   confer as to the specific redactions.  And if you all

20   disagree, I'll resolve them, but generally the testimony of

21   Ms. Rock should be part of the public transcript with just

22   limited redactions in that regard.

23          Okay.  Ms. West, continue.

24          MS. WEST:  Mr. Egtvedt would like to address the

25   Court further.

1          THE COURT:  Okay.  Step right up, sir.

2          THE DEFENDANT:  Thank you, Your Honor.

3          I just wanted to publicly state my letter.

4          THE COURT:  Okay.

5          THE DEFENDANT:  When I went to D.C. for the

6    presidential speech, I had no intention of going to the

7    Capitol.  In fact, I brought my dog to enjoy time at the

8    national park.  At the end of the presidential park, I

9    learned that there would be a continuation of the events at

10   the Capitol grounds, so I proceeded with the intent of

11   listening to a few more speakers.

12          Upon arrival, it was unclear as to where the

13   speeches would take place, and as you know, I didn't have

14   the opportunity to see those presentations as they never

15   took place on the Capitol grounds.  Sadly, I didn't realize

16   the gravity of the events that had taken place prior to my

17   arrival.

18          As you know, I took a photo of what was happening

19   in the Capitol, and I was immediately sprayed in the face,

20   and after that point I literally couldn't see clearly.  The

21   series of events that followed led me to your court.

22          I had not been -- had I not been sprayed, I don't

23   believe that I would be in this situation that I find

24   myself.  I got caught up in the moment, failed to read my

25   surroundings and my situation appropriately.  In hindsight,

1    I should have just walked away at that moment, and I regret

2    that I did not.

3           In more than two months of solitary confinement

4    and more than two years of house arrest, I've had a lot of

5    time to think.  I learned that you can't change the past,

6    but you can affect the future.  So I have sought to achieve

7    this on a daily basis.

8           I chose to have a renewal of spiritual

9    enlightenment, to read the *Bible* in solitary confinement and

10   participated in an Easter day service that was actually

11   developed by the inmates themselves.

12          Upon release, I asked a friend that's also a

13   pastor to act as my spiritual advisor.  We have had bible

14   studies once a week -- typically on Tuesdays or Thursdays --

15   and I have attended church most weekends.  This has

16   strengthened my relationship with God and renewed my spirit

17   with Jesus Christ.

18          Since my spiritual advisor is also a guitarist,

19   singer, and songwriter, we have incorporated music into the

20   bible study.  This has led me to sing with him at multiple

21   nursing homes and his church during the Christmas season.

22   And we intend to continue singing events in the spring and

23   the summer.

24          I have been a productive member of society with 22

25   years in the healthcare industry educating doctors as to how

1   to possibly treat their patients for optimal health results.

2   I've also been a regional mentor while calling on federal,

3   state, and local accounts.

4   In addition, I have provided hospital assistance

5   with staffing and support services, IT -- information

6   technologies -- services to enterprise businesses, provided

7   security guard services for access control, loss prevention,

8   and active threat deterrence.

9   Being a long-standing supporter of law and order,

10   I find it perplexing that I actually am in the situation

11   that I am.

12   I've served in motorcades for both presidential

13   and vice presidential staffers in conjunction with the

14   Secret Service, have been support and security staffer for

15   the VIP section of the National Memorial Day Parade --

16   THE COURT:  Let me interrupt you.  I read that

17   line in your letter.

18   THE DEFENDANT:  Uh-huh.

19   THE COURT:  I don't understand what your role is.

20   THE DEFENDANT:  As a volunteer, Your Honor.

21   THE COURT:  In official motorcades?

22   THE DEFENDANT:  Oh, no, no, it's two different

23   things.

24   THE COURT:  Explain that to me, sir.

25   THE DEFENDANT:  I actually drove for the Secret

1    Service as a volunteer for the staffers of both presidential

2    and vice presidential --

3              THE COURT:  The Secret Service allows volunteer

4    civilians to ride in their official --

5              THE DEFENDANT:  For their staffers, yes, for both

6    presidential and vice presidential.  It's selective, but

7    yes.

8              Yes, I had a full background check.

9              And I've been supporting security staffers also as

10   a volunteer for the VIP section and the National Memorial

11   Day Parade for eight consecutive years prior to detainment,

12   and I desire to continue that service.

13             I've also supported the Back the Blue events at a

14   local sheriff's office in northern Virginia prior to moving

15   to Maryland.

16             I'm most proud of being a father to my son, Logan,

17   and despite being divorced, I was also granted majority

18   custody and continue to be an integral part of his life.  I

19   moved from Virginia to Maryland to spend more time with my

20   mother who is failing in health and has memory issues.  I

21   desire to continue that care with your permission.

22             I come before you to request the Court's grace so

23   that I can provide service to my family, friends, and

24   society as a whole.

25             Thank you.

1          THE COURT:  Okay.  How old is Logan?

2          THE DEFENDANT:  Pardon me?

3          THE COURT:  How old is Logan?

4          THE DEFENDANT:  24.

5          THE COURT:  All right.  The Court will take a

6   brief recess, and we'll come back and pronounce the

7   sentence.

8          THE DEFENDANT:  Thank you.

9          MS. WEST:  Yes, Your Honor.

10          (Recess taken)

11          THE COURTROOM DEPUTY:  All right.  Mr. Egtvedt,

12   Ms. West, please approach.

13          MS. WEST:  Yes, sir.

14          THE COURT:  All right.  I think of all the January

15   6th sentencings I've been involved in, this one is most

16   characterized by two different views through the looking

17   glass.  I mean, you have a time-served recommendation on the

18   one hand, and a 64-month recommendation on the other.

19   Obviously that's an incredibly disparate way of viewing the

20   same case.

21          Mr. Egtvedt, we talk a lot about guidelines ranges

22   and numbers and enhancements, and sometimes I feel bad about

23   that because it gives the impression that we don't fashion

24   sentences individually based on each person and their

25   conduct and all of the circumstances surrounding their case,

1    and I want to assure you that I've tried my best to do that

2    in this case.  I'm not the kind of judge that lectures

3    defendants, but I am required to explain why it is I've

4    arrived at the sentence that I have so that that's clear for

5    you and for the public.

6            We start with that guidelines range, which is 57

7    to 71 months.  That's a long time.  A lot of that is

8    reflected by the fact that you chose to go to trial and not

9    enter a plea and that eight-level enhancement that we've

10   talked so much about today.

11           As I've said, there's a range of conduct that can

12   qualify for that enhancement.  You know, so one question,

13   and a major question for me is where your conduct falls

14   within that range of conduct.

15           I've watched the video.  I've heard the testimony.

16   I've thought a lot about that.  I found at trial that the

17   evidence did not show that you assaulted anyone beyond a

18   reasonable doubt, and I stand by that finding today.  And

19   because assault is an obvious way to qualify for that

20   guideline, I think that you are entitled to somewhat of

21   a variance based on the fact that that eight levels does

22   not -- or overstates the seriousness of your conduct.

23           Now, make no mistake about it, your conduct caused

24   injury certainly to Officer DaCruz for the reasons that I've

25   stated in questioning Ms. West, and regardless of whether

1    you caused injury, you did not distinguish yourself on

2    January 6th.  And I've seen a lot of these cases, and you

3    were among the most disruptive and belligerent and

4    threatening and dangerous instigators there.  Okay?

5            And your conduct -- and we can debate whether

6    it's, you know, violent or not.  You didn't commit any

7    violence yourself, but, you know, it was dangerous because

8    you put lots of people at risk of physical harm, including

9    yourself, and you caused injury to an officer.

10           And, as we've discussed, I think you were part of

11   a group that overran the police line outside of those doors

12   or that were just inside of the doors.

13           You tried to get back in later, and you tried to

14   call in other folks.

15           All of that was incredibly dangerous.

16           And, you know, the officers who finally kicked you

17   out of the building I'm sure could have used a little bit

18   more care, but you put yourself in that situation.  All

19   right.  And you still didn't leave after that.

20           And none of that is to even mention the larger

21   damage that your participation in the riot caused to our

22   democracy and our democratic institutions and to our

23   politics.

24           I've heard a lot about the pepper spray, and I

25   mentioned that in delivering the verdict.  The only reason

1     you got sprayed is because you joined the mob that invaded

2     the Capitol.  All right?

3             You knew full well that you weren't supposed to be

4     there and that it was a dangerous situation.  You saw the

5     broken windows.  You saw the police line.  You saw -- you

6     heard the sirens and the alarms, and you went in anyway.

7             And that's the only reason that you got sprayed

8     with pepper spray, and you're fortunate that you didn't get

9     shot with something else.  All right?

10            And I've told lots of defendants this; that, you

11    know, it's amazing that more violence or more deaths did not

12    occur that day, and it's due to the restraint that the

13    Capitol Police officers showed; largely because they were

14    outnumbered, but it is still amazing to me that they -- that

15    more people were not killed.  All right?  And you could have

16    been one of them, particularly telling people to shoot you.

17            And I know you were mad when you got sprayed, but

18    I just don't buy the notion that you couldn't see for the

19    next 30 minutes and didn't know exactly where you were and

20    exactly what you were doing.

21            And that leads to acceptance of responsibility,

22    which we've talked about today as well.  You know, as I've

23    said, you're not entitled, legally speaking, to credit of

24    acceptance of responsibility, and frankly I don't think that

25    you are entitled to it in a more colloquial sense, all

1    right, and nothing I've heard from you today changes that

2    opinion.

3            I sat through trial.  I've read the defense's

4    memo.  I've read your letter.  I've heard you today.  There

5    may be some general expression of regret, but there's a lot

6    more blame.  All right?  You blame President Trump.  You

7    blame BLM protesters and Antifa.  You blame the polarized

8    media.  You blame, you know, the rioters that went in before

9    you and led the way.  You blame the officers who sprayed

10   you.  You blame the officer who tried to stop you from going

11   further into the Capitol.  I hear a lot about a lot of

12   people besides yourself.  Okay?

13           You're a 58-year-old man.  You're a college

14   graduate.  You were a successful pharma rep.  You're used to

15   dealing with facts and evidence, and so, you know, I don't

16   buy that you didn't have the faculties and the wherewithal

17   to figure out what the right thing to do was, to research

18   the election results, and that your only choice was to

19   blindly follow Donald Trump and the mob into the Capitol

20   that day.  All right?

21           And I also don't hear a lot about the folks who

22   were injured, the Capitol Police officers.  I didn't hear an

23   apology to Officer Marshall or to Officer DaCruz or to any

24   of the young congressional staffers who were cowering behind

25   some of those doors that you were shouting outside of.

1          We also consider your history as a person.

2          As we've said, no prior criminal record, solid

3     employment history.  You seem to have support from your

4     family judging by the letters that I've received.

5          We've discussed the mental health issues.  I won't

6     go into the details of Ms. Rock's testimony, but, you know,

7     one thing that concerns me about her testimony is for

8     whatever reason, you know, you seem to have an inability to

9     take your medications unless it's in a very controlled

10    setting.  All right?  And I don't know if that relates to

11    some of the things that you said about the pharma industry

12    or about vaccinations.  You know, I don't know, but that

13    concerns me; that you would not be able to check your

14    behavior outside of an institutionalized or very controlled

15    setting, all right, and that gives the Court a lot of pause.

16         We talked a lot about disparities.  You know, we

17    try to treat similarly situated defendants similarly,

18    roughly similarly.

19         The one other case that went to trial before me

20    where a defendant was convicted of similar felonies was a

21    fellow named Thomas Robertson.  He was a police officer out

22    in western Virginia.  Neither of you had any prior criminal

23    history.  The convictions were roughly similar.  He had a

24    stick with him, but he didn't use it to hurt anyone, and he

25    didn't hurt anyone.  Neither of you assaulted police

1    officers.

2          I applied that eight-point enhancement, but I

3    indicated on the record that I thought that it overstated

4    his conduct.  I gave him a guidelines sentence of 87 months

5    because he essentially assembled a small arsenal of weapons

6    after he had been arrested and released by me, and it was

7    clear to me that he would have answered the next call

8    readily.

9          And he also obstructed justice by destroying

10   evidence.

11         And so, you know, notwithstanding my finding on

12   the eight levels, you know, I gave him a guidelines

13   sentence.

14         But for those other things, I think that you all

15   are pretty similarly situated.

16         As I tell most of my defendants, this process has

17   nothing to do with your political views or your -- the

18   exercise of your First Amendment rights.  It's about how you

19   chose to exercise them that day.

20         In terms of your desire to continue to take care

21   of your mother, I wish her well, but there are almost always

22   collateral consequences to criminal convictions.  All right.

23   And one of them is being away from family.

24         I've heard from your brother.  I've gotten letters

25   from your other brothers.  And I am confident that they will

1    be able to keep her in good care whatever happens.

2           So, with that, pursuant to the Sentencing Reform

3    Act of 1984 and in consideration of the provisions of 18 USC

4    Section 3553 as well as the advisory sentencing guidelines,

5    it is the judgment of the Court that you, Daniel Dean

6    Egtvedt, are hereby committed to the custody of the Bureau

7    of Prisons for a term of 42 months on Count 4 and terms of

8    36 months as to Counts 1, 2, and 3, a term of 12 months on

9    Counts 5 and 6, and one month as to Count 8 all to be served

10   concurrently.

11          You are further sentenced to serve a 36-month term

12   of supervised release as to Counts 1, 2, 3, 4 -- 3 and 4,

13   and 12 months as to Counts 5 and 6.  All supervised terms to

14   be served concurrently.

15          In addition, you are ordered to pay a total

16   special assessment of $100 as to each of Counts 1, 2, 3, and

17   4, $25 as to each of Counts 5 and 6, and $10 as to Count 8

18   for a total of $460 in accordance with 18 USC 3013.

19          While on supervision, you shall abide by the

20   following mandatory conditions as well as all discretionary

21   conditions recommended by the probation office in Part D,

22   "Sentencing Options of the Presentence Report," which are

23   imposed to establish the basic expectations for your conduct

24   while on supervision.

25          The mandatory conditions include you must not

1    commit another federal, state, or local crime.

2           You must not unlawfully possess a controlled

3    substance.  You must refrain from any unlawful use of a

4    controlled substance.  You must submit to one drug test

5    within 15 days of placement on supervision and at least two

6    periodic drug tests thereafter as determined by the Court.

7           You must cooperate in the collection of DNA as

8    directed by the probation officer.

9           You must make restitution in accordance with 18

10   USC 3663A and 3663 or any other statute authorizing a

11   sentence of restitution.

12          You shall also comply with the following special

13   conditions.

14          Financial information disclosure.  You must

15   provide the probation officer access to any requested

16   financial information and authorize the release of any

17   financial information.  The probation office shall -- may

18   share financial information with the U.S. Attorney's Office.

19          Mental health treatment.  You must participate in

20   a mental health treatment program and follow the rules and

21   regulations of that program.  The probation officer, in

22   consultation with the treatment provider, will supervise

23   your participation.

24          Reentry progress hearing.  Within 45 days of

25   release from incarceration you will appear before this Court

1    for a reentry progress hearing.  The United States Probation

2    Office in the District you are supervised will submit a

3    progress report to the Court within 30 days of the

4    commencement of supervision.  Upon receipt of the progress

5    report, the Court will determine if your appearance is

6    required.

7            You are ordered -- I will order restitution in the

8    case, but not a fine.

9            All right.  With respect to restitution, one of

10   the counts of conviction, the entering and remaining in a

11   restricted building count, triggers mandatory restitution

12   under the Mandatory Victims Restitution Act, 18 USC 3663A.

13   The government has shown by preponderance of the evidence,

14   namely the -- Ms. Kukowski, I've usually gotten a letter

15   from the Architect of the Capitol documenting the damages

16   figure.  Is there something in the record to that effect

17   here?

18           MS. KUKOWSKI:  I believe we cite to it in our

19   memorandum.

20           THE COURT:  Okay.

21           MS. KUKOWSKI:  But Mr. Liebman's also indicating

22   to me the PSR.

23           But we did not provide the actual letter, we just

24   provided the most recent estimate which was as of October of

25   last year.

1          THE COURT:  Okay.  Based on that estimate which

2     was reflected in the PSR, the Court finds that the

3     government has shown by a preponderance of the evidence that

4     the January 6th riots caused over $2.7 million in damage to

5     the Capitol.  The Court finds that the Architect of the

6     Capitol was the victim of the riots as contemplated by the

7     statute and that the defendant's conduct in entering the

8     Capitol and participating in the riot contributed to that

9     damage.

10          The government has further established that the

11     sum of $2,000 is a reasonable estimate of how much of the

12     damage should be apportioned to the defendant consistent --

13     and that is consistent with what others have agreed to in

14     connection with their plea agreements, so the Court will

15     impose a restitution figure of $2,000 to be payable to the

16     Architect of the Capitol.  And given the defendant's

17     financial wherewithal and liquid assets, the Court will not

18     set a payment plan but will order that that restitution as

19     well as all other financial obligations be paid immediately.

20          All right.  The probation office shall release the

21     presentence investigation report to all appropriate

22     agencies, which includes the United States Probation Office

23     in the approved district of residence in order to execute

24     the sentence of the Court.  Treatment agencies shall return

25     the presentence report to the probation office upon the

1    defendant's completion or termination from treatment.

2              As to Counts 1, 2, 3, 4, 5, and 6, you have the

3    right to appeal your conviction of guilt to the U.S. Court

4    of Appeals for the D.C. Circuit.  You also have the

5    statutory right to appeal your sentence to the D.C. Circuit

6    under certain circumstances, including if you think the

7    sentence was imposed in violation of law or as a result of

8    an incorrect application of the Sentencing Guidelines or is

9    more severe than the maximum established in the guideline

10   range.

11             You may also appeal your sentence if you believe

12   you received ineffective assistance of counsel.

13             You also have the right to challenge the

14   conviction entered or the sentence imposed to the extent

15   permitted by 28 USC 2255.  Any notice of appeal must be

16   filed within 14 days after entry of judgment or within 14

17   days of the filing of a notice of appeal by the government.

18   If you are unable to afford the cost of an appeal, you may

19   request permission from the Court to file an appeal without

20   cost to you.  On appeal you may also apply for court-

21   appointed counsel.

22             As to Count 8, you have the right to appeal your

23   conviction.

24             You also have a statutory right to appeal your

25   sentence imposed on the Class B misdemeanor under certain

1    circumstances, including if you think the sentence was

2    imposed in violation of law or is plainly unreasonable.  You

3    may appeal your sentence if you believe you received

4    ineffective assistance of counsel at sentencing.  You also

5    have the right to challenge that conviction to the extent

6    permitted by 28 USC 2255.  Again, any notice of appeal shall

7    be filed within 14 days or within 14 days of the filing of a

8    notice of appeal by the government.

9              Any other objections to the sentence, Counsel?

10             MS. KUKOWSKI:  Not from the government, Your

11   Honor.

12             MS. WEST:  No, Your Honor, none from the defense.

13             THE COURT:  Mr. Egtvedt, you remain a conundrum to

14   me of sorts in many ways.  You know, I don't know what led

15   you down this path, but, you know, I hope that over the next

16   few years, in a setting where you can reflect and take care

17   of your mental health, that you will come out of this in a

18   better place than when you went in.

19             It is, you know, very much inconsistent with how

20   it appears you led your life for many years, and someone

21   with your, you know, background, your professional

22   background, your educational background, it's really

23   baffling to me that you would make the kind of decisions

24   that you have and put not only yourself but your family

25   members, you know, in the sort of jeopardy that you have.

1   All right?

2          So I tell people you shouldn't be judged by the

3   worst mistake you ever made, and that certainly applies to

4   you as well.  So I wish you well.  All right?

5          MS. WEST:  You're not allowing self-surrender?

6          THE COURT:  Any objection to self-surrender,

7   Counsel?

8          MS. KUKOWSKI:  We do, Your Honor, because we asked

9   that the defendant be remanded after trial.  So consistent

10  with that request, we would ask that he be remanded now.

11         MS. WEST:  I would point to the presentence

12  report, Your Honor.  The probation office made a

13  recommendation that he should self -- is a good candidate, I

14  should say, for self-surrender.

15         THE COURT:  The Court finds by clear and

16  convincing evidence that the defendant does not present a

17  risk of flight or a danger to the community provided that he

18  continues to comply with the conditions that have been in

19  place since the trial.  Okay?

20         It would not be wise for you to violate any of

21  those conditions.  You have complied thus far, and I have no

22  reason to believe that you will not continue to comply until

23  the Federal Bureau of Prisons designates a facility for you.

24         THE DEFENDANT:  Thank you.

25         THE COURT:  On that point, Ms. West?

1          MS. WEST:  Yes, and on that point, Your Honor, we

2     would ask for a facility that is close to this Maryland --

3     DMV area.

4          THE COURT:  Okay.  The Court will recommend a

5     facility near the defendant's home in Maryland.

6          Anything else?

7          MS. WEST:  No, Your Honor.

8          MS. KUKOWSKI:  No, Your Honor.

9          THE COURT:  All right.  We're adjourned.

10         THE DEFENDANT:  Thank you, Your Honor.

11              (Whereupon the hearing was

12               concluded at 4:37 p.m.)

13         **CERTIFICATE OF OFFICIAL COURT REPORTER**

14

15          I, LISA A. MOREIRA, RDR, CRR, do hereby

16     certify that the above and foregoing constitutes a true and

17     accurate transcript of my stenographic notes and is a full,

18     true and complete transcript of the proceedings to the best

19     of my ability.

20       Dated this 12th day of September, 2023.

21

22                              /s/Lisa A. Moreira, RDR, CRR

23                              Official Court Reporter
                                United States Courthouse

24                              Room 6718
                                333 Constitution Avenue, NW

25                              Washington, DC 20001